IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| KENT CHRISTOFFERSON, et al., | Case No. 01-495C |
| Plaintiffs | Senior Judge Eric G. Bruggink |
| v. | **DECLARATION OF JOHN OTA IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE PROPOSED SECOND AMENDED COMPLAINT** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

Pursuant to the Rules of the U.S. Court of Federal Claims, I, John Ota, declare as follows:

1. I am an attorney associated with the law firm, Minami Tamaki LLP, attorneys for plaintiffs in the above-captioned civil action, and I submit this declaration in that capacity. As such I have personal knowledge of the following facts and can testify regarding these facts if called upon to do so.

2. Approximately 14 out of the 42 Concord plaintiffs, or less than 27 percent – had straight time claims, and those who did mostly had claims involving a small number of straight time hours. Until the Court's ruling February 28, 2005 that plaintiffs were not entitled to overtime pay for work in excess of eight hours per day unless they also worked more than 40 hours during that week, many of the Concord straight time claims were thought to be overtime claims because they involved hours worked in excess of eight hours per day.

3. During negotiations on the Concord plaintiffs' claims, plaintiffs' counsel

attempted to obtain payment for the incidental straight time claims. It was not until October 2006 that defendant made it clear that it would not agree to compensate plaintiffs for any claim that they were denied payment of straight time hours. Up until that point, plaintiffs and defendant had been negotiating settlement of both plaintiffs' straight time and overtime claims.

4. After extensive review by counsel for both plaintiffs and defendant, and also review by the Court, claim forms were mailed to the non-Concord plaintiffs in about September 2006 and plaintiffs's counsel began contacting responding plaintiffs and processing the 2,768 forms that were returned, a process that is continuing, but near completion. An estimated 56 percent (1069 out of 1885) of all plaintiffs other than the Concord plaintiffs, whose claims have been input into the database, have straight time claims. At the time of this writing, about 89 percent of the 2,768 non-Concord plaintiffs who had submitted claim forms, had been entered into plaintiffs' database. The average claim of unpaid straight time is for about 25 hours.

5. Having learned in October 2006 that defendant would not agree to pay plaintiffs' claims for unpaid straight time hours, I asked defense counsel Steven Gillingham by email on December 21, 2006 if defendant would stipulate to amending the Complaint to add a cause of action for straight time claims. Mr. Gillingham did not agree to such a stipulation and, as recently as January 17, 2007, cited legal authority and arguments against such an amendment. Before a motion to amend could be made, plaintiffs' counsel needed to research the legal grounds for such an amendment, and also collect declarations from plaintiffs with claims for unpaid straight time wages.

6. Attached hereto as Exhibit 1 is a true and correct copy of Plaintiffs' Proposed Second Amended Complaint, which, in this motion plaintiffs are seeking leave to file.

7. Attached hereto as Exhibit 2 are true and correct copies of Declarations from the following plaintiffs who state that they were denied pay for straight or regular time hours (40 or fewer per week) when they worked on the 2000 Census:

Jacqueline Cage
Linda Chan
Henry Compton
Shalamar Jones
Ethel Lockhart
Maria Lopez-Kallis
Shannon McCowan
Marsha Mitchell
Alvin Monroe
Henry Myrthil, Jr.
Myra Romero
Frank Santiago
Adam Schlachter
Joseph Sciacca
William Sevilla
Julia Shoffner
Teri Walker
Angelita Watahomigie
Philip Waters
James Wright
Anidia Zabala

8. Attached as Exhibit 3 is a true and correct copy of the February 17-18, 2005 Memorandum of Understanding for Settlement between counsel for the parties in this action.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 13th day of February 2007 in San Francisco, California.

s/
John Ota

# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KENT CHRISTOFFERSON, CHRISTOPHER LANDERS, MICHAEL LENOWSKY and LOIS OLDHAM, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD EVANS, SECRETARY OF UNITED STATES DEPARTMENT OF COMMERCE,<br><br>Defendant. | ) | Case No. 01-495C<br><br>Judge Eric G. Bruggink<br><br>**PROPOSED SECOND AMENDED COMPLAINT FOR WAGES, OVERTIME COMPENSATION AND LIQUIDATED DAMAGES UNDER THE FAIR LABOR STANDARDS ACT, THE BACK PAY ACT AND OPM STATUTES AND REGULATIONS** |

## Nature of the Action

1. The Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, explicitly and plainly mandates that employees who work more than forty (40) hours per week are entitled to overtime pay, at one and a half times their regular rate of pay. Nonetheless, the Bureau of the Census (the "Bureau"), a division of the United States Department of Commerce, has made a conscious decision to ignore this long-standing statutory mandate. The Bureau has also violated Office of Personnel Management (OPM) regulations which mandate payment of wages to federal employees at their regular rate of pay for all hours they work up to 40 hours per week.

2. The decennial census is indisputably essential to this nation's democratic system of government. During the often hurried and hectic process of collecting data for the 2000 census, the Bureau required hundreds, of thousands of temporary employees to work extensive overtime hours in the rush to complete the Year 2000 census on time. These census workers performed

the legwork that is critical to achieving an accurate census by going door-to-door, sometimes under dangerous or unsafe conditions, conducting detailed and intensive interviews in isolated locations, and completing copious paperwork during and after normal duty hours. Census workers regularly worked after 5 p.m. and on weekends, during times when people would be home. In spite of these employees' hard work and dedication to this task, the Bureau refused to provide adequate overtime pay, as required by law, and in some cases, also failed to pay employees for all of their hours up to 40 hours per week.

3. The plaintiffs, KENT CHRISTOFFERSON, CHRISTOPHER LANDERS, MICHAEL LENOWSKY and LOIS OLDHAM, were employed by the U.S. Department of Commerce, Bureau of the Census, in various positions, including but not limited to the jobs of enumerators, assistant crew leaders, crew leaders and field operations supervisors. Additional persons who may join this action as opt-in consenters are similarly situated in that they were also employed by the Bureau in non-exempt positions, or in the same or similar positions as named plaintiffs, and have been subject to the same policies and practices described herein in violation of the FLSA.

4. This action, therefore, is brought by plaintiffs on behalf of themselves and all others similarly situated, who were employed by the Bureau in various positions during the time period between January 1, 2000 and November 1, 2000 in the States of California, Arizona, Illinois, Georgia, New York and other states. This action is brought pursuant to Rule 23 of the Rules of the Court of Federal Claims ("RCFC"), and seeks monetary damages in the form of back pay for unpaid regular time and overtime wages, liquidated damages, attorneys' fees and costs, and such further relief as may be necessary to remedy these past violations of the FLSA and OPM regulations regarding federal employee pay.

//

**Parties**

5. Plaintiff KENT CHRISTOFFERSON was employed by the Bureau from February 1999 until July 20, 2000, and held the title of crew leader, a non-exempt position, and a field operations supervisor, a position which was labeled exempt. Plaintiff worked in the Tucson, Arizona, local office of the Census during this entire period. As a crew leader, plaintiff was in charge of a crew of twenty to twenty-five (20-25) enumerators. Plaintiff's duties were to supervise and train enumerators and assistant crew leaders and to directly monitor their field activities. Plaintiff also conducted quality control of his crews' work and conducted daily briefings and meetings with crew members.

6. Plaintiff CHRISTOFFERSON worked regularly in excess of eight hours a day and/or forty hours per week. Plaintiff was informed that he should "carry over" his hours until the end of the week, month or project. Plaintiff estimates that he worked an average of fifty hours of overtime per month. Without interest and penalties, plaintiff believes that his outstanding overtime amounts to over $4,000.00. Despite all of the overtime worked, plaintiff has not been paid any overtime wages whatsoever. Plaintiff filed a written consent to become a party in this action simultaneously with the original Complaint in this action and a copy of the consent was attached to the original Complaint in this action as Exhibit A.

7. Plaintiff CHRISTOFFERSON also worked as a field operations supervisor where he regularly worked in excess of eight hours a day and 40 hours a week. As a field operations supervisor who was paid on an hourly basis, plaintiff supervised crew leaders.

8. Field operations supervisors were called exempt but plaintiff CHRISTOFFERSON did not meet the requirements of an exempt employee under the FLSA. He was not paid overtime as a field operations supervisor.

9. Plaintiff CHRISTOPHER LANDERS was employed by the Bureau from March 2000 to June 1, 2000 and held the job titles of enumerator, assistant crew leader and crew leader. Plaintiff worked in Richmond, California, during this entire period. Plaintiff's duties as a crew leader were to supervise and train enumerators and assistant crew leaders and to directly monitor their field activities in meeting the deadlines of completing Census 2000. Plaintiff also conducted quality control of his crews' work and conducted daily briefings and meetings with crew members to monitor their work.

10. Plaintiff LANDERS worked regularly in excess of eight hours a day and/or forty hours per week. Plaintiff was informed that he should "carry over" his overtime hours until the end of the week and/or month. Plaintiff estimates that he worked an average of 40 to 60 hours of overtime per month. Without interest and penalties, plaintiff believes that his outstanding overtime amounts to over $3,500.00. Despite all of the overtime worked, plaintiff has not been paid his full overtime wages and/or premium pay. Plaintiff filed a written consent to become a party in this action attached as Exhibit A to the original Complaint in this action.

11. The above-named plaintiffs are referred to collectively herein as the "named plaintiffs." The named plaintiffs collectively represent a class of non-exempt and exempt hourly census workers from throughout the country. The additional persons who may join this action as consenters are similarly situated to the named plaintiffs and one another in that they were employed by the Bureau during the time period of January 1, 2000 to November 1, 2000 as non-exempt or exempt hourly employees for the specific purpose of assisting on a temporary basis with the 2000 census, and were subject to the same policies and practices that resulted in the denial of overtime and/or regular time pay in violation of the FLSA and OPM regulations regarding federal employee pay.

12. Plaintiff MICHAEL LENOWSKY was a crew leader working for the Bureau of the Census in Brooklyn, New York, from May 2000 through July 2000. Plaintiff regularly worked over fifty hours a week with the knowledge and encouragement of his supervisor.

13. When he asked about overtime pay, plaintiff LENOWSKY was told that he could only submit time sheets showing a maximum forty hours a week. His supervisor informed him that he too was working more than forty hours, but was not being paid for this extra time. Plaintiff estimates that the overtime and/or premium pay he was owed as of the time of his termination was between $2,000.00 and $4,000.00.

14. Plaintiff LOIS OLDHAM worked as a full-time enumerator for the Bureau from April 2000 to August 2000 in Decatur, Illinois. OLDHAM was consistently assigned more work than was possible to complete within an eight hour day and/or forty hour week.

15. Although she consistently worked over fifty hours a week, plaintiff OLDHAM was not allowed to submit time sheets in excess of forty hours a week. Her supervisors instructed her to "carry over" her hours to the following week. Plaintiff was led to believe that her extra hours would be compensated by the end of the census process, but she was not subsequently allowed to submit any of her overtime hours. Consequently, plaintiff was denied payment of any overtime and/or premium pay through August 2000.

16. Significant numbers of similarly situated consenters, all of whom were non-exempt workers who were denied overtime wages and/or premium pay or who were misclassified as exempt supervisors but who were paid hourly, worked in cities across the United States. In addition to the named plaintiffs who reside, respectively, in the states of Arizona, California, New York, and Illinois, the following 19 consenters, all of whom worked in five different states, have filed opt-ins to join this class action.

17. The names of the 19 consenters are set forth below; their opt-in forms were attached to the original Complaint in this action as Exhibit B.

| | |
|---|---|
| a. Alice Barnes | Far Rockaway, New York |
| b. Ann C. Bates | Decatur, Illinois |
| c. Sue Berner | Decatur, Illinois |
| d. Donald Dobyns | Pleasant Hill, California |
| e. Emma Flowers | Atlanta, Georgia |
| f. Bev Fosbinder | Hanover Park, Illinois |
| g. Earl M. Gray | Decatur, Illinois |
| h. Ruth Kyle | Chicago, Illinois |
| i. Sheila Lawton | Decatur, Illinois |
| j. Doris Lum | Richmond, California |
| k. Tyrone Oldham | Decatur, Illinois |
| l. Nance Rogers | San Pablo, California |
| m. Maria P. Rubenstein | San Pablo, California |
| n. Charles Skibbens | Decatur, Illinois |
| o. Nitima Stirarat | Chicago, Illinois |
| p. Bryan Williams | Chicago, Illinois |
| q. Lavetta Williams | Chicago, Illinois |
| r. Erica Wright | New York, New York |
| s. James Zar-Hall | Oak Forest, Illinois |

18. As additional similarly situated persons consented to become plaintiffs in this action, their written consents were filed with this Court.

19. The records concerning the identities of all potential plaintiffs and opt-in consenters, the number of excess hours worked by each plaintiff and opt-in consenters and the compensation they received are in the exclusive possession and control of defendant Bureau. Therefore, plaintiffs are unable to state at this time the exact amount owing to each of them. Plaintiffs propose to obtain such information and revise these approximations by appropriate discovery proceedings to be taken in this case.

20. All of the named plaintiffs and potential consenters are proper plaintiffs pursuant to the provisions of the FLSA, 29 U.S.C. § 216(b), which includes as covered employees any individuals employed by the government of the United States in any executive agency. 29 U.S.C. § 203(e)(2)(A)(ii).

21. Defendant Bureau of the Census is a division within the U.S. Department of Commerce, and was the employer of plaintiffs herein during all times relevant to the claims presented in this action. Defendant Bureau has its principal office in Washington, D.C., and has local offices throughout the United States. The Bureau is a proper defendant pursuant to the provisions of the FLSA, 29 U.S.C. § 216(b), as amended in 1974 to include the government of the United States as a public agency employer subject to the coverage of the Act. 29 U.S.C. § 203 (d). As such, Congress has waived the federal government's sovereign immunity from suit under the FLSA for unpaid wages and liquidated damages. 29 U.S.C. § 203(e)(4)(x), § 216(b). Additionally, at all relevant times herein, defendant Bureau has been an enterprise engaged in commerce or in the production of good for commerce, by engaging in the activities of a public agency, within the meaning of the FLSA, 29 U.S.C. § 203(e)(4)(s)(1)(C), § 203(e)(4)(x). The Bureau is also a proper defendant in this action for back pay pursuant to the Back Pay Act and OPM regulations concerning federal employee pay.

**Jurisdiction**

22. Jurisdiction of this action is conferred upon the Court of Federal Claims by section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b); 28 U.S.C. § 1491; the Back Pay Act, 5 U.S.C. § 5596; and various statutes and regulations regarding federal employees' pay.

**Statutory and Regulatory Structure**

23. The FLSA and related regulations mandate that all employees engaged in commerce be paid on the basis of an eight-hour day and a 40-hour workweek. 29 U.S.C. § 207(a)(1) (mandating overtime for "workweek longer than forty hours"); 5 C.F.R. § 551.501(a) (mandating overtime for "all hours of work in excess of 8 in a day or 40 in a workweek"). Overtime is defined as "a rate not less than one and one-half times the regular rate" of pay. *Id.* The FLSA mandates that only persons employed in bona fide administrative or executive capacities on a salary or fee basis are exempt from federal overtime provisions. 29 U.S.C. §§ 207, 213(a) (1).

24. The Back Pay Act provides that a federal employee is entitled to back pay if a court or other authority determines that the employee was wrongfully denied pay based on "an unjustified or unwarranted personnel action," i.e., "an act of commission or an act of omission (i.e., failure to take an action or confer a benefit) that an appropriate authority subsequently determines, on the basis of substantive or procedural defects, to have been unjustified or unwarranted under applicable law, Executive order, rule, regulation, or mandatory personnel policy established by an agency."

25. Office of Personnel Management regulations at Title 5 of the Code of Federal Regulations, Parts 530, 531, 532, 534, 536, 550 and 551 mandate the rates of pay for federal employees at various occupations, levels, grades and employment status, and under various circumstances.

**Factual Allegations**

25. During the time period of January 1, 2000 to November 1, 2000, defendant Bureau required or permitted plaintiffs to work in excess of forty hours per week on numerous occasions without paying plaintiffs overtime compensation as required by the FLSA and/or related regulations. Plaintiffs, who served the Bureau as "Field Census Employees," including but not limited to enumerators, assistant crew leaders, crew leaders and field operations supervisors, often worked up to ten to twenty-five (10-25) hours of overtime work per week for weeks on end without a single hour being compensated as overtime. Plaintiffs frequently and repeatedly worked such excess hours under instructions from their supervisors not to record their overtime hours on daily time sheets, being told instead that they would be paid at a later time. In fact, plaintiffs were never paid for the overtime hours they worked. Plaintiffs also worked many hours of work amounting to 40 or fewer hours per week without being paid for all of those hours at their regular rate.

26. Indeed, it was generally impossible for plaintiffs during this time period to perform all of their required tasks within the limits of a forty-hour workweek. The responsibilities inherent in the job – e.g. contacting people during off hours, conducting detailed interviews with survey subjects, traveling extensive distances, rushing to meet deadlines, completing copious and detailed paperwork -- made adherence to a 40-hour workweek difficult and frequently impossible. Bureau supervisors therefore assigned tasks and duties to census workers fully cognizant that such tasks and duties could not responsibly be performed within a 40-hour workweek.

27. On some occasions the supervisors' demands for overtime work from their employees was overt. Supervisors demanded that employees accomplish tasks in "whatever"

time it took. At other times the Bureau's manipulations took a more pernicious form, whereby employees were told to do an amount of work that could not reasonably be accomplished in an eight hour day or forty hour week, but were told that their timesheets should reflect no more than eight hours per day and no more than forty hours per week. Similarly, employees were often given goals by supervisors that would have been impossible to meet without working extra hours. In some instances, workers were told to "bank" their extra hours to give the false appearance in their records that no overtime had been worked. Later, when the pay periods ended, workers were told they had to forfeit any overtime hours to be entitled to their regular pay for forty hours. These pernicious methods of forcing unpaid overtime were used frequently during the time period relevant to this suit.

28. Additionally, all of these activities had to be performed in accordance with the Bureau's necessarily high standards of competence and thoroughness, in order to meet the United States Government's goal of achieving a reliable and accurate census. If census workers failed to perform these tasks effectively and in a timely fashion, the potential detrimental consequences to the interests of the United States would have been substantial, especially given the importance of the census to issues such as redistricting and federal benefits.

29. Management encouraged competition among different units of the Bureau by rewarding those administrative units with recognition or other forms of consideration for completing their assignments earlier than projected or with fewer staff and resources. This competition was encouraged by regularly publicizing and lauding the speed and accuracy of particular Bureau census units. In this way and others, management encouraged and manipulated their field units to compete against one another for producing the most results with the most minimal staffing and resources.

30. During the time period of January 1, 2000 to November 1, 2000, defendant Bureau willfully and in bad faith failed and refused to pay plaintiffs one and one-half their regular rate of pay for hours worked in excess of forty hours per week, in violation of the FLSA, 29 U.S.C. § 207(a) and the regulations of the Department of Labor and the Office of Personnel Management promulgated thereunder. 5 C.F.R. § 551.501(a). Despite the clarity of the statutory command and clear evidence that census workers were expected to work substantial overtime, the Bureau made a conscious decision to ignore the statutory and regulatory requirement that employees be compensated for all hours worked in excess of 40 hours per week.

31. During the time period of January 1, 2000 to November 1, 2000, defendant Bureau willfully and in bad faith mis-classified field operations supervisors as exempt employees, hence not eligible for overtime, even though field operations supervisors were paid on a hourly basis and did not meet the requirements to be classified as exempt employees, in violation of the FLSA, 29 U.S.C. § 213(a).

32. During the time period of January 1, 2000 to November 1, 2000, defendant Bureau willfully and in bad faith failed to pay some field employees, most commonly Enumerators, for all of their hours under 40 hours per week. Some field employees who were denied such pay were told that they could only claim a certain amount of time on their time sheets for each completed Census questionnaire form their turned in, without regard to how long they worked to complete the forms. Others were told that they were supposed to be part-time employees and therefore could not record 40 hours of work per week, even if they worked 40 or more hours during the week. Still others were told that they could record on their time sheets only the time they were actually out in the field going door to door, and not time spent meeting with their supervisor or time they worked at home reviewing their forms or completing the forms

through phone calls with residents. Some employees were given no explanation, but simply told that their hours had been cut, or told to record a number of hours that was lower than their actual work hours. Employees who complained about such unjustified cuts in their hours were fired or not given any more work. Those who wanted to continue working were forced to go along with this illegal practice.

**Class Action Allegations**

33. Plaintiff brings this class action pursuant to RCFC 23, with a previously filed Motion for Class Certification, on behalf of a class defined as:

34. All persons employed in Census field positions, including but not limited to enumerators, assistant crew leaders, crew leaders, and field operations supervisors, by the Bureau of the Census at any time during the period between January 1, 2000 to November 1, 2000 in the States of California, Arizona, Illinois, Georgia, New York and other states.

35. The class of plaintiffs is numerous and therefore joinder of all members is impracticable. The total number of employees subjected to the Bureau's policy and practice of denying overtime pay as alleged herein is approximately 400,000. Upon information and belief, the number of class members will exceed 7,000 individuals.

36. The class of plaintiffs is manageable. All of the plaintiffs have worked for a common employer in comparable positions during a finite period of time, and the Bureau maintains records that clearly and easily identify all class members. All of the plaintiffs had common duties and goals.

37. There are questions of fact and law that are common to the entire class. Such common questions include, but are not limited to, the following:

a. Whether the Bureau has violated federal law by refusing, as a matter of

policy, pattern or practice, to compensate plaintiffs for hours worked in excess of forty (40) hours per week.

b. Whether the Bureau, as a matter of policy, pattern or practice, expected, encouraged, or induced its census workers to work hours in excess of forty (40) hours per week;

c. Whether the Bureau, as a matter of policy, pattern or practice, mis-classified its hourly employees as exempt and thus ineligible for overtime;

d. Whether the Bureau is liable to plaintiffs for all overtime hours worked.

e. Whether the Bureau wilfully failed to comply with the FLSA;

f. Whether the Bureau, as a matter of policy, pattern or practice, has violated federal law by failing and refusing to pay plaintiffs for all of their hours up to 40 hours per week at their regular hourly rates;

g. Whether the Bureau is liable to plaintiffs for failure to pay them wages at regular hourly rates for hours of work up to 40 hours per week;

38. The common issues of law in this case predominate over separate factual issues affecting individual members.

39. The named plaintiffs' claims are typical of the claims of the class. The named plaintiffs have no interests antagonistic to the claims of the class and will represent the class without conflicts of interest.

40. The named plaintiffs will fairly and adequately protect the interests of the class. The named plaintiffs are committed to the vigorous representation of the class and have retained highly competent counsel experienced in the prosecution of complex class action cases.

41. Defendant has acted on grounds generally applicable to the class, thereby justifying relief for the class as a whole.

42. Because of the nature of the claims asserted by the plaintiff class, involving violations in the administration of statutorily mandated compensation procedures equally and commonly applicable to all members of the class, no individual class member has an interest in individually controlling the prosecution of his or her claim.

43. The claims of many class members are so small – in the hundreds or few thousands of dollars -- that they are not otherwise likely to be pursued. In addition, many individuals with valid claims, especially those who continue to work or who seek to work for the U.S. Government, would be disinclined to pursue an action on an individual basis, even though statutorily entitled to a claim, for fear of retaliation, negative career repercussions, or other stigma, prejudice or bias associated with pursuit of a legal action against an employer, as a result of pursuing such an action against the Bureau.

44. Given the statutory and regulatory structure that governs entitlement to overtime pay for plaintiffs, the prosecution of separate actions by individual members of the class would create the possibility of inconsistent adjudications, which would establish incompatible standards of conduct for defendant with respect to its obligation to compensate employees fairly and consistently for overtime hours worked under the statutes and regulations.

45. For all the above stated reasons, the certification of this case as a class action would serve the interests of justice.

**First Cause of Action**

**Violation of Fair Labor Standards Act (29 U.S.C. § 216(b))**

46. Plaintiffs incorporate herein by reference the allegations of the Complaint set forth in Paragraphs 1 through 45 above.

47. Defendant Bureau is an “employer” for the purposes of FLSA, and is thereby subject

to the requirements set forth therein and in regulations promulgated pursuant to the Act. 29 U.S.C. § 203(d), §(4)(s)(1)(C), & § 203(e)(4)(x).

48. Plaintiffs were employees of an Executive agency, and therefore were employees for purposes of the Act. 29 U.S.C. § 216(b) & § 203(e)(2)(A)(ii).

49. The FLSA provides that hours of work suffered or permitted in excess of 40 hours in an administrative workweek performed by an employee are overtime work. 29 U.S.C. § 207(a)(1); 5 C.F.R. § 551.501(a).

50. It has been the policy, pattern or practice of the Bureau that its enumerators, assistant crew leaders, crew leaders, administrators, and supervisors were expected to work, and did work, in substantial excess of forty (40) hours per week at all times relevant herein.

51. Field operations supervisors were engaged in work in substantial excess of forty (40) hours per week. Field operations supervisors were hourly employees who were improperly classified as exempt and hence ineligible for overtime.

52. Supervisory personnel, above the level of field operations supervisors, with authority to approve overtime actively encouraged or induced the implementation of this policy, and had actual knowledge that plaintiffs were engaged in such work in substantial excess of forty (40) hours per week and have approved of such efforts.

53. As a result of this policy, pattern or practice, and the demands of their jobs, plaintiffs have performed the principal activities of their positions in excess of 40 hours per week.

54. Accordingly, because defendant expected, encouraged, or induced plaintiffs to work substantial amounts of overtime, had knowledge that plaintiffs worked substantial amounts of overtime and purposely classified non-exempt employees as exempt employees, it has acted wilfully, and without a good faith, reasonable belief that it was complying with the requirements

of the FLSA.

55. Plaintiffs, therefore, are entitled to receive overtime pay for all hours of work in excess of 40 per week during the time period relevant to this action.

56. Plaintiffs have not received full compensation for the vast majority of overtime worked.

57. As a result, plaintiffs have been damaged financially by the Bureau's refusal to provide overtime compensation for each hour of overtime actually worked and the failure to accurate classify it employees as non-exempt, the exact amount of damages to be determined at trial.

**Second Cause of Action**

**Violation of Back Pay Act and Federal Employees Pay Regulations**

58. Plaintiffs incorporate herein by reference the allegations of the Complaint set forth in Paragraphs 1 through 57 above.

59. Defendant Bureau is subject to the requirements of Office of Personnel Management regulations concerning federal employee pay.

60. Plaintiffs were federal employees who were covered by the Office of Personnel Management regulations concerning federal employee pay.

61. It has been the policy, pattern or practice of the Bureau that its field employees such as plaintiffs were expected to work, and did work, up to or in excess of forty (40) hours per week at all times relevant herein. However, in many cases, plaintiffs were not paid at their regular rate for each hour of work up to 40 hours per week.

62. Supervisory personnel, at and above the level of assistant crew leader, had actual or constructive knowledge that plaintiffs were not being paid at their regular rate for all hours of

work up to 40 hours per week.

63. As a result of this policy, pattern or practice, and the demands of their jobs, many plaintiffs have not received full compensation for all their hours of work up to 40 hours per week.

64. As a result, eligible plaintiffs have been damaged financially by the Bureau's refusal to pay them at their regular rate for each hour up to 40 hours per week actually worked, the exact amount of damages to be determined at trial.

65. If and when this Court finds that the Bureau improperly denied some plaintiffs pay at their regular hourly rate for all hours of work up to 40 hours of work, those plaintiffs will be entitled to an award of back pay under the Back Pay Act.

**Prayer For Relief**

Wherefore, plaintiffs, by their counsel, respectfully request that this Court:

(a) Certify this action as a class action pursuant to Rule 23 of the Rules of the Court of Federal Claims, certify plaintiffs as the class representatives, and approve the undersigned attorneys as attorneys for the class;

(b) Enter a declaratory judgment declaring that the defendant has acted willfully, and without a good faith, reasonable belief that it was complying with its statutory obligations under the FLSA, in depriving plaintiffs of their rights, protections and entitlements under the FLSA, as alleged herein;

(c) Award damages for uncompensated overtime in an amount to be proven at trial;

(d) Award liquidated damages in an amount equal to the sum of all uncompensated overtime;

(e) Award those plaintiffs who were improperly denied pay for hours of work up to 40 hours per week, pay at their regular rate of pay;

(f) Award prejudgment and post-judgment interest;

(g) Award plaintiffs reasonable attorneys' fees, costs and expenses;

(h) Enjoin defendant to cease the unlawful policies and procedures which gave rise to this action; and

(i) Award such other equitable and legal relief as the Court deems just.

DATED: February 9, 2007

Respectfully submitted,

MINAMI TAMAKI LLP

JACK W. LEE
360 Post St. 8th Floor
San Francisco, CA 94108-4903
Telephone: (415) 788-9000
Fax: (415) 398-3887

Attorneys for Plaintiffs

# EXHIBIT 2

**DECLARATION OF JACQUELINE CAGE**

I, Jacqueline Cage, declare as follows:

1. I am currently employed in in-home support services, and I'm also a student taking computer courses. During the 2000 Census, I worked full-time as an enumerator in the Culver City East Office. I do not remember my supervisors' names, but my direct supervisor was a Hispanic woman who was pregnant at the time. Originally, my supervisor had us meet at a park each morning, but she later changed our meetings to the Taco Bell on Crenshaw and 27th Streets in Los Angeles.

2. I never received all of the pay that I should have, regardless of the overtime. I was paid based on the number of forms I would have filled out. My supervisor would give me a book of forms. The books were mixed, containing both short and long forms. My supervisor would tell us how many forms we needed to get done, although she did not specify how many of each variety. For example, if I was supposed to fill out 20 forms, and I only got 10 filled out, I would be paid for about 4 hours of work rather than for 8. It would take longer to fill out the forms than my supervisor anticipated. As an enumerator, I had to reach people while they were at their homes. I would often set up appointments with people, and when I went to their houses at the given times, the people would not be at home. I would then be stuck in their neighborhood, having to try to get other forms filled out. Other times, it would just take a lot longer to get a form filled out. Once I ended up spending about 2 hours on a long form because the man told me his entire life story. When I told my supervisor that it took longer than expected, she said to me, "Why'd you waste company time doing that?" I did not receive pay for that time.

3. I remember, too, that it took more time than we were allowed because we were only paid strictly by completed forms. We never were paid for other time we spent doing census-related work. Once, for example, I was given an address to a business on 11th Avenue, but we were only supposed to take Census at residential addresses. When I told my supervisor that the address was a business rather than a residence, she told me I had to collect evidence to prove that it was a business. I then had to go back to that address—on my own time—to get a business card to prove that it was not someone's home. In addition, we were never paid for other work-related activities: we were never paid for the travel time it took to get from place to place. We made our appointments from home when people weren't home, and we never got paid for making the phone calls from home. Because the pay was completely based on how many forms we had filled out rather than our hours, I never was even paid for a full 40-hour week when I worked much longer than that.

4. My supervisor never changed my timesheets herself. If I gave her a timesheet that reflected the time I had worked rather than the number of forms I had completed, she would just refuse to sign that timesheet. This occurred every day when I would return my completed forms; I would have to fill out a timesheet that reflected the number of forms I finished rather than my hours.

5. A lot of people quit working for the Census. When I first started, there were about 30 people in my group, but by the end of taking Census, there were only 10 of us. All of us, enumerators, would discuss that we were not receiving our pay; that is why so many people quit. I could not quit because I needed the job. Working for the Census was the only income I had, and the pay was good.

I state under penalty of perjury under the laws of the Unit : States of America that the foregoing is true and correct to the best of my knowledg and memory.

Date: 1/24/07 Signed: [signature]

## DECLARATION OF LINDA CHAN

I, Linda Chan, declare as follows:

1. I worked as a Special Places Operations Supervisor for the U.S. Census Bureau during the 2000 Census. I worked out of the Essex County Local Census Office in Verona, NJ. One of my supervisors was an Italian woman in her 60's named Claire. I think her last name was Lagomacini. Another supervisor was Charles, who was also Italian. I no longer remember his last name. Before I worked for the Census I worked as a waitress. I currently work as a waitress.
2. The special places I covered included the homeless, battered women's shelters, prisons, and nursing homes. These places were difficult to enumerate because they were busy, dense areas where people weren't always willing to give out their information. We would have to make multiple return trips to get all the forms completed. When the deadlines for the special places arose, I had to work extra hours to get the job done. I think that March was the deadline for the prison populations and April was the deadline for the homeless.
3. My supervisors did not allow me to put down all the hours I actually worked for the Census. I followed what they said because if you didn't cooperate and put the number of hours on your timesheet that they told you to put down, you were told to leave. My supervisors communicated this to us when we first learned how to fill out our timesheets.
4. My supervisors thought a red flag would go up if we claimed the actual number of hours we worked. They said there were budget restrictions on the amount we could be paid and that we would only get paid an eight hour day if we completed a certain number of forms. They said if you didn't meet your quota, you wouldn't have a job. When my supervisors pressured me to meet the quota, I in turn pressured my crews.
5. If my enumerators put more than 8 hours on their timesheets, I would return them because I knew my supervisor wouldn't sign off on them and their pay would be delayed.

When enumerators would complain about not getting paid for all their hours, I told them, "You have to stay out there and get it done." I frequently told my supervisors that enumerators were complaining about not getting paid for all the hours they worked.

6. Some weeks I would put in ten or twelve hour days because there was so much work to do. I couldn't claim the extra hours though, because we were only allowed to put eight hours down on our timesheets. This meant that if I worked less than eight on other days that week, I would only get paid for less than 40 hours even though I worked more. Other weeks, my supervisor would tell me I had to work on the weekend in order to meet a deadline, but I couldn't put any hours on my timesheet for the weekend days. When my total hours were less than 40, I would end up being denied regular hours because I couldn't put down the additional hours I worked on the weekend.

7. There were other occasions when I wasn't paid for all of my regular time. I remember a time in mid-April, around the deadline for counting the homeless people, when my supervisor told me that I could only put down 30 hours on my timesheets instead of the 40 hours I actually worked. This was because it was toward the end of the Census and they had to hire a lot more workers to get it done on time. My supervisors said that we had to put less hours on our timesheets to make up for all the new people they had to pay because they wanted to keep the payroll down. I did what my supervisor told me to do because I was worried about losing my job. It was good money and I wanted to keep my job.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 1-25-07 Signed: Linda A. Olvera

**DECLARATION OF HENRY COMPTON**

I, Henry Compton, declare as follows:

1. I live in Palmer, Alaska and I worked on the 2000 Census as a Crew Leader out of the Anchorage, Alaska LCO. I also periodically took over for the Regional Manager when he had to go back to Anchorage. I covered areas from the Bering Sea to the Yukon River to down south in King Salmon. My supervisor's name was Jim; I think his last name was Malmacmain or something like that. He worked in the field in King Salmon.

2. From approximately April 21st to May 8th, 2000, I was sent to work in a village, where I slept on a classroom floor on a mattress. During that trip, I worked for the census during all daylight hours – about 12-16 hours per day. I lived on the floor of the school. However, I was not even paid for all of my straight time hours. The executive officer of the group – I don't remember his name, but he was a retired colonel from the air guard – told us they could only pay what they can afford, and if we didn't like it to go home.

3. During the trip, when I sent in my timesheets with 40 hours, someone from payroll would call and say something like, "hey, we can only charge 20 hours this week total." They said they didn't have any more hours available to pay – they could only pay a certain number. They said maybe one day it would get straightened out. My supervisor was in King Salmon, so there was no one to complain to on a daily basis. I kept working because I thought I might get compensated for it later.

I state under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge and memory.

Date: 02-03-2007 Signed: [signature]

NEW ADDRESS:
HENRY COMPTON
2308 STEPPING STONE CT.
ORLANDO, FLORIDA 32837
(407) 363-1363

**DECLARATION OF SHALAMAR JONES**

I, Shalamar Jones, declare as follows:

1. I live in Inglewood, California, and I currently work as a travel counselor. In 2000, I worked for the Census full-time as an enumerator. I worked out of the Inglewood office, and my supervisor was Theresa George.

2. Typically, I worked 6 or 7 days a week for the Census. I had to return to houses on several occasions to try to reach the residents. In some cases, I would set up appointments with people, and they would not be at their homes at the arranged meeting times. Sometimes, I had to go back to houses three or more times. I would also work from my home in the evening. I called people that I had been unable to reach earlier that day at their house to try to set up appointments with them. I spent about two hours a day making these phone calls from home.

3. I was not paid for all of the time that I worked for the Census. When I turned in timesheets, my supervisor spoke with me about the time I was claiming. She told me that the number of papers I turned in determined my hours. I explained that people did not necessarily follow through with their appointment times, and I had to return to houses numerous times to collect the data. My supervisor, however, told me that I was not doing enough work to claim 8 hours each day. Nevertheless, I filled out my timesheets based on the number of hours I worked.

4. My supervisor also asked me to double check others' work. I was given forms that other enumerators filled out, and I was asked to make sure all of these forms were filled out properly. I checked for the accuracy of these forms, but I was never paid for any of my hours verifying them. I was told that the information on these was not new,

and, thus, I would not be paid for collecting it. I was given work to do; I did that work; I was not compensated, however, because of the nature of the assignment.

5. When I received my paycheck, I noticed that I was not paid for the number of hours that I had worked. I asked my supervisor what had happened. I explained I should have received more pay, but she said, "that's just not how it works." My supervisor changed my timesheets after I submitted them in order to reflect the amount of paperwork I completed. After asking about my pay and realizing I would not be paid for all of my hours, I stopped working for the Census Bureau.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 1/28/07 Signed: [signature]

**DECLARATION OF ETHEL LOCKHART**

I, Ethel Lockhart, declare as follows:

1. I was an Enumerator with the U.S. Census Bureau during the 2000 census. I worked out of the Hawthorne, California office. When I first started working, I was told that we were supposed to get paid for all of our work time, including work we did at home. I did some of my work at home, such as calling people by phone to fill out their census forms. I filled out between one quarter and one half of my forms this way. I also did other work at home, such as putting together my forms and planning which areas I would cover before I went out, and organizing and reviewing my forms before I turned them in.

2. However, when I included my work time at home on my time sheet, my supervisor made me take it off. He said that we could only put on our time sheets the time we were out going door to door. But we did not even get paid for all the time we went out door to door. My supervisor would tell me and others how many hours to put down on our time sheets, and that's all we could put down, even if we worked much more than that. I worked many straight time hours (up to 40 hours per week) and many overtime hours that I was not paid for. Some people got fed up with that and either quit or were let go. I needed the job, so I just did what my supervisor said. I could see that if I complained, they wouldn't give me any more work.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 12/11/06 Signed: Ethel Lockhart

**DECLARATION OF MARIA LOPEZ-KALLIS**

I, Maria Lopez-Kallis, declare as follows:

1. At the time of the 2000 Census, my name was Maria Ramirez-Kallis; currently, my name is Maria Lopez-Kallis. I worked as an enumerator out of the Cook County South (Chicago) office full time during the Census. My supervisor during the Census was also employed as a deacon at a local church; his assistant was a Polish woman, whose name I cannot remember. Currently, I am attending Moraine Valley College, where I am studying radiology.

2. My typical day of work for the Census began around 8:30 a.m. or 9:00 a.m. Everyone in my group would meet with our supervisor and his assistant at the Alsip Library for approximately 15 to 20 minutes. Our supervisor would tell us at that time where we would be taking Census each day. He instructed us to do whatever we needed to in order to collect the necessary information, whether this involved returning to a home numerous times or making phone calls from our own homes. My typical day would last anywhere between 8 and 12 hours. I would also work on weekends; often on Sundays, I would work for the Census as soon as Church was over. However, I was not paid for all of the time I worked for the Census. In fact, I was not even paid up to 40 hours a week on some occasions.

3. My pay varied from week to week. I was paid based on the number of forms I filled out. My supervisor would tell us how many forms we needed to have completed each week. If we did not complete that number of forms, we knew we would not be given any additional work. It was not that we were paid per form; we just had to complete so many forms in total. Some weeks, he might have said we needed to have

a total of 50 forms filled out for that week. Furthermore, my supervisor limited my pay even below 40 hours a week. All of us in his crew only were allowed to work so many hours a week. My supervisor's supervisor imposed a limit about how much time we could all claim; it seemed the more that his supervisor was "on" him, the more he was "on" us about restricting our hours. It seemed that he would distribute the total number hours we were allowed to claim among all of the enumerators. How many hours a person received was not necessarily based on his or her work; sometimes, it seemed to be based on who my supervisor liked.

4. In addition to limiting the number of hours we could claim, I think my supervisor changed my time sheet. I would turn in my time sheet, and it would say I did a certain number of hours. However, when I received my pay check, I was not paid for that number of hours. This was true even for the number of hours I worked leading up to 40 in one week; my overtime was not even considered! When this happened, I assumed that my supervisor changed my time sheet to make sure I did not go over the specified amount. At times like this, I trusted him because he said we would eventually be paid for all of our hours.

5. The enumerators in my crew discussed our lack of pay with our supervisor. Because none of us received pay based on the hours we worked, we would talk to him and his assistant during our meeting mornings at Alsip Library. Every time we talked to him, our supervisor would say that we should not worry about the hours that were not paid and that we would be paid for them the following week. He said this on a regular basis, and we trusted him that eventually the Census would catch up on our pay. This never happened, however.

6. In addition to not receiving pay for the hours I worked, I also did not receive pay for my mileage or for the phone calls that I made. Although I was based in Cook County South, I often had to drive to other parts of Chicago to gather information from other residences. I may have been paid for some of my mileage, but I know I was never reimbursed to the extent that I should have been. We had also been told that we would be reimbursed for the phone calls we made from our own homes, but I know I was never reimbursed for any of the calls I made.

7. I continued to work for the Census despite the fact that I was not paid for all of my time because I needed the job. I had two daughters at the time, and I needed income to support all of us. Prior to working for the Census, I had worked at the Public Aid Office. When the Census needed to hire workers, coworkers at the Public Aid Office told me to apply to the Census because it paid better than other jobs. I applied for that reason, and I continued to work because the money I received was still better than at other jobs.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: Feb 5, 07 Signed: Maria Reyes-Rolle

## DECLARATION OF SHANNON MCCOWAN

I, Shannon McCowan, declare as follows:

I was an Enumerator on the 2000 census. I worked in the Watts area of Los Angeles and in another part of Los Angeles that I cannot remember now. When I started working, my supervisor told me and the others how many hours we could put down for our work each day, even though we actually worked more hours sometimes. It would depend on the number of forms we turned in. I asked my supervisor if there was like a quota system and she said yes, definitely there was. Because of this quota system, I was not paid for overtime work I did (over 40 hours per week) and I also missed some pay for regular time work (under 40 hours per week). I needed the job, so I just did what my supervisor said.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 12/14/06 Signed: Shannon McCowan

# DECLARATION OF MARSHA MITCHELL

I, Marsha Mitchell, declare as follows:

1. I live in Los Angeles, California and I do daycare and foster care through an agency. I worked in the 2000 Census as an enumerator out of the Local Census Office in Inglewood. I mainly worked in Inglewood and Hawthorne. Some of these areas were shady with illegal activity and gangs. They weren't very good or clean areas and they were difficult to enumerate. I also spent 3-4 days in other areas of Los Angeles considerably further away, about 10 miles east. I had no other source of income while working for the 2000 Census. Prior to working for the Census, I worked doing daycare and foster care.

2. My initial supervisor, a man, was fired after two weeks. He was really strict that we couldn't be paid for overtime. A woman named Keisha replaced him. On average, I worked 60 hours per week, Monday through Saturday. I was told that we couldn't be paid for time spent at home in the morning and the evening preparing packets, routing, and calling people to set up appointments. They said all of that was part of the job and we needed to absorb those hours. We also were not paid for time waiting in the office for assignments from our supervisor.

3. I was not paid for overtime; straight time hours were taken off my time sheets also. If I turned in my timesheet with all the hours I worked, Keisha would give it back to me and say it couldn't be processed and under no circumstances could we be paid for all those hours. She would tell me how to redo the timesheet. I was really frustrated – we had a lot of arguments in the office about this. Other people were denied straight time also. When they saw the paychecks with 7 or 6.5 hours a day, it dawned on them, "I didn't even get 8 hrs for the 10 hrs worth of work. It's bad enough I didn't get paid for the overtime, I didn't get paid for straight time either."

4. They paid by packets completed rather than by hours worked. I think they paid something like 7 hours for a packet, no matter how long it took. The packet might have anywhere from 10-15 people you needed to see within that time span. If they gave you a packet of 10

people and you came back with 8 finished, you would only be paid 6 hours. So you worked extra hard on the next packet to make up for the first one. I was pretty fast; but for the "problem" cases, it might take a longer time. If the first enumerator went to a house 2 or 3 times without a response, they would pass it on to people, like me, who they thought would get a better response; those took longer to complete.

5. I complained, but it fell on deaf ears. We were told we'd be replaced if we complained. This happened to everyone. You were stuck. I figured I would ride it out, but never do it again; I did need the job at the time. When people complained, they weren't technically "fired," but I saw that they were not given more assignments. I saw them sit and sit and sit in the office at their own cost, because they weren't paid for the hours they waited for assignments. They would see other enumerators (who didn't complain) coming in and getting assignments right off the bat. I saw a couple of people get fired for complaining. It got pretty explosive and ugly. I saw this happen on more than one occasion.

I state under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge and memory.

Date: Jan 17, 2007 Signed: Marsha Mitchell

# DECLARATION OF ALVIN MONROE

I, Alvin Monroe, declare as follows:

1. I currently live in Mountain House, California, and I am employed as a special education teacher. While working for the Census, I was an enumerator throughout the majority of my employment; there were 2 weeks when I supervised other enumerators. Despite my payroll information listing me as a clerical employee, I never worked as such. It seemed that the Census work was divided into smaller phases, each focusing on a specific area. After each phase, I worked 3-4 days during the interim period. At that time, I worked to verify the work others had already done. While working for the Census, I worked full-time and out of the Davis office. I worked in Vallejo, California, for the first week, and I then switched to the Vacaville and Fairfield areas. I do not remember my supervisors' names, but I do remember my supervisor in Vallejo was an African American man, and my supervisor in the Vacaville area was a Pakistani woman.

2. While working for the Census, I would have to check in with my forms and review each of them to ensure they were filled out correctly. When it came to signing my time cards, however, I was not allowed to write down the actual number of hours I worked. Instead, I wrote what I was told to report. My supervisor instructed me as to how many hours I was allowed to record. It was my understanding that we were each allowed to only work so many hours in a given week. I think that there were too many enumerators employed by the Census for each of us to be allowed to work a full week; it seemed we had to distribute a set number of hours among each of us. Based on the way the Census was set up, the work needed to be verified so many times that it didn't seem efficient. To make up for the lack of efficiency, more enumerators were hired.

Even though my supervisor told us what hours to put on our timesheets, there would still be times the supervisor failed to turn them in. I don't know what happened with those timesheets, but most of us accepted that that was just the way it was with the Census.

3. I did not speak with my supervisors about the discrepancies between the number of hours I was working and those getting recorded or those for which I was paid because there was a climate of intimidation, which was very subtle but very pervasive. If someone questioned the system under which we recorded our hours and were paid, that person would not be asked back to work. Instead, some minor fault would be found with that person's work; his or her work would be collected at the end of that day, and it would be that person's last. During my time of working for the Census, this happened to 7 or 8 individuals. The supervisor wouldn't let these individuals go in private; instead, they would let them go in front of all of us. It instilled a certain amount of understated fear among all of us. It would not have been the same had they done this behind closed doors; it would not have had the same effect on the rest of us.

4. Another reason I never complained was because I needed the job. I am classified as 100% permanently disabled and working for the Census was one of the few jobs I could have. I was able to work around my disability. The Census hired people like me, who were—in some way—displaced individuals. They knew we wanted to work and could not find many opportunities; thus, the Census hired the people they knew they could take advantage of and hear little or no complaints. It worked in my case. I wanted to keep the job and have some income to take a bit of the pressure off of my wife, and I continued to remain silent about how much work I was actually doing

versus that for which I was paid. In other words, I was willing to work for free in order to get paid sometimes. There was an unspoken understanding: if I had questioned the system, I would not have been asked back for additional work. In fact, what ended my employment with the Census was my refusal to be a part of the lie when I was supervising other enumerators. I let the enumerators I supervised write down all of the hours they had worked, and after I did that, I was let go. No explanation was given to me for why I was let go; all of the sudden, I just was.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: January 25, 2007 Signed: Alvin L Monroe

RECEIVED

FEB 09 2007

# DECLARATION OF HENRY MYRTHIL, JR.

I, Henry Myrthil, Jr., declare as follows:

1. I worked for the U.S. Census in New York City from April 2000 through July 2000. I currently work as a correctional officer, where I have been for six years since I started in early 2001.

2. At first, I worked in my neighborhood, Cambria Heights, NY. Then, they moved me to Jamaica and Laurelton. I reported to the Queens office every day. I was an enumerator. Basically, I went door-to-door interviewing people. In my group, there were about 13 enumerators, but then they split up the groups and fired some people, so the number dropped.

3. My crew leader was a woman, but I don't remember her name. It might have been Maryann or Miriam. They changed crew leaders halfway through. The first one quit, and then they made another enumerator into a crew leader. I saw my crew leader every night when I went to her house to hand in my paperwork. By the time I arrived, it was usually late. Then we had to wait around for a while, depending on the amount of people the crew leader had to see. I usually waited between half to one and a half (½ – 1½) hours. I was never paid for this time that I waited.

4. I was not paid for much of my regular time. My crew leader said that they could only pay for the amount of interviews we completed. Basically, they said that we were not getting 40-plus hours. And just to get 40 hours, we needed a certain number of forms, I'm pretty sure it was like 1 or 2 completed forms for one hour of pay. So even if I worked over 40 hours, they would not give me the full amount. If I completed enough interviews to record more than forty, any extra amount would roll over to next week's

check. I worked over 40 hours per week, but I couldn't get enough interviews for them to permit me to record 40 hours on my timesheet. I believe there were a couple weeks where I did get more than 40 hours' worth of forms, but they never rolled it over.

5. The crew leader let my cousin go because he did not have enough work for the hours that he put down. I saw the entire exchange between my cousin and the crew leader. Basically, he asked for his full 40 hours plus overtime. She asked him to change it because she couldn't pay him for the whole time. He refused to change the hours and she said something like, "You aren't getting paid for it." After that, she stopped giving him work to do and he was no longer working for the Census. I do not know if this happened to anyone else.

7. Even though I got less pay, I kept quiet and continued to work so I could make money. I just did whatever the crew leader wanted me to do, including the work that other people brought back incomplete. It was dark by the time I was done, usually 9 or 10 o'clock by the time I left the crew leader's house. When I wrote down that I worked 40 hours, she told me to cancel them out and she gave me a lower number of hours to submit. I did not want to get fired, so I put down whatever she told me.

8. When I told another supervisor about the overtime, he said, "Don't worry about it, we'll hook you up next week." I understood that to mean that I would get more hours next week, and the supervisor would throw some extra hours on there. But I never got paid back.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 2-5-07 Name: [signature]

**DECLARATION OF MYRA ROMERO**

I, Myra Romero, declare as follows:

1. I worked for the U.S. Census Bureau from 1990 through 2000. In the years between the 1990 Census and the 2000 Census, I would work on special projects for the Census, off and on. In between 1990 and 2000, I also worked as a Certified Nurse's Assistant and a Research Technologist at Mt. Sinai hospital. When I worked for the Census in 1990, I was an enumerator and a Crew Leader and worked in the Bronx. During the 2000 Census, I worked out of the White Plains local census office. At the time, I lived in Yonkers, which was near White Plains. Both cities are in Westchester County, New York. I currently live in Pennsylvania.
2. I got my job working for the 2000 Census by calling my former supervisor. His first name is Bob. I no longer remember his last name. He was in charge of the White Plains office. When I started working for the 2000 Census, I was hired as an office clerk and was then quickly promoted to Field Operations Supervisor. Eventually, in July when we had done the majority of the work, I worked as a Crew Leader. My direct supervisor was an Italian woman named Mrs. Spano whose first name I no longer remember. Her supervisor was Bob, my former supervisor who helped me get the job working for the 2000 Census. I remember the names of many of my Crew Leaders. For example, I remember Robert Long, Janice Macarthy, Sandra Williams, Kim Holland, John Canales, and a man named Rafael whose last name I don't remember at this time.
3. I worked on weekdays and weekends. I remember one weekend in April that I didn't work on Saturday and Sunday because I got married that weekend. This was April 22nd and 23rd. I remember asking my supervisor, Mrs. Spano, if I could take time off for a honeymoon. She told me "You must not want this job if you want to take time

off to go on your honeymoon." So I cancelled my honeymoon. Right after that is when I began working so many hours.

4. In the first week and a half of working there, I remember there was a meeting in the White Plains office with Bob and all the field operations supervisors because people were already claiming overtime but it hadn't been approved. Bob said that they would not accept timesheets with overtime. If you did submit a timesheet with overtime, it would be torn up. They never said overtime had to be pre-approved. They said that they would not pay overtime. When we asked why people's hours were being cut, they told us that our district was spending too much time on our cases. Bob was getting flack for it and wanted to tighten the reins. I asked them what to do because people were working overtime. They told me to tear up my Crew Leaders' timesheets if they had overtime on them. I remember doing it. Then I told my Crew Leaders to tell their enumerators the same thing, which they did. In fact, I remember being at a meeting where a Crew Leader told the enumerators that their timesheets with overtime would be ripped up. When the enumerators looked to me to see if this was true and I said yes. I can remember tearing up timesheets. If they complained about it, I would tell them that it happens to me too, and they should complain to Mrs. Spano and the other managers.

5. There was also a quota system in the White Plains office. I don't know if Bob knew about it, but Mrs. Spano did. Mrs. Spano told me about this. The purpose was to get people motivated to complete a substantial number of cases. Like, if you brought in 5 cases, you'll get 3 to 4 hours of pay. Or if you don't have 20 cases completed, you won't get an 8 hour day. I think about 20 forms would give you an 8 hour day but I'm not sure. It would depend on whether they were short or long forms. I would tell my Crew Leaders to enforce this policy throughout their crew of enumerators. Some of my Crew Leaders had problems with it. I remember that Janice had a lot of issues

with the quota system. She would say she wasn't comfortable and so I would have to enforce it for her. Janice almost quit because of it several times actually. Several enumerators quit because they weren't getting paid for all their hours, mostly because they couldn't meet the quotas.

6. I thought it was a problem because the quota system didn't take into consideration that people are very chatty. An enumerator might go in for an interview and it might take 20 minutes for someone to answer the first three questions. I know because I was an enumerator in the 1990 Census.

7. Because my days were so long, I ended up working overtime almost every week. But I didn't always get paid for the full amount of hours I worked. My supervisor would tell us to come to meetings with them or hold meetings with our Crew Leaders, even though we had worked a full 8 hour day. We would ask how we could come to the meeting after already putting in eight hours? How could we not put in overtime? They told us we could roll it over, but we were never allowed to do that. There were some days that I would work more than eight hours and my supervisor would tell me I could roll them into the next day. Then I would work a little less and try to roll the hours over, but they refused to let me do that. Therefore I didn't get paid for even 40 hours that week.

8. I can remember how many hours I worked because there was one week, the week of June 17, where I finally got paid for all the time I was putting in. I was working these same hours for all the weeks prior to this week but didn't get paid the correct amount. The reason that the June 17 week was different is because I had resigned to protest their mistreatment of one of my Crew Leaders and they told me if I came back things would be different. After that, I met with my crew in the White Plains office instead of various locations in the field and I got paid overtime for a while.

9. Even though I was frustrated and complained, I didn't quit because I liked the work and it was a good paying job.

10. I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 02/19/07 Signed: [signature]

RECEIVED
JAN 22 2007

# DECLARATION OF FRANK SANTIAGO

I, Frank Santiago, declare as follows:

1. I live in Hillside, New Jersey and I work as an Information Services Manager. I worked on the 2000 Census as an enumerator. My Local Census Office was in Bergen County North, New Jersey. The three primary towns I worked in were Fort Lee, Palisade Park, and Leomia. Fort Lee was middle class and up and the homes were cleaner and more pleasant. Palisade Park and Leomia were not as nice; the homes were dirty and often 5 people lived in a one bedroom apartment. While I worked for the Census, I also worked about 35 hours per week as a library analyst doing research for a major company, the same one I work for now. I don't remember my Census supervisor's name, but I remember he was a retired air traffic controller. He said the job was too overwhelming for him, and he asked me to take over, but I said no because I had another job.

2. I worked part-time for the Census. I was not paid for all of the hours I worked. My supervisor said his bosses told him we had to do a certain number of homes in a certain amount of time. A lot of people weren't meeting these goals, but we couldn't get paid for more than a certain number of hours because we weren't full time. Most of us were part time. I don't remember what the exact guidelines were for how many hours you could put down if you were part-time versus full-time; but, for example, if I worked 5-9.30 pm, I was only supposed to put 4 hours on my timesheet. Their explanation was something about the budget – the government was running out of money. A lot of people

quit; I was one of the few people who actually stayed. At the time, I actually enjoyed the work.

3. I remember one time, I submitted my timesheet and my supervisor signed it, but the final person who tallied hours in payroll sent it back, saying they couldn't pay all of the hours because they didn't want to go over budget. Another time, I got my paycheck and saw that it was for fewer hours than I submitted. I asked "what happened?"; they said I couldn't be paid for all of the hours because they didn't have enough money in the budget. I said it would have been nice to know about that at the beginning. That's when we lost a lot of people – a lot of people quit.

I state under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge and memory.

Date: 1/17/07 Signed: [signature]

(FRANK SANTIAGO)

RECEIVED

JAN 2 2 2007

**DECLARATION OF ADAM SCHLACHTER**

I, Adam Schlachter, declare as follows:

1. I was an Enumerator with the U.S. Census Bureau during the 2000 Census. I originally worked out of the Hollywood/Mid-Wilshire office, but the last several weeks, I was transferred. I then worked mainly on the west side of Los Angeles County. Over the course of working for the Census, I had several supervisors. I cannot remember the name of my first supervisor, but she is the one who instructed me about what time to claim; the last supervisor's name was Daniel. While working for the Census, I also worked as a freelance production coordinator part-time. Currently, I am employed as a filmmaker.

2. I was not paid for all of the hours that I worked for the Census. I generally worked during the regular work day: the Census records are fairly accurate. I just needed to add the traveling time to those. Some days, I may have started my work earlier in the morning, but I rarely worked into the evening. It took me some time to get to my start location each morning, and I would typically work until I finished the forms my supervisor gave me. I would meet with my supervisor either in the morning or in the evening; sometimes, if I finished my forms early, I'd meet with the supervisor twice in a day.

3. When I started working for the Census, my first supervisor strictly instructed me that I could not include time for certain activities. One of these activities she prohibited the other enumerators and me from claiming was our driving time. She was really strict with us; she made it seem like a big deal that no one could claim time for any of the work-related activities for which she prohibited us from claiming time. She

said she would get in lots of trouble if anyone claimed this time. I did not question her, as I was used to jobs where you would get paid for the time for which you had "punched in." Since I couldn't "punch in" for driving time at my previous jobs, I assumed I was not supposed to here either. Because my first supervisor was so strict about not claiming driving time, I never asked a subsequent supervisor whether I could claim this driving and traveling time. I assumed it was the Census's rule that this was not included as work time.

4. While working for the Census, I traveled a lot. It is difficult to determine exactly what the average time I spent traveling each day was. I did not keep records because I did not think I would ever be compensated for this time. But toward the end of my employment with the Census, when I was enumerating throughout Los Angeles County, I traveled a lot. Even within one neighborhood of Los Angeles, it could take up to half an hour to get around. One of my longest drives was from Hollywood to Pacific Palisades; it took about an hour and a half one-way to drive there. It was my understanding they could not find enough enumerators in the area, so that is why I ended up traveling all the way to that neighborhood.

5. There were days and weeks where I did not necessarily work a full 40 hours, but I still was not paid for all of the time I was doing Census work. Because of the instructions from my first supervisor, I did not claim the hours I spent traveling from location to location in Los Angeles County.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 1/19/7 Signed: [signature]

## DECLARATION OF JOSEPH SCIACCA

I, Joseph Sciacca, declare as follows:

1. I am a retired Post Office supervisor. I live in Franklin Lakes, New Jersey, which is near Patterson, N.J. I worked on the 2000 Census as an Enumerator. My supervisor was Paul Sumner.

2. Paul Sumner and other supervisors told me and others that we should be completing about one case per hour. Sumner gave me and others on my team a memo dated May 10, 2000 where he referred to this ratio, saying, "We need to optimize time in the field to raise productivity and to achieve a case per hour ratio higher than one. Our current ratio is around .90." A copy of this memo is attached. Most of the time, I was able to complete one case per hour and often I did better than that. I won at least two awards from Mr. Sumner for outstanding productivity. A copy of my awards is attached.

3. However, some of the more difficult cases took more than one hour to complete. I remember I was given one case where another Enumerator tried, but failed to complete the form. I went to the house on May 24, 2000 at 10:00 a.m and waited there until 11:30 a.m., but no one was there. I returned at 5:00 p.m. and waited until someone came home. When I completed the form and returned home, it was 10:00 p.m. It took me a total of 6.5 hours to complete the case. But when I turned in my time sheet for that day, Paul Sumner crossed out the 6.5 hours and changed it to 1.0 hours, probably because I completed only that one case. A copy of my time sheet for that day, with Mr. Sumner's cross-out and change is attached. Sumner even initialed the changes on the time sheet. So, even though I worked 6.5 hours, I only got paid for 1.0 hour on that day.

4. From what I heard, others who worked on the Census also got their hours cut just like what happened to me. From what Mr. Sumner was telling us, I figured that the higher ups were putting a lot of pressure on the Census supervisors and managers to keep the hours down.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: Dec 12 - 06 ____________________

# Team 0408, The Daystar Team
# May 10, 2000

Team 0408 has reached the 50% mark in returning completed questionnaires. This is a good record, but we were fortunate in getting off to a fast start by working with 20 enumerators. Now, it is important to work efficiently and quickly in completing the balance of our calls. With confidence, persistence, completeness and accuracy, we can accomplish our goal, 100 % returns in record time.

The Day Star for May 10 is Enumerator ***Theresa Chesler, who*** wins another Daystar award for filling is so well as temporary Crew Leader Assistant while Crew Leader Paul was on vacation.

Enumerators: I am glad to be back working with you again. I was thinking of you often during my vacation trip.

Remember the rules. Six attempts to complete a return, recording each attempt with time and date. Only when these attempts fail can you approach a neighbor or other knowledgeable person to get the required information.

Try to have all returns and payroll forms complete in every respect to enable reviews by the Crew Leader Assistants to be completed in a minimum of time.

The Crew Leader Assistants have organized and scheduled reviews well to optimize your time and theirs. We need to optimize time in the field to raise productivity and to achieve a case per hour ratio higher than one. Our current ratio is around .90. Use phone calls as much as possible to complete returns and schedule visits and organize visits to reduce time and driving.

You are doing a good job in getting returns completed, but spending an inordinate amount of hours in getting the job done.

United States Census 2000

## The 408's
## Day Star Award

*It is with great honor that we bestow upon you the Coveted award of*

***OUTSTANDING VOLUME***

*Presented this 28th day of April, in the year 2000*

*To: JOSEPH SCIACCA*

Subscribed hereto this day by

**Paul Sumner**

Crew Leader

United States Census 2000

## The 408's
## Day Star Award

*It is with great honor that we bestow upon you the Coveted award of*

***PRODUCTIVITY***

*Presented this 5th day of May, in the year 2000*

*To: JOE SCIACCA*

Subscribed hereto this day by

**Paul Sumner**

Crew Leader

FORM **D-308**
(4-16-98)

U.S. DEPARTMENT OF COMMERCE
BUREAU OF THE CENSUS

# DAILY PAY AND WORK RECORD
## United States Census 2000

## Part A – EMPLOYEE INFORMATION

**1. Social Security Number** . . . . 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

**2. Name**
Last Name: SCIACCA
First Name: JOSEPH MI: J

**3. Date worked** . . . Month 05 Day 24 Year 2000

Sun Mon Tue Wed Thu Fri Sat

**Day worked** . . .

Fill in this circle if Reclaim. ⟶

**4. Task code** 046 **Name of operation** NRFU

**5. Changing check mailing address?**
Street address or RFD number *(Include apartment number, if any)*

City

State ZIP Code

Remarks
Field work → work
Home ⟷ CL Review
Franklin Palm Oakland

## Part B – PAY INFORMATION

*Do not write in this area.*

**1. Hours worked**
Regular . . . . . . 10.0
Training . . . .
Night Differential (6 pm–6 am) . . .
Overtime . . . . .
Night Differential/ Overtime (6 pm–6 am) . . . . 1.00
TOTAL . . . . . . .

**2. Reimbursements**
Miles driven . . . . 20
Telephone . . . $ $
Other *(Specify in remarks and attach receipts where required.)* $ $

**3. Times of day worked** *(Do not include breaks.)*

| | | | | | |
|---|---|---|---|---|---|
| START | 1000 a.m./p.m. | 530 a.m./p.m. | a.m./p.m. | a.m./p.m. | a.m./p.m. |
| FINISH | 1130 a.m./p.m. | 1000 a.m./p.m. | a.m./p.m. | a.m./p.m. | a.m./p.m. |

## Cases Completed *(Filled by supervisor.)*

CLD number: 0408
CL I.D. number
AA number
FOS I.D. number
GQ I.D. number
GQ I.D. number
Cases submitted
Cases accepted
Office name: 2211

## Part C – CERTIFICATION

**Privacy Act Notice –** All information furnished will be treated in accordance with the Privacy Act of 1974. No information will be released except as authorized by the Act.

**Employee's Certification –** Under penalty of fine and/or imprisonment, I certify that the information on this form is true and correct to the best of my knowledge.

Signature [signature] Date 5/24/2000

**Supervisor's Certification –** I certify that I have reviewed the entries made and they appear to be reasonable and accurate.

Signature [signature] Date 5/26/00

| FOR OFFICE USE ONLY | Audited by *(Initial and date)* | Remarks |
|---|---|---|
| | | |

**Copy 3** – Employee

## DECLARATION OF WILLIAM SEVILLA

I, William Sevilla, declare as follows:

1. I worked for the Census as an enumerator in April and May of 2000 out of the Culver City East Local Census Office in Los Angeles. The office was about five miles from where I lived back then. I still live in Los Angeles, but now live about five minutes away. My mom still lives at that house though. My supervisor was a woman with glasses who was Asian-American. I no longer remember her name. She was in her 40's or 50's.
2. Working for the Census was one of my first jobs. I was 19 when I worked for the Census. Before that I worked at a restaurant equipment supplier as a stock boy. I also attended Santa Monica College around this time. Now I'm a freelance Assistant Editor for film and TV. I mostly work on reality TV shows and some features.
3. I was scheduled to work a 40 hour week but I always put in more hours because I had to bring my work home to finish it. At the end of the day, when we would meet with our supervisor to turn in our forms, she would tell us to finish whatever still needed to be filled out at home. So I would end up putting in 2 or 3 extra hours a day. Usually, I also worked four or five hours on Saturdays and Sundays.
4. I didn't get paid for all the hours I worked because our supervisor told us that we weren't getting paid by the hour, but for what we got done. She was concerned about the numbers and would tell us to get a certain number of forms completed in 8 hours in order to get paid. I remember she said that if the numbers didn't start going up, people would start getting cut. After that, the topic was taboo.
5. Because I was younger and it was one of my first jobs, I was scared to complain because I didn't want to get fired. I was making good money. But I remember

this one time we got together as a group and spoke to her about the extra time we were putting in. We told her we were working more hours and asked her what we should do about that. I remember her saying, "If it takes you five minutes, fine. If it takes you all day, fine." But she told us she didn't want to get overtime approvals because it would make her look bad to her supervisors, so we couldn't get paid for all the hours we worked.

6. In the last two weeks, I didn't get paid for all my regular hours. I worked a total of 56 hours in the second to last week but was only paid for 36 hours. The extra 20 hours was time I worked at home at night and on the weekend. In the last week, I worked a total of 23 hours but only got paid for 13 hours of work, which was all I could get based on the number of forms I turned in. The 10 additional hours of regular time that I didn't get paid for was time worked on the weekend and at night. I only worked 23 hours that week because I got sick of it and quit due to all the pressure she put on us to get more and more forms done in the same amount of time. I remember we were having a meeting at a restaurant and she started going off on others and then going off on me about getting more forms done. So I quit. I put my badge on the table and walked away.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 1/29/07 Signed: ____________

RECEIVED
JAN 22 2007

**DECLARATION OF JULIA SHOFFNER**

I, Julia Shoffner, declare as follows:

1. I was an Enumerator with the U.S. Census Bureau during the 2000 Census. I worked out of the Jamaica, Queens, New York office. During the Census, my supervisor's name was Stacey. He lived at Linden and either 188th or 189th; I knew this because I worked at his house each evening. While employed by the Census, I was also a "call-in" employee at Macy's; in other words, I worked on standby when another employee was unable or failed to come in. Currently, I work at a tax firm, and I am in school for accounting.

2. I was not paid for all of the hours that I worked for the Census. Typically, I would start my work for the Census around noon or 12:30, and I would work until about 11:00 p.m. Then, I would have to go to my crew leader's—Stacey's—house. Every enumerator had to go to his house each evening, so he could go through all of our paper work. We would all have to stay until he went through each person's paperwork. Generally, we would not finish until 2:00 or 3:00 am. He told us that we could not leave until he had completed going through everyone's paperwork; if we left before our paperwork had been completed, we would not be paid at all. This was the typical schedule every day and night of the week, although on Sundays, I did not start my day until about 1:00 p.m. when church finished.

3. Each night at Stacey's house, the other enumerators, Stacey, and I would discuss the time we worked, but for which we were not paid. Stacey told us that there was a limit as to how much time we could claim on our time cards; either he would fill out our time cards for us to make sure they followed the limit or he would tell us what to

fill out ourselves. Our time cards always showed less than what we had actually worked, even if we worked fewer than 8 hours in a day. In addition to there being a limit on the regular hours we could claim, Stacey said that the Census Office had made it very clear that we would, under no circumstance, be paid for our overtime. I never understood why I didn't get paid for all of my hours, even those making 40 in a week. All I knew was that Stacey had to enforce the limit. Furthermore, he related to us that we should have finished the work already without having to do additional hours beyond the limit. Stacey told me, also, that the Census Bureau Office paid him $3000 to remain quiet about all of the overtime we all had to do. I know that other crew leaders in the area were paid also to stay silent about the overtime.

4. At the time, I accepted the fact that I was not being paid for all of the hours I worked. I was not making a lot of money, and I needed the job. I couldn't put my job in jeopardy because I had three children. The Census paid me more than twice what I could have made at Macy's, so I wanted to keep the job.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 1-18-07 Signed: Ms Julia Shaffer

**DECLARATION OF TERI WALKER**

I, Teri Walker, declare as follows:

1. During the 2000 Census, I was an Enumerator with the U.S. Census Bureau. I worked in Tempe, Arizona. While taking the Census, I did not have any other employment; currently, however, I work at the Phoenix Zoo. My supervisor during the Census was named Stacy; I remember going to her house every day; she lived within a mile of my home.

2. I was not paid for all of the hours that I worked for the Census. I did not have an exact schedule that I followed each day. Instead, I varied when I went out during the day and in the evenings in order to find the most people at home. I also worked on the weekends approximately 8 hours a day because that's when most people were home. The only day I took off during my Census employment was Mother's Day.

3. When I was trained for the Census, I was told that we would have an hour and a half to complete a long form and 45 minutes to complete a short form. The amount of time I was paid followed these specifications. Once I tried to turn in a time sheet showing the number of hours I actually worked rather than base my hours strictly on the number of completed forms. Stacy told me that I "hadn't done sufficient work" to claim that many hours. I had to resubmit my time based on the number of forms I filled out.

4. On one particular occasion, I did a number of hours for which I was never paid. I was told to go to a large apartment building; while speaking with some of the residents, I learned that many of them had already mailed in their census forms under a different mailing address. I realized that this apartment building had two different

addresses. I told Stacy this, and she said that I should try to straighten out the problem so that the residents were not counted twice. I spent approximately 5 or 6 hours trying to figure out who had been counted already and who hadn't. I was never paid for any of these hours. When I asked Stacy about not receiving pay, she told me, "that's the way it works."

5. I was never paid a full 40 hours during any week I worked for the Census, although I would estimate I worked, on average, 50 hours a week. My pay was based on the number of forms I completed rather than the amount of time it took to do the work. Also, I was given a special assignment with respect to the apartment building that had two addresses, and I was never paid for that because it did not involve completing forms.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 1-14-07 Signed: Teri Walker

# DECLARATION OF ANGELITA WATAHOMIGIE

I, Angelita Watahomigie, declare as follows:

1. I am a Native American. In 2000, I lived on the Havasupai Reservation in the Grand Canyon, about 193 miles from Flagstaff, Arizona. I worked on the 2000 Census as an Enumerator and later I was promoted to be a Crew Leader when my Crew Leader quit, but I was not given the pay of a Crew Leader. Besides me, there were only two other census employees on the Reservation, which has about 700 people

2. I was not paid for all the overtime hours I worked and my regular time hours were cut almost every week. I also was not paid for all of my mileage and work expenses. I filled out my time sheets and we mailed them to Flagstaff every Monday, but when I got my pay check, I was not paid for all of my hours. For instance, I recall that in about the last two weeks of May, I worked about 55 to 60 hours the first week and about 35-45 hours the second week, but I was paid only for eight hours the first week and four hours the second week. I sent in my time sheets for both weeks as usual on the Monday after the week was done, but a woman manager at the Flagstaff office said that my time sheets were late. I also did not receive payment for all my mileage and expenses, such as the $50 cost of the helicopter ride to and from the reservation.

3. The first of the two weeks, I had to fly by helicopter out of the Grand Canyon and then travel by car to Flagstaff. I spent most of the week there meeting with people in the Flagstaff office who had questions about the surveys we had turned in. I

flew to Flagstaff on Monday and returned to the reservation on Friday by helicopter and car. I worked throughout the weekend at the reservation. I remember those weeks because I had only two trips to Flagstaff during the census work.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 1-12-07 Signed: Angelita A. Wolatongie

## DECLARATION OF PHILIP WATERS

I, Phillip Waters, declare as follows:

1. I live in Gardena, California, in Los Angeles County. I worked in the 2000 Census as an enumerator in South Central Los Angeles. This was a volatile, low-income area. This made working there difficult and many enumerators were afraid, especially the younger ones. A lot of undocumented immigrants from Mexico and Central America live there. Many of them refused to be counted because they were afraid of being deported. My Crew Leader's name was Cheryl Stephens.

2. I would often work 10 or 12 hours per day; I also worked some weekend days. Cheryl told us early on of a policy that we could only be paid 1 hour for every case completed, regardless of how many hours it took. For example, if we completed 4 cases in 12 hours, we would only be paid for 4 hours. If you only partially completed a case because people were not home or they weren't cooperative, she wouldn't accept it as part of your completed cases for that day. Since I lived in an area where there were so many undocumented workers, I would have to keep going back to try to get information from them, so it took a while to complete; but I couldn't get paid for those cases until they were finished.

3. If I completed more than 8 cases in a day, Cheryl would tell me to turn over the extras to other enumerators to even out their daily estimated records. She said it was a rule – we were only supposed to get paid for 8 hours in a day. I complained about it, but she didn't take me seriously. She would just take it upon herself to rearrange the hours. Sometimes she would say they'd straighten it out on the next paycheck, but that never happened because I worked overtime the next week also.

4. My best recollection is that I would turn in my timesheet, Cheryl would tear it up and tell me to change it if it didn't match up to how many cases I completed. Sometimes she would sign it and pass it on to two young Hispanic ladies who worked for her. They handled much of that work for her under her direction. Sometimes they would come back and tell me I had to take some hours off my or put them on another time sheet and redate it. They were just doing what Cheryl told them to do.

I state under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge and memory.

Date: 01-26-07 Signed: Phillip Nalos

# DECLARATION OF JAMES WRIGHT

I, James Wright, declare as follows:

1. I live in Yonkers, New York, and I work as an iron worker, building skyscrapers. I worked as an iron worker at Ground Zero after 9/11. I am also a Vietnam veteran. I worked on the 2000 Census as an Assistant Crew Leader. I worked out of the White Plains Local Census Office, in the southwest corner of Yonkers, which is a low to medium income suburban area. While I worked for the census, I also worked approximately 35 hours per week as an iron worker, excluding a leave of absence during the first month of my work with the census. My Crew Leader's name was Yan Renner. My Field Operation Supervisor's name was Pat; I don't remember her last name.

2. I was not paid for all the hours I worked. At the beginning, they told us there was a target of expected hours necessary to complete the assignments, but didn't give a numerical figure. It varied from week to week how many hours I was permitted to record. My job of Assistant Crew Leader was very time consuming. I had to go back to apartment buildings to spot check the reports of the enumerators; this took a lot more time than the guidelines permitted. I worked 6 or 7 days per week. Time spent in meetings with my Crew Leader at our houses was rarely reported because there was a cap on how many hours that could be reported.

3. The director of the section told me that the enumerators had a set number of hours that they were permitted to report because they were supposed to be part time employees. I think it was 25 hours per week, although I'm not sure if that was the exact number. The Crew Leaders and Assistant Crew Leaders did not have a set rule about weekly hours, but we were still expected to complete our work within the target amount

of time. When I turned in my timesheets, my Crew Leader would give them back, and say that there was a cap on how many hours could be reported for that particular week – she got orders about hour restrictions. I would say to her, "look, I have to do something about these hours because I'm working 20 more hours per week than I'm being paid for." At first, they would tell me to roll over hours to the next week. However, there was never room to record the rollover hours, because they would ask us to work extra hours the next week too. Later, my supervisors told me I would be paid for all the hours as an extra week at the end, but that never happened either. When I asked about getting paid at the end, they literally said "I'm sorry, but we can't submit your timesheets." I don't recall the exact bureaucratic reason they gave.

4. There were people in my crew who left because they weren't allowed to write down all the hours they worked. I enforced the rule passed that the enumerators could only report a certain number of hours per week. I would tell them to record their hours on the next week, because that is what I was instructed to do. But then they had to work extra hours the next week too, so after a while they said "I'm wasting my time," and quit. I continued working for two reasons: one, I'm patriotic and I took the responsibility of collecting accurate information seriously; and two, I believed I would be paid at the end.

I state under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge and memory.

Date: 1/29/07 Signed: James E. [signature]

**DECLARATION OF ANIDIA ZABALA**

I, Anidia Zabala, declare as follows:

1. I live in San Francisco, California, where I am employed by Bed, Bath, and Beyond, although I am currently on disability leave. By profession, I am ~~an~~ accountant. AZ 1/26/07 I've previously worked at the Bank of America in Corporate Trust~~s~~ as well as in Trader Joe's ~~corporate office~~ STORE #10. AZ 1/26/07 I received my education at University of California, Berkeley, and Stanford University. In 2000, I worked for the Census full-time, as I had just moved back to San Francisco. I worked through all three phases of the Census in San Francisco's Potrero Hill and Bayview neighborhoods. My supervisor's name was Clancy, and his last name may have been Brown.

2. I tried to be really efficient and work only Monday through Friday because I did not want to turn it into a 7-day-a-week job. Occasionally, though, when I was working on the last addresses in a book, I would have to work on Saturdays or Sundays in an effort to catch people while they were at home. It was harder to get these people because they had never been home when I stopped at their houses, nor had they called me to set up an appointment despite my leaving my telephone number on their doors asking them to do so.

3. I was not always paid for all of the hours I worked. During our meetings at Atlas Café, Clancy would tell us that we were only allowed 30-45 minutes for a short form and an hour and a half to two hours for a long form. There was no way we could always complete a form in the amount of time specified. As an accountant and former auditor, I always tried to be both productive and accurate, but there were a lot of details in the long form. It just took a while, especially if I had to be in the housing projects in

Bayview, where there were often 10 people sharing a unit. Nevertheless, Clancy would tell us how many hours to claim based on our completed forms. If we only completed 5 or 6 forms, for example, he would tell us we needed to adjust some of our hours so that our productivity wasn't low. There was a statistical program in the Census Bureau's computer that would identify low productivity. It would flag enumerators with low productivity, and those enumerators would be fired. I was not happy about having to adjust some of my hours because I was not padding my time. I was claiming only the time that it took to complete the work I had done.

4. I did adjust my hours, however, to make my productivity appear higher. Clancy, to some degree, relished firing people. He would always threaten us about losing our jobs if we claimed too many hours or did not complete enough forms. After he did so, we might be short a person or two at the next meeting. I assumed that those people did not come because they had been fired. Because working for the Census was my only job at the time, I could not take the risk that I get fired. I needed the money while I looked for more permanent employment.

I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and memory.

Date: 1/25/01 Signed: [signature]

# EXHIBIT 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KENT CHRISTOFFERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 01-495C |
| | ) | (Judge Bruggink) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF UNDERSTANDING FOR SETTLEMENT

1. Pursuant to the parties' confidentiality agreement, the parties memorialize their efforts to resolve this case as follows.

2. From August 24-26, 2004, the parties in this case met with their mediator, Senior Judge Eric Bruggink, to design a procedure for resolving the claims of the non-Concord, California plaintiffs in this case. Participating in the meetings were Judge Eric Bruggink and Chris Danley (Judge S. Braden's law clerk), Jack W. Lee and John Ota for the plaintiffs, Steve Gillingham (DOJ), and Rayna Eller (Department of Commerce, Office of General Counsel) for the defendant. They were joined on August 25, 2004, by statisticians Dr. Richard Drogin, for the plaintiffs, and Dr. Pat Cantwell, for the defendant. Since then, the parties have had additional discussions.

3. The parties' negotiators have reached agreement upon settlement amounts for 20 out of 53 Concord plaintiff claims (one plaintiff has a FOS and non-FOS claim). All or part of 14 of the remaining 33 will be subject to motions for summary judgment, as explained further below. The parties will discuss the remaining 19 with an eye towards settling them as soon as possible. <u>See</u> Attachment (Summary of Settlement Negotiations as of October 4, 2004).

4. The parties agree to make their best efforts to resolve the remaining 7500+ claims through the process described below. The parties will advise the court of the outline of this procedure to obtain the time necessary to execute this plan, and may seek court approval of particular portions if they determine that doing so will aid the process. In general, the process will include four general phases: first, completion of a questionnaire to elicit information about plaintiffs' claims and to advise plaintiffs of this process and of their obligations; second, depositions of some plaintiffs; third, the negotiation of the claims of the deponents; and fourth, the application of the deposition results to the claims of non-deposed plaintiffs. The process is detailed below.

5. Step One: Obtaining Plaintiffs' Work Data. In order to provide plaintiffs' work data, the Census Bureau must have plaintiffs' SSNs in electronic form. Plaintiffs' counsel will provide the SSNs for the majority of the plaintiffs, but the parties will cooperate to obtain the SSNs of those plaintiffs whose current SSNs are unknown.

6. Step Two: Questionnaires. The parties agree that the questionnaires will be sent by plaintiffs' counsel. The questionnaire format remains a matter of discussion between the parties. The intent of the questionnaire is to provide more detail concerning the plaintiffs' claims. Plaintiffs will be furnished Census payroll data that will identify the work weeks at issue, the hours submitted for payment, and the total hours paid by week to assist them in completing the questionnaire. Plaintiffs will be asked to provide information, to the best of their recollection, asking for each day they worked overtime and how much overtime they worked.

7. Step Three: Processing of Questionnaires. The questionnaires will be returned to the Plaintiffs' counsel. Upon their return, plaintiffs' counsel will provide them to a third party administrator ("TPA") to be hired by plaintiff. The role of the TPA will be to assist plaintiffs' counsel to: (a) create a database identifying plaintiffs, their filing dates, and questionnaire return dates; (b) compile a listing of those who have not responded by the deadline; (c) respond to questions of plaintiffs and refer them to legal counsel; and (d) create a database that will record all relevant information contained in the questionnaire. Communications between plaintiffs and the TPA will not be considered a waiver of any applicable attorney-client or work product privilege.

8. Step Four: Identification of Deponents Subject To Further Discovery. After the questionnaires are returned and the data compiled, the parties will examine the data for the purpose of dividing the returns into groups and identifying specific groups (strata) for further discovery, including deposition. The first group, the "certainty" group, will consist of plaintiffs nominated by each side. All members of the certainty group will be deposed. The members of the certainty group cannot be identified until questionnaires are returned. Following depositions, the certainty group's claims will be negotiated on an individual basis. Any adjustment to their claims shall not affect the claims or the adjustments of any other plaintiffs.

9. Once the certainty group has been determined, the remaining plaintiffs will be divided into strata designed to combine like plaintiffs. The parties have discussed useful stratifying factors such as job position, size of claim, and other characteristics. Once the stratification has been agreed upon, the parties will randomly select a sub group in each stratum for depositions. Nothing in this Memorandum of Understanding prevents the parties from deposing a smaller pilot group of the above sample and relying upon the pilot group for extrapolations if both parties agree. The purpose of the sampling is: (1) to measure the inverse ratio (reciprocal) of the amount of overtime claimed to the amount of overtime negotiated after deposition, based on a sampling of plaintiffs, not to estimate the overall amount of overtime; and (2) to estimate the variability of this sample ratio. The parties agree that, whenever possible, they should plan the depositions in a way that minimizes any burden on plaintiffs, including limiting travel distance

and commute time. Ideas discussed included holding depositions in major urban centers and using telephone depositions.

10. Step Five: Negotiation. Following the depositions, the parties will negotiate amounts to be paid individual deponents. Then, as previously agreed, within each stratum, the parties will compute the ratio of the sum of the negotiated Overtime amounts to the sum of the claimed Overtime amounts ("Ratio"). For each non-deponent in the stratum, the Ratio will be applied to the amount of Overtime he or she has claimed, which will provide an estimated amount of overtime that would have been negotiated, had that person been deposed. This estimated amount will be the amount to be paid such non-deponents.

11. Dispute Resolution Going Forward. The parties agree that the participation of a mediator and/or the court for resolution of issues related to their negotiated process and, potentially, the negotiation of individual pay amounts, is indispensable.

12. Legal Issues That Require Resolution. The resolution of certain legal issues will impact the negotiations in this matter. Thus, the parties have presented the following issues to the Court for resolution by summary judgment:

1. Whether the Concord Field Operations Supervisors are barred from receiving overtime pay under FLSA because they are exempt as executive employees.[1]

2. Whether the Concord Field Operations Supervisors are barred from claiming overtime under FEPA because they cannot show that their overtime work was "ordered and approved" in writing.

3. Whether plaintiffs may claim back pay under the FLSA for days in which they worked more than 8 hours per day, in weeks in which they did not work more than 40 hours.

4. Whether the claims of certain plaintiffs are time-barred either fully or partially by the FLSA's three-year statute of limitations.

13. The parties have filed cross motions for summary judgment on these issues and oral argument was held in February 3, 2005. During the time the motion is pending, the parties intend to pursue the resolution process to the extent possible.

---

[1] It is conceivable that the resolution of the issue of the exempt status of FOS, with respect to their duties, would not be finally resolved by way of summary judgment.

14. The parties agree to use their best efforts to resolve this case by March, 2006 [this now sounds unrealistic, as the original suppositions about processing did not materialize and we concentrated on the MSJs (and now a trial) instead].

15. Unaddressed/Unresolved Issues. In addition to any such issues noted above, the following issues were not resolved, but will be discussed at a later date.

a. Identifying claimants whose questionnaires demonstrate that, on their face, they are not claiming or entitled to payment. Prior to the mediation, the parties acknowledge that certain responses like "I have no interest in pursuing any overtime claim" may be a basis for elimination from the lawsuit, but the parties must agree on how to interpret ambiguous or contradictory responses.

b. Dismissal or severance of claims by those who were not employed as decennial field staff.

c. Size and choice of the certainty group.

d. Determination of other strata of respondents, and number of deponents in these strata.

e. Resolving complaints presented by plaintiffs who do not agree with their negotiated amounts.

Jack W. Lee
Attorney for Plaintiffs

Date: 2/18/05

Steven Gillingham
Attorney for Defendant

Date: 2/17/05

VERSION: February 8, 2005