**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| KENT CHRISTOFFERSON, et al., | ) | |
| | ) | Case No. 01-495C |
| | ) | |
| *Plaintiffs* | ) | Senior Judge Eric G. Bruggink |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| | ) | |
| ______________________________ | ) | |

**PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER**

Jack W. Lee
Hugo Zia
MINAMI TAMAKI LLP
360 Post Street, 8th Floor
San Francisco, CA 94108
(415) 788-9000
Attorneys of Record

## TABLE CONTENTS

**Statement of Questions**……………………………………………………………………1

**Concise Statement of the Case**………………………………………………………………2

**I. Factual Matters**……………………………………………………………………..3

**II. Memorandum of Points and Authorities**…………………………………………7

**A. Defendant's Requested Discovery Is Not Permitted Under RCFC 26(b)(1) Because It Relies on Extrinsic Evidence Barred by the Parol Evidence Rule**…..7

**1. The MOU is an Enforceable Contract**…………………………………7

**2. Defendant's Extrinsic Evidence is Barred by the Parol Evidence Rule**……..……….……….……….………..……….……….……….………9

**B. Defendant's Requested Discovery Is Not Permitted Because It Violates the Attorney-Client Privilege**……….……….………..……….……….……….……13

**C. Defendant's Requested Discovery Is Not Permitted Because It Violates the Work Product Doctrine**……..……….……….………..……….……….……….……20

**D. Defendant's Requested Discovery Will Cause Undue Burden**……..……..…..24

**III. Conclusion**………………………………………………………………………..25

# TABLE OF AUTHORITIES

## Cases

*David Nassif Assoc. v. United States*, 214 Ct.Cl. 426 (1959)……………………………………12

*EEOC v. Int'l Profit Assocs., Inc.*, 206 F.R.D. 215 (N.D. Ill. 2002) .................... 15, 16, 17, 19, 20

*First Fed. Sav. Bank of Hegewisch*, 55 Fed.Cl. 263 (2003) ................................................ 18, 19

*First Heights Bank, FSB v. United States*, 51 Fed.Cl. 659 (2001)……………………… 12, 13, 21

*First Nationwide Bank v. United States*, 431 F.3d 1342 (Fed. Cir. 2005)................................... 12

*Hughes Commc'ns Galaxy, Inc. v. United States*, 26 Cl.Ct. 123 (1992) ............................... 10, 12

*Melton v. Dept. of Health & Human Serv.*, 212 Fed Appx. 988 (Fed. Cir. 2007).......................... 7

*Silicon Image v. Genesis Microchip Inc.*, 395 F.3d 1358 (Fed. Cir. 2005) ................................... 7

*Sparton Corp. v. United States*, 44 Fed.Cl. 557 (1999)........................................................ 14, 21

*United States v. White*, 950 F.2d 426 (7th Cir.1991)................................................................. 16

*Upjohn Co. v. United States*, 449 U.S. 383 (1981).............................................. 14, 18, 19, 21, 22

## Other Authorities

ABA Code of Professional Responsibility, Ethical Consideration 4-1………………………….19

Restatement (Second) of Contracts § 209(3)................................................................................. 10

Rule 26 of the Rules of the Federal Court of Claims…………………………………………….22

Rule 26(b)(3) of the Rules of the Federal Court of Claims……………………………........20, 24

Rule 26(c) of the Rules of the Federal Court of Claims……………………………................... 24

Rule 26(c)(8) of the Rules of the Federal Court of Claims……………………………...............24

Rule 408 of the Rules of the Federal Court of Claims…………………………….......................12

This Motion seeks to protect attorney-client privileged information which the Defendant concedes is privileged yet now claims it must have, in breach of the parties' written agreement. In accordance with Rule 26(c)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the Plaintiffs, Kent Christofferson, *et al*. ("Plaintiffs"), move the Court for a Protective Order that certain requested disclosures or contemplated discovery by the Defendant be denied, specifically, its demand for copies of all of the Plaintiffs' "questionnaire responses" as well as "verbatim transcripts of the responses to the questionnaires, minus only privileged communications …." *See* Letter from Steven Gillingham to Jack Lee, dated May 25, 2007 ("Gillingham Letter"); attached to Declaration of Jack W. Lee in Support of Plaintiffs' Motion for a Protective Order ("Lee Decl."), Exh. 4. This matter was discussed at the hearing before the Court on June 26, 2007, whereupon the Plaintiffs' counsel agreed to file the instant Motion for a Protective Order ("Motion"). In support of this Motion, the Plaintiffs rely upon the pleadings and record of this action to date, the attached Declaration and Exhibits, and the accompanying memorandum of points and authorities.

## Statement of Questions

Plaintiffs' Motion presents the following questions:

1. Is the Defendant's requested discovery permitted under RCFC 26(b)?

2. Does good cause exist to grant a Protective Order under RCFC 26(c) to prevent Defendant's requested discovery?

**Concise Statement of the Case**

The Court should issue a Protective Order pursuant to RCFC 26(c)(1) – that discovery of the returned questionnaires and any other related data not already provided to the Defendant pursuant to the MOU, including notes of conversations between plaintiffs and their counsel, not be had by the Defendant.

Without a Protective Order, the Defendant would be free to demand these and related items from the Plaintiffs, even though permitting it such access would not lead to the discovery of admissible evidence under RCFC 26(b)(1). The only way in which the evidence sought by the Defendant would be relevant is if extrinsic evidence was admitted, to wit: that it "expected" to receive "verbatim transcripts" of questionnaire responses and "a log of the communications withheld upon the grounds of privilege." The parol evidence rule bars consideration of such extrinsic evidence because there is no ambiguity in the contract's terms; therefore, to permit the Defendant's request would allow it to undermine the MOU.

The Court should also not permit the requested discovery on the grounds of both attorney-client privilege and the attorney work product doctrine. The Defendant readily concedes in its Letter that it is not entitled to receive attorney-client privileged communications. Nevertheless, it still demands the returned questionnaires and responses contained therein based on the disingenuous assumption that the Plaintiffs' Counsel can simply excise any privileged material out. On the contrary, the entire questionnaire process was attorney-client privileged, as evidenced by the Attorney Letter and Notice included with every Claims Packet. Both of these

documents expressly advised the Plaintiffs of the attorney-client privileged nature of their responses and contact with counsel.

Moreover, whenever communications with an individual Plaintiff did occur, the Plaintiffs' Counsel's attorneys or Law Clerks would jot down notes of their conversations, containing their memory and impressions of oral statements made by the client. It was a common practice for the Law Clerks to jot down notes directly onto the returned Claim Form or Payroll Summary. Thus, discovery of the returned forms is also precluded by the attorney work product doctrine. Given the constraints of both privilege (readily conceded) and work product, the only information the Defendant would get after redaction is the very same MOU database information already supplied. Without a Protective Order, the Plaintiffs' Counsel would be oppressed and unduly burdened with performing a very costly exercise in futility.

Conceptually, the responses to the returned Claim Forms or Payroll Summaries are no different from, say, the first draft of interrogatory responses a client might write down for his or her counsel. It would be unthinkable for an attorney to be required to turn those over to an adversary, absent extraordinary circumstances. Yet, that is, in essence, what is being demanded by the Gillingham Letter. Accordingly, good cause exists under RCFC 26(c) for the Court to grant the instant motion for a Protective Order that discovery not be had.

## I. Factual Matters

The facts and procedural history of this case by the Court are set forth in its recent opinion, *Christofferson v. United States*, No. 01-495C, 2007 WL 1989371, at *1 (Fed. Cl. July 6, 2007) ("July 6th Opinion"). Briefly, the facts pertinent to this Motion center upon the question-

naire and subsequent data compilation procedures set forth in the Memorandum of Understanding ("MOU") executed by the parties. Lee Decl., Exh. 1. In accordance with the MOU, the questionnaire at issue – *i.e.*, the "Claim Form," was created. Lee Decl., Exh. 2. Nothing in the MOU states that the Defendant would have access to the completed Claim Forms that were returned to Plaintiffs' counsel. The MOU procedure merely contemplates providing the *data compiled* from the Claims Forms, by Plaintiffs' counsel, to the Defendant. As the MOU expressly states: "After the questionnaires are returned *and the data compiled*, the parties will examine the *data* for the purpose of dividing the returns into groups and identifying specific groups (strata) for further discovery, including deposition." MOU at ¶8; Lee Decl., Exh. 1 (emphasis added).[1]

Plaintiffs' counsel sent a Claim "Packet" to over 7,000 Plaintiffs. Lee Decl. at ¶8. Each of the Claim Packets contained four separate documents: (1) a letter signed by Jack W. Lee to the Plaintiffs ("Attorney Letter"); (2) a "Notice of Claims Procedure"; (3) the Claim Form; and (4) a "Payroll Summary" from the Census Bureau's payroll records, custom prepared for each Plaintiff. A sample Claim Packet is attached as Exh. 2 to the Lee Declaration.

Each Attorney Letter sent to the Plaintiffs had a boldface, underlined, and all-capital letter heading, titled "**<u>CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION</u>**." Lee Decl. at ¶9, attached thereto as Exh. 2. The Attorney Letter, in turn, referenced the Notice of Claims Procedure ("Notice"), which explained to the plaintiffs, *inter alia*, why they were receiving the Packet and how to fill out the Claim Form. Plaintiffs were expressly instructed in both the Attorney Letter and the Notice to contact Plaintiffs' Counsel if they had questions. *Id.*

---

[1] A sample page of the database spreadsheet with the compiled data provided to the Defendant is attached as Exh. 5 to the Lee Declaration.

Importantly, the **"What If I Have Questions?"** section of the Notice contained the following statement: "*As your attorneys, our conversations with you are confidential and protected by the attorney-client privilege*." Lee Decl., Exh. 2, Notice at 1 (emphasis added). The Defendant had ample opportunity to review the Notice and, in fact, several draft versions were exchanged between the parties without objection to the above statement. Lee Decl. at ¶10. Finally, each Plaintiff received a Payroll Summary, showing the number of paid hours worked for each week that the particular Plaintiff worked for the Census Bureau. Lee Decl. at ¶11. The Payroll Summaries were custom prepared for each individual Plaintiff by a statistician hired by the Plaintiffs' Counsel to convert the payroll data provided by the Census Bureau. Lee Decl. at ¶11.

Plaintiffs' Counsel started receiving completed Claim Forms as early as August 7, 2006; the completed Claim Forms continued to arrive through July 2007. Lee Decl. at ¶12. In order to help clients complete their Claim Packets and to answer their questions, Plaintiffs' Counsel had to hire three Law Clerks to work on a full time basis, by early September 2006. Lee Decl. at ¶13. Two more full-time Law Clerks had to be hired in ensure timely completion of the data compilation. *Id.* The Law Clerks performed their duties under the supervision of Mr. Lee or other licensed attorneys from his firm at all times. *Id.*

The Law Clerks worked on clarifying the Claim Forms, including overtime estimates, and entering the completed information into the database. Direct communications during this process occurred with thousands of the individual Plaintiffs. Lee Decl. at ¶16. In order to assist the Plaintiffs in filling out their Claim Forms as accurately and completely as possible, the Law Clerks telephoned and spoke with any Plaintiff whose returned Claim Form responses were in-

complete or unclear. *Id*. The Law Clerks made notes of their conversations, and it was a common practice for the notes to be written directly onto the returned Claim Form or Payroll Summary. *Id*. The Plaintiffs' files also include letters written to the Plaintiffs' Counsel, along with other writings, such as charts. Lee Decl. at ¶17.

Currently, all of the completed Claim Forms and Payroll Summaries are housed in the Plaintiffs' Counsel's offices. The files containing these completed forms completely occupy six lateral file drawers (each drawer being 33 inch across). Using photocopy industry standards, six lateral office file drawers would contain roughly 27,000 to 30,000 pages of documents. Lee Decl. at ¶19. If the files were stacked atop one another in a pile, the pile would be about 16.5 feet high. *Id*.

A preliminary database with the majority of claims received was submitted to the Census Bureau on February 21, 2007, via e-mail. Lee Decl. at ¶18. A copy of this database was also sent on a compact disc to the Census Bureau via overnight mail. *Id*. An updated copy containing all of the valid claims received was sent to the Census Bureau via overnight mail on June 21, 2007. *Id*. Upon receiving the database compiled by the Plaintiffs' Counsel pursuant to the MOU, Defendant's Counsel, Steven Gillingham, informed Plaintiffs, by phone and then by letter, that it has the right to receive and examine all of the actual returned Claim Forms. Lee Decl. at ¶¶20-21. As Mr. Gillingham states:

> The difficulty we have with what you have provided in lieu of the questionnaire responses is that it inhibits our ability to evaluate the credibility of the claims, determine certainty groups, and stratify the claims.… [W]e expected to receive verbatim transcripts of the responses to the questionnaires, minus only privileged communications, that is, questions or comments directed to plaintiffs' attorneys seeking legal advice.

Gillingham Letter at 2, Exh. 3 of Lee Decl. The Plaintiffs' Counsel responded both verbally and in a written letter, dated June 11, 2007 ("Lee Letter"), that it would decline to provide both the questionnaires and notes of discussions between plaintiffs and their counsel, pending possible resolution of this matter by the Court at the June 26th hearing. Lee Decl., Exh. 4 at 3. At the hearing, it was agreed that the instant Motion would be filed. Lee Decl. at ¶24.

## II. <u>Memorandum of Points and Authorities</u>

### A. Defendant's Requested Discovery Is Not Permitted Under RCFC 26(b)(1) Because It Relies on Extrinsic Evidence Barred by the Parol Evidence Rule

#### 1. The MOU is an Enforceable Contract

The MOU is a contract because, *inter alia*, it was negotiated, agreed to and executed by the parties for the purpose of resolving disputed claims in this action. "Settlement agreements are contracts." *Silicon Image v. Genesis Microchip Inc.*, 395 F.3d 1358, 1363 (Fed. Cir. 2005); *Melton v. Dept. of Health & Human Serv.*, 212 Fed Appx. 988, 990 (Fed. Cir. 2007). The MOU was developed as the "ultimate result" of ongoing settlement discussions and Court mediation, in order to facilitate and establish "an approach to resolving the claims of the [thousands of] non-Concord plaintiffs." July 6th Opinion, at *2-3. Although not a complete settlement of the litigation in this action, the MOU represents a partial settlement of the issues that were outstanding between the parties as to how to best resolve the thousands of overtime claims and is, therefore, a contract.

Moreover, the MOU is an enforceable contract because the Plaintiffs' Counsel has substantially performed in accordance with express terms of the contract and has, therefore, already

provided the bargained-for consideration contemplated by the agreement. As set forth in the July 6th Opinion, the "first step" in the MOU plan was the development of a questionnaire to be sent to the Plaintiffs. *Id*. at 3. Significantly, the Court found that agreement on the language of the questionnaire "took more than a year," and that the Plaintiffs' Counsel had performed over a period of several months to process the returned questionnaires:

> The questionnaires were mailed to the non-Concord plaintiffs in September 2006. *More than two thousand responses, or claim forms*, were returned to plaintiffs' counsel during the subsequent months. Plaintiffs' counsel *spent several months reviewing the responses to the questionnaires* and sometimes contacted individual plaintiffs when clarifications were needed.

*Id*. (emphasis added). In actuality, however, Plaintiff's Counsel had more than occasional personal contact with individual clients: contact was made with thousands of the individual plaintiffs, usually by telephone or by email. Lee Decl. at ¶16.

Once the Plaintiffs returned their questionnaires to the Plaintiffs' Counsel, the procedures in Step Three ("Processing of Questionnaires") of the MOU's four-step plan then came into play. Lee Decl., Exh. 1 at ¶7. Step Three's procedures were simple and straight-forward. First, upon receiving the returned questionnaires, Plaintiffs' Counsel would provide them to a third-party administrator ("TPA") "to be hired by plaintiff."[2] As Step Three expressly states, the TPA's only role was "*to assist the plaintiffs' counsel*." *Id*. (emphasis added). Next, the TPA was tasked with performing the following – and only the following – tasks:

> (a) create a database identifying plaintiffs, their filing dates, and questionnaire return dates; (b) compile a listing of those who have not responded by the deadline; (c) respond to questions of plaintiffs and refer them to le-

[2] The Plaintiffs' Counsel reconsidered using a TPA after the Defendant declined to share the costs; consequently, the Plaintiffs' Counsel opted instead to handle the TPA duties internally, with the Defendant's full knowledge and non-objection. Lee Decl. at ¶18.

> gal counsel; and (d) create a database that will record all relevant information contained in the questionnaire.

*Id*. That's it. The MOU says nothing about the TPA providing either a copy of the questionnaires or the raw data contained therein to the Defendant.

In good faith, the Plaintiffs' Counsel expended considerable resources, in terms of time, personnel and costs in order to comply the above Step Three procedures – thereby performing its part of the bargain under the MOU; *see* Factual Matters, *supra* at 4-5. Indeed, Minami Tamaki LLP personnel have spent over 4,000 hours processing the questionnaires, just by the Law Clerks that had to be hired to perform the processing and to create the requisite database that was ultimately provided to the Defendant. Those hours do not include the substantial amounts of attorney time expended by Mr. Lee and an associate in developing and then processing the questionnaire. Nor are the expenses for a statistician, third-party mailing agent, and overhead included. Lee Decl. at ¶18.

Accordingly, there can be no question that the MOU constitutes an enforceable contract.

**2. Defendant's Extrinsic Evidence is Barred by the Parol Evidence Rule**

The Defendant claims that it is entitled to discover all of our clients' completed questionnaire responses because this expectation on its part was "a material element of *our* ADR agreement." Lee Decl., Exh. 3 at 2. (emphasis added). Indeed, the Defendant uses the word "expected" twice.[3] The Defendant fails to explain in their letters, however, which MOU provision(s) expressly provide it with such a right. Thus, at bottom, its request is based on nothing more than self-serving, extrinsic evidence of its own pre-contract expectations – *i.e.*, unsubstan-

[3] *See* Lee Decl., Exh. 3 at 2 ("We expected to receive verbatim transcripts …. We also expected that we would receive a log of the communications withheld….")

tiated statements of its *subjective intent* during the negotiation of the MOU.

As this Court held in *Hughes Commc'ns Galaxy, Inc. v. United States*, 26 Cl.Ct. 123 (1992):

> It is axiomatic that parol evidence cannot be used to alter the terms of an integrated document, in the absence of ambiguity. The question of whether the document is ambiguous is a matter of law for the Court to decide. If the court finds ambiguity in the document, the court's next task is to ascertain the intent of the parties by viewing the *outward manifestations* of that intent.

*Id*. at 140 (citations omitted) (emphasis added).[4] In *Hughes*, the plaintiff offered a declaration from a V.P. and principal negotiator on the contract stating that the company "would not have contracted with the United States Government" had the contract permitted the government to escape contractual liability due to a change in policy. *Id*. at 140.

The Court dismissed Hughes' evidence, holding that:

> Hughes' evidence, however, reflects *little more than its subjective intent*, and thus is not relevant in construing the agreement. Hughes offers no evidence as to whether it had concerns about the Article *contemporaneous with the negotiations* of the LSA or *whether such concerns were communicated to NASA*. Thus, its evidence misses the mark.

*Id*. (emphasis added).

Here, consideration of the Defendant's extrinsic evidence is similarly barred by the parol evidence rule on two grounds. First, the MOU is unambiguous on its face: as the MOU expressly provides, only the *compiled* data from the questionnaires is to be given to the Defendant – not the questionnaires themselves, or the raw data contained therein. Here, consideration of the

[4] The MOU does not contain an integration clause, but a contract can be an integrated agreement without one. *See, e.g.,* Restatement (Second) of Contracts § 209(3) ("Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.")

Defendant's extrinsic evidence is similarly barred by the parol evidence rule on two grounds. First, the MOU is unambiguous on its face: as the MOU expressly provides, only the *compiled* data from the questionnaires is to be given to the Defendant – not the questionnaires themselves, or the raw data contained therein. Rather, the term compiled means processed, and in the context of the MOU, that means processed into an electronic format for the thousands of anticipated claimants. Electronically formatted data, in turn, has to be in a binary format, *i.e.*, on/off or yes/no. Given this structural limitation, the fields in the database had to be designed so that the data recorded in each field were in a yes/no (or true/false) format, including the responses to question no. 17. The statistician's services were required to assist in the database design to ensure that, *inter alia*, the responses to question no. 17 were properly recorded in an electronic format. There is simply no way to compile an electronic database to capture narrative responses of thousands of individuals. Lee Decl. at ¶14.

Furthermore, under ¶7 of the MOU, the Plaintiffs' Counsel is tasked only with "creat[ing] a database that will *record all relevant information contained in the questionnaire*." (emphasis added). The MOU does not say that, in addition to this database, the Defendant would have access to the actual Claim Forms and Payroll Summaries. Had this been intended by the parties, there would have been no need for the Plaintiffs' Counsel to have processed and compiled the data. Rather, it would have simply handed over the completed questionnaires with raw data to the Defendant, thereby rendering as superfluous both ¶7 and all if its carefully crafted data compilation procedures that have already been performed – and at considerable expense.. Thus, the Defendant's request must also be rejected as violating a cardinal rule of contract interpretation:

that "a contract is construed to give effect to all of its provisions. . . ." *First Nationwide Bank v. United States*, 431 F.3d 1342, 1347 (Fed. Cir. 2005). This principle "does not exempt contracts with the United States." *Id*.

Second, its statements regarding its expectations merely reflect *its subjective intent* during the negotiation phase of the MOU; again, it offers no other evidence of "outward manifestations of intent." *Hughes*, 26 Cl.Ct. at 140 (quoting *David Nassif Assoc. v. United States*, 214 Ct.Cl. 426, 439 (1959)). Nor does the Defendant offer evidence as to whether it had concerns, contemporaneous with the MOU negotiations, related to its subjective expectations.[5] Similarly, in *First Heights Bank, FSB v. United States*, 51 Fed.Cl. 659, 666 (2001), this Court rejected an attempt by the government to seek discovery "regarding the plaintiffs' *subjective opinion, at the time the contract was entered into,* about the availability, usefulness, and importance of the covered asset loss deduction." *Id.* (emphasis added). Such evidence, however, would have had the effect of contradicting – and thereby undermining – the contract:

> The granting of defendant's request would not lead to the discovery of admissible evidence. *The only way in which the evidence sought by defendant would be relevant would be to undermine the Assistance Agreement's definition of the covered asset loss deduction as a Tax Benefit Item.* As such, this evidence defendant hopes to discover is inadmissible under the parol evidence rule that 'extrinsic evidence will not be received to change the terms of a contract that is clear on its face.'

*Id*. (citations omitted) (emphasis added).

---

[5] The Gillingham Letter states that its intent "was reflected in our refusal to accede to a provision contained in an August 2004 [draft MOU] which provided that the Defendant would only have access to the questionnaires of those plaintiffs selected for deposition." Lee Decl, Exh. 3 at 2. It should be noted, however, that the Plaintiffs' Counsel's offer of questionnaire access during depositions was a concession made during the course of settlement negotiations under Rule 408; that offer was later withdrawn. Lee Decl. at ¶21.

Thus, as in *First Heights*, the Court should reject the Defendant's attempt to, in effect, change contractual terms that are clear on their face and, thereby, undermine the MOU – an integrated agreement that was forged from court-supervised mediation and months of negotiation. Accordingly, good cause exists for the Court to grant the instant Motion in order to protect the Plaintiffs from the oppression and undue burden that would result from an undermining of the MOU.

**B. Defendant's Requested Discovery Is Not Permitted Because It Violates the Attorney-Client Privilege**

As noted above, the Defendant readily concedes that it cannot discover attorney-client privileged information. Of course, the Defendant has no choice, and for several obvious reasons. First, the MOU it negotiated and fully executed contains a provision in ¶7 expressly recognizing that "communications between plaintiffs and the TPA will not be considered a waiver of any applicable attorney-client and work product privilege." Second, the language in the Notice – which the Defendant had the opportunity to review and object to – contains an express warning, at the bottom of the first page, that only conversations with the Plaintiffs' Counsel were "protected by the attorney-client privilege." Thus, by agreeing to these provisions in the MOU and Notice, the Defendant had, at the very least, tacitly recognized the attorney-client and work product privileged nature of the questionnaire process.

Furthermore, the Plaintiffs' Counsel assumed the role of the TPA in ¶7 of the MOU. The fact that the Defendant agreed to this arrangement demonstrates it knew and understood that communications to occur between the Plaintiffs and their counsel during the data processing

phase were protected by privilege. Inexplicably, the Defendant now attempts to circumvent the MOU by asserting a right to the returned questionnaires, including the statements contained therein from our clients, on the ground that such material is discoverable. Its reasoning is fundamentally flawed, as shown by case law that is directly on point

The attorney-client privilege "provides *unqualified, absolute protection*" to communications both "made by a client to an attorney for the purpose of obtaining legal advice" and "the legal advice and opinion communicated from the attorney to the client." *Sparton Corp. v. United States*, 44 Fed.Cl. 557, 566 (1999) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (emphasis added). The facts in *Upjohn* are strikingly analogous to ours. There, an internal investigation was conducted in which company attorneys prepared a letter containing a questionnaire; the questionnaire sought detailed information about possible bribe payments made to foreign government officials. The letter was distributed to various employees over the company chairman's signature, with instructions to treat it as "highly confidential," and to return the completed questionnaire to the general counsel. The general counsel and outside counsel subsequently interviewed the employees who responded to the questionnaire. After completing a preliminary report of investigation, a copy was submitted to both the SEC and the IRS. The IRS began an investigation and issued a summons demanding production of the written questionnaires and notes of the interviews. The Court held that the communications from the employees to company counsel were protected as privileged and that this determination also "disposes of the case so far as *the responses to the questionnaires* and *any notes reflecting responses* to interview questions are concerned." *Id*. at 397 (emphasis added).

A more recent and also strikingly similar case to ours is *EEOC v. Int'l Profit Assocs., Inc.*, 206 F.R.D. 215 (N.D. Ill. 2002) ("IPA"). There, the EEOC filed suit against IPA on behalf of a class of about 2000 IPA female employees involving intentional discrimination and sexual harassment against women. *Id*. at 217. After the EEOC had filed the suit, it sent a letter and "Questionnaire to Potential Class Members" out to the 2000 current and former employees. *Id*. The women then initiated contact with the EEOC attorneys by telephone or by returning the questionnaire. *Id*. Both EEOC counsel and other employees under their direction conducted telephone interviews of the women who responded to the letter. *Id*. In the interviews, each woman was asked if they wanted to be a class member and have the EEOC represent her. *Id*. The interviewers were also instructed to inform each woman that the communications were confidential, but the IPA would receive a summary of the facts. *Id*. In response to interrogatories served by IPA, the EEOC provided the names of 120 women identified as belonging to the class, along with a factual summary of the interview. *Id.* at 217-18. The IPA, "not satisfied with the factual summaries" of the interviews, filed a motion to compel production of the notes of all interviews. The EEOC asserted attorney-client privilege and the work product doctrine. *Id*. at 218.

The court then applied the general principles for finding the existence of attorney-client privilege that were set forth by Wigmore, and are followed in the Seventh Circuit:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Id*. (citing *United States v. White*, 950 F.2d 426, 430 (7th Cir.1991)). The court concluded that the post-suit interviews "fit within the definition provided by Wigmore, and as such, unless waived, are protected by attorney-client privilege." *Id*.

The following side-by-side comparison of the facts demonstrates the uncanny similarities between this case and *IPA*:

| **<u>EEOC v. IPA</u>, 206 F.R.D. 215 (N.D. Ill. 2002)** | **<u>Our Case</u>** |
|---|---|
| 1. Letter and questionnaire sent to about 2,000 present and former employees who were prospective class members. *Id*. | 1. Letter, Notice, Questionnaire and Payroll Summary sent to over 7,000 existing plaintiffs, already represented by Plaintiffs' Counsel. |
| 2. "After receiving this information, women responded by initiating contact with counsel for the EEOC for the purpose of participating in this lawsuit by telephone or by returning the questionnaire." *Id*. | 2. Plaintiffs also initiated contact with counsel by returning their completed questionnaires, and/or by calling the toll-free hotline or sending emails or letters. |
| 3. Questionnaire contained ID information – name, SSN, sex, address, telephone numbers, dates worked at IPA, position held, supervisor's name. *Id*. | 3. Same, except for the narrative response requested in ¶17 of the Claim Form. Narrative responses to other questions on the form were sometimes supplied as well. |
| 4. Although the EEOC did produce the questionnaires, it should be noted that – unlike here – the EEOC's returned questionnaires contained only the straight, factual ID information noted above. *Id*. at 217-18. | 4. The data agreed to be provided under the MOU was compiled in a database and delivered to the Defendant; this information obtained from the Plaintiffs is strictly factual data that is equivalent to the EEOC questionnaire responses. |
| 5. EEOC conducted telephone interviews with women who responded to the letter. *Id*. at 218. | 5. Same, though legal advice was provided to Plaintiffs, since they were already clients, in |

| | |
|---|---|
| | order to assist them in establishing their claims. |
| 6. EEOC provided factual summaries of their interviews in interrogatory responses. *Id*. | 6. The ¶17 narrative responses were compiled into the database by classifying them into eight categories, five of which were listed in the Notice as examples of a supervisor's knowledge of overtime work. The Defendant agreed to the language contained in the Notice. The providing of these categories is equivalent to the EEOC's factual summaries. |
| 7. Defendant filed a motion to compel production of interview notes because it "wasn't satisfied" with the summaries. *Id*. | 7. Same: Defendant is not satisfied with the use of the very categories that it agreed to be used as the examples of supervisor knowledge in the Notice. |

Although the EEOC turned over the questionnaires to the defendant in IPA, as the matrix above notes, this is a distinction without a difference because the database turned over to the Defendant was the factual equivalent of the questionnaire in *IPA*. Moreover, the database information produced here was the result of negotiation and contractual agreement between the parties. Unlike *IPA*, the Plaintiffs here were already existing clients represented by the Plaintiffs' Counsel in existing litigation. If interview notes with prospective clients/class members in *IPA* were afforded attorney-client privileged protection, then *a fortiori*, notes of conversations with existing clients and plaintiffs here should also be protected from discovery.

As existing clients, the fact that Plaintiffs responded to their Attorney Letter demonstrates their reliance on the representations of confidentiality. Many of the Plaintiffs called, asking for legal assistance in filling out their Claim Forms and Payroll Summaries. Indeed, the purpose of

the privilege is "to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *UpJohn*, 449 U.S. at 390. The purpose of the privilege is also to encourage "complete disclosure of information . . . by a client to the attorney during the attorney-client relationship." *First Fed. Sav. Bank of Hegewisch*, 55 Fed.Cl. 263, 266 (2003). The Plaintiffs' Counsel had established a toll-free phone number back in 2001 for that very purpose, to invite such calls from the Plaintiffs. Lee Decl., at ¶9. Thus, the Plaintiffs would have viewed the Claim Packet as a continuation of their existing attorney-client relationship with the Plaintiffs' Counsel.

The Plaintiffs openly discussed with counsel details about their work with the Census Bureau; the Plaintiffs' Counsel's Law Clerks then provided advice and guidance to each Plaintiff about how to fill out his/her Claim Form and Payroll Summary. Lee Decl. at ¶¶14, 16. Plaintiffs then used this information when completing the forms, including data, figures, and notes from the advice given to them. *Id*. at ¶14, 16-17 Based on their Claim Packets' representations of attorney-client privilege protection, Plaintiffs freely sent letters to the Plaintiffs' Counsel describing their claims and experiences while working for the Census Bureau, including charts demonstrating their overtime on a daily and weekly basis, and they openly responded to questions on the Claim Forms that called for written explanation. *Id*. at ¶17. Many of these letters were addressed specifically to Mr. Lee. *Id*. The willingness of the Plaintiffs to speak freely with counsel was tempered, however, by the apprehension of some Plaintiffs who feared retaliation by the Census Bureau if they claimed overtime. *Id*. at ¶15. Clearly, the Plaintiffs intended to communicate only with their attorneys, not with third parties or opposing counsel.

Further, the conversations between the Plaintiffs' Counsel's Law Clerks and the Plaintiffs were *prima facie* attorney-client privileged. *See*, *e.g.*, *Hegewisch*, 55 Fed.Cl. at 266. By contacting Plaintiffs whose returned questionnaire estimates were not clear or incomplete, the Law Clerks offered advice to the Plaintiffs on how to complete their claims via telephone and e-mail. Lee Decl. at ¶16. In so doing, the Law Clerks were, in effect, offering clients legal advice on their claims in these legal proceedings. As the Supreme Court stated in *Upjohn*: "The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." 449 U.S. at 390-91 (citing to ABA Code of Professional Responsibility, Ethical Consideration 4-1:"A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system."). Thus, the Wigmore standard cited in *IPA* for finding attorney-client privilege is more than satisfied.

The Defendant already has, in hand, all of the non-privileged data that the Plaintiffs' Counsel had compiled from the questionnaire. *See* Lee Decl., Exh. 5, for a sample page from the database. Anything additional, including the completed forms themselves, would be protected by attorney-client privilege. The holding in *Upjohn* bears repeating: the determination of privilege "disposes of the case so far as *the responses to the questionnaires* and *any notes reflecting responses* to interview questions are concerned." *Id*. at 397 (emphasis added). Accordingly, the "unqualified, absolute" protection against oppression and undue burden afforded by the attorney-client privilege applies here, and good cause exists for granting of a Protective Order.

//

**C. Defendant's Requested Discovery Is Not Permitted Because It Violates the Work Product Doctrine**

RCFC 26(b)(3) allows discovery of "documents and tangible things" that are prepared in anticipation of litigation or for trial by or for another party only when the party seeking discovery can show substantial need of the materials and is unable—without undue hardship—to obtain the substantial equivalent of the materials by other means. To assert the attorney work product doctrine, a party must establish two requirements: (1) that the material sought to be protected from discovery was prepared in anticipation of litigation; and (2) that actual litigation exists.

As already noted, the Claim Forms and Payroll Summaries, including the Plaintiffs' written responses to the questionnaire, fall precisely within this definition. These forms were created during and as a result of the litigation between parties. Subsequently, the Plaintiffs received the questionnaire in order to complete their individual claims, both after the litigation already commenced and in the midst of that litigation. In the *IPA* case, the court found that the interview notes were covered by the work product doctrine because "[n]ot only was litigation already in fruition, these interviews produced articulable claims likely to lead to trial." 206 F.R.D. at 221. Likewise, here the records of contacts with the Plaintiffs reflect the efforts made by the Plaintiffs' Counsel to advance their overtime claims.

Moreover, the questionnaire forms are inextricably intertwined with work product. As part of their effort to clarify the Claim Packet materials, including overtime estimates, direct communications with individual Plaintiffs occurred with thousands of the Plaintiffs. Lee Decl. at ¶16. The Law Clerks telephoned and spoke with Plaintiffs whose returned form responses were

incomplete or unclear in order to assist them in filling out their forms as accurately and completely as possible. *Id*. The Law Clerks made notes of their conversations with the Plaintiffs, and it was their common practice to write notes directly onto the returned Claim Forms or Payroll Summary documents from the Plaintiffs. *Id*.

As this Court has held, the work product doctrine "requires a two-tiered approach" in which material prepared in anticipation of trial may be obtained only "after a showing of substantial need and the inability to obtain substantially equivalent materials without undue hardship." *First Heights Bank v. United States*, 46 Fed. Cl. 827, 829 (2000). Even after this showing is made, however, the court is required to take extra care to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Id*. Concerning the latter category of attorney opinion work product, the *Sparton* court held that:

> Opinion work product, unlike ordinary work product, is afforded nearly absolute protection from disclosure. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney.

44 Fed. Cl. At 565 (citation omitted). The Law Clerks' notes would, of course, have included statements drawn from the Law Clerks' memory and mental impressions of oral statements made by Plaintiffs, and, therefore, would squarely meet the definition of classic opinion work product. *Id*. at 564 ("an attorney's memory, notes and impressions of oral statements of witnesses interviewed in the course of preparing for litigation are also a form of opinion work product which merits special protection") (citing *Upjohn*).

In *Upjohn*, the Supreme Court held that both the attorney-client privilege and the attorney work product doctrine protected the questionnaire responses and notes of the interviews from discovery:

> The notes and memoranda sought by the Government here, however, are work product based on oral statements. If they reveal communications, they are, in this case, protected by the attorney-client privilege. To the extent they do not reveal communications, they reveal the attorneys' mental processes in evaluating the communications. As Rule 26 and *Hickman* make clear, such work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship.

449 U.S. at 401. There is no reason for a different result here. Any communications with the Plaintiffs, including their responses to the questionnaires, are attorney-client privileged, and to the extent any conversations occurred with the Plaintiffs' Counsel or its agents, any notes from those conversations are protected by the attorney work doctrine.

The Defendant claims it requires more complete information than the data already provided for the responses to question no. 17 – *i.e.*, the entire narrative responses given by the Plaintiffs. Lee Decl., Exh. 3 at 3. Specifically, the Plaintiffs were first asked, in question no. 16: "Do you believe your supervisor knew or had reason to know that you worked overtime prior to your working overtime?" Claim Form, Lee Decl. at Exh. 5. Question no. 17 then posed a follow-up question:

> If you answered yes to Question 16, explain *why* you believe your supervisor knew or had reason to know that you worked overtime prior to your working the overtime. (Please refer to pages 2 and 3, 'What is Overtime?' for examples of *how* your supervisor knew or should have known about your working overtime.)

*Id*. (emphasis added).

The Gillingham Letter claims that the Plaintiffs' Counsels' "one-line categories" make it impossible for the Defendant to tell "at *which point* the supervisor became aware of the alleged overtime." Lee Decl., Exh. 3 at 2 (emphasis added). But the issue of precisely *when* a supervisor became aware of the overtime is not asked in question no. 17. Rather, the Plaintiffs were only asked to explain *why* they believed a supervisor "knew or had reason to know that you worked overtime prior to your working the overtime." Regardless of how essential it is that Defendant know at which point each supervisor became aware of an employee's overtime, Defendant will not find that information by discovering the Claim Forms and Payroll Summaries because the question was simply never asked.

It should be noted, however, that the data already provided by the Plaintiffs' Counsel for the responses to question no. 17 (the "one-line categories") *affirmatively answer why* Plaintiffs believe that their supervisors knew that they worked overtime prior to their working the overtime. In fact, five of the categories used in the database expressly answer this question: (1) Supervisor asked me to work overtime; (2) Supervisor told me to work until job complete; (3) Supervisor told me to rollover OT hrs; (4) Supervisor worked alongside me; and (5) Supervisor saw me early am and late at night. *See* sample database page, Lee Dec., Exh. 5 at fields P through X. Under any of these five categories, the supervisor would have had either actual knowledge or constructive knowledge of the employee working overtime. *These are precisely the same five examples listed in the Notice that the Defendant had reviewed and approved during the course of the year-long questionnaire negotiations.* Thus, any complaint now by the Defendant about the

data for the responses to question no. 17 as "not useful" is either disingenuous or a case of "buyer's remorse" – or both.

Any expectation by the Defendant to learn "*at which point* the supervisor became aware of the alleged overtime" is simply that, an expectation. The Claim Form clearly only asks *why* a Plaintiff believed the supervisor knew or had reason to know about overtime worked; it does not ask for the *precise moment when* a supervisor knew. The Defendant simply cannot demonstrate a substantial need under RCFC 26(b)(3) for information that never was collected.

Accordingly, the Defendant's requested discovery is not permitted because it would violate the attorney-work product doctrine, and the Defendant cannot satisfy its burden under RCFC 26(b)(3) of substantial need and undue hardship.

**D. Defendant's Requested Discovery Will Cause Undue Burden**

Good cause for the issuance of this Motion also exists under RCFC 26(c) because allowing the Defendant's request will cause an undue burden on the Plaintiffs' Counsel. As noted above, the files that have been amassed during the collection of the data from the Plaintiffs are voluminous, occupying six full lateral office file drawers. Using photocopy industry standards, six lateral office file drawers would contain roughly 27,000 to 30,000 pages of documents. Lee Decl. at ¶7. Put another way, if the files were stacked atop one another into pile, the pile would be about 16.5 feet high. *Id*. It would be extremely burdensome, expensive and unreasonable to expect the Plaintiffs' Counsel to go through every file, redact all privileged information, and create a privilege log – especially when the end result would be to hand over *the same database information already been produced* to the Defendant. Pursuant to Rule 26(c)(8), the Plaintiffs'

Counsel has also filed, under seal, a sample of some client files to assist the Court's good cause determination, *in camera*.

Accordingly, good cause exists to issue the Motion based on undue burden.

## III. Conclusion

In sum, the Defendant's requested discovery cannot be permitted without violating the parol evidence rule, and to do so would undermine the unambiguous terms of the contract, thereby oppressing the Plaintiffs and causing undue burden and expense. The requested discovery also violates both the attorney client privilege and the attorney work product doctrine. For the foregoing reasons, the requested Motion for Protective Order should be granted.

DATED: August 3, 2007

Respectfully submitted,
MINAMI TAMAKI LLP

s/______________________________

JACK W. LEE
360 Post St. 8th Floor
San Francisco, CA 94108-4903
Telephone: (415) 788-9000
Fax: (415) 398-3887