**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| KENT CHRISTOEFFERSON, et al., Plaintiffs | Case N. 01-495C |
| v. | Senior Judge Eric G. Bruggink |
| UNITED STATES OF AMERCA, Defendant. | **Declaration of Jack W. Lee in support of Plaintiffs' Motion for a Protective Order** |

Pursuant to the Rules of the U.S. Court of Federal Claims, I, Jack W. Lee, declare as follows:

1. I am the attorney of record for the Plaintiffs in the above-captioned civil action, and a partner with the law firm of Minami Tamaki LLP. I have personal knowledge of the following facts and can testify regarding these facts if called to do so.

2. Attached hereto as Exhibit 1 is a true and correct copy of the February 17-18, 2005, Memorandum of Understanding.

3. Attached hereto as Exhibit 2 is a true and correct copy of the Claim Packet, which includes, in full: 1) a letter from Plaintiffs' counsel to class members; 2) the Notice of Claims Procedure; 3) a Claim Form (questionnaire); and 4) a Payroll Summary.

4. Attached hereto as Exhibit 3 is a true and correct copy of Mr. Gillingham's May 25, 2007 letter to Plaintiff's Counsel.

5. Attached hereto as Exhibit 4 is a true and correct copy of Plaintiffs' Counsel June 11, 2007 letter to Mr. Gillingham.

6. Attached hereto as Exhibit 5 is a copy of the first page of the spreadsheet sent to Defendant on June 20, 2007, with column width, row height, and text alignment slightly modified, for easier viewing in hard copy format.

7. As Plaintiffs' Counsel, my firm has completed what the Memorandum of Understanding (MOU) currently requires. Specifically, we administered a questionnaire, the "Claim Form," which was sent to approximately 7,000 class members to elicit information about their overtime worked. The MOU does not provide the Census Bureau with access to the completed claim forms that the Plaintiffs returned to us. On the contrary, as the Third Party Administrator ("TPA") in Step Three (¶7) of the MOU, my firm created a database to "record all relevant information contained in the questionnaire."

8. This questionnaire was sent out as part of a Claim Packet to all 7,000 Plaintiffs on or around August 1, 2006. The Claim Packet consisted of four documents: 1) an Attorney Letter signed by me to the class members; 2) the Notice of Claims Procedure; 3) a Claim Form (questionnaire); and 4) a Payroll Summary, which was a document created specifically for each individual plaintiff by my firm.

9. The Attorney Letter explained the case and instructed each plaintiff on what to do to continue asserting his or her claim. At the top of this letter, the words "**CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**" were printed in all capital letters, in boldface type, and underlined. The Notice of Claims Procedure ("Notice") explained to the Plaintiffs: why they were receiving the Claim Packet; what to do if they needed help filling out the questionnaire; and general information about the lawsuit. The Attorney Letter, as well as the Notice of Claims Procedure, instructed Plaintiffs to contact my firm if they had any questions, either by telephone or e-mail. Both documents also directed class members to call our toll-free

hotline, 1-888-528-9707, with questions. My firm had previously informed class members of the hotline in September 2001; since then, class members have relied on it to leave confidential messages to Counsel.

10. The "What If I Have Questions?" section of the Notice contained the language, "As your attorneys, our conversations with you are confidential and protected by the attorney-client privilege. However, any communications you have with persons outside this law firm about your claim are not confidential." The Notice was reviewed by the Defendant during the questionnaire negotiations. Although several drafts of the Notice were exchanged electronically between both parties' counsel, the Defendant did not attempt to eliminate the above-quoted language.

11. A statistician, using the payroll data we received from the Census Bureau, created a Payroll Summary specific to each individual. This document showed the number of hours, per week, for which each Plaintiff was paid. This document was intended to help Plaintiffs estimate their overtime hours.

12. We began receiving completed questionnaires as early as August 7, 2006. The questionnaires continued to arrive through July 2007; as of July 3, 2007, 2,807 Claim Forms and Payroll Summaries were received, although not all of these contained valid claims. Anything received after November 29, 2006, was considered "late," unless an exception was made due to the late receipt of payroll data, thereby delaying the creation of a Payroll Summary. In early October 2006, a statistician, again using the payroll data from the Census Bureau, created a database of this information, organized by a Plaintiff's last name, then by first name, and finally by weeks worked, in chronological order.

The database included the fields: Employee name, SSN, LCO Code, LCO Name, Position, Pay Period End Date, Regular Hours Paid, Training Hours Paid, Overtime Hours Paid, and Total Hours Paid. In addition to the fields created by the data supplied by the Census Bureau, our statistician also created the following fields: Regular Hours Claimed; Rollover Hours Claimed; Overtime Hours Claimed; Claim Form Signed Under Penalty of Perjury; whether the class member wished to decline further participation in the lawsuit; whether the class member's supervisor knew that the employee was working overtime prior to his working overtime (Question 16 on the Claim Form); and finally, whether the claim was an estimate (Question 13 on the Claim Form). Within the last two fields were subfields to allow an answer in greater depth. Under the "supervisor knowledge" field were nine categories: (16a) I told/complained to my Supervisor that I worked OT; (16b) I saw others denied OT so did not claim myself; (16c) Supervisor asked me to work overtime; (16d) Supervisor told me to work until job complete; (16e) Supervisor rejected my timesheet with OT; (16f) Supervisor told me to rollover OT hrs; (16g) Supervisor worked alongside me; (16h) Supervisor saw me early am and late at night; and (16i) Supervisor denied travel time.

13. By early September 2006, my firm hired three full-time law clerks to assist a full-time associate in the processing of the questionnaires, including answering plaintiffs' questions and ensuring the incoming questionnaires were completely filled out. By mid-October, the firm hired two more law clerks to ensure timely processing of the questionnaires and completion of the database. The five clerks ("the Law Clerks") performed these duties under my supervision and under the supervision of other licensed attorneys from our firm at all relevant times.

14. Once a questionnaire was returned to our office, the Law Clerks would follow the procedures in Step 3 of the MOU. When a Law Clerk received a questionnaire for processing or

communicated with a Plaintiff, the Law Clerk would create a file for the Plaintiff using a manila folder, allowing all of the Plaintiff's documents to be kept together. The Law Clerks, as well as the associate attorney directly supervising them, responded to Plaintiffs' telephone calls and questions about, and advised them on, how to complete the Claim Packets, telephoned Plaintiffs as necessary in order to complete the forms or to clarify ambiguous claims or responses. The Law Clerks then entered all of the data contained on the Claim Forms and Payroll Summaries into a database.

The Law Clerks assigned the narrative response to question no. 17 on the Claims Form into the nine sub-categories noted above in ¶12. These categories were devised because the MOU database required the compiling of data from the Claim Form into an electronic format for the thousands of anticipated claimants. Electronically formatted data, in turn, has to be in a binary format, *i.e.,* on/off or yes/no. Given this structural limitation, the fields in the database had to be designed so that the data recorded in each field were in a yes/no (or true/false) format, including the responses to question no. 17. The statistician's services were required to assist in the database design to ensure that, *inter alia*, the responses to question no. 17 were properly recorded in an electronic format. There is simply no way to compile an electronic database to capture narrative responses of thousands of individuals.

15. When calling a Plaintiff, the Law Clerks identified themselves as calling from "Minami Tamaki, the law firm representing 2000 Census workers in the case against the Census Bureau for unpaid overtime" or similar words to that effect. Some callers expressed apprehension about claiming unpaid overtime because they feared the Census Bureau would retaliate by, for example, not hiring them for the next Census in 2010.

16. The Law Clerks have communicated, via phone and/or e-mail, with thousands of the Plaintiffs. In some cases, returned claim forms were not finished; *e.g.*, Plaintiffs left their Payroll Summary blank or failed to answer some of the required questions. In other cases, Plaintiffs' estimates were not clear: overtime estimates may have represented straight time, overtime, or rollover time. Because we wanted to accurately enter all of the estimates, the Law Clerks would telephone Plaintiffs to clarify this information. Plaintiffs also called the firm, either via the toll-free hotline or the direct firm telephone line, for help in filling out their claim forms. During the telephone conversations, which number in the thousands, the Law Clerks would take notes, but did not make verbatim recordings of the calls. Many Plaintiffs noted that they had signed their questionnaires under penalty of perjury and that they took the duty to tell the truth seriously. Consequently, if changes needed to be made to a Claim Form or Payroll Summary, Plaintiffs frequently requested that the Law Clerks make the changes since they were already in our possession. Hand-written notes by my staff were often made directly on the Claim Forms and Payroll Summaries.

17. Also included in Plaintiffs' files are letters addressed to me, in which Plaintiffs delineate their claims, narrate their experiences about working for the Census Bureau, and reflect upon conversations they had with counsel. Plaintiffs also included figures, notes, and charts regarding overtime hours that were worked. These files are organized by Plaintiff, and attorney or Law Clerk notes are also interspersed with the Claim Forms and Payroll Summaries.

18. The data contained in each questionnaire was transferred into the database. This complied with our duties under the MOU at ¶ 7. I decided to have my firm assume the role of the TPA in ¶7 after the Defendant declined to share in the costs of a TPA. The Defendant did not object. A preliminary database with the majority of claims received was submitted to the

Census Bureau on February 21, 2007, via e-mail. A copy of this database was also sent on a compact disc to the Census Bureau via overnight mail. An updated copy containing all of the valid claims received was sent to the Census Bureau via overnight mail on June 21, 2007. Although a total of 2,806 Claim Forms and Payroll Summaries were received, Plaintiffs' Counsel was careful to cull out a number of plaintiffs who were not eligible for various reasons: *e.g.,* they worked in 1999, were clerical rather than field employees, missed deadlines, or failed to claim any overtime on their Payroll Summaries. These plaintiffs' overtime estimates were not included in the database. By the time the database was completed, my firm had expended over 4,000 hours of the Law Clerks' time in processing the questionnaires. Those hours do not include the substantial amounts of attorney time expended by me or associates in developing and then processing the questionnaire. Nor are the expenses for a statistician, third-party mailing agent, and overhead included.

19. All of the completed Claim Forms are housed in my firm's office within filing drawers and bankers' boxes. The files completely occupy six lateral file drawers (each drawer being 33 inch across). According to a Pitney Bowes company representative, the standard industry rule of thumb is that a standard lateral office file drawer can hold about 4500 to 5000 pages of documents. Thus, six drawers would hold between 27,000 and 30,000 pages. If the files were stacked atop one another in a pile, the pile would be about 16.5 feet high. It would be extremely burdensome and expensive for my firm to have to now review every single file in order to redact privileged or work product protected material. It would also be futile, and thus a complete waste of time and money, because redaction will ultimately result in the same data being produced to the Defendant that is already in the compiled database – which was given to the Defendant.

20. In or around March 2007, Defendant's counsel first raised the issue of receiving all of the returned Claim Forms and Payroll Summaries in order to examine Plaintiffs' answers and to ensure that our Law Clerks did not augment the number of hours each Plaintiff claimed. I informed Mr. Gillingham that the Claim Form questionnaires were confidential because of both attorney-client privilege and attorney work product doctrine. Mr. Gillingham did not desist from his requests.

21. Mr. Gillingham sent a letter—dated May 25, 2007—to us detailing his client's request to receive the Claim Forms and Payroll Summaries. On June 11, 2007, I replied to Mr. Gillingham's letter, explaining that the MOU contains no basis for the Defendant to expect to receive "verbatim transcripts of the responses to the questionnaires, minus only privileged communications." Additionally, I provided Mr. Gillingham with legal arguments regarding why both attorney-client privilege and attorney work product doctrine protect the Plaintiffs' actual responses to the questionnaire. I also noted that we would be requesting a case management conference on June 26, 2007, following oral arguments for the motion for leave to file a second amended complaint, for a possible resolution to this matter.

22. In his letter, Mr. Gillingham argues that Defendant's intent to discover the entirety of the questionnaires was reflected in its refusal to agree to a proposed provision in a August 2004 draft of the MOU that provided that Defendant would be able to discover the questionnaires of those class members actually deposed. While the questionnaires are privileged communications, I felt that, as a settlement concession only under FRE Rule 408, my firm could redact privileged information since only a few of the class members would actually be deposed. That concession has since been withdrawn.

23. On June 26, 2007, both parties' counsel in this case appeared before Judge Bruggink and began discussing this issue. It was agreed in an off-the-record discussion with the Court that I would file a Motion for a Protective Order.

24. Concurrently filed under seal with this Motion for Protective Order is a sample of some of the Plaintiffs files that were created by my firm during the course of our administration of the MOU questionnaire process. We have filed these sample documents under seal, in accordance with RCFC 26(c), to assist the Court in its determination of whether good cause exists to issue a Protective Order, based on oppression and undue burden and expense. However, because the sealed documents are only to be viewed the Court, we cannot file them electronically and will be filing them instead by overnight mail.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 13th day of February 2007 in San Francisco, California.

Dated: August 3, 2007

Jack W. Lee
Attorney for the Plaintiffs