No. 01-495C
(Judge Bruggink)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KENT CHRISTOFFERSON, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Attorneys For Defendant

OF COUNSEL
JOHAHNA JOHNSON
Office of the General Counsel
Department of Commerce
Bureau of the Census
Suitland, MD 20746-24

September 14, 2007

## TABLE OF CONTENTS

**PAGES**

DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER . . . . . 1

STATEMENT OF THE ISSUES . . . . . 1

STATEMENT OF THE CASE . . . . . 1

I. The Complaint And Course Of Proceedings . . . . . 1

II. The Questionnaire . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . 7

ARGUMENT . . . . . 8

I. Withholding The Non-Privileged Responses Is A Breach Of The MOU . . . . . 8

II. The Requested Information Is Not Privileged . . . . . 12

A. The Requested Information Is Not Protected By The Attorney-Client Privilege . . . . . 12

B. The Requested Information Is Not Protected By The Work-Product Doctrine . . . . . 17

III. A Protective Order Is Not Warranted Because Plaintiffs Have Failed To Show Cause . . . . . 17

SUMMARY . . . . . 19

CONCLUSION . . . . . 20

## TABLE OF APPENDIX

Description — Exhibit Number

Excerpts of Transcript of November 1, 2006 Hearing . . . . . . . . . . 1

Email from Steve Gillingham to Jack Lee, dated 12/18/06 . . . . . . . . . . 2

Email from Jack Lee to Steve Gillingham , dated 1/17/07 . . . . . . . . . . 3

Excerpts of Transcript of June 26, 2007 . . . . . . . . . . 4

Declaration of Dr. Cantwell . . . . . . . . . . 5

## TABLE OF AUTHORITIES

**CASES** — **PAGES**

AAB Joint Venture v. United States,
75 Fed. Cl. 448 (2007) . . . . . . . . . . 13, 14, 15

Cabot v. United States,
35 Fed. Cl. 442 (1996) . . . . . . . . . . 14

Christofferson v. United States,
67 Fed. Cl. 68 (2005) . . . . . . . . . . 3

Christofferson v. United States,
77 Fed. Cl. 361 (2007) . . . . . . . . . . 1

Duplan Corp. v. Deering Milliken, Inc.,
397 F.Supp. 1146 . . . . . . . . . . 13

EEOC v. Int'l Profit Assocs., Inc.,
206 F.R.D. 215 (N.D. Ill. 2002) . . . . . . . . . . 15

In re EchoStar Commc'ns Corp.,
448 F.3d 1294 (Fed. Cir. 2006) . . . . . . . . . . 13

First Federal Sav. Bank of Hegewisch v. United States,
55 Fed. Cl. at 263 (203) . . . . . . . . . . 14

Fisher v. United States,
425 U.S. 391 (1976) . . . . . . . . . . 14

In re Grand Jury Proceedings October 12, 1995,
78 F.3d 251 (6th Cir.1996) . . . . . . . . . . 16

In re Grand Jury Witness (Salas),
695 F.2d 359 (9th Cir.1982) . . . . . . . . . . 14

Hickman v. Taylor,
329 U.S. 495 (1947) . . . . . . . . . . 8

Hodges, Grant & Kaufman v. United States,
768 F.2d 719 (5th Cir.1985) . . . . . . . . . . 14

In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.),
348 F.3d 16 (1st Cir. 2003) . . . . . . . . . . 14

In re Sealed Case,
877 F.2d 976, 981 (D.C. Cir.1989) . . . . . . . . . . 16

Matter of Walsh,
623 F.2d, 489 (7th Cir.), cert. denied, 449 U.S. 994 (1980) . . . . . . . . . . 15

Morisky v. Pub. Serv. Elec. & Gas Co.,
191 F.R.D. 419 (D. N.J. 2000) . . . . . . . . . . 19

NLRB v. Harvey,
349 F.2d 900 (4th Cir.1965) . . . . . . . . . . 14

Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.,
967 F.2d 980 (4th Cir. 1992) . . . . . . . . . . 17

Pac. Gas & Elec. Co. v. United States,
69 Fed. Cl. 784 (2006) . . . . . . . . . . 13, 17

Penk v. Or. State Bd. of Higher Educ.,
99 F.R.D. 511 (D.Or. 1983) . . . . . . . . . . 11

Resolution Trust Corp. v. Dabney,
73 F.3d 262 (10th Cir.1995) . . . . . . . . . . 17

Sanchez v. Matta,
229 F.R.D. 649 (D.N.M. 2004) . . . . . . . . . . 15

Trollinger v. Tyson Foods, Inc.,
2007 WL 951869 (E.D. Tenn. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Collis,
128 F.3d 313 (6th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. El Paso Co.,
682 F.2d 530 (5th Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Robinson,
121 F.3d 971 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Tellier,
255 F.2d 441 (2d Cir.1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Upjohn Co. v. United States,
449 U.S. 383 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

Wall Indus., Inc. v. United States,
5 Ct. Cl. 485 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Matter of Witnesses Before Special March 1980 Grand Jury,
729 F.2d 489 (7th Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATUTES**

29 U.S.C. §201, et. seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KENT CHRISTOFFERSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 01-495C |
| | ) | (Judge Bruggink) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER

The United States respectfully opposes plaintiffs' motion for a protective order ("Pl. Mot."), which is aimed at preventing the disclosure to defendant of individual claimant responses to the questionnaire negotiated by the parties as part of their February 18, 2005 Memorandum of Understanding ("MOU"). The relief sought violates the rights we bargained for in the MOU, and would needlessly prolong the resolution of this case.

## STATEMENT OF THE ISSUES

1. Whether, pursuant to the MOU plaintiffs are entitled to withhold non-privileged verbatim responses to questionnaires.

2. Whether questionnaire responses are *per se* protected by the attorney-client or work-product privileges.

## STATEMENT OF THE CASE

### I. The Complaint And Course Of Proceedings

The background of this case is set out in Christofferson v. United States, 77 Fed. Cl. 361, 362-63 (2007). To summarize, former employees of the United States Bureau of the Census ("Bureau") filed this lawsuit in August 2001, alleging that the Bureau required them to work uncompensated overtime, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C.

§ 201, et. seq. Id. The plaintiffs performed census-taking and related work throughout the country, during the 2000 Decennial Census. They held positions known as Field Operation Supervisors ("FOSes"), Crew Leaders, Crew Leader Assistants, and Enumerators. Id.

At the suggestion of the parties, the Court ordered the parties to focus their initial discovery upon the claims of former employees of the Concord, California Local Census Office ("LCO"). Id. Following two years of discovery, which included numerous interrogatories, document requests, and depositions, the Court scheduled a trial to begin in March 2004. Id. But, after beginning their preparation for trial, the parties informed the Court that they wished to resolve the case by a means other than a series of trials. Id. To that end, the parties commenced negotiations of the Concord plaintiffs' claims, and agreed to participate in Alternative Dispute Resolution ("ADR") for the purpose of negotiating a procedure to resolve the non-Concord claims. Id.

During the week of August 21, 2004, Judge Bruggink, serving as the ADR judge, held the first such ADR session and, thereafter, continued to mediate the parties' efforts to develop a procedure to resolve the 7,000 remaining claims presented in this lawsuit. Id. During these negotiations, the parties exchanged numerous drafts of a memorandum of understanding, which culminated in the February 2005 MOU (Plaintiffs' Exhibit ("Pl. Ex.") 1); Def. Ex. 5 (Cantwell Dec.) ¶ 1.

II. The Questionnaire

The centerpiece of the MOU was the requirement for a claim questionnaire, which was to be developed by the parties and completed by all claimants. Designed to avoid the massive discovery that uncovering the details of every one of the approximately 7,000 claims would

necessarily entail, the questionnaire described the nature of the lawsuit (a claim for unpaid FLSA overtime) , how it would be resolved, and posed questions designed to reveal the viability of individual claims and necessary factual circumstances. See id. at ¶ 6. Questionnaire responses were to inform the parties' grouping of the claims into "strata," which might be resolved by intra-stratum sampling techniques, and "certainty groups," individual cases meriting individual inquiry. As early as May 1, 2006, the Court instructed plaintiffs' counsel to work with defendant concerning how to handle any extraneous writing placed on the forms that might give rise to a claim of attorney-client privilege.[1]

The parties spent nearly two years working together, and with the Court's suggestions, to develop the questionnaire. Cantwell Dec. ¶ 1.[2] The parties and their experts proposed questions, crafted the wording of questions, devised various formats, and reviewed successive drafts to ensure the questions would elicit the information necessary to evaluate the claims. See id. defendant's expert, Dr. Patrick Cantwell, consulted a Bureau expert in survey questionnaires, to ensure that the respondents would be able to produce the requested information without assistance. Id.

The final three-page questionnaire contained 17 questions. Pl. Ex. 2 at 7-9. The first nine concerned contact information and asked whether the respondent wished to continue to pursue a claim. Id. at 8. Three of the remaining questions required the respondent to answer by

---

[1] This instruction is contrary to plaintiffs' assertion that the issue of the response format was not brought to their attention until March 2007. Lee Dec. ¶ 20.

[2] During this period, as provided in the MOU, the parties continued to litigate significant legal issues, and obtained rulings that further shaped their negotiations. See Christofferson v. United States, 64 Fed. Cl. 316 (2005), Christofferson v. United States, 67 Fed. Cl. 68 (2005).

checking "yes" or "no." Id. at 9-10. Questions 11 and 12 requested the number of claimed hours of uncompensated overtime and the number of any uncompensated hours carried forward and reported in a subsequent week's time reports. Id. at 9. Question 15 asked respondents to submit any documentation that showed they worked the overtime claimed. Id. at 10.

The remaining two questions, Questions 14 and 17, were unique among the questions, in that they required narrative responses. Id. at 10. Question 14 asked, "If any of your numbers are based on estimates, please identify on the Payroll Summary, where indicated, which numbers are estimates and describe how you arrived at those estimates." Id. Question 17 asked, "If you answered yes to Question 16, explain why you believe your supervisor knew or had reason to know that you worked overtime prior to your working the overtime." Id. This question was intentionally open-ended to allow the respondent to furnish a narrative concerning the circumstances surrounding the supervisor's knowledge, if the respondent claimed such knowledge. Cantwell Dec. ¶ 2.

The questionnaire was mailed to over 7,000 non-Concord plaintiffs in August 2006. Lee Dec. ¶ 8.[3] Responses were originally due on September 29, 2006, Pl. Ex. 2 at 9, but the deadline was extended to November 30, 2006. Def. Ex.1 at Page 3. Plaintiffs' counsel reports that his firm began receiving completed forms as early as August 7, 2006.[4] Lee Dec. ¶ 8. According to

---

[3] The questionnaire plaintiffs attached as an exhibit to their brief contains a cover letter of which we were unaware until its filing. Pl. Ex. 2 at 1-2. That letter contains a legend at the top of the first page stating, "Confidential Attorney-Client Communication." Id. at 1. We never were informed of this misrepresentation of the parties' agreed upon process, and certainly never would have agreed to the inclusion of this language. The actual agreed-upon questionnaire contains no such language. See Pl. Ex. 2 at 4-10.

[4] Plaintiffs indicate that plaintiffs' attorneys continued to receive responses through July 2007. Pl. Mot. at 5.

the MOU, plaintiffs' intended to hire a Third Party Administrator ("TPA") to receive the questionnaire responses before producing them to the Government.[5] Pl. Ex. 1, ¶ 7.

Prior to the mailing of the questionnaires and for months afterwards, the Court encouraged the parties to negotiate a procedure for processing the responses. In a status conference held on November 1, 2006, when plaintiffs suggested providing defendant with only summaries of the responses, the Court pointed out that defendant would need to see the actual language of the responses in order to meaningfully evaluate them. Def. Ex. 1 at Page 15. The Court also asked the parties to negotiate a process for handling privileged responses. Def. Ex. 1 at pag 17-18. Defendant attempted to resolve this issue with plaintiffs' counsel. Def. Ex. 2. On January 10, 2007, plaintiffs' counsel provided 1 with a copy of the proposed questionnaire report format. Def. Ex. 3. Defendant objected to the proposed format, to which plaintiffs' counsel responded by asserting a blanket attorney-client privilege. Pl. Ex. 3; Pl. Ex. 4.

In February 2007, plaintiffs' attorney reported the first batch of questionnaire responses to defendant in spread sheet format. Instead of providing defendant with the responses to the open-ended questions, plaintiffs' counsel created a document containing plaintiffs' interpretation of the responses. Pl. Ex. 5. As plaintiffs' attorney has explained, he directed temporary law clerks to interpret and classify the responses for questions 14 and 17 into several categories. Lee Dec. ¶¶ 13-16. Defendant never consented to this as a substitute for the responses.

For question 14, the clerks reported answers as: "(1) Reconstructed memory; (2)

---

[5] When only a fraction of the consenters responded, plaintiffs' counsel decided to dispense with the TPA and hired additional legal staff to obtain questionnaire responses. Pl. Mot. at 8; Lee Dec. ¶ 13.

Contemporary records and documents; and (3) added lunch/breaks and/or travel time."[6] Lee Dec. ¶ 12. For Question 17, which requested the claimant's explanation for any assertion that supervisors knew the claimant was working the overtime hours claimed, the law clerks were instructed to report the response as falling into any of eight categories: "(1) I told/complained to my Supervisor that I worked overtime; (2) I saw others denied overtime so did not claim myself; (3) Supervisor asked me to work overtime; (4) Supervisor told me to work until job complete; (5) Supervisor rejected my time sheet with overtime; (6) Supervisor told me to rollover overtime hours; (7) Supervisor worked alongside me; and (8) Supervisor saw me early morning and late at night." Id.

By June 2007, plaintiffs' counsel provided defendant with a spreadsheet that purported to contain the responses of all respondents who plaintiffs' attorney determined had valid claims, but again failed to include all responses, and, notably, omitted verbatim responses to Questions 14 and 17. Cantwell Dec. ¶ 3, 4. The final spreadsheet included claims from 2,098 respondents.[7] Cantwell Dec. ¶ 5.

On August 3, 2007, at the Court's invitation, plaintiffs' counsel filed the instant motion for a protective order, including a confidential version of some responses, for *in*

---

[6] Plaintiffs' counsel did not produce the contemporary records or documents which he received, see Pl. Mot. at 18, nor did he provide any specifics as to how the respondents' memory had been "reconstructed."

[7] While plaintiffs' counsel indicates that he received 2,806 completed claim forms, Lee Dec. ¶ 18, and that he sent responses from approximately 2,200 claimants to defendant, Def. Ex. Page 3, he actually produced proposed data for 2,098 claimants. In any event, given the fact that the questionnaire claim form was mailed to more than 7,000 claimants and defendant received data for only 2,098 claimants, it appears that the majority of the original claimants had no valid claim.

*camera* inspection. Defendant has never seen these or any responses.

**SUMMARY OF THE ARGUMENT**

Plaintiffs are not entitled to a protective order, because doing so is contrary to the MOU, we need the responses to resolve the case, and the responses are covered by no automatically-applicable privilege. The one line, conclusory categories that plaintiffs would like to rely upon are problematic, because in the current form, defendant is unable to evaluate the reliability of the claims, which was key to defendant's concession to forego formal and more extensive discovery. Instead, defendant must accept plaintiffs' counsel's characterization of the claims, in effect, substituting a legal conclusion for hard data. In order to proceed under the MOU, defendant must review the claimants' own narratives concerning how *they* determined their estimates and entitlement, in order to evaluate the reliability of their claims.

Plaintiffs' error is in treating the withheld information as if it were collected pursuant to a discovery request. However, that information, which comprises only the most basic elements of plaintiffs' claims, was collected pursuant to negotiation and never was intended as discovery. In fact, the MOU directs plaintiffs to provide defendant with the response data *in lieu of discovery*. Furthermore, plaintiffs' characterization notwithstanding, our request is quite limited, and extends only to copies of the narrative responses to Questions 14 and 17 and the applicable contemporaneous documentation, minus any privileged information redacted (presuming the invocation is proper and a proper privilege log is furnished).[8]

Plaintiffs also err in asserting a blanket privilege over questionnaire responses. That

[8] Even though this opposition focuses upon disclosure of the narrative responses, we do not waive our MOU right to obtain copies of every all completed questionnaires.

information also enjoys no blanket protection simply because it was collected initially by plaintiffs' attorneys, a procedural step intended to identify instances where claimants truly sought confidential communications, and not to erect a barrier to non-privileged responses. [9]

## ARGUMENT

I. Withholding The Non-Privileged Responses Is A Breach Of The MOU

Consistent with RCFC 1 (requiring the "just, speedy, and efficient" resolution of every action) and the unassailable notion that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation,"[10] we agreed to the idea of this MOU with the intention of obviating the need to take detailed discovery of 7,000 claimants. We did so against the background of the parties two-year, detailed investigation of what turned out to be approximately 50 Concord claimants (the others failed to appear for depositions). In so doing, we suspended the discovery options that might have afforded us a more perfect understanding of the claims (and, no doubt the discovery of many more who would fail to participate) and, based upon the advice of survey experts who expected us to obtain direct evidence on the important questions, attempted to resolve plaintiffs' claims based upon less than perfect information.

Thus, throughout the course of proceedings, we communicated the need to obtain specific narrative claims from the individual plaintiffs. For instance, during the development of the questionnaire, we drafted a question inquiring about the supervisor's knowledge of the alleged overtime. Plaintiffs' counsel initially objected to the requested level of specificity; but, because

[9] Of course, we are in no position to examine individual claims of privilege, because we have not seen the individual responses and plaintiffs have provided no privilege log. Accordingly, any dispute concerning particular claims of privilege are left for another day.

[10] Hickman v. Taylor, 329 U.S. 495, 507 (1947).

that information is essential to the claim, we insisted upon including the question. Id. Eventually, the language of the question was reworked until both sides agreed to include the question. Id. This concession serves little purpose if plaintiffs' attorneys are permitted to boil down the responses to non-specific summaries. In another example, an early draft MOU of August 2004 provided that the Government would have access to the questionnaires only for those claimants selected for deposition. This provision was deleted, allowing the Government access to the questionnaire responses of all the respondents. See Cantwell Dec. ¶ 6.

Moreover, because the questions were accompanied by simple instructions and written, rewritten and reviewed by survey experts to ensure they were understandable on their face and, thereby, designed specifically to obviate the need for direct, personal, legal guidance concerning how to respond to the questionnaire, we never understood that we would not see the responses. See, e.g., Cantwell Dec. ¶ 1. Indeed, if the questionnaires were intended only as a basis for an attorney-client conversation, with no need for disclosure to the Government, we could have spent far less time negotiating the questions, and simply have sent interrogatories of our own drafting.[11] Thus, plaintiffs cloud the issue by arguing that "Defendant . . . knew . . .

---

[11] In fact, defendant participated in drafting the very language in the questionnaires that plaintiffs now cite in support of a blanket privilege. Specifically, in response to a previous letter sent to claimants by their attorney, individual claimants called Bureau employees asking when they could expect their settlement checks. As a result, defendant recommended the inclusion of language in the claim form directing claimants to call their attorneys if they had questions. The notice further stated: "Please do not call the Court, the U.S. Census Bureau or any Department of Justice attorneys for assistance. As your attorneys, our *conversations* with you are confidential and protected by the attorney-client privilege. However, any communications you have with persons outside this law firm about your claim are not confidential." Pl. Ex.2 at 3 (emphasis added). The questionnaires reference to the attorneys' ("our") "conversations" with claimants indicates a distinct form of communication, quite distinct from *responses* to questions. Indeed, the *conversations* were intended to provide 'assistance," i.e., with completing the questionnaire.

communications [with] Plaintiffs would occur during the data processing phase were protected by privilege . . . and Defendant now attempts to circumvent the MOU by asserting a right to the returned questionnaires." Pl. Mot. at 13-14. We do not assert that the MOU erases the attorney-client privilege, where applicable – only that there is no basis for arguing that we agreed to not receive responses because it would necessarily interfere with the attorney-client privilege.

The MOU and questionnaire are consistent with our effort to avoid litigation of each individual claim, by obtaining relevant information that would permit us to resolve the claims with some level of confidence. Thus, for example, Step Three specifically requires the creation of "a database that will record all relevant information contained in the questionnaire." Pl. Ex. 1, ¶ 7. There is no dispute that the supervisors' knowledge and the quantification of the claim are relevant knowledge. Step Four of the MOU specifically provides that the parties will examine the data for the purposes of dividing and identifying specific strata. Pl. Ex.1, ¶ 8. As our expert explains, the question regarding estimation of hours, for example, can be used to determine strata. Cantwell Dec. ¶ 7. If, for example, a pattern emerged in the responses to that question that would be related to a particular region or LCO , that region or LCO could be used in stratifying respondents. Id. Similarly, the reliability of the methods used to estimate back pay may affect how ranges of hours are determined for stratification purposes, such as in the case of hours considered excessively high. Id.

In addition, responses with missing information would assist us in determining whether to settle at all. For example, responses concerning supervisory knowledge may demonstrate that the supervisors did not know overtime was being worked until after it was worked, which would nullify a claim. Moreover, because plaintiffs were asked to respond to the question regarding

supervisory knowledge in an open-ended fashion, they may well have included their supervisors' response or other details that may not have been important to plaintiffs' counsel's law clerks in categorizing the response.

As it is, without seeing the responses, we have no way to audit plaintiffs' assignment of responses to any particular category. As a result, the MOU process is no longer the joint, fact-finding process anticipated by the MOU, but a one-sided one by which plaintiffs' counsel discovered their clients' claims, and reported plaintiffs' counsel's conclusions about them to defendant. See Pl. Mot. at 3 ("Conceptually, the responses to the returned Claim Forms or Payroll Summaries are no different from, say, the first draft of interrogatory responses a client might write down for his or her counsel."). Thus, we are left with the choice of either accepting plaintiffs' conclusions or engaging in plenary discovery, because hiding the direct evidence raises doubt concerning every claim, diminishes the evidentiary value of the questionnaires and poisons the well of faith required for effective negotiations. See Def. Ex. 1 at Page 15 (the Court explains that the level of certainty in summary data is not that meaningful to the Government). "Fundamental fairness requires that defendant have access to the factual basis for ... [individual] claims if it is to be subjected to possible class-wide liability in this case." Penk v. Or. State Bd. of Higher Educ., 99 F.R.D. 511, 517 (D.Or. 1983).

Nonetheless, plaintiffs urge that the information is burdensome, has already been produced, or is somehow obviated by plaintiffs' MOU obligation to supply a response database. First, although plaintiffs have an obligation to provide an electronic record to assist managing the claims (there is no other effective way of managing what the parties anticipated would be 7,000 claims); that does not mean that the Government is not entitled also to see the source data

that the electronic medium presents. Second, the only language contained in the MOU that concerns transcribing the responses to the questionnaire is found in Step Three which specifically contemplates the creation of "a database that will record all relevant information contained in the questionnaire." Pl. Ex. 1, ¶ 7. As we have shown, "all relevant information" would necessarily include verbatim questionnaire responses. Indeed, although the MOU is silent as to how the information should be recorded and disclosed, it explicitly states that "the parties must agree on how to interpret ambiguous or contradictory responses." Pl. Ex. 1, ¶ 15.

Third, the requested information is not identical to what plaintiffs have currently produced. Pl. Mot. at 24. The questionnaires were intentionally returned to plaintiffs' counsel so that comments and questions (as opposed to the answers themselves) intended for legal advice could be scrutinized for privilege. After plaintiffs' counsel screened for privilege, we expected to see all non-privileged information, including the questionnaire responses. The spreadsheet provided by plaintiffs' counsel appears to have recorded all information from the claim forms, except for the narrative answers to Questions 14 and 17. Categories are not the same as narrative answers and categories are not data.

## II. The Requested Information Is Not Privileged

### A. The Requested Information Is Not Protected By The Attorney-Client Privilege

The attorney-client privilege is not a boundless shield. The privilege protects communications made in confidence by clients to their lawyers for the purpose of obtaining legal advice. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); In re EchoStar Commc'ns Corp., 448 F.3d 1294, 1300 (Fed. Cir. 2006); AAB Joint Venture v. United States, 75 Fed. Cl. 448, 456 (2007).

The privilege applies only if:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, . . .; and (4) the privilege has been (a) claimed and (b) not waived by the client.

AAB Joint Venture, 75 Fed. Cl. at 456 (citing Energy Capital Corp. v. United States, 45 Fed. Cl. 481, 484-85 (2000)) (omissions in the original); accord Pac. Gas & Elec. Co. v. United States, 69 Fed. Cl. 784, 810 (2006).

Moreover, communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others. Duplan Corp. v. Deering Milliken, Inc., 397 F.Supp. 1146, D.C.S.C. 1975 (citing United States v. Tellier, 255 F.2d 441 (2d Cir.1958)). Put another way, those claiming the privilege must have a reasonable expectation of confidentiality, either that the information disclosed is intrinsically confidential, or by showing that he had a subjective intent of confidentiality. United States v. Robinson, 121 F.3d 971, 976 (5th Cir. 2002).

Finally, the privilege protects only disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney. “The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." Upjohn, 449 U.S. at 396.

In light of these requirements of proof and the fact that invocations of the privilege

necessarily frustrate the search for the truth, assertions of privilege . . . are extremely disfavored. In re Grand Jury Witness (Salas), 695 F.2d 359, 362 (9th Cir.1982). As one court has put it, blanket assertions of privilege "disable the court and the adversary party from testing the merits of the claim and privilege." United States v. El Paso Co., 682 F.2d 530, 541 (5th Cir.1982). Thus, "[b]ecause the assertion of attorney-client privilege withholds relevant information to the fact finder, it is narrowly construed, and applied only where necessary to achieve its purpose of protecting client communications essential to obtain legal advice." Trollinger v. Tyson Foods, Inc., 2007 WL 951869, *1 (E.D. Tenn. 2007) (citing Fisher v. United States, 425 U.S. 391, 403 (1976)); accord In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003) (the attorney-client privilege must be narrowly construed because it comes with substantial costs and stands as an obstacle to the search for truth); NLRB v. Harvey, 349 F.2d 900, 907 (4th Cir.1965). For these reasons, blanket assertions of privilege are not tolerated. Hodges, Grant & Kaufman v. United States, 768 F.2d 719, 721 (5th Cir.1985).

The party seeking to assert the privilege has the burden of establishing its applicability. AAB Joint Venture ,75 Fed. Cl. at 456; First Federal Sav. Bank of Hegewisch v. United States, 55 Fed. Cl. at 263, 277 (203); Cabot v. United States, 35 Fed. Cl. 442, 444 (1996). In so doing, claimants "must establish the elements of privilege as to each record sought and each question asked so that . . . the court can rule with specificity." Matter of Walsh, 623 F.2d, 489, 493 (7th Cir.), cert. denied, 449 U.S. 994 (1980); see also AAB Joint Venture at 456; Matter of Witnesses Before Special March 1980 Grand Jury, 729 F.2d 489, 495 (7th Cir.1984).

Here, as we have shown, the very nature of the questionnaire, which explained to claimants that the form was agreed to by both parties, that claimants must answer the questions

in order to be paid, and must sign their responses under penalty of perjury, demonstrate that the questionnaires were to be seen by the Government. See Pl. Ex.2. Thus, plaintiffs had no reasonable expectation that their responses, upon which the payment of their claims *by the Government* depended, would be confidential. Moreover, the privilege, even if applicable, protects only communications, not facts. Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004) (citing Upjohn at 395). Here, the only source of facts to which the parties agreed (other than discovery that might be aimed at particular claimants *based upon* their questionnaire responses) was the questionnaire responses. Thus, merely because a claimant might have discussed the questions with an attorney (as permitted by the questionnaire form), is no ground for denying the Government access to plaintiffs' responses.

Nonetheless, plaintiffs assert that the "entire questionnaire process was attorney-client privileged."[12] Pl. Mot. at 2. This is a claim of blanket privilege of precisely the sort disfavored at law, because it cannot be shown to further the limited goal of the privilege. We understand that plaintiffs' counsel has submitted some documents to the Court in camera, Pl. Mot. at 24-25, but we have not seen them and, therefore, cannot assume that the privilege is warranted in those instances. In any event, it is safe to say that, even if plaintiffs could demonstrate the

---

[12] Plaintiffs' reliance upon Upjohn and EEOC v. Int'l Profit Assocs., Inc., 206 F.R.D. 215 (N.D. Ill. 2002), is misplaced. See Pl. Mot. at 14-17. Unlike in Upjohn where at issue was an *internal* investigation conducted by a party's attorneys, here, the parties worked together to develop the questionnaire so that it would elicit factual information helpful to both parties. Cantwell Dec. ¶ 1. Likewise, the instant case is unlike Int'l Profit Assocs, which also involved a questionnaire prepared by plaintiffs' counsel. There, the defendant sought to compel the production of plaintiffs' counsel's notes from interviews with potential plaintiffs. Here, we seek no such notes, only the claimants' own narrative responses to the questions that the parties agreed to for settlement purposes.

applicability of the privilege in some cases, that does not mean that the privilege applies in all cases, or that plaintiffs can rest upon simple argument to establish the privilege, without a proper privilege log.

Moreover, plaintiffs have produced the responses to 15 of the 17 questions. But, as is recognized by the "same subject matter" rule, courts may and should except documents from privilege protection if it appears that a party in litigation has disclosed only a portion of certain privileged communications to obtain a tactical advantage in litigation. See, e.g., United States v. Collis, 128 F.3d 313, 320 (6th Cir.1997); In re Grand Jury Proceedings October 12, 1995, 78 F.3d 251, 255 (6th Cir.1996); In re Sealed Case, 877 F.2d 976, 981 (D.C. Cir.1989).

Permitting plaintiffs to respond to the questionnaires with conclusory affirmations that they are entitled to their claims, without disclosing the key and potentially disabling facts of those claims is precisely the unfair tactical advantage the rule was designed to disallow. Thus, permitting plaintiffs' to hide behind their own attorney's cover letter, which, without the Government's assent, labeled the questionnaire as "Confidential Attorney-Client Communication" was improper and does not make the responses at issue attorney-client privileged. In fact, despite the heading, nothing in the cover letter itself is privileged, as indicated by the fact that plaintiffs have attached it as an exhibit to their motion.

B. The Requested Information Is Not Protected By The Work-Product Doctrine

"The work product doctrine is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal strategy 'with an eye toward litigation,' free from unnecessary intrusion by adversaries. Pac. Gas & Elec., 69 Fed. Cl. at 789 (quoting Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)). Like the attorney-client privilege, the work product privilege does not protect facts contained within or underlying the attorney work product. In re Unilin Decor N.V., 153 Fed. Appx. 726, 728 (Fed. Cir.2005); Resolution Trust Corp. v. Dabney, 73 F.3d 262, 266 (10th Cir.1995); Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co., 967 F.2d 980, 984 (4th Cir. 1992).

Here, as with the attorney-client privilege claim, we have seen no privilege log nor indication that the work product doctrine applies to any particular questionnaire response. Moreover, because the factual information we seek is from the claimants directly, the work product privilege is not implicated at all. We do not seek the legal notes or mental impressions of plaintiffs' counsel, [13] and the doctrine is inapplicable to the statements of the plaintiffs, who were required to complete the questionnaire and sign it under penalty of perjury. Pl. Ex. 2.

III. A Protective Order Is Not Warranted Because Plaintiffs Have Failed to Show Cause

Pursuant to RCFC 26(c), a court may order that discovery not be had when justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue

[13] If anything is protected by the work product doctrine, it would be the summarized categories for the narrative answers already provided by the plaintiffs' counsel; such summaries directly reflect the mental impressions of plaintiffs' counsel with regard to the response data. Yet plaintiffs' have willingly produced the summaries.

burden or expense.[14] The Rule also requires that the moving party show good cause and make an effort to resolve the dispute without court action. Moreover, the Rule is inappropriate here, because this matter does not involve discovery but rather an attempt at settlement. However, even if it were discovery, plaintiffs have failed to show cause for a protective order.

Contrary to their assertion, plaintiffs would not suffer oppression and undue burden by producing the documents as requested. See Pl. Mot. at 13. First, the allegation that it is impossible to compile an electronic database to capture narrative responses of thousands of individuals is simply untrue. Lee Dec. ¶ 14 ("Electronically formatted data, in turn, has to be in a binary format."). In fact, the Microsoft Excel program in which plaintiffs' counsel provided the data is capable of handling narrative entries, as evidenced by the "Names" contained therein. Cantwell Dec. ¶ 8. Second, if plaintiffs' counsel chose to photocopy the claim forms rather than insert the narrative answers into a database, they would not need to photocopy over 27,000 related pages, as alleged. Lee Decl. at ¶ 7. Although we reserve our right to request all returned questionnaires, we have requested only copies of the responses that present actual claims, which totals 2,098 forms. Plaintiffs also fail to demonstrate that the disclosure of the response data would cause annoyance, embarrassment, or oppression.

Furthermore, even if plaintiffs had established good cause, the Court nevertheless should decline to issue the order, because justice does not require one. See Wall Indus., Inc. v. United States, 5 Ct. Cl. 485 (1984). Indeed, justice requires denial. As demonstrated above, we have a substantial right to and need of the completed questionnaires, because the questionnaires are the

---

[14] If a motion for a protective order is denied in whole or part, the court may, on such terms and conditions as are just, order that any party or other person provide or permit discovery. RCFC 26(c).

only source of the information necessary to establish the validity of these claims. In a similar case, Morisky v. Pub. Serv. Elec. & Gas Co., 191 F.R.D. 419, 426 (D.N.J. 2000) (an employee class action for FLSA overtime pay), the court ordered production of the plaintiffs' attorney's claim questionnaire, explaining that it would be "patently unfair" to require the employer to depose employees who already had completed the questionnaire. The court noted that it would be unduly burdensome for both parties to require depositions and burdensome for the employer to serve interrogatories as an alternative to simply producing the questionnaires. Id. As was the court in Morisky, we seek to avoid discovery, which is the alternative to being screened off from the source evidence in this case.[15]

Moreover, any undue burden to plaintiffs is of their own making. Plaintiffs were specifically told to discuss the production of this evidence with us and, despite our consistent view that we were entitled to see the raw data of the responses, plaintiffs unilaterally decided to proceed as they wished.

## SUMMARY

The questionnaire at issue was developed in an attempt to settle more than 7,000 outstanding claims in this lawsuit. Despite spending nearly two years developing the questionnaire and repeatedly requesting that plaintiffs' counsel provided verbatim responses with requests for legal advice redacted, plaintiffs continue to deny access to the response data, thereby precluding the Government from proceeding under the MOU as anticipated. The requested information is neither privileged nor burdensome to produce.

---

[15] Defendant would be at an even bigger disadvantage at this point if it had to begin discovery, due to the passage of time.

**CONCLUSION**

For the foregoing reasons, we respectfully request that the Court deny Plaintiffs' Motion for a Protective Order.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:
JOHAHNA JOHNSON
Office of the General Counsel
Department of Commerce
Bureau of the Census
Suitland MD 20746-24

STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St. NW
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311

Attorneys for Defendant

September 14, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 14, 2007, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham

# APPENDIX

061101A



UNITED STATES COURT OF FEDERAL CLAIMS

KENT CHRISTOFFERSON, et al., )
Plaintiffs, ) Docket No. 01-495C
)
v. )
UNITED STATES, )
Defendant. )

Room 301
National Courts Building
717 Madison Place NW
Washington, D.C.
Wednesday,
November 1, 2006

The parties met, pursuant to notice of the Court, at 2:00 p.m.

BEFORE: HONORABLE ERIC G. BRUGGINK
Judge

APPEARANCES: (Via Telephone)
For the Plaintiffs:
JACK WING LEE, Esquire
JOHN OTA, Esquire
Minami, Lew & Tamaki, LLP
360 Post Street, 8th Floor
San Francisco, California 94108
(415) 788-9000



APPEARANCES: (Continued)
For the Defendant:
STEVEN J. GILLINGHAM, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-2311
RAYNA G. ELLER, Esquire
Department of Commerce
Bureau of the Census
Office of General Counsel
Suitland, Maryland 20746
(301) 763-6513



EXHIBIT 1

P R O C E E D I N G S

(2:00 p.m.)

THE COURT: Good morning, Mr. Lee.

MR. LEE: Good morning, Judge Bruggink. With me is Sonia Merida and John Ota.

THE COURT: All right. And good afternoon, Mr. Gillingham.

MR. GILLINGHAM: Good morning, Your Honor. I'm here alone.

THE COURT: And Ms. Eller.

MS. ELLER: Good afternoon, Judge Bruggink.

THE COURT: Good afternoon or morning, as the case may be. I guess the purpose of the conference is for me to get caught up on where things stand after, I assume now you all have been receiving the returns on the questionnaires, Mr. Lee?

MR. LEE: Yes, Your Honor.

THE COURT: Let me give you an update of where we are. In early August, we sent out claim forms, 7,500 of them, approximately, and asked for returns of those completed claim forms by the end of September. About 600 of those came back with inaccurate addresses and we re-sent those, so that's delayed to some extent the deadline.

Also, we have a small group of about 500

addresses where we had the wrong return address, but we've fixed that, and so people are able to send it to the correct return address now. To date, we have about 2,700 claim forms returned to us completed.

THE COURT: How many are still not overdue because of the problems with the addresses? In other words, what new date did you give for the people who either had the wrong return address or you had the wrong address?

MR. LEE: We gave them till yesterday, October 31.

THE COURT: I see.

MR. LEE: Which is kind of an artificial date but we wanted to have a date certain for them, and even though they are coming in a day or two late we're still accepting them because we wanted a date in there so that they would have something real to deal with, but we didn't want to quibble with them over one week or four, so we still are accepting them until probably the end of November.

THE COURT: Okay. And what are we going to treat as the drop-dead-date?

MR. LEE: We were intending to use the drop-dead date of either the end of November or mid-December as an absolute drop-dead date. But let me go

5

on and tell you what we are doing so maybe you can have some context with that.

THE COURT: All right.

MR. LEE: The claim forms that are received, we have a staff of six people looking at each one of those and entering them into a database which we intend to share with the government. It's going to be on Excel spreadsheet, and we've done about 850 to date, about 30 percent, and we're continuing to do them as fast as we can. But we do have to call back at least the majority of people that are filling out the claim forms because there's ambiguities on their claim forms, and they don't understand how to roll over hours. And so we have to talk to them that oftentimes involves phone calls. So it's not a quick process but we're hoping that we can finish most of them by November, end of November, and by mid-December complete the whole group.

THE COURT: Okay. Now, did you end up hiring a third party to do the processing?

MR. LEE: What we did was we hired a third party to send out claim forms and to do the re-mails and handle some of the logging, but our staff here is handling the actual contact with the class.

THE COURT: When you said 850 were



processed, does that mean so that you have sufficient data that you don't need to recontact these people?

MR. LEE: In general, that's true, although we're finding that here and there we're having to contact people because we get clarification on an

issue and we change our position, or we're basically seeing an issue more than once, so we're calling people back that we had a different conclusion on. So in general, the ones that are in the database are the ones that we do not intend to go back to.

THE COURT: And that's the 850 or some other number?

MR. LEE: 850.

THE COURT: Okay. And what kind of shorthand version results are you getting with that 850?

MR. LEE: If you mean in germs of the number of overtime hours claimed, we're getting some for as little as one or two hours, and some in excess of a thousand, 2,000 is the highest, and most of them are, I would say, under 100.

THE COURT: Okay. Have you been in contact with the government as this process has unfolded?

MR. LEE: Well, we have been continuing to talk about settlement, and about 30 or 40 of those



that I think we've reached resolution on, so we're narrowing our differences on that. I think there are still about five or six that we still have differences on and we intend to address those, but at least for the Concord people, the ones who we did the trial on, we're nearing settlement on all those, and I think we have three-quarters of those resolved.

THE COURT: Okay. I meant more generally.

In terms of the results you're getting on these forms, is, for example, the problem with the addresses, either the bad addresses for the Plaintiffs or the return address, is this something, Mr. Gillingham, that you're hearing for the first time or have you been tied into this?

MR. GILLINGHAM: Mr. Lee and I spoke today about his progress. I knew generally that he was sending these out, but we haven't been getting weekly updates or anything like that. But no, Mr. Lee and I have spoken.

THE COURT: Okay. Now, as I recall, both the application of my ruling to the Concord group and the application of the returns on these forms to the larger group are both something that presumptively you're going to try to work out a settlement for, is that right?



MR. LEE: That's my understanding, Your Honor.

MR. GILLINGHAM: That's right, Your Honor.

THE COURT: Okay. In terms of the returns that you haven't gotten, why would someone who hasn't sent in a return yet be likely to send one in? If they're operating with an end of September deadline or even if it's an extended deadline, why do you think you're likely to get more?

MR. LEE: Well, because we get phone calls

almost daily asking for extensions because of some emergency or another that are personal in nature, and we're giving them limited extensions, quick turnaround extensions. But even though they're coming back to the table and asking us for other extensions because of personal circumstances. So there is going to be a point in time when we're going to just cut it off.

THE COURT: All right. And is this something that you and Mr. Gillingham needed to negotiate up front or are you just planning to do that after you get all your results?

MR. LEE: Well, I guess the way we've been approaching it is that we haven't really agreed among ourselves, you know, between the parties that there will be a drop-dead date. We assume there will be,



but we want to set that date as we go, and there certainly is going to be a time period where it's just too late.

THE COURT: But is that going to be communicated to everybody you haven't heard from or is that just an in-house, drop-dead date?

MR. LEE: That's an in-house. We don't intend to send anymore flyers out saying, you know, there is one last chance. Right now I guess we haven't set that date yet. The only reason I guess is I'm not comfortable setting that date is that we've given people, with deadlines.

MS. ELLER: Your Honor, may I say something

on behalf of the Department of Commerce? When we negotiated this, and our understanding of that questionnaire was that there was going to be a drop-dead date filled in on that, and it was going to mean something, and that it wasn't going to be something that was done, you know, after the fact.

MR. LEE: I guess I would disagree with that. The government has never stated that we agreed to a drop-dead date. We haven't. And we agree that that's something we will agree to, but we haven't set that date yet, and we don't want to argue with the claimants about a week here or a week there.



THE COURT: Well, it's one thing to give the, I think what we discussed, Ms. Eller is correct, we discussed putting a drop-dead date into the form, but that's a somewhat different question than what the Department of Justice is going to accept as a straggler in the future.

I really think it's probably best that the three of you, or the four of you, however many, five of you out there, really need to talk about that, and I'm not sure this is the time or the place to do it. But it seems to me that there will probably be stragglers coming in a year from now, and we need to know what to do with those people and the people who come in two months from now.

So because this is a negotiated process, I

think you have the option to do whatever you can agree on, but I really think that at some point in the very near future there needs to be some clear understanding that X date is the time that returns are presumptively in effect ignored. And I assume these are being stamped somehow with the date of receipt?

MR. LEE: Yes, they are.

THE COURT: Okay. But I guess, Mr. Gillingham, I need to hear from you as well on this subject.



MR. GILLINGHAM: Well, I don't have any agreement in front of me. Whatever it says it says. I recall that we had a date, and it was going to be a false date inserted so people have a built-in period for stragglers. But I'll review that, and discuss it with all concerned, and we'll, I guess, proceed from what we've agreed on. And to the extent there is an ambiguity, or a lack of precision, then we'll negotiate as you've suggested to be more precise.

THE COURT: All right. I would highly recommend that. The people who are claiming, say, a thousand hours based on -- I'm not asking you to give away anybody's rights here, but is it a return that has some plausibility to it?

I really don't know how many hours people worked total, for example, whether or not that's in effect such an extreme that you all are going to have to ignore it, or is that a total outlier kind of

claim, or is it physically possible to have worked 1,000 hours of overtime?

MR. LEE: The claims that are coming in like that are plausible, are credible.

MS. ELLER: Your Honor, for the Department of Commerce, we don't even have people who -- there are very few people who would have straight time for



the decennial that would have been paid that much for 40 hours a week. The decennial isn't that long.

THE COURT: Did we not talk about having some process of eliminating, or maybe this is just a statistical analysis you all have to do, but there is probably some principled way to look at things like this and focus on where the mean, median or mode lie?

MR. GILLINGHAM: Your Honor, Steve Gillingham. We each have experts in this area who would certainly advise us of that. In general, what the agreement left open was into which strata or groups the questionnaires would be placed, and there is a number of options.

Hours could be the grounds for a strata or it could be done by area of the country or by region or by office or by type of claim, or it could be by all of those. Obviously the more strata you have the more groups you have to deal with.

An agreement was that within each strata there would be designated --

THE COURT: Deponents.

MR. GILLINGHAM: -- deponents to sort of flush out the issues, and we would go from there. There are also those whose -- those responses would be designated as the certainty group, and I think the



criteria for that were also to be developed. I would imagine we would be looking at anybody with a high number as someone who would be placed in the certainty group.

In effect, the certainty group is a group of one; that is, that person would probably be deposed, or the case would be analyzed somehow on its own merits and negotiated, resolved on its own merits, and whatever happened wouldn't affect anybody else basically.

THE COURT: And then how do you use the results of that certainty group?

MR. GILLINGHAM: Well, they would just affect the individuals. So if you have 15 that were, for example, if they were outliers, we would probably identify those as ones who we wanted to treat as a certainty group, meaning one at a time, and negotiate those one at a time.

Those who are not in the certainty group, those who were not designated for one-at-a-time treatment would be banded by -- according to the criteria the parties have yet to agree upon -- and what the agreement provided was that some number

within a given group would be negotiated, and depending upon the experience of the deponents.



For example, if someone claimed -- people were deposed in a ceratin group of hours and following negotiations the parties agreed that their claim should be discounted 10 percent, that 10 percent discount would then be applied to everybody else in the group, so that's the effect of being in a strata.

If you are in a certainty group, you're just being handled on your own merits basically, and our thinking was there wouldn't be a whole lot of those. I guess if I see a claim for 1,000, I think that person is probably a pretty good candidate to be examined on his own because I gather from what Mr. Lee is saying that's not the usual case.

MR. LEE: Right. And Your Honor, the named Plaintiff for this case, Ken Christofferson, has extensive documentation of 500 overtime hours. And if you look at the class period we have here, which is 11 months, if you worked 160 hours for that full 11 months, you would come out to something like 1,700 out of normal time. I mean, it is unusual but certainly possible.

THE COURT: You mean 160 days?

MR. LEE: One hundred and sixty hours per month.

THE COURT: Oh, per month. I'm sorry. I

missed the per month. Okay.

MR. LEE: Eleven months --

THE COURT: All right.

MR. LEE: -- gives us 1,700 hours total.

THE COURT: All right. Okay. So I guess it's premature until you the Plaintiffs develop whatever it is that you're going to offer to the government to negotiate these strata groups and certainty groups and all that?

MR. LEE: Yes, Your Honor. I mean, we're doing that every day.

THE COURT: Doing which part every day?

MR. LEE: Doing the database, talking to people, filling out their forms -- excuse me -- filling out the database based on what they put down in their claim forms.

THE COURT: Okay. So I gather that there is no point in asking you all to negotiate that in the short term, but am I right in thinking that whatever the terms are for telling somebody you're too late is something that needs to be negotiated before you can draw the database to a close?

MR. LEE: Your Honor, we're not opposed to that. We will talk to the government about that.

THE COURT: Okay.

MS. ELLER: This is Rayna Eller. Another issue that I don't recall ever being resolved, of course, was what to do about like an index for attorney-client privileges, what's being claimed as attorney-client privilege, because I gather we're not getting transcriptions of what's on these questionnaire forms.

MR. LEE: You're getting summaries.

THE COURT: Okay. I gather you're right that that's something we haven't drawn closure on. Are you saying, Ms. Eller, that that's something that the government is going to insist on seeing raw data?

MR. GILLINGHAM: Your Honor, as I recall you had, Your Honor, mentioned this in one of your orders. I know I've e-mailed awhile ago Mr. Lee about that being one of our concerns, and we're not going to see the original papers because in the end we were going to see these spreadsheets or database that was going to contain all the answers, most of which would be one-word answers.

THE COURT: Right.

MR. GILLINGHAM: If something is being excluded, then, of course, you know, we would want to know what that is. The whole purpose of the claim is to determine what people are saying that is the basis



for their claim.

THE COURT: All right. It's one thing to talk about sort of mass evaluation of documents. It's another thing to depose somebody. How would the government be able to, or how in a deposition would a Plaintiff, the deponent be able to meaningfully respond to questions unless they had their own either cuff list or their original written response in front of them?

MR. GILLINGHAM: We did have something about this in the MOU. I can't remember right off the bat, but I do remember that it talked about the possibility that original documents would be available for those chosen for depositions, and otherwise they would generally not be available.

THE COURT: Well, it seems to me you're going to have to have some kind of an outlet like that for the government to test certainly whoever you draw on a sample groups, otherwise their level of certainty about what they're getting in the summary data is not going to be all that meaningful.

Okay. Well, I guess I'm responding to Ms. Eller's suggestion. Is that something that needs to be further negotiated or is what's in the MOU sufficient for purposes at least for the present?



MR. GILLINGHAM: Your Honor, I would have to go back and look at it again because I remember that we reserved until later on, and I just was not prepared to address this today.

THE COURT: Okay. Well, then I'll ask the five of you, what, other than giving me an update on where things stand at the moment, what do you all need to tell me or what do I need to be asking you?

MR. LEE: Well, I think most of what we will need to talk about after we complete the database and give it to the Defendants and they do their analysis. And at that point we need to sit down and agree upon what statistical analysis we're going to be using, and I think there might be a point in time where we need to sit down together and do that.

THE COURT: Well, that's certainly true. If that is sort of the next major step, the only interim step that I can see that you have to reach some agreement on is, as I said, the closure date, because otherwise the database is a continuous work in process.

MR. LEE: Right. And we don't disagree with that, Your Honor. In fact, we agree that there should be a drop-dead date. I want to talk to my supervisor about what that should be, but the concept was

19

completely agreeable. We're not trying to hold this thing open. We don't think that serves any purpose for people that are stragglers, and we want also to cut it off.

THE COURT: Okay. All right. Well, when should I next inquire, or is it sufficient for our

present purposes for you all to report in writing jointly in a status report say in 30 days or thereabouts what the status of things is?

MR. LEE: That would be fine. We could do that in 30 days.

THE COURT: Mr. Gillingham?

MR. GILLINGHAM: It depends on whether Mr. Lee expects if anything is going to change in the next 30 days.

THE COURT: Change?

MR. GILLINGHAM: From the status today. I mean, the last thing he referred to is getting us documents in December. We'll certainly go over the MOU again and see if there is any imprecision concerning plans or anything else that needs to be negotiated. I was wondering whether Mr. Lee expects there would be anything to report in the next 30 days.

THE COURT: Well, I'm assuming that you all are going to have to have a conversation about the



timeliness of late returns in something less than 30 days. Otherwise he won't know what's going to happen in 30 days unless there is some understanding reached as to whether or not you have a series of dates or a final date or how firm that is.

But Mr. Lee was talking about two possible dates, the end of November and the middle of December, and I'm not sure exactly what that would represent, whether it would be the time that the government gets

everything or the time that all returns are supposed to be due. But whatever that is, my suggestion would be to talk to each other about that, otherwise the next 30 days may lead to more misunderstandings or confusion.

So it may be that 30 days ends up being premature in terms of the final database's being produced, but I'd rather stick with a 30-day reporting back date just to make sure that you all have further conversation about what's going to happen in the next couple of months.

MR. LEE: Yes, I think we're committed to doing that and can file status reports whenever.

THE COURT: Okay. Well, let me ask Mr. Lee to take the initiative in doing that and run it by the government as well. But I'm assuming that prior to



that 30 days that you all would have talked about any other pieces that can be most usefully negotiated now rather than later in terms of anything left out of the MOU or cutoff dates and that kind of thing.

MR. LEE: Sure.

MR. GILLINGHAM: That's fine, Your Honor.

THE COURT: All right. Anything else?

MR. GILLINGHAM: Nothing from the government, Your Honor.

THE COURT: Mr. Lee?

MR. LEE: No.

THE COURT: All right. Thank you, folks.

MR. LEE: Thank you, Your Honor.

MR. GILLINGHAM: Thank you.

(Whereupon, at 2:25 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//



REPORTER'S CERTIFICATE

DOCKET NO.: 01-495C

CASE TITLE: Kent Christofferson v. United States

HEARING DATE: November 1, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: November 1, 2006

Barbara Berney
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018

"Gillingham, Steve (CIV)"
<Steve.Gillingham@usdoj.gov>
12/18/2006 10:58 AM

To rayna.g.eller@census.gov
cc
bcc
Subject FW: Jack, pls. call when you are ready to talk about the dtabase fields and procedures for providing us the claimant responses.

History: This message has been forwarded.

---

From: Gillingham, Steve (CIV)
Sent: Monday, December 18, 2006 10:58 AM
To: 'JWL@mltsf.com'
Subject: Jack, pls. call when you are ready to talk about the dtabase fields and procedures for providing us the claimant responses.

winmail.dat

EXHIBIT 2

"Gillingham, Steve \(CIV\)" <Steve.Gillingham@usdoj.gov>

01/17/2007 04:12 PM

To <rayna.g.eller@census.gov>
cc
bcc
Subject FW: database

History: This message has been replied to and forwarded.

**From:** Jack Lee [mailto:JLee@MinamiTamaki.com]
**Sent:** Wednesday, January 10, 2007 4:59 PM
**To:** Gillingham, Steve (CIV)
**Subject:** database

this is what it looks like.

Jack W. Lee

**Minami Tamaki LLP**

360 Post Street, 8th Fl., San Francisco, CA 94108

Tel: 415/788-9000 x130 | Fax: 415/398-3887

Email: jlee@MinamiTamaki.com

***South Bay Office***

333 El Camino Real, Suite 350

Sunnyvale, CA 94087

Tel: 408/739-1137 | Fax: 408/739-4641

**************************************************************

IRS CIRCULAR 230 DISCLOSURE. To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in the communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

**************************************************************

EXHIBIT 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KENT CHRISTOFFERSON, et al.,)
Plaintiffs, )
v. ) Docket No. 01-495C
UNITED STATES, )
Defendant. )

Courtroom 9, Room 310
National Courts Building
717 Madison Place NW
Washington, D.C.
Tuesday
June 26, 2007

The parties met, pursuant to notice of the Court, at 10:00 a.m.

BEFORE: HONORABLE ERIC G. BRUGGINK
Judge

APPEARANCES:
For the Plaintiff:
JAKE W. LEE, Esquire
Minami Tamaki, LLP
360 Post Street, 8th Floor
San Francisco, California 94108
(415) 788-9000

For the Defendant:
STEVEN J. GILLINGHAM, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-2311



APPEARANCES: (Cont'd)
For the Defendant:
RAYNA ELLER, Esquire
U.S. Department of Commerce
Bureau of the Census
Silver Hill Road
Suitland, Maryland 20746
(301) 763-6513



EXHIBIT 4

THE COURT: Jurisdiction is probably the thing I guess we need to get cleared up first of all. Precisely what is it you're saying makes this a money-mandating claim under the Tucker Act.

MR. LEE: I will address that in my opening, if that's okay.

THE COURT: Okay.

MR. LEE: By this motion, Plaintiffs seek permission to amend our complaint on behalf of thousands of former census workers.

THE COURT: Let me ask you, in that regard -- I guess this is by way of clarification, we have identified, what, roughly 5,000 people that are currently in the lawsuit?

MR. LEE: I'm going to update you on that. Originally, Your Honor, we started with 7,000.

THE COURT: Yes.

MR. LEE: And now we're down to about 2,200.

THE COURT: Okay. Now, would the amendment involve adding people?

MR. LEE: No.

THE COURT: Okay. Good.

MR. LEE: Okay. Currently our complaint seeks overtime pay under the FLSA for hours worked in



excess of 40 per week. We are seeking to add a claim for straight time, which are hours under 40.

THE COURT: Yes.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **KENT CHRISTOFFERSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 01-495C** |
| **v.** | ) | |
| | ) | **Senior Judge Eric G. Bruggink** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DECLARATION OF PATRICK J. CANTWELL PURSUANT TO 28 U.S.C. § 1746**

I, Patrick J. Cantwell, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. Currently, I am the Assistant Division Chief for Mathematical Statistics in the Statistical Research Division at the U.S. Census Bureau in Suitland, Maryland. At the request of attorneys from the Department of Justice and Department of Commerce's Office of General Counsel, I participated in developing the Memorandum of Understanding, dated February 18, 2005, and the questionnaire that set forth a framework for resolving the above-captioned civil action. I reviewed numerous drafts of both the MOU and questionnaire over a period of nearly two years. When crafting the questions, I consulted with survey experts at the Census Bureau in order to reduce the likelihood that the questionnaire would require respondents to seek outside assistance, and to ensure that the questions would elicit information helpful to both parties.

2. Several questions on the questionnaire were intentionally left open-ended. By allowing the respondent to furnish a narrative response, it was hoped that the format would allow the Defendant to evaluate the credibility of the plaintiffs' claims based on their own narrative answers.

3. I received a copy of the initial database containing partial responses from some of the

Exhibit 5

plaintiffs in February, 2007. Rather than providing narrative responses, the database contained columns with categories of potential narrative answers coded as either "true" or "false." No instruction was provided as to how the responses were coded and keyed. Additionally, there was no indication as to which hours were based on plaintiffs' estimates.

4. In June 2007, I received a database that contained partial responses from additional plaintiffs.

5. After analyzing the data contained in the June 2007 database, I was able to determine that the database contained information for 2,098 plaintiffs based on the responses provided.

6. We purposefully structured the procedure for resolving the claims so that groups of plaintiffs could be divided into strata, and then some plaintiffs would be selected for deposition. I believe viewing the full responses would be helpful in determining strata for such depositions.

7. The answers to Question 14 of the questionnaire regarding the estimation of hours might be helpful in determining strata. If, for example, a pattern emerged in the responses to that question regarding a particular region or LCO , that region or LCO might be considered in stratifying respondents. Similarly, the reliability of the plaintiffs' methods used to estimate back pay may affect how ranges of hours are determined for stratification purposes, for example, the number of hours considered excessively high. Complete unedited responses could help accomplish this goal.

8. I am familiar with the Microsoft Excel program in which the Plaintiffs provided the response data. The data fields in the spreadsheet are capable of recording narrative entries. The data entered do not need to be in a binary (true/false) format.

Executed on: Sept. 11, 2007

Patrick J. Cantwell

Patrick J. Cantwell