APPENDIX

061101A



UNITED STATES COURT OF FEDERAL CLAIMS

KENT CHRISTOFFERSON, et al., )
Plaintiffs, ) Docket No. 01-495C
)
v. )
UNITED STATES, )
Defendant. )

Room 301
National Courts Building
717 Madison Place NW
Washington, D.C.
Wednesday,
November 1, 2006

The parties met, pursuant to notice of the Court, at 2:00 p.m.

BEFORE: HONORABLE ERIC G. BRUGGINK
Judge

APPEARANCES: (Via Telephone)
For the Plaintiffs:
JACK WING LEE, Esquire
JOHN OTA, Esquire
Minami, Lew & Tamaki, LLP
360 Post Street, 8th Floor
San Francisco, California 94108
(415) 788-9000



APPEARANCES: (Continued)
For the Defendant:
STEVEN J. GILLINGHAM, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-2311
RAYNA G. ELLER, Esquire
Department of Commerce
Bureau of the Census
Office of General Counsel
Suitland, Maryland 20746
(301) 763-6513



EXHIBIT 1

061101A



P R O C E E D I N G S

(2:00 p.m.)

THE COURT: Good morning, Mr. Lee.

MR. LEE: Good morning, Judge Bruggink. With me is Sonia Merida and John Ota.

THE COURT: All right. And good afternoon, Mr. Gillingham.

MR. GILLINGHAM: Good morning, Your Honor. I'm here alone.

THE COURT: And Ms. Eller.

MS. ELLER: Good afternoon, Judge Bruggink.

THE COURT: Good afternoon or morning, as the case may be. I guess the purpose of the conference is for me to get caught up on where things stand after, I assume now you all have been receiving the returns on the questionnaires, Mr. Lee?

MR. LEE: Yes, Your Honor.

THE COURT: Let me give you an update of where we are. In early August, we sent out claim forms, 7,500 of them, approximately, and asked for returns of those completed claim forms by the end of September. About 600 of those came back with inaccurate addresses and we re-sent those, so that's delayed to some extent the deadline.

Also, we have a small group of about 500

addresses where we had the wrong return address, but we've fixed that, and so people are able to send it to the correct return address now. To date, we have about 2,700 claim forms returned to us completed.

THE COURT: How many are still not overdue because of the problems with the addresses? In other words, what new date did you give for the people who either had the wrong return address or you had the wrong address?

MR. LEE: We gave them till yesterday, October 31.

THE COURT: I see.

MR. LEE: Which is kind of an artificial date but we wanted to have a date certain for them, and even though they are coming in a day or two late we're still accepting them because we wanted a date in there so that they would have something real to deal with, but we didn't want to quibble with them over one week or four, so we still are accepting them until probably the end of November.

THE COURT: Okay. And what are we going to treat as the drop-dead-date?

MR. LEE: We were intending to use the drop-dead date of either the end of November or mid-December as an absolute drop-dead date. But let me go

5

on and tell you what we are doing so maybe you can have some context with that.

THE COURT: All right.

MR. LEE: The claim forms that are received, we have a staff of six people looking at each one of those and entering them into a database which we intend to share with the government. It's going to be on Excel spreadsheet, and we've done about 850 to date, about 30 percent, and we're continuing to do them as fast as we can. But we do have to call back at least the majority of people that are filling out the claim forms because there's ambiguities on their claim forms, and they don't understand how to roll over hours. And so we have to talk to them that oftentimes involves phone calls. So it's not a quick process but we're hoping that we can finish most of them by November, end of November, and by mid-December complete the whole group.

THE COURT: Okay. Now, did you end up hiring a third party to do the processing?

MR. LEE: What we did was we hired a third party to send out claim forms and to do the re-mails and handle some of the logging, but our staff here is handling the actual contact with the class.

THE COURT: When you said 850 were



processed, does that mean so that you have sufficient data that you don't need to recontact these people?

MR. LEE: In general, that's true, although we're finding that here and there we're having to contact people because we get clarification on an

issue and we change our position, or we're basically seeing an issue more than once, so we're calling people back that we had a different conclusion on. So in general, the ones that are in the database are the ones that we do not intend to go back to.

THE COURT: And that's the 850 or some other number?

MR. LEE: 850.

THE COURT: Okay. And what kind of shorthand version results are you getting with that 850?

MR. LEE: If you mean in germs of the number of overtime hours claimed, we're getting some for as little as one or two hours, and some in excess of a thousand, 2,000 is the highest, and most of them are, I would say, under 100.

THE COURT: Okay. Have you been in contact with the government as this process has unfolded?

MR. LEE: Well, we have been continuing to talk about settlement, and about 30 or 40 of those



that I think we've reached resolution on, so we're narrowing our differences on that. I think there are still about five or six that we still have differences on and we intend to address those, but at least for the Concord people, the ones who we did the trial on, we're nearing settlement on all those, and I think we have three-quarters of those resolved.

THE COURT: Okay. I meant more generally.

In terms of the results you're getting on these forms, is, for example, the problem with the addresses, either the bad addresses for the Plaintiffs or the return address, is this something, Mr. Gillingham, that you're hearing for the first time or have you been tied into this?

MR. GILLINGHAM: Mr. Lee and I spoke today about his progress. I knew generally that he was sending these out, but we haven't been getting weekly updates or anything like that. But no, Mr. Lee and I have spoken.

THE COURT: Okay. Now, as I recall, both the application of my ruling to the Concord group and the application of the returns on these forms to the larger group are both something that presumptively you're going to try to work out a settlement for, is that right?



MR. LEE: That's my understanding, Your Honor.

MR. GILLINGHAM: That's right, Your Honor.

THE COURT: Okay. In terms of the returns that you haven't gotten, why would someone who hasn't sent in a return yet be likely to send one in? If they're operating with an end of September deadline or even if it's an extended deadline, why do you think you're likely to get more?

MR. LEE: Well, because we get phone calls

almost daily asking for extensions because of some emergency or another that are personal in nature, and we're giving them limited extensions, quick turnaround extensions. But even though they're coming back to the table and asking us for other extensions because of personal circumstances. So there is going to be a point in time when we're going to just cut it off.

THE COURT: All right. And is this something that you and Mr. Gillingham needed to negotiate up front or are you just planning to do that after you get all your results?

MR. LEE: Well, I guess the way we've been approaching it is that we haven't really agreed among ourselves, you know, between the parties that there will be a drop-dead date. We assume there will be,



but we want to set that date as we go, and there certainly is going to be a time period where it's just too late.

THE COURT: But is that going to be communicated to everybody you haven't heard from or is that just an in-house, drop-dead date?

MR. LEE: That's an in-house. We don't intend to send anymore flyers out saying, you know, there is one last chance. Right now I guess we haven't set that date yet. The only reason I guess is I'm not comfortable setting that date is that we've given people, with deadlines.

MS. ELLER: Your Honor, may I say something

on behalf of the Department of Commerce? When we negotiated this, and our understanding of that questionnaire was that there was going to be a drop-dead date filled in on that, and it was going to mean something, and that it wasn't going to be something that was done, you know, after the fact.

MR. LEE: I guess I would disagree with that. The government has never stated that we agreed to a drop-dead date. We haven't. And we agree that that's something we will agree to, but we haven't set that date yet, and we don't want to argue with the claimants about a week here or a week there.



THE COURT: Well, it's one thing to give the, I think what we discussed, Ms. Eller is correct, we discussed putting a drop-dead date into the form, but that's a somewhat different question than what the Department of Justice is going to accept as a straggler in the future.

I really think it's probably best that the three of you, or the four of you, however many, five of you out there, really need to talk about that, and I'm not sure this is the time or the place to do it. But it seems to me that there will probably be stragglers coming in a year from now, and we need to know what to do with those people and the people who come in two months from now.

So because this is a negotiated process, I

think you have the option to do whatever you can agree on, but I really think that at some point in the very near future there needs to be some clear understanding that X date is the time that returns are presumptively in effect ignored. And I assume these are being stamped somehow with the date of receipt?

MR. LEE: Yes, they are.

THE COURT: Okay. But I guess, Mr. Gillingham, I need to hear from you as well on this subject.



MR. GILLINGHAM: Well, I don't have any agreement in front of me. Whatever it says it says. I recall that we had a date, and it was going to be a false date inserted so people have a built-in period for stragglers. But I'll review that, and discuss it with all concerned, and we'll, I guess, proceed from what we've agreed on. And to the extent there is an ambiguity, or a lack of precision, then we'll negotiate as you've suggested to be more precise.

THE COURT: All right. I would highly recommend that. The people who are claiming, say, a thousand hours based on -- I'm not asking you to give away anybody's rights here, but is it a return that has some plausibility to it?

I really don't know how many hours people worked total, for example, whether or not that's in effect such an extreme that you all are going to have to ignore it, or is that a total outlier kind of

claim, or is it physically possible to have worked 1,000 hours of overtime?

MR. LEE: The claims that are coming in like that are plausible, are credible.

MS. ELLER: Your Honor, for the Department of Commerce, we don't even have people who -- there are very few people who would have straight time for



the decennial that would have been paid that much for 40 hours a week. The decennial isn't that long.

THE COURT: Did we not talk about having some process of eliminating, or maybe this is just a statistical analysis you all have to do, but there is probably some principled way to look at things like this and focus on where the mean, median or mode lie?

MR. GILLINGHAM: Your Honor, Steve Gillingham. We each have experts in this area who would certainly advise us of that. In general, what the agreement left open was into which strata or groups the questionnaires would be placed, and there is a number of options.

Hours could be the grounds for a strata or it could be done by area of the country or by region or by office or by type of claim, or it could be by all of those. Obviously the more strata you have the more groups you have to deal with.

An agreement was that within each strata there would be designated --

THE COURT: Deponents.

MR. GILLINGHAM: -- deponents to sort of flush out the issues, and we would go from there. There are also those whose -- those responses would be designated as the certainty group, and I think the



criteria for that were also to be developed. I would imagine we would be looking at anybody with a high number as someone who would be placed in the certainty group.

In effect, the certainty group is a group of one; that is, that person would probably be deposed, or the case would be analyzed somehow on its own merits and negotiated, resolved on its own merits, and whatever happened wouldn't affect anybody else basically.

THE COURT: And then how do you use the results of that certainty group?

MR. GILLINGHAM: Well, they would just affect the individuals. So if you have 15 that were, for example, if they were outliers, we would probably identify those as ones who we wanted to treat as a certainty group, meaning one at a time, and negotiate those one at a time.

Those who are not in the certainty group, those who were not designated for one-at-a-time treatment would be banded by -- according to the criteria the parties have yet to agree upon -- and what the agreement provided was that some number

within a given group would be negotiated, and depending upon the experience of the deponents.



For example, if someone claimed -- people were deposed in a ceratin group of hours and following negotiations the parties agreed that their claim should be discounted 10 percent, that 10 percent discount would then be applied to everybody else in the group, so that's the effect of being in a strata.

If you are in a certainty group, you're just being handled on your own merits basically, and our thinking was there wouldn't be a whole lot of those. I guess if I see a claim for 1,000, I think that person is probably a pretty good candidate to be examined on his own because I gather from what Mr. Lee is saying that's not the usual case.

MR. LEE: Right. And Your Honor, the named Plaintiff for this case, Ken Christofferson, has extensive documentation of 500 overtime hours. And if you look at the class period we have here, which is 11 months, if you worked 160 hours for that full 11 months, you would come out to something like 1,700 out of normal time. I mean, it is unusual but certainly possible.

THE COURT: You mean 160 days?

MR. LEE: One hundred and sixty hours per month.

THE COURT: Oh, per month. I'm sorry. I

missed the per month. Okay.

MR. LEE: Eleven months --

THE COURT: All right.

MR. LEE: -- gives us 1,700 hours total.

THE COURT: All right. Okay. So I guess it's premature until you the Plaintiffs develop whatever it is that you're going to offer to the government to negotiate these strata groups and certainty groups and all that?

MR. LEE: Yes, Your Honor. I mean, we're doing that every day.

THE COURT: Doing which part every day?

MR. LEE: Doing the database, talking to people, filling out their forms -- excuse me -- filling out the database based on what they put down in their claim forms.

THE COURT: Okay. So I gather that there is no point in asking you all to negotiate that in the short term, but am I right in thinking that whatever the terms are for telling somebody you're too late is something that needs to be negotiated before you can draw the database to a close?

MR. LEE: Your Honor, we're not opposed to that. We will talk to the government about that.

THE COURT: Okay.

MS. ELLER: This is Rayna Eller. Another issue that I don't recall ever being resolved, of course, was what to do about like an index for attorney-client privileges, what's being claimed as attorney-client privilege, because I gather we're not getting transcriptions of what's on these questionnaire forms.

MR. LEE: You're getting summaries.

THE COURT: Okay. I gather you're right that that's something we haven't drawn closure on. Are you saying, Ms. Eller, that that's something that the government is going to insist on seeing raw data?

MR. GILLINGHAM: Your Honor, as I recall you had, Your Honor, mentioned this in one of your orders. I know I've e-mailed awhile ago Mr. Lee about that being one of our concerns, and we're not going to see the original papers because in the end we were going to see these spreadsheets or database that was going to contain all the answers, most of which would be one-word answers.

THE COURT: Right.

MR. GILLINGHAM: If something is being excluded, then, of course, you know, we would want to know what that is. The whole purpose of the claim is to determine what people are saying that is the basis



for their claim.

THE COURT: All right. It's one thing to talk about sort of mass evaluation of documents. It's another thing to depose somebody. How would the government be able to, or how in a deposition would a Plaintiff, the deponent be able to meaningfully respond to questions unless they had their own either cuff list or their original written response in front of them?

MR. GILLINGHAM: We did have something about this in the MOU. I can't remember right off the bat, but I do remember that it talked about the possibility that original documents would be available for those chosen for depositions, and otherwise they would generally not be available.

THE COURT: Well, it seems to me you're going to have to have some kind of an outlet like that for the government to test certainly whoever you draw on a sample groups, otherwise their level of certainty about what they're getting in the summary data is not going to be all that meaningful.

Okay. Well, I guess I'm responding to Ms. Eller's suggestion. Is that something that needs to be further negotiated or is what's in the MOU sufficient for purposes at least for the present?

18

MR. GILLINGHAM: Your Honor, I would have to go back and look at it again because I remember that we reserved until later on, and I just was not prepared to address this today.

THE COURT: Okay. Well, then I'll ask the five of you, what, other than giving me an update on where things stand at the moment, what do you all need to tell me or what do I need to be asking you?

MR. LEE: Well, I think most of what we will need to talk about after we complete the database and give it to the Defendants and they do their analysis. And at that point we need to sit down and agree upon what statistical analysis we're going to be using, and I think there might be a point in time where we need to sit down together and do that.

THE COURT: Well, that's certainly true. If that is sort of the next major step, the only interim step that I can see that you have to reach some agreement on is, as I said, the closure date, because otherwise the database is a continuous work in process.

MR. LEE: Right. And we don't disagree with that, Your Honor. In fact, we agree that there should be a drop-dead date. I want to talk to my supervisor about what that should be, but the concept was



completely agreeable. We're not trying to hold this thing open. We don't think that serves any purpose for people that are stragglers, and we want also to cut it off.

THE COURT: Okay. All right. Well, when should I next inquire, or is it sufficient for our

present purposes for you all to report in writing jointly in a status report say in 30 days or thereabouts what the status of things is?

MR. LEE: That would be fine. We could do that in 30 days.

THE COURT: Mr. Gillingham?

MR. GILLINGHAM: It depends on whether Mr. Lee expects if anything is going to change in the next 30 days.

THE COURT: Change?

MR. GILLINGHAM: From the status today. I mean, the last thing he referred to is getting us documents in December. We'll certainly go over the MOU again and see if there is any imprecision concerning plans or anything else that needs to be negotiated. I was wondering whether Mr. Lee expects there would be anything to report in the next 30 days.

THE COURT: Well, I'm assuming that you all are going to have to have a conversation about the

20

timeliness of late returns in something less than 30 days. Otherwise he won't know what's going to happen in 30 days unless there is some understanding reached as to whether or not you have a series of dates or a final date or how firm that is.

But Mr. Lee was talking about two possible dates, the end of November and the middle of December, and I'm not sure exactly what that would represent, whether it would be the time that the government gets

everything or the time that all returns are supposed to be due. But whatever that is, my suggestion would be to talk to each other about that, otherwise the next 30 days may lead to more misunderstandings or confusion.

So it may be that 30 days ends up being premature in terms of the final database's being produced, but I'd rather stick with a 30-day reporting back date just to make sure that you all have further conversation about what's going to happen in the next couple of months.

MR. LEE: Yes, I think we're committed to doing that and can file status reports whenever.

THE COURT: Okay. Well, let me ask Mr. Lee to take the initiative in doing that and run it by the government as well. But I'm assuming that prior to



that 30 days that you all would have talked about any other pieces that can be most usefully negotiated now rather than later in terms of anything left out of the MOU or cutoff dates and that kind of thing.

MR. LEE: Sure.

MR. GILLINGHAM: That's fine, Your Honor.

THE COURT: All right. Anything else?

MR. GILLINGHAM: Nothing from the government, Your Honor.

THE COURT: Mr. Lee?

MR. LEE: No.

THE COURT: All right. Thank you, folks.

MR. LEE: Thank you, Your Honor.

MR. GILLINGHAM: Thank you.

(Whereupon, at 2:25 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//



REPORTER'S CERTIFICATE

DOCKET NO.: 01-495C

CASE TITLE: Kent Christofferson v. United States

HEARING DATE: November 1, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: November 1, 2006

Barbara Berney
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018

"Gillingham, Steve (CIV)" <Steve.Gillingham@usdoj.gov>

12/18/2006 10:58 AM

To rayna.g.eller@census.gov

cc

bcc

Subject FW: Jack, pls. call when you are ready to talk about the dtabase fields and procedures for providing us the claimant responses.

History: This message has been forwarded.

---

From: Gillingham, Steve (CIV)
Sent: Monday, December 18, 2006 10:58 AM
To: 'JWL@mltsf.com'
Subject: Jack, pls. call when you are ready to talk about the dtabase fields and procedures for providing us the claimant responses.

winmail.dat

EXHIBIT 2

"Gillingham, Steve \(CIV\)" <Steve.Gillingham@usdoj.go v>

01/17/2007 04:12 PM

To <rayna.g.eller@census.gov>

cc

bcc

Subject FW: database

History: This message has been replied to and forwarded.

---

**From:** Jack Lee [mailto:JLee@MinamiTamaki.com]
**Sent:** Wednesday, January 10, 2007 4:59 PM
**To:** Gillingham, Steve (CIV)
**Subject:** database

this is what it looks like.


Jack W. Lee

**Minami Tamaki LLP**

360 Post Street, 8th Fl., San Francisco, CA 94108

Tel: 415/788-9000 x130 | Fax: 415/398-3887

Email: jlee@MinamiTamaki.com

***South Bay Office***

333 El Camino Real, Suite 350

Sunnyvale, CA 94087

Tel: 408/739-1137 | Fax: 408/739-4641



*****************************************************************

IRS CIRCULAR 230 DISCLOSURE. To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in the communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

*****************************************************************


Exhibit 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KENT CHRISTOFFERSON, et al.,)
Plaintiffs, )
v. ) Docket No. 01-495C
UNITED STATES, )
Defendant. )

Courtroom 9, Room 310
National Courts Building
717 Madison Place NW
Washington, D.C.
Tuesday
June 26, 2007

The parties met, pursuant to notice of the Court, at 10:00 a.m.

BEFORE: HONORABLE ERIC G. BRUGGINK
Judge

APPEARANCES:
For the Plaintiff:
JAKE W. LEE, Esquire
Minami Tamaki, LLP
360 Post Street, 8th Floor
San Francisco, California 94108
(415) 788-9000
For the Defendant:
STEVEN J. GILLINGHAM, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-2311



APPEARANCES: (Cont'd)
For the Defendant:
RAYNA ELLER, Esquire
U.S. Department of Commerce
Bureau of the Census
Silver Hill Road
Suitland, Maryland 20746
(301) 763-6513



EXHIBIT 4

THE COURT: Jurisdiction is probably the thing I guess we need to get cleared up first of all. Precisely what is it you're saying makes this a money-mandating claim under the Tucker Act.

MR. LEE: I will address that in my opening, if that's okay.

THE COURT: Okay.

MR. LEE: By this motion, Plaintiffs seek permission to amend our complaint on behalf of thousands of former census workers.

THE COURT: Let me ask you, in that regard -- I guess this is by way of clarification, we have identified, what, roughly 5,000 people that are currently in the lawsuit?

MR. LEE: I'm going to update you on that. Originally, Your Honor, we started with 7,000.

THE COURT: Yes.

MR. LEE: And now we're down to about 2,200.

THE COURT: Okay. Now, would the amendment involve adding people?

MR. LEE: No.

THE COURT: Okay. Good.

MR. LEE: Okay. Currently our complaint seeks overtime pay under the FLSA for hours worked in

5

excess of 40 per week. We are seeking to add a claim for straight time, which are hours under 40.

THE COURT: Yes.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **KENT CHRISTOFFERSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 01-495C** |
| v. | ) | |
| | ) | **Senior Judge Eric G. Bruggink** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DECLARATION OF PATRICK J. CANTWELL PURSUANT TO 28 U.S.C. § 1746**

I, Patrick J. Cantwell, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1. Currently, I am the Assistant Division Chief for Mathematical Statistics in the Statistical Research Division at the U.S. Census Bureau in Suitland, Maryland. At the request of attorneys from the Department of Justice and Department of Commerce's Office of General Counsel, I participated in developing the Memorandum of Understanding, dated February 18, 2005, and the questionnaire that set forth a framework for resolving the above-captioned civil action. I reviewed numerous drafts of both the MOU and questionnaire over a period of nearly two years. When crafting the questions, I consulted with survey experts at the Census Bureau in order to reduce the likelihood that the questionnaire would require respondents to seek outside assistance, and to ensure that the questions would elicit information helpful to both parties.

2. Several questions on the questionnaire were intentionally left open-ended. By allowing the respondent to furnish a narrative response, it was hoped that the format would allow the Defendant to evaluate the credibility of the plaintiffs' claims based on their own narrative answers.

3. I received a copy of the initial database containing partial responses from some of the

Exhibit 5

plaintiffs in February, 2007. Rather than providing narrative responses, the database contained columns with categories of potential narrative answers coded as either "true" or "false." No instruction was provided as to how the responses were coded and keyed. Additionally, there was no indication as to which hours were based on plaintiffs' estimates.

4. In June 2007, I received a database that contained partial responses from additional plaintiffs.

5. After analyzing the data contained in the June 2007 database, I was able to determine that the database contained information for 2,098 plaintiffs based on the responses provided.

6. We purposefully structured the procedure for resolving the claims so that groups of plaintiffs could be divided into strata, and then some plaintiffs would be selected for deposition. I believe viewing the full responses would be helpful in determining strata for such depositions.

7. The answers to Question 14 of the questionnaire regarding the estimation of hours might be helpful in determining strata. If, for example, a pattern emerged in the responses to that question regarding a particular region or LCO , that region or LCO might be considered in stratifying respondents. Similarly, the reliability of the plaintiffs' methods used to estimate back pay may affect how ranges of hours are determined for stratification purposes, for example, the number of hours considered excessively high. Complete unedited responses could help accomplish this goal.

8. I am familiar with the Microsoft Excel program in which the Plaintiffs provided the response data. The data fields in the spreadsheet are capable of recording narrative entries. The data entered do not need to be in a binary (true/false) format.

Executed on: Sept. 11, 2007

Patrick J. Cantwell

Patrick J. Cantwell