**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| KENT CHRISTOFFERSON, et al., Plaintiffs, v. UNITED STATES OF AMERCA, Defendant. | Case No. 01-495C<br>Senior Judge Eric G. Bruggink<br>**Reply Brief in Support of Plaintiffs' Motion for a Protective Order** |

# TABLE OF CONTENTS


I. Introduction ........................................................................................................... 1

II. Defendant's Extrinsic Evidence Should Be Barred ............................................................... 1

III. Neither the Cantwell Declaration Nor the November 1, 2006 Status Conference Transcript Support Defendant's Position ........................................................................................ 2

IV. Plaintiffs had a Reasonable Expectation of Confidentiality in Completing the Forms .......... 4

V. The Database Information Already Provided to Defendant is Sufficient ............................... 9

VI. Conclusion ........................................................................................................... 12

**TABLE OF AUTHORITIES**

**Cases**

*Brock v. Panzarino*, 109 F.R.D. 157 (E.D.N.Y. 1986) ........................................................... 11

*Duplan Corp. v. Deering Milliken, Inc*., 397 F. Supp. 1146 (D. S.C. 1975) .................................. 7

*EEOC v. Int'l Profit Assocs*., 206 F.R.D. 215 (N.D. Ill. 2002) ............................................ 4, 8, 9

*In re Spalding Sports Worldwide, Inc*., 203 F.3d 800 (Fed. Cir. 2000)......................................... 7

*United States v. Robinson*, 121 F.3d 971 (5th Cir. 1997) ............................................................ 7

*Upjohn v. United States*, 449 U.S. 383 (1981)............................................................................ 4, 8

**Other Authorities**

Federal Rules of Evidence Rule 408……………………………………………………..2, 13

Rules of the United States Court of Federal Claims Rule 26(b)(3)………………...…………...11

## I. Introduction

Defendant's Opposition is most notable for what it does *not* say in three major respects. First, Defendant completely fails to address the application of the parol evidence rule which, as we pointed out, bars its extrinsic evidence of contractual intent. Accordingly, Defendant waives its right to now object to the application of the rule by the Court. Second, Defendant fails to perform any real analysis of attorney-client privilege and thus cannot explain why, for example, as a matter of law, Plaintiffs' written narrative responses should not be considered as privileged communications to counsel when all of the evidence is to the contrary. Lastly, despite a declaration from its statistician, Defendant fails to articulate precisely why the database is deficient for strata identification purposes.

## II. Defendant's Extrinsic Evidence Should Be Barred

The application of the parol evidence rule here was adequately explained in our opening brief and need not be further addressed in reply except to note that Defendant's calculated decision to ignore our argument leaves one rather gaping flaw in its brief: it fails to explain why the MOU says nothing about providing Defendant with copies of either the completed questionnaire forms or even the raw narrative responses. Surely, if the receipt of the questionnaire and narrative responses was a "deal breaker," Defendant would have insisted upon appropriate provisions being inserted in the MOU expressly requiring Plaintiffs' Counsel to disclose them.

On the contrary, despite two years of arms length negotiations, the MOU contains no such provision, leaving Defendant grasping for the thinnest straws of extrinsic evidence, such as its argument that the term "relevant information" in ¶7 of the MOU was intended to include the raw, narrative responses provided in the questionnaire. Once again, however, the MOU says no

such thing. Indeed, as we have pointed out, ¶7 plainly contemplated a data compilation procedure in which the third-party administrator (*i.e.*, Plaintiffs' Counsel) would process the questionnaire information. If raw narrative responses were merely to be handed over to Defendant, then ¶7 would be superfluous. Thus, the parol evidence rule should be applied to bar such extrinsic evidence which, if permitted, would effectively undermine the MOU and also render superfluous the considerable amounts of time and money already expended by Plaintiffs' Counsel in performing the third-party administrator duties under ¶7. Defendant's failure to negotiate MOU terms it now asserts were critical is mere buyer's remorse that should be construed against it, not the Plaintiffs.

## III. Neither the Cantwell Declaration Nor the November 1, 2006 Status Conference Transcript Support Defendant's Position

Defendant introduces two new items – the Cantwell Declaration and the transcript of the November 1, 2006 status conference – in support of its interpretation of the MOU. For example, Defendant cites to the Cantwell Declaration at ¶6 as its basis for asserting that, by deleting an earlier draft MOU provision allowing access to the questionnaires for claimants selected for deposition, Defendant was thereby allowed access to all of the questionnaires.[1] DOJ Brief at 9. But Cantwell never actually says that he participated in the MOU negotiations or that Defendant's negotiation position was that it would have access to all of the questionnaires. Indeed, Cantwell did not participate in negotiation sessions regarding the questionnaire,[2] and to the extent Defendant asserts or even implies that Cantwell can testify as to the parties' intent during the

[1] In actuality, the opposite is true: as we pointed out, Mr. Lee offered to provide such limited access to the questionnaires as a settlement concession only under FRE Rule 408, and this concession was subsequently withdrawn. Lee Decl. at ¶22.

[2] *See* Supplemental Declaration of Jack W. Lee in Support of Plaintiffs' Motion for a Protective Order at ¶2. As Mr. Lee states, Cantwell was never involved in any of the face-to-face discussions regarding the content of the questionnaires.

negotiations, we move to strike his entire declaration on the grounds that he is incompetent to so testify since he did not participate in the actual face-to-face negotiations conducted pursuant to FRE Rule 408. In any event, ¶6 of his declaration merely states that he *believes* that "viewing the full responses *would be helpful*" in determining the strata for depositions under the MOU. (emphasis added). Defendant further cites to ¶1 of his declaration as its basis for stating that it "never understood that we could not see the responses." Again, Cantwell says no such thing.

Most tellingly, a careful reading of the November 1, 2006 status conference transcript shows that the statements made by both the Court and by Mr. Gillingham at the hearing actually support Plaintiffs, not Defendant. For example, Defendant states: "[In the status conference] when plaintiffs suggested providing defendant with only summaries of the responses, the Court pointed out that defendant would need to see the actual language of the responses in order to meaningfully evaluate them." DOJ Brief at 5. But again, a careful reading of the transcript shows that Defendant is wrong. The Court's reference to the narratives being provided is limited to their usefulness for actual depositions. *See* transcript, DOJ's Exh. 1, at 15:

> THE COURT: All right. It's one thing to talk about sort of mass evaluation of documents. It's another thing *to depose* somebody. How would the government be able to, or how *in a deposition* would a Plaintiff, the deponent be able to meaningfully respond to questions unless they had their own either cuff list or their original written response in front of them?

*Id*. (emphasis added).

Mr. Gillingham, in response to the Court, actually *admits* to the Court that under the MOU, the returned questionnaire forms "*would generally <u>not</u> be available*:"

> MR. GILLINGHAM: We did have something about this in the MOU. I can't remember right off the bat, but I do remember that it talked about the possibility that original documents would be available *for those chosen for depositions, and otherwise they would generally <u>not</u> be available.*

*Id*. (emphasis added).

Clearly, Defendant's understanding of the MOU at the time of the status conference accords with Plaintiffs' position. Thus, it is simply not credible for Defendant to now argue that it "never understood" that it could not see the responses.

## IV. Plaintiffs had a Reasonable Expectation of Confidentiality in Completing the Forms

Turning now to the relevant law governing attorney-client privilege:[3] in our opening brief, we cited the Supreme Court's decision in *Upjohn v. United States*, 449 U.S. 383 (1981) and the district court's decision in *EEOC v. Int'l Profit Assocs., Inc.*, 206 F.R. D. 215 (N.D. Ill. 2002) as controlling law since the facts in those cases were virtually directly on point. Defendant relegated its analysis of both cases to a mere footnote, and in one sentence, attempts to distinguish *Upjohn* on the basis that it involved an internal investigation versus a questionnaire format agreed to by both parties, as here. DOJ Brief at 15, n. 12. Defendant fails to explain why an agreed-to questionnaire would necessarily preclude a finding of attorney-client privilege, other than to assert, by implication, that because the form was agreed-to, "it was *understood* that the information communicated in the conversation was to be conveyed to others" and, therefore, the Plaintiffs had no "*reasonable expectation* of confidentiality." *Id*. at 13 (emphasis added).

Defendant fails to offer any evidence, however, to show either that the Plaintiffs "understood" that the information they were providing would be conveyed to others, or that the Plaintiffs did not have any "reasonable expectation" of confidentiality when they returned their forms to the Minami Tamaki law firm. The Claim Packet documents do not contain any sort of disclaimer language to warn Plaintiffs that their responses would not be confidential or that their completed forms would then be forwarded to anyone else. On the contrary, the message con-

[3] Defendant concedes that it is not seeking any notes relating to the questionnaire responses. *See* DOJ Brief at 15, n. 12 ("Here, we seek no such notes . . . .").

veyed to the Plaintiffs was unmistakably that of attorney-client communications, as demonstrated by the following list of facts contained in Mr. Lee's Declaration:

- Each Claim Packet was sent *from* Minami Tamaki LLP to each Plaintiff;
- The Attorney Letter enclosed in the Packet was printed on Minami, Lew & Tamaki LLP[4] letterhead, bearing the firm address, phone and fax numbers as well as the dedicated Census toll-free phone number and web site address;
- Each Attorney Letter bore Mr. Lee's name and signature;
- Each Attorney Letter contained a prominent headline on the first page, in bold-faced print and all-caps, "**CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**;"
- The "Re:" line of the Attorney Letter stated: "Your Claim for Unpaid Overtime Against the U.S. Census Bureau: Christofferson vs. United States, U.S. Court of Federal Claims (No. 01-495C)";
- The first sentence of the Attorney Letter, which began as follows: "*We are the law firm representing you* . . . " (emphasis added);
- The substance of the Attorney Letter, advising each Plaintiff of the worth of their claim and the "next steps" to be taken in order to be eligible for payment.
- The final two paragraphs of the Attorney Letter are a plea by Mr. Lee "urging" each Plaintiff to return the completed the Claim Form "as soon as possible," that "[w]e remain available to assist you," and that "if you have any questions in completing your Claim Form and Payroll Summary" to go to www.censusclassaction.com, send an email to the Minami Tamaki LLP email address, call the toll-free number or send a letter to Minami Tamaki LLP;
- The Notice stated in the first paragraph: "You are part of a group of people ("Plaintiffs") who filed a claim . . . This Notice explains this lawsuit, the settlement process for this lawsuit and what you must do to continue your claim for unpaid overtime pay.";
- The Notice stated in the second paragraph that it was "being sent to you by MINAMI, LEW & TAMAKI LLP, the San Francisco law firm *representing the Plaintiffs*"(emphasis added);

[4] The firm has since shortened its name.

- The very next paragraph of the Notice instructed the Plaintiff to send the completed Claim Form and Payroll Summary, "in the enclosed envelope," to "MINAMI, LEW & TAMAKI LLP;"

- Under the "What if I have Questions" section of the Notice, plaintiffs were instructed to "please contact *this law firm*" (emphasis added) and were given a choice of calling the toll-free number, sending an email to the law firm, or going to the dedicated web site (which is run by the Minami Tamaki law firm);

- At the bottom of the first page of the Notice, Plaintiffs were instructed not to call the government or the Court because: "As *your attorneys*, our conversations with you are confidential and protected by the attorney-client privilege," and that "*any communications*" with persons outside of "*this law firm*" about a Plaintiff's claim are not confidential. (emphasis added); and

- The fact that in ¶3 of the Claim Form itself, Plaintiffs were asked to check a "yes" or "no" as to whether they wished to continue their claims, and that "[a] 'NO' means that you no longer wish to be a participant in this lawsuit," thus clearly indicating by negative inference that a "yes" would mean a continuation of the lawsuit and, therefore, the on-going attorney-client relationship with the Minami Tamaki law firm.

Thus, as the above facts amply demonstrate, the only reasonable expectation any Plaintiff reviewing his or her Claim Packet could possibly have had was that he or she was communicating only with counsel, for the purpose of seeking legal advice or assistance with the on-going litigation. Furthermore, the Plaintiffs could only have reasonably believed that their completed Claims Form and narrative responses would be treated as a confidential attorney-client communication. Indeed, the Plaintiffs welcomed the Claim Packet as an opportunity to communicate with the Minami Tamaki firm in order to receive assistance with their claims, as demonstrated by the following facts that were also contained in Mr. Lee's Declaration:

- Thousands of telephone calls, emails and letters were received or made between the Plaintiffs and the Minami Tamaki Law Clerks in response to the Claims Packets. The volume of contacts with the Plaintiffs during the questionnaire data processing phase is indicated in the Lee Decl. at ¶¶16 and 19 (*e.g.,* 16.5 feet of paper occupying six lateral file drawers full); and

- Plaintiffs actively sought assistance and advice from our firm in order to fill out their forms, for reasons ranging from needing clarification of ter-

minology, to fear of retaliation from the Census Bureau. Lee Decl. at ¶¶14-17.

Defendant offers no evidence to the contrary. In lieu of factual evidence to support its assertion that Plaintiffs had no expectation of confidentiality, Defendant cites to two cases, without any analysis: *Duplan Corp. v. Deering Milliken, Inc*., 397 F. Supp. 1146 (D. S.C. 1975) and *United States v. Robinson*, 121 F.3d 971 (5th Cir. 1997). But these cases involve very different facts and, thus, are easily distinguished. For example, *Duplan Corp.* construed the attorney-client privilege within the context of communications between a corporation and its corporate patent department. There, the court found, via party admissions, that "DRMC used no independent discretion in the filing of Chavanoz patents in this country *but merely did whatever Chavanoz directed*," and DRMC served as a "conduit in the prosecution of Chavanoz' (sic) patents." *Duplan Corp.,* 397 F. Supp. at 1168 (emphasis added). The court held that the communications at issue were not privileged because, *inter alia*, the so-called "conduit theory" of patent prosecutions applied as the law of the case.

The conduit theory's characterization of patent attorneys as mere "conduits" to the Patent Trademark Office, however, has been rejected in the Federal Circuit. *See In re Spalding Sports Worldwide, Inc*., 203 F.3d 800, 805 (Fed. Cir. 2000) (holding that "an invention record constitutes a privileged communication, as long as it is provided to an attorney 'for the purpose of securing primarily legal opinion, or legal services, *or assistance in a legal proceeding*'") (emphasis added). The Federal Circuit's holding in *Spalding* is equally applicable here: the Claim Packet information both provided Plaintiffs with legal advice and also invited them to seek further advice and assistance in pursuing their litigated claims – *i.e.*, a legal proceeding.

Moreover, the Minami Tamaki firm was certainly no "conduit" to the Census Bureau: as Plaintiffs' Counsel, the firm's Law Clerks and attorneys were pro-actively involved in both as-

sisting Plaintiffs in completing their forms as well as in weeding out those Plaintiffs whose claims were not eligible for various reasons. See, *e.g.*, Lee Decl. at ¶18. Importantly, the firm has protected the confidentiality of the Plaintiffs' communications by only disclosing the underlying facts of their responses, in the agreed upon database format. Accordingly, the communications are privileged and no waiver of that privilege has occurred.

Defendant's attempt to distinguish *Upjohn* also rests on the flawed premise that somehow whether an investigation is internal or external matters. But that issue, along with the questionnaire being jointly developed, are red herrings that have nothing to do, ultimately, with the Supreme Court's analysis and conclusions in *Upjohn*. Rather, the critical and determinative facts in *Upjohn* were that communications were being made by clients to their attorney, in confidence. As the Court stated in *Upjohn*:

> [T]he privilege exists to protect not only the giving of professional advice to those who can act on it *but also the giving of information to the lawyer to enable him to give sound and informed advic*e. [citations omitted] The first step in the resolution of any legal problem is *ascertaining the factual background and sifting through the facts with an eye to the legally relevant*.

449 U.S. at 390-91 (emphasis added). The above principles from *Upjohn* are directly applicable to the facts here. As demonstrated by the above-listed facts from Mr. Lee's Declaration, the Claim Packets alone amply demonstrate that both the sending of the Packets to the Plaintiffs, *and* the return of their narrative responses to the Minami Tamaki firm – their counsel – were attorney-client communications and therefore privileged.

Defendant's dismissal of the *Int'l Profit Assocs.* case, on the ground that it seeks only the Plaintiffs' "own narrative responses" and not the notes of our Law Clerks, is similarly flawed. Defendant's two-sentence analysis appears to suggest that the *Int'l Profit Assocs*. case supports its distinction between the interview notes of communications with the Plaintiffs, versus the raw

narrative responses. But this is an artificial distinction because it presupposes that the narrative responses are not an attorney-client communication. Facts and evidence aside, the *Int'l Profit Assocs*. opinion draws no such distinction; rather, there, the EEOC had instructed its interviewers "to inform each interviewee that the communications were confidential, but IPA would be provided with a summary of the facts told to EEOC." *Int'l Profit Assocs*., 206 F.R.D. at 217.

Similarly, here, for the reasons listed above, the Plaintiffs' completed questionnaires and narrative responses were attorney-client communications, and the words "attorney-client privilege" and "confidential attorney-client communication" were actually used, in both the Attorney Letter and the Notice.[5] Also, as in *Int'l Profit Assocs*., a summary of the facts provided by the Plaintiffs' narrative responses was provided to Defendant, pursuant to the MOU database procedures. Accordingly, the narrative responses provided by the Plaintiffs were attorney-client communications, and as such, are not distinguishable from counsel's conversations with Plaintiffs or notes of such conversations.

## V. <u>The Database Information Already Provided to Defendant is Sufficient</u>

Lastly, we address Defendant's argument that the term "relevant information" in ¶7 of the MOU – an undefined term – should be construed expansively because "it would necessarily include verbatim responses." In spite of Mr. Gillingham's admission at the November 1, 2006 status conference, Defendant now argues that the Cantwell Declaration is evidence of its interpretation. Defendant is clearly over-reaching. Aside from the fact that Cantwell is incompetent to testify as to the negotiated intent of the MOU, Cantwell never states that the raw narrative re-

[5] The language contained in the Notice was reviewed in draft by Defendant during negotiations. Thus, Defendant fully consented to the reference made to attorney-client privilege at the bottom of the first page of the final version of the Notice. Although Defendant now claims that privilege should only apply, literally, to "conversations" between Plaintiffs and their counsel, this is yet another strained distinction without a difference since Plaintiffs reasonably believed their questionnaire responses to be confidential communications to counsel.

sponses are necessary or even critical to Defendant's determination of the "strata" of plaintiffs to be chosen for depositions, pursuant to ¶8 of the MOU. Rather, he merely states that he "believes" that "viewing the full responses would be *helpful* in determining strata" and that the "unedited responses *could* help accomplish this goal." Cantwell Decl. at ¶¶6-7 (emphasis added).

Thus, Defendant's claim that the database information is deficient rings hollow. The fact that Cantwell admits that the raw narrative responses would only be "helpful" rather than necessary proves that he can perform calculations for strata purposes based on the categories as provided. Of course, we pointed out in our opening brief that five of the categories used in the database, with regard to the narrative responses to question no. 17, were the *same exact categories listed in the Notice* as examples of why a Plaintiff believed a supervisor knew about overtime being worked:

> In fact, five of the categories used in the database expressly answer this question: (1) Supervisor asked me to work overtime; (2) Supervisor told me to work until job complete; (3) Supervisor told me to rollover OT hrs; (4) Supervisor worked alongside me; and (5) Supervisor saw me early am and late at night. *See* sample database page, Lee Dec., Exh. 5 at fields P through X. Under any of these five categories, the supervisor would have had either actual knowledge or constructive knowledge of the employee working overtime. *These are precisely the same five examples listed in the Notice that the Defendant had reviewed and approved during the course of the year-long questionnaire negotiations.*

Plaintiffs' Motion at 21 (emphasis in original).

Accordingly, it should be noted that Plaintiffs did, in fact, produce a searchable database which provides: (1) each Plaintiff's estimate of the her overtime claim by week; (2) each Plaintiff's estimate of his or her "banked" hours by week; (3) each Plaintiff's home office/work location; (4) how each Plaintiff estimated his or her overtime; and (5) whether their supervisor knew or had reason to know that the Plaintiff had worked overtime, prior to it being worked.

Defendant had originally attempted to justify its request for discovery of the questionnaires on the ground that it would be unable to "evaluate the credibility of the claims, determine certainty groups, and stratify the claims." Gillingham Letter, Lee Decl., Exh.4 at ¶3[6]. To determine certainty groups and stratify the claims, the Defendant needs only the class members' overtime estimates. These were provided in the database; thus, there is no substantial need for Defendant to discover the questionnaires for this purpose.[7] Moreover, the Defendant has another avenue available to it for obtaining the information sought: it can "evaluate the credibility of the claims" by deposing class members. Thus, the Defendant cannot satisfy its burden of showing undue hardship since the work product material "is generally protected if the party seeking discovery is able to obtain the desired information by taking the deposition of the witnesses." *Brock v. Panzarino*, 109 F.R.D. 157, 159 (E.D.N.Y. 1986) (holding that the "possibility of locating impeachment material in a potential witness' prior statement does not amount to substantial need" justifying the discovery of attorney-work product).

//

//

//

//

//

//

[6] Defendant now asserts a right to "*audit* plaintiffs' assignment of responses to any particular category," as if Plaintiffs' Counsel was a government contractor. DOJ Brief at 11 (emphasis added). Of course, how such an "audit" would be conducted without a wholesale violation of attorney-client privilege and attorney-work product doctrine is unexplained.

[7] Although Defendant appears to concede that it is not entitled to attorney-work product, as we have previously explained, "the questionnaire forms are inextricably intertwined with work product." Plaintiffs' Motion at 19. Thus, in accordance with RCFC 26(b)(3), Defendant would have to show both substantial need for the forms and responses, and undue hardship.

## VI. Conclusion

For the foregoing reasons, the requested Motion for Protective Order should be granted.

DATED: September 28, 2007

Respectfully submitted,
MINAMI TAMAKI LLP

s/

JACK W. LEE
360 Post St. 8th Floor
San Francisco, CA 94108-4903
Telephone: (415) 788-9000
Fax: (415) 398-3887