# In the United States Court of Federal Claims

No. 01-495C
(Filed: October 25, 2007)

* * * * * * * * * * * * * * * * * * * * * *

KENT CHRISTOFFERSON, *et al.,*

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant.*

* * * * * * * * * * * * * * * * * * * * * *

Motion for Protective Order; RCFC 26(b)(1); Attorney-Client Privilege; Work Product Doctrine.

*Jack W. Lee*, San Francisco, CA, for plaintiffs.

*Steven J. Gillingham,* United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Peter D. Keisler*, Assistant Attorney General, and *Jeanne E. Davidson*, Director, for defendant. *Rayna G. Eller*, Bureau of the Census, of counsel.

______________

OPINION

______________

BRUGGINK, *Judge*.

This is a pay case brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219 (2000), and the Federal Employee Pay Act, 5 U.S.C. §§ 5541-5550a (2000), by thousands of former employees of the United States Bureau of the Census ("Bureau") for unpaid overtime hours worked during the 2000 Decennial Census. Pending now is plaintiffs' motion for a protective order. Plaintiffs seek protection, primarily based on an asserted attorney-client privilege, from discovery of questionnaires mailed to individual plaintiffs, completed, and returned to plaintiffs' counsel. The matter is fully briefed. Oral argument was heard on October 19, 2007. We

denied plaintiffs' motion on the record and by order dated October 19, 2007. We now issue this memorandum detailing the reasons for the denial of plaintiffs' motion for a protective order.

## BACKGROUND

During the lengthy course of this litigation, the court has resolved a number of procedural and substantive issues. *See Christofferson v. United States*, 64 Fed. Cl. 316 (2005) ("*Christofferson I*") (dismissing plaintiffs' FLSA claims for hours in excess of eight per day and denying plaintiffs' request for equitable tolling of the FLSA's limitations period); *Christofferson v. United States*, 67 Fed. Cl. 68 (2005) ("*Christofferson II*") (holding that Field Operations Supervisors were not FLSA exempt); *Christofferson v. United States*, 72 Fed. Cl. 541 (2006) ("*Christofferson III*") (denying plaintiffs' request for equitable tolling of the limitations period as applied to two specific Field Operations Supervisors); *Christofferson v. United States*, 77 Fed. Cl. 361 (2007) ("*Christofferson IV*") (denying plaintiffs' motion to amend the complaint five years later to include claims for unpaid regular hours). Familiarity with the background facts is assumed.

In February 2005, the parties agreed to a Memorandum of Understanding ("MOU"), which expressed their desire to resolve the claims of thousands of plaintiffs not yet deposed through settlement. In short, the MOU established a plan whereby certain plaintiffs would be selected and deposed and, depending on the evidence obtained, the parties would attempt to settle, reduce, or eliminate the claims of numerous other similarly situated plaintiffs in like manner. To ascertain the nature of each plaintiff's claims, the MOU called for the creation of a mutually agreeable questionnaire that would be used to gather key information from the thousands of plaintiffs. The parties spent more than one year negotiating the language of the questionnaire.

The final questionnaire, entitled "claim form," asked for a variety of factual information, including each claimant's name, address, social security number, and other contact information, whether the claimant ever worked more than forty hours in one week while employed by the Bureau, which weeks the claimant estimated he or she worked overtime, the number of overtime hours that went unpaid, and whether the claimant believed his or her supervisor had reason to know that the claimant would work overtime prior to working the overtime. While most questions required only a short one-word answer, two questions called for a narrative response. Question #14 asked

claimants to explain how they arrived at their estimates of overtime hours worked if the hours claimed were based on estimates.[1] Question #17 required claimants to explain why they believed their supervisors knew or had reason to know that the claimant would work overtime. At the end of the questionnaire, there is a certification requirement calling for the date, signature, and printed name of each claimant. The certification language above the signature line reads: "Certification: I swear or affirm under penalty of perjury that the above statements are true to the best of my knowledge and belief." Pl.'s Mot., Ex. 2.

Plaintiffs' counsel mailed the questionnaires to more than 7,000 plaintiffs on August 1, 2006. At the top of a cover letter accompanying the questionnaires, plaintiffs' counsel included the language "**CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**." *Id*. The letter explained to the recipients that the "United States Government has agreed to a process of evaluating all claims of unpaid overtime that have been filed in this case." *Id.* Plaintiffs' counsel also included a document entitled "notice of claims procedure" with the questionnaire, which provided basic information about how various claims would be processed, evaluated, and possibly settled. The notice instructed the recipients that they should "not call the Court, the U.S. Census Bureau or any Department of Justice attorneys for assistance. As your attorneys, our conversations with you are confidential and protected by the attorney-client privilege. However, any communications you have with persons outside this law firm about your claim are not confidential." *Id*. The final step on the Notice of Claims Procedure informed the claimants that, "[*t*]*he Department of Justice and this law firm will attempt to agree on appropriate compensation based upon the Claim Form responses and the sworn oral statements of some claimants*." *Id*. (emphasis supplied). Plaintiffs' counsel received more than 2,000 completed or partially completed questionnaires over the subsequent months. While reviewing the questionnaires, plaintiffs' counsel and several law clerks in the firm contacted individual claimants when information in his or her questionnaire was unclear

---

[1]Included with each questionnaire was a separate payroll summary provided by the Bureau. The questionnaire instructed claimants to enter estimated hours of overtime directly on the payroll summaries. References to "completed questionnaires" or "returned questionnaires" throughout this opinion include completed and returned payroll summaries.

or incomplete. Plaintiffs' counsel and law clerks often took notes from those conversations directly onto the returned questionnaires.

With considerable effort, plaintiffs' counsel compiled the raw data from the thousands of returned questionnaires and converted it into an electronic database. The conversion of the data to electronic format was fairly straightforward for those questions that required either a "yes" or "no" answer. The data from questions that required a narrative response, however, was converted by selecting one of several of the more common answers. Thus, responses to Question #17, which asked how the claimant knew that his or her supervisor was aware that he or she worked overtime, were reduced to one of the following choices in the database: (1) I told or complained to my supervisor that I worked overtime; (2) I saw others denied overtime so I did not claim any myself; (3) my supervisor asked me to work overtime; (4) my supervisor told me to work until the job was complete; (5) my supervisor rejected my time-sheet that included overtime; (6) my supervisor told me to roll-over my overtime hours to another week; (7) my supervisor worked along-side me; (8) my supervisor saw me early in the morning and late at night; or (9) my supervisor denied my travel time. *See* Pl.'s Mot., Ex. 5. Likewise, responses to Question #14, which asked for a description of how the claimant estimated the overtime hours claimed, were reduced to one of three choices: (1) memory, (2) contemporaneous documents or records, or (3) added lunch breaks and/or travel time. *Id.*

On February 21, 2007, plaintiffs' counsel transmitted a copy of the electronic database to defense counsel. In accordance with the next step laid out in the MOU, the parties were to "examine the data for the purpose of dividing the returns into groups and identifying specific groups (strata) for further discovery, including deposition." Pl.'s Mot., Ex. 1, ¶ 8. The different groups or strata of individual plaintiffs were important because once the parties agreed to settle the claims of one plaintiff in a particular strata after more extensive and focused discovery, they would then settle the claims of all the remaining plaintiffs in that same strata without such additional discovery. Thus, the joint effort of analyzing and grouping the plaintiffs based on their responses to the questionnaires is central to the agreed approach toward expeditiously resolving this litigation.

After receiving the electronic database, defense counsel requested copies of the original returned questionnaires. Plaintiffs' counsel objected on grounds that the returned questionnaires constituted privileged

communications between the attorney and his clients. Plaintiffs' counsel also believed the questionnaire, and the responses thereto, were more akin to interrogatories and a first draft of an answer a client might provide to his attorney. In a letter to plaintiffs' counsel on May 25, 2007, defense counsel explained that the original questionnaires were a "material element of our ADR agreement" and that "we expected to receive verbatim transcripts of the responses to the questionnaires, minus only privileged communications." Pl.'s Mot., Ex. 3. Moreover, defense counsel explained that the electronic database "provides only a categorization of the response" to the narrative questions, which "eliminates the question's usefulness." *Id.*

On June 11, 2007, plaintiffs' counsel responded to the May 25 letter from defense counsel, informing the government that he declined the request for copies of the questionnaires. Immediately following oral argument in *Christofferson IV*, 77 Fed. Cl. 361, heard June 25, 2007, the parties notified the court of their impasse with respect to the production of the questionnaires, and plaintiffs' counsel indicated that he would seek a protective order. We thus directed plaintiffs to file the subject motion.

## DISCUSSION

Pursuant to Rule 26(c) of the Rules of the Court of Federal Claims ("RCFC"), plaintiffs seek a protective order for "good cause shown" in response to defendant's attempted discovery of the completed questionnaire forms, including a verbatim transcript. Plaintiffs insist that the electronic database provided to defendant accurately and completely captures the pertinent data in the complete questionnaires and, therefore, there is no need for defendant to attain actual copies of the completed questionnaires. Plaintiffs present three grounds that they believe justify the imposition of a protective order: (1) defendant's request violates the terms of the MOU; (2) the completed questionnaires are privileged; and (3) defendant's request will cause an undue burden. We address each argument in turn.

### I. Defendant's Request is Not Inconsistent with the MOU

One of plaintiffs' arguments is that the MOU is an enforceable contract, and, because defendant's request violates the terms of that "contract," a protective order is necessary. Specifically, plaintiffs believe the MOU does not allow for defendant's receipt of copies of the returned questionnaires.

Plaintiffs point to the language of "step three" of the five-step process laid out in the MOU for resolving the remaining claims:

> Step Three: Processing of Questionnaires. The questionnaires will be returned to the Plaintiffs' counsel. Upon their return, plaintiffs' counsel will provide them to a third party administrator ("TPA") to be hired by plaintiff. The role of the TPA will be to assist plaintiffs' counsel to: (a) create a database identifying plaintiffs, their filing dates, and questionnaire return dates; (b) compile a listing of those who have not responded by the deadline; (c) respond to questions of plaintiffs and refer them to legal counsel; and (d) create a database that will record all relevant information contained in the questionnaire.

Pl.'s Mot., Ex. 1. Plaintiffs insist that the MOU "says nothing about the TPA providing either a copy of the questionnaire or the raw data contained therein to Defendant." Pl.'s Mot. at 9.

Plaintiffs believe the MOU is an enforceable contract because "it was negotiated, agreed to and executed by the parties for the purpose of resolving the disputed claims in this action." *Id.* at 7. Plaintiffs also argue that the MOU is an enforceable contract because plaintiffs' counsel has "substantially performed in accordance with the express terms of the contract and has, therefore, already provided the bargained-for consideration contemplated by the agreement." *Id.* Plaintiffs cite the Federal Circuit's decision in *Silicon Image v. Genesis Microchip Inc.*, 395 F.3d 1358 (Fed. Cir. 2005), for the proposition that "settlement agreements are contracts." *Id.* at 1363.

Even if the MOU is an enforceable contract, we are not convinced defendant's request would violate its terms. At most, step three explains that the relevant data collected from the returned questionnaires will be compiled and converted into an electronic database. The MOU says nothing, as plaintiffs readily admit, about whether defendant is entitled to receive copies of the returned questionnaires. We take the reference to the recording of "relevant data" to mean preserving, to the extent possible, the answers to all

of the questions. Therefore, defendant's request does not contradict any explicit terms of the MOU.[2]

II. The Completed Questionnaires Are Not Privileged

1. Attorney-Client Privilege

Plaintiffs insist that the information provided by individual claimants in the returned questionnaires, and any notes taken by plaintiffs' counsel, are protected by the attorney-client privilege. Plaintiffs argue that individual claimants telephoned plaintiffs' counsel and asked for "legal assistance in filling out their Claim Forms and Payroll Summaries," Pl.'s Mot. at 17, and "openly discussed with counsel details about their work with the Census Bureau." *Id.* at 18. Because the information and advice provided to individual claimants by counsel over the telephone was then used by the claimants to complete their claim forms, plaintiffs assert that a verbatim transcript or copy of the returned forms constitutes privileged communications between attorney and client. Additionally, plaintiffs argue that the privilege was invoked prior to mailing the questionnaires to the claimants. Plaintiffs point to language in the MOU that explains that communications between individual claimants and a third-party administrator (who would review the forms and compile the data into electronic form) will not be considered a waiver of any privilege. Plaintiffs further argue that the cover letter included a conspicuous warning that the subject communication was privileged, and that language in the notice accompanying the questionnaire reminded claimants that conversations with plaintiffs' counsel would be protected by the attorney-client privilege.

---

[2]We also disagree with plaintiffs' argument that, had the parties intended for defendant to receive copies of the questionnaires, "there would have been no need for the Plaintiffs' Counsel to have processed and compiled the data." Pl.'s Mot. at 11. While we do not know the parties' particular motives at the time they agreed to the MOU, we believe an electronic database containing basic information about the thousands of outstanding claims against defendant serves a very useful purpose. The database not only assists defendant in knowing the nature and extent of the claims it intends to negotiate and settle, but it also benefits plaintiffs' counsel by organizing thousands of claims into a single, searchable database.

Plaintiffs primarily rely on two cases to support their argument that the completed questionnaires are subject to the attorney-client privilege. In *Upjohn Co. v. United States*, 449 U.S. 383 (1981), the Supreme Court explained that completed questionnaires and notes from interviews with employees by company counsel were privileged communications when the in-house counsel obtained such information as part of an internal investigation. In *EEOC v. Int'l Profit Assocs., Inc.*, 206 F.R.D. 215 (N.D. Ill. 2002), defendant, not satisfied with the provided factual summaries, moved to compel production of notes taken by plaintiffs' counsel during interviews of class action members. The court denied defendant's motion on the grounds that the interviews were protected by the attorney-client privilege and the work product doctrine. *Id*. at 222.

Generally, a party may obtain discovery of any matter that (1) is "not privileged" and (2) "is relevant to the claim or defense of any party." RCFC 26(b)(1). The attorney-client privilege "protects the confidentiality of communications between attorney and client made for the purpose of obtaining legal advice." *Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1415 (Fed. Cir. 1997). Therefore, "[t]he attorney-client privilege pertains to legal advice. . . . [I]t does not protect either factual information or business advice." *Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 485 (2000). Communications from clients seeking legal advice are privileged "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co.*, 449 U.S. at 389. The privilege is "founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888). Ultimately, "[t]he privilege is that of the client, not that of the attorney." *American Standard, Inc. v. Pfizer Inc.*, 828 F.2d 734, 745 (Fed. Cir. 1987). Moreover, the "assertion of privileges is strictly construed because privileges impede full and free discovery of the truth." *Energy Capital Corp.*, 45 Fed. Cl. at 484 (citing *Eureka Fin. Corp. v. Hartford Accident & Indem. Co.*, 136 F.R.D. 179, 183 (E.D. Cal. 1991)). The party claiming the privilege bears the burden of establishing it. *See id.*

We believe plaintiffs have failed to carry their burden that the original, completed questionnaires presumptively should be protected based on attorney-client privilege. To a large extent, the privilege, if it existed, is

waived insofar as the written responses to the questionnaires have already been provided to defendant in the form of an electronic database. In this respect, the asserted privilege is limited to the complete narrative answers to questions #14 and #17, the two questions in which plaintiffs' counsel summarized the written responses in lieu of providing a verbatim copy. We are not convinced that the complete, verbatim answers are privileged.

As a principal matter, the written answers do not seek legal advice. The questions call for purely factual information that would identify the nature and basis of each plaintiff's claim. Such information is discoverable through formal means, such as interrogatories or depositions. A written narrative explaining the calculation of estimated overtime and whether the supervisor knew or had reason to know that the claimant would work overtime does not require or seek legal advice.

The questions themselves, moreover, comprised a central component of a joint effort to reach a settlement. As described in the MOU, defendant agreed to a process that it believed would expeditiously resolve the thousands of remaining claims. Essentially, defendant agreed to pay these claims on a representative basis, without the benefit of individual depositions or other focused discovery for most of the plaintiffs, based solely on the information contained in the returned questionnaires. The purpose of the questionnaire was, therefore, to lead to the settlement of all remaining claims. Before defendant would pay any claims based on the formula set out in the MOU, defendant needed the answers to questions defense counsel co-authored and approved. In this regard, individual claimants should have understood that they were providing answers to defendant even though the completed questionnaires were returned to plaintiffs' counsel.

The questionnaire itself is somewhat different from a typical questionnaire used by attorneys to discover information about the claims of their existing or putative clients. Unlike *Upjohn* and *EEOC*, the questionnaire here was jointly developed in the specific context of ADR for the sole purpose of expedient settlement of claims. In those cited cases, the attorney-client privilege was found with respect to communications between client and counsel in which counsel took notes of interviews with its clients. Those communications were private and were solely for the benefit of counsel. They were not part of a joint effort.

We disagree with plaintiffs' argument that individual claimants believed their written answers to the questions would be kept confidential. Not only were claimants informed that the Department of Justice would review the responses to the questionnaires as a necessary part of the agreed upon ADR process,[3] they also signed and certified the questionnaire under the penalty of perjury. Such a certification would be without consequence if the questionnaires remained in the hands of their lawyers. The certification requirement suggests to the claimants that someone other than their lawyer would read their responses. Thus, claimants could not have reasonably expected that their returned questionnaires would remain confidential.[4]

We also disagree with the assertion that the warning of attorney-client privilege on the top of the questionnaire cover letter is sufficient to trigger protection. At most, the privileged "communication" is the letter itself, not a communication (i.e., the completed and returned questionnaire) that will occur in the future. Nothing on the questionnaire states that the answers provided would be privileged. Additionally, plaintiffs' counsel insists that he informed his clients that the questionnaire responses would be privileged based on the statement that "our conversations with you are confidential and protected by the attorney-client privilege." Pl.'s Mot., Ex. 2. We find this warning inapplicable. This statement appeared under the heading, "What If I Have Questions?", and, in context, clearly refers to situations in which individual clients had questions or concerns about the lawsuit, and decided to contact someone for assistance. Indeed, unlike *Upjohn* and *EEOC*, defendant does not seek counsel's notes from conversations with clients, communications defendant recognizes as privileged. Rather, defendant seeks the answers to a jointly drafted questionnaire.

Equity favors the production of the questionnaires. Defendant agreed to settle claims based solely on the individual claimant's sworn answers in the questionnaire. It is entirely reasonable for defendant to request copies of the

---

[3]The notice accompanying the questionnaires informed claimants that the "Department of Justice and this law firm will attempt to agree on appropriate compensation based upon the Claim Form responses . . . ." Pl.'s Mot., Ex. 2.

[4]To the extent an individual plaintiff sought legal advice by including communications outside of the questions posed in the questionnaire, then those communications, even if recorded on the questionnaires, are likely privileged.

completed questionnaires if it is to pay those claims without additional discovery. While we have no reason to doubt the veracity and accuracy of plaintiffs' database (particularly its summary of questions #14 and #17), the electronic data is less detailed than the complete answers in the returned questionnaires. Plaintiffs' attempt to categorize and summarize the various narrative responses leaves the government with something less than what it reasonably expected to learn. By agreeing to the settlement procedure in the MOU and thereby forgoing additional discovery, defendant is entitled to at least know how each claimant responded to the jointly drafted questions.[5]

To summarize, we decline to issue a protective order because the attorney-client privilege is not present. The questionnaires were not used to promote informed, effective representation. Rather, they were intended to solicit information to expeditiously and efficiently settle the individual claims. Their sole purpose, in other words, was to obtain factual information, which could have been discovered by more burdensome and lengthy interrogatories and depositions. Notes from conversations between counsel and individual claimants may be privileged to the extent they go beyond factual information necessary to complete the questionnaire. Plaintiffs' counsel may assert the privilege, if appropriate, to redact any such notes and impressions from the completed questionnaires before providing copies to defendant. If plaintiffs do assert privilege in this manner, a log should be furnished to defendant.

2. Work Product Doctrine

Plaintiffs also argue that the completed questionnaires should be protected because they are privileged under the work product doctrine. Plaintiffs argue that the completed questionnaires "were created during and as a result of litigation between parties" and that the completed questionnaires are "inextricably intertwined with work product" due to the "direct communications" between individual claimants and counsel. Pl.'s Mot. at 20.

---

[5]While we are sympathetic with plaintiffs' argument that the returned questionnaires are analogous to a client's first draft of answers to interrogatories provided to his lawyer — a document that generally would not be discoverable—the circumstances here are different. The completed questionnaires are more accurately described as signed and certified "claim forms," which contain basic information about the nature of the claim against defendant for purposes of settling the claim.

Plaintiffs thus believe that the completed questionnaires are privileged because they include the work product of their counsel.

Documents prepared by an attorney in advance of litigation are privileged as the work product of the attorney. *See AAB Joint Venture v. United States*, 75 Fed. Cl. 432, 444 (2007). The work product doctrine "encourages attorneys to write down their thoughts and opinions with the knowledge that their opponents will not rob them of the fruits of their labor." *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (citing *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)). "Unlike the attorney-client privilege, which protects all communication whether written or oral, work-product immunity protects documents and tangible things, such as memorandums, letters, and e-mails." *Id.*

While the privilege might attach to notes written on the questionnaires by counsel or law clerks, the work product doctrine does not extend to the written answers to the questions. Plaintiffs' counsel probably learned much about his clients' claims based on their responses to the questionnaires, and such information is useful for the preparation of the case. That result does not, however, transform the completed questionnaires into protected work product. As previously explained, the questionnaires were prepared jointly in a larger ADR process. In this special context, the purpose of work product immunity does not apply:

> In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways–aptly though roughly termed by the Circuit Court of Appeals in this case as the "Work product of the lawyer."

*Hickman,* 329 U.S. at 510-11. The questionnaires and the answers provided are not (and were not intended to be) private. Therefore, they are not privileged under the work product doctrine. On the other hand, notes, mental impressions, and other personal beliefs transcribed on the returned questionnaires, may be privileged.

III. Production of Completed Questionnaires is Not an Undue Burden

Finally, plaintiffs argue that production of the completed questionnaires will cause an undue burden on plaintiffs' counsel. Plaintiffs explain that the subject documents contain approximately 27,000 to 30,000 pages. Plaintiffs argue that it would be "extremely burdensome, expensive and unreasonable" to review these documents, redact privileged communications, and create a privilege log. Pl.'s Mot. at 24. Plaintiffs also believe such an effort is unnecessary because the "end result would be to hand over the same database information [that has already been] produced to the Defendant." *Id.* We disagree.

While we acknowledge that the effort required to review and redact the completed questionnaires is burdensome, it is not undue, especially in light of the corresponding benefit to defendant. Although defendant may already possess most of the information contained in the completed questionnaires, production of those documents would serve several additional purposes. First, defendant would be able to read the original narrative answers to questions #14 and #17, information not fully included in the database. Second, defendant would be able to confirm the accuracy of the electronic database. Third, defendant would possess the signed and sworn "claim forms" against which it may pay the claims. Given their purpose, defendant's request is not unreasonable.

CONCLUSION

For the foregoing reasons, plaintiffs' motion is denied. As stated during oral argument, counsel are encouraged to engage in an expedited production of the completed claim forms in a way that preserves plaintiffs' right to assert specific instances of privilege. A telephonic status conference will be held on November 6, 2007, at 2:00 pm EST to discuss progress toward implementing this order.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge