No. 01-495C
(Senior Judge Bruggink)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

KENT CHRISTOFFERSON, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# EXHIBITS TO DEFENDANT'S MOTION TO COMPEL

---

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:

RAYNA ELLER
Office of the General Counsel
Bureau of the Census
Suitland, MD 20746-24

JULY 14, 2008

# INDEX TO THE EXHIBITS

Tape Transcription of June 17, 2008 Status Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Notice of Claims Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Communication Between Plaintiff and Attorney Regarding Packet Sent to Plaintiff, dated August 1, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Transcript of November 1, 2006 Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Joint Status Report submitted by Plaintiff, dated December 4, 2006 . . . . . . . . . . . . . . . . . . . . . . 5

Plaintiffs' Sample Spreadsheet Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Carla Smith Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Ashley Smart Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Doris McAfee Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Shunell Kiper Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Steven Graham Claim Form. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Richard Lawler Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Letter, dated April 22, 2008, from Plaintiff's Attorney to Steven Gillingham . . . . . . . . . . . . . . 13

Privilege Log of All Clients, dated February 13, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Tamber Simonson Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tamber Simonson Spreadsheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Cindy Leung Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cindy Leung Spreadsheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Rachel Muhammad Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Rachel Muhammad Spreadsheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Jeffrey Smith Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Jeffrey Smith Spreadsheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Maureen Worrell Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Maureen Worrell Spreadsheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Edmond Slatus Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Edmond Slatus Spreadsheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Carmen Worden Claim Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Carmen Worden Spreadsheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Def. Ex. 1

In the United States Court of Federal Claims

No. 01-495C

* * * * * * * * * * * * * * * * * * * * * * *

KENT CHRISTOFFERSON, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

* * * * * * * * * * * * * * * * * * * * * * *

TAPE TRANSCRIPTION

P R O C E E D I N G S

JACK LEE: Yes this is Jack Lee and Nina Paul here.

JUDGE: Alright, and for the government we got Mr. Gillingham.

STEVE GILLINGHAM: Hello your Honor this is Steve Gillingham. Rena Eller is with me and one of our students who works with us Kyle Stingily is here as well.

JUDGE: Okay.

STEVE GILLINGHAM: Perhaps a budding lawyer -- might get in law school.

JUDGE: Depress him quickly – no just kidding. Okay I've read the status report and I gather that despite the fact that there is chatting about production of some more materials that there's maybe a need for some judicial intervention. Mr. Lee or who would like to go forward?

JACK LEE: Well your Honor I can start I'm sure Mr. Gillingham will add his comments. In conjunction with your earlier order regarding

discovery which we complied with - basically you asked us to turn over all the documents accompanying the claim form and we did that. We provided claim forms and we provided any notes - no actually any documents that the claimants gave to us in addition to their claim forms and although we disagreed with it at the time we respected the court's opinion on that - it took a different opinion on that and we complied with that and we provided a privilege log - now we're getting to the second generation of this dispute which is basically after we provided those documents we got into a disagreement about whether or not number 1 a claimant who has submitted a claim form and left blanks in it could amend it - could amend it after they sent it to us - after we talked to them and number 2 whether or not the notes that we wrote as the attorneys for the plaintiffs and entered into a log are discoverable and we think that - our view is that they are not and I think the defendant's view is that they need them to make sense of the

claim form - our view is that the database that they have which has all this relevant information about any results of their amended answers is all in there. We think that the matter is right for some type of briefing and we haven't arranged - we haven't decided on the dates yet but we have talked about trying to resolve it in that manner.

JUDGE: Okay tell me more precisely when you say fill in the blanks I gather from the way the status report was written, the people signed under oath their answer and left some things blank. Now who is actually then filling in the blanks afterwards?

JACK LEE: It was usually our staff your honor - the attorneys - let me tell they most prominently in two instances just to give you a little bit more flavor about the issue. Number 1 sometimes the - there are two questions that people have problems with number 1 was how did you come up with your estimate of your overtime and if it was not with hardcopy documents that you refreshed your recollection

with - how did you decide - how did you estimate those overtime hours that was the first question. Number 2 was did your supervisor know that you were doing the overtime and as you recall everything was signed under penalty of perjury. On both those questions because of the requirement of penalty of perjury many people were reluctant to sign something or put something down until after they talked to us and so they would often say well call me or I don't know how to answer this and we would talk to them and they would still have to turn in their claim form by certain dates so they would go ahead and sign their claim form and send it to us and then we would talk to them. Not only when they invited us to call them but also when they gave contradictory answers on their claim form and so all these conversations were entered into a log which we kept - we have 4 and 5 attorneys working on this and they kept a log of what was said and sometimes they would amend their answers based on the log but we would not be able to send it back

to them and have them resign it under penalty of perjury but they would give us permission to change their claim form to reflect what they were saying [INAUDIBLE] and then we would enter all that new information onto the database which we gave to the defendant.

JUDGE: Okay now is this a single question? In other words are we talking about simply the log or is there some more that's being sought here?

JACK LEE: Well I think there's two issues before the court - one is the log I think they want to see what our attorneys wrote down in terms of what they did to amend the answers and this was not a verbatim transcript we weren't recording these conversations. A person would talk to them based on their experience and the issue they would note there was certain type of answers that were typically given by the claimant and sometimes we would take them through for instance how to estimate their claim forms - their overtime - what was going on at that time

during your life - did you have a new baby, did you have a grandson, were you working full time and we would walk them through how to recreate for their memories what their day was like during that time seven years ago and then we would enter that information what we heard that we thought was relevant on to a log which is what our analysis of why they are coming up with this particular number now.

JUDGE: So how does the data move from the log to the completed form?

JACK LEE: The data is sometimes moved - the data did not move to the completed form - usually it moved to what we call our database which was - we designed a database to reflect each of the categories of information in the claim form and we gave a numerical value to each one which we have a legend and we would enter the information but for instance for overtime if they had submitted 10 hours and they didn't put anything under overtime claimed they left that blank we would put 10 hours on the database and

say see log on the claim form.

JUDGE: Okay, well I guess the basic question is if it says see log then are you saying that the log is the answer?

JACK LEE: No it's not often times the log was filtering what the attorney heard from the client and they would go through the reasoning process and they would generally put down a number but not always - but we would put it on the database and that would reflect that and the defendants have that information it wouldn't go exactly through how they - the database does not have how they actually came to that number - it didn't have a number and it would say by memory for instance there's a checkmark by memory.

JUDGE: Right but who's actually coming up with the number if they can't remember?

JACK LEE: They're coming up with it with the assistance with our attorneys.

JUDGE: How would the government know - well basic question I guess again - how do we

know these are certified answers?

JACK LEE: Well the only way we can answer that question is saying that we got permission to amend their answers on the phone and our argument I guess your Honor is that it's simply the same thing as whenever you ask your client to complete at document and you don't have a chance to talk to them their able to amend that answer later on after talking to them it's no different than a complaint no different than a discovery response. They give us specific permission we will not amend something without them giving us permission to do so.

JUDGE: Right I understand what you - I think the process now but the question is whether or not that's accessible to the government to test.

JACK LEE: The only way they could test that your Honor is to depose our attorneys. Right now we do have an avenue for them to test the claimants and that is they can depose whoever we want - whoever they want.

JUDGE: Has any of that happened yet?

JACK LEE: No. There is a way to test it – it's just not testing it through the attorneys.

JUDGE: And how…

JACK LEE: And that's how I explained it in our MOU.

JUDGE: How would the government know which answers on that database has been pulsed straight off of the forms versus which ones were blank on the original form but now have a number in them?

JACK LEE: They would have to look at – they have both those sources of information. One they have the database so it has to be a new answer or the answer that they gave us after we talked to them and number 1 they have the actual claim form whatever was put down or not put down.

JUDGE: So by process of elimination you're saying they could tell which ones we helped to fill in because they're blank on the original form?

JACK LEE: They're blank where it says "see log" which means that we talked to them or there's a modification.

JUDGE: Well alright I think I see the issue. How many - any idea of the universe of times that you had to do this?

JACK LEE: I'd say that it happened quite often especially on the question about how did your supervisor know you worked overtime because the question caused for speculation if someone asked that at a deposition and lots of people had problems with how to answer that question. Many of them interpret it as - the supervisor had to say I know your working overtime and so there was a lot of confusion about how to answer that question under penalty of perjury. So I would say on that question probably half the people had problems answering that question. The other a third of the other people had problems estimating 7 years hence - 7 years past how much overtime they worked on a particular day and we would help them go through

that process.

JUDGE: I understand the need to do it and now my question I guess is procedural [INAUDIBLE] having done that is have you made it necessary for the government to see what the notes are to see how faithful the answer is to the notes.

JACK LEE: Like I said your Honor these are not verbatim notes these are notes that were taken by our attorneys after talking to them. You will not always be able to find out what their exact responses are and the only way we can do that is depose the attorneys they have all the information they need to depose the claimants on this they can ask them well why did you change it, did you change it after you talked to an attorney and why did you change it? What information did you have before you signed this and what information did you have after that made you change it? Those are perfectly legitimate questions.

JUDGE: Oh yes I think they're good

questions. I guess my question is not so much one of whether or not it might originally be subject to attorney-client privilege but whether or not there's been some kind of a waiver.

JACK LEE: You have to understand that our original argument here your Honor we briefed it and we lost this issue but we believe the whole claim form was privileged document and we took that position and at the time we were helping people complete it that was our understanding. We believe that these documents were attorney-client privilege so now you're saying that we've waived it because you ordered it.

JUDGE: Well what's the chronology here? When were they filled in before or after I ordered disclosure of the forms?

JACK LEE: They were filled in before you ordered them. We completed the claim process after - we completed the claim process - the defendants asked for the exact - the verbatim claim forms we said no we briefed it to you - you

said no you thought that the parties agreed to a different deal and we complied by giving it to them and I don't think we can be really accused of waiving anything here because we did object to it - you ruled against us but we did object to it so we didn't do it willingly.

JUDGE: Oh I know but that's why I asked about the chronology. You went through this process of filling in the log and filling in the blanks before we had this discovery dispute right?

JACK LEE: Correct.

JUDGE: Okay. So certainly nothing after that would be a waiver but, okay let me hear from the government and I'm not trying to cut off briefing schedule but I'm trying to see if ones really necessary. Mr. Gillingham why can't you simply depose these people?

STEVE GILLINGHAM: Well there are 1,800 people your Honor I don't have account of how many are affected by this problem but as you know the whole idea was we would get claim forms that

were authentic that we could rely on for their authenticity and that we – and as a result of our experience having been through the conquered plaintiffs in detail we would exercise some judgment and try and settle these things. But, in fact originally you may or may not recall there was a dispute as to whether the attorney should be involved at all in the process of putting together these claims and therefore we spent in the neighborhood of a year trying to craft questions that were not only legally relevant – there's not that many of them – but were clear each side in fact consulted experts in polls to tell us whether these are the sort of things that could be reasonably understood. And so our original inclination was to say these are understandable, they are clear, we've negotiated them to death, let's just send them out and we will take the answers we get and although there was some opportunity to depose we obviously weren't going to depose what that time was a lot more than 1,800 but we weren't about to depose

thousands of people. However, Mr. Lee made the point that people want to be able to have the access to counsel before they fill these forms out and therefore we didn't press very hard against that argument. Now however as you can see sort of a heavier hand the attorneys in massaging these forms they become less convincing to us, we've become less willing to take them at face value and when an answer is as simple as did your supervisor know that you were working overtime and the answer is blank or no "N-O" that there's a change that tends to send up alarm signals. So we're really kind of litigating if you can still call it that this is case one arm tied behind our back because we're trying do it basically on the plaintiff's worth. But, when these things get so complicated as they are and so engineered as they are and we can't see the engineering going on - not to accuse anybody of anything but they just become less reliable. We know that Mr. Lee had - Mr. Lee normally points to his what he calls his database which is really

a spreadsheet prepared by his attorneys with categorizing the answers and he gave that to us but in a letter I wrote to him dated April 14 having earlier explained why we didn't put a lot of faith in that we gave specific examples as to why the database was problematic for our use. Where the database did one thing and our review of the document said something else. So there's certainly a question of memory and accuracy and interpretation and things like that that we ought to be able to review to assure that we reach the same conclusion as Mr. Lee's attorneys did when they populated that database.

JUDGE: How easy will it be to find the more problematic changing?

STEVE GILLINGHAM: So how difficult it will be to what the changes?

JUDGE: To spot which changes went from a No answer to - he knew it because whatever. How easy is it to spot those?

STEVE GILLINGHAM: Uh we spotted them because we raised the issue so Ms. Eller is here

maybe she can give you the chapter and verse on that question.

RENA ELLER: From my understanding was there two - the ones that are that say see privilege log or whereas [INAUDIBLE] about supervisory knowledge there are ones where the answer was no and it has changed to yes and it says see privilege log. There are other places where the hours are changed and it says see privilege log. We have others where it's harder for us to tell because we don't have the original document. When we were in California reviewing them we noticed that there was a column that was written in pencil that was different from the original numbers. It's harder for us to see that on copies but you know the ones where it says see privileged log where something was - and where something was - an answer was changed we can tell. Now there's this whole different category that Mr. Lee is now talking about where there are these discrepancies between what's in the so called database some is itself spreadsheet and

what's on the questionnaire and now it [INAUDIBLE] us we have to go through each - every single one and compare it with what's on that spreadsheet all 1,828 of them.

JACK LEE: Can I point out something your honor?

JUDGE: Yes.

JACK LEE: First of all I think you can guess as a picture that they have everything on the database they need to figure out what's different on the claim form that's why they got the claim form. We have given them every shred of documents that we have that they sent as the response. And the second point I want to make very briefly all this is very much contemplated by the MOU I know you don't look at this case everyday like we do but the MOU set out a procedure whereby people would submit a claim form - some people would be plucked out and deposed - the rest of them would be grouped into categories and we renegotiating with them based on those depositions. Now we're moving away from

that for reasons I don't agree with but we're going to a kind of a person by person resolution which the government is asking that they look at attorney's notes to determine the truth of falsely - claimants claim form here which I think is very much unprecedented.

JUDGE: Well but you can understand why it's an issue in a way but if…

JACK LEE: I could if they didn't have any other information.

JUDGE: Okay well hang on a second I guess what I was about to say is if I was the government too I would raise an eyebrow if an answer is changed and it says see attorney's notes and yet I can't see the attorney's notes. One of the issues that's sort of lurking I guess the government sort of eluded to is we're sort of half way between settlement and litigation at all times and my role is not as a settlement judge because I'm appointed to hear the case as the assigned judge, and so what I've got to do is not think in terms of what's been agreed to sort of

behind the scenes at settlement but what technically does the government get access to in litigation. So this is really an aside but you need to think about what it's going to take to settle the case on the other hand and that may be something that's beyond what it would take – what you would have to produce in litigation I guess is what I'm suggesting but – assuming the government was content with the way the forms were produced and we didn't have the immediate issues about the log what would be the next thing happening?

STEVE GILLINGHAM: From my perspective we should be implementing the MOU.

JUDGE: So what's the next step?

STEVE GILLINGHAM: What next would happen in the MOU is they would pluck out the outliers each party could nominate a certain number of people for depositions – these people will be a statistical pool of one. Their depositions would not affect any other folks other than their own claim. There will be a

second process instituting where people would be put into baskets of life categories - certain number would be selected out of each basket deposed and whatever plus or minus the figure is for overtime would be applied across the grouping across the basket.

JUDGE: Okay, here's what I would propose that we'd do I'm not sure what that universe was going to be that initial round I think what your describing reminds me it's going to be in waves in categories [INAUDIBLE] this isn't a ruling it's a suggestion and anybody can challenge it by filling in one time [INAUDIBLE] an illegal answer but my suggestion would be that you go ahead and try to take a first wave of depositions as if you simply - you as the government simply got the answers you initially assume that you ultimately receive irrespective of how they were crafted. Truly for two reasons: one is it would if for some reason in that process of deposing people it becomes obvious that there really is a problem here then

obviously we would have to rethink the whole process and also the need for whether or not to pierce some sort of attorney-client privilege here but more importantly I guess it would - if the government would be a better position to decide for settlement purposes how reliable this information is on a sampling basis. From the [INAUDIBLE] of it that the logs would strike me as highly privileged and then normally that sounds like the kind of thing you would never get access to but somehow the thing that gives me pause is that if you're asking the government to rely on an answer and saying the explanation for the answer is here on my previously privileged log it seems to obviously raises the question about waiver. So my suggestion would be that we hunt on that legal question until you both sides go through at least the first wave of depositions to get some idea of whether or not there's a real problem here or whether or not it's the government to reach the level of confidence that may not be the same level of confidence we would

have had but for this problem but it may be sufficient for settlement purposes. So I'm not trying to avoid work but it just seems to me that I would rather even if I have to answer this question formally I'd rather see some indication that there's a need and hopefully it will be apparent that the litigants actually do mean exactly what they use on the database now. After having them tested in the fire of the depositions but I guess government is the one that's really got more need for concern here is that acceptable at least to the - without waiving any rights is that something we can try on a interim basis?

STEVE GILLINGHAM: Your Honor, with all due respect I don't really see how it's going to help we've already taken about 52 depositions in this case and although it wasn't on a specific subject of are you a lawyer and did you really authorize him to tell you what he says he put on a form we know enough about this case that we should be able to march forward on the merits and we think we have a good plan for doing that and

it seems like sort of a detour into a procedural area which I think Mr. Lee and I agree can either be bereaved in the same way that a very similar question was bereaved with respect to these very kinds of papers anyway. I appreciate what you're saying that we're sort neither fish nor fowl here we're sort of half in a settlement mode and half in the litigation mode but even under that same umbrella you did give us a very helpful ruling - I don't want to say helpful because it was in my favor but you gave us a ruling that as Mr. Lee says moved us forward to this point, the question then was did he have to turn over the questionnaires at all and the attachments furnished by the plaintiffs and you said yes and he did and we have been able to more farther. So we're that much closer to being able to resolve this on the merits rather than on a procedural basis. So to take time off for detour to sort of regress back into procedural question doesn't sound very helpful. I recognize we're raising sort of a procedural question but I certainly

believe that the best thing to do is just to bereave it. I'm not so sure who I would choose for a deposition, how many I would need to choose to satisfy my client that the answers were all kosher, I think a lot of people we have problems to getting them to show up they are all over the country, they'd say they didn't remember, they want to see the notes, there'd be objections that this was enquiring even further into the attorney-client privilege. I just see this as a recipe for nothing really. So what we talked about was a really sort of an expedited schedule we would get you simultaneous briefings and a couple of - we know what the issues are, we've identified to Mr. Lee what our actions are there are 4 and 5 - he knows what they are we can set them out again and explain what our objection is, we also know we have gotten a flavor of what his response is going to be from a letter that he sent us - this all took place back in April. So we're probably both in positions to brief simultaneously the questions and then to reply to

each other's briefs a short time afterwards. At that point you your Honor can then decide that there's a better way to resolve this that by answering the briefs but I think we know enough about the facts. I'm sorry Tuesday in San Francisco is horn day at noon so.

JUDGE: Okay is that every Tuesday?

STEVE GILLINGHAM: Every Tuesday at noon so you can set your watch to it.

JUDGE: Okay wasn't bad I never heard of that.

STEVE GILLINGHAM: It's a quaint tradition I don't know where it comes from.

JUDGE: Probably something nautical I would imagine.

STEVE GILLINGHAM: Anyway I think we have sufficient facts to get this case as far as we're going to get it and the depositions would only really complicate it - really delay and especially in the summertime there'd be further objections - I don't know if I could get enough evidence to make our mind up one way or the

other.

JUDGE: Okay, okay hang on. I thought when I asked the question earlier about had the depositions started I thought the answer to that was no.

STEVE GILLINGHAM: Correct. Oh no well Mr. Lee was correct he was – you were asking him we thought – I'm sure he thought whether depositions had begun pursuant to the MOU and not before we even got to the point of signing the MOU we had taken depositions of those plaintiffs who came from the Concord, California office – many of the motions that you resolved were based on testimony taken in those depositions – we've trailed San Francisco concerned field operations supervisors who were from the Concord, California office.

JUDGE: Okay [INAUDIBLE] MOU contemplated depositions had not yet begun.

STEVE GILLINGHAM: Right, correct.

JUDGE: Alright Mr. Lee…

JACK LEE: Your Honor, may I speak to

that.

JUDGE: Yeah.

JACK LEE: You know I appreciate you trying to go beyond this issue and try to look at this in a practical level and I think we need to do that sooner rather than later. I do think the legal issues have been set forth by both the parties and can be resolved but we're still going to have the same problem even if you say it should be, it can be, those notes are not privileged we would say how come the attorney's notes don't match exactly what this says or we need to depose the attorney it brings us into a real quagmire.

JUDGE: Well we're not going to have any depositions [INAUDIBLE].

JACK LEE: The focus is going to be on the attorney's notes when we have the horse's mouth right there - this person is going to be able to explain why their answer was modified and what their confusion was about this and any so called doubts about the veracity of it can be

resolved by the horse's mouth.

JUDGE: Well once again you're making the same practical point I guess I was unsuccessful earlier. Okay the government can insist on its right to embrace the issue and so I guess we need to do that - my concern is the impact of an answer yea or nay on the settlement process and hopefully it won't one way or the other affect its party's ability to pursue the process of the MOU. But in the event that is [INAUDIBLE] to go ahead and do an instant brief Mr. Gillingham and get that to me as soon as possible and we'll have the normal reply and we'll just have a I assume I'll have an oral argument and I'll try to resolve it.

STEVE GILLINGHAM: Ordinarily the burden is on the plaintiff to maintain its privilege - well Mr. Lee and I talked about the interest of compressing this with simultaneous briefings because we've already exchanged letters so we kind of know where each other is coming from so neither one of us will be shooting in the

dark. It would be sensible if we both briefed – he and I can agree – we were even talking about this and we're looking at something within the next two to three weeks.

JUDGE: You tell me it's just one round of briefings?

STEVE GILLINGHAM: Well no simultaneous opening brief from both sides and then simultaneous reply by both sides.

JUDGE: Well if y'all agree to that that's fine with me I don't care. Okay.

STEVE GILLINGHAM: Probably stage 1 or if you got the time on your calendar.

JUDGE: I'm sorry say again?

STEVE GILLINGHAM: That is only round 1 – the question privilege in my mind is one separate question Mr. Lee sort of sees it as two but there certainly is a separate question which is where do we go from here even if we had everything we want – we as you know have been going through the claims forms that we have and not all of them are tainted by this problem. Mr.

Lee said many are but certainly some are not. The MOU specifically leaves open the question that what happens if someone fills out a claim form and demonstrates thereby that he or she is not entitled to a payment, what then? MOU specifically says that's an open question. So we've addressed it this way and this is the way we've been preceding. We have approximately 1,8000 claim forms in our possession hooking them into four pools basically ranging from less worthy to most worthy and the first category which you've been calling A are those claim forms which we think demonstrate and if it's not entitled to payment as a matter of law and therefore the only offer I would be able to make that person is zero. We set out the basis for that and the letter I sent to Mr. Lee in February and there are categories such as people who did not serve in the field during the [INAUDIBLE] an office worker for example, that are like one category. Another category is for example workers who do not allege they worked more than

40 hours in any week. They would have to be out prior to your prior ruling, or left questions on the form blank, or have already been paid for the overtime they've alleged, or did not give any explanation where explanations are required in other words a blank form. So we basically set out 6 basis and have given them to Mr. Lee in a letter we said these people have got to go and we proposed - and Mr. Lee says philosophically he agrees with some and philosophically he disagrees with others but our view it always comes down to cases. Okay, who's out and who's in? And so what we proposed was that we provide names in this group which I've called group A and said we think these people are not entitled to payment at all as a matter of law based solely on their responses.

JUDGE: And how large is that universe?

STEVE GILLINGHAM: Approximately 500 out of 1,800. So we've already given him the names of 42 and proposed that he then - so this was referred to in the status report by the way

you should have in front of you - and basically proposed that the way we proceeded then he give us a response and if he agrees I'm out - if he disagrees then we would have to have an understanding as to why they should remain in. The MOU does provide for negotiations of course and this is we think a principled way to proceed. So openly we would get - we thought we would give him a group of names, he would give us a response a week or two, we would give him the next group of names, he'd give us a response and every response we got would help color our view of the rest of the people that are in a group. But any event we do think there are a group that had not entitlement as a matter of law and though Mr. Lee has responses to some of these in the negative and some he concurs. So we just want to decide who's in and who's not out in this group. Others we're prepared to move ahead to settlement we think the claim forms were fine as far as they go. Then there's the middle group and those are the ones which are the hardest the ones we would

have to get through with some sort of procedure however of that group - the big middle group - we think are the significant percentage that there's something in their form which suggest they are entitled to payment but there's something the completely contradicts it or raises a question that with that question in our mind we can't tell whether they're entitled or not and if we can ask a question or two we could probably get to the bottom of it. But any event a simpler way to conceive this as we do think there's a group - a large group of about 500 people that are categorically not entitled to payment in this lawsuit or under the fair labor standards act therefore they shouldn't get anything. There's another group that we're ready to settle. There's a big group in the middle where we just kind of wonder. Some we wonder a lot about some we wonder a little about.

JUDGE: Now this prior conversation we had about the answers to the forms are any of the people in this category B which I gather are the

ones your ready to contemplate paying out affected by that issue?

STEVE GILLINGHAM: Uh, no.

JUDGE: Okay. Is there any reason we can't move forward at both ends simultaneously?

STEVE GILLINGHAM: Uh, I'm not sure how we'd do it but there's nothing physically standing in the way.

JUDGE: With this Mr. Lee I assume within that 500 there are some that you might not agree with but are there some that you agree has in effect knocked themselves out of the box no matter what?

JACK LEE: There are only narrow categories that I might agree on dead on and I'm not sure if it's across the board answers. There are some people that worked only in the office and not in the field, this case is about field employees and to the extent they may not have worked in bulk but they're still in the case to the extent they only worked in the office I don't disagree with that. The only other category I

can see that happening in is people who were – who had to work over 40 to claim overtime according to the court's earlier ruling we did not anticipate that when we first talked to each of these people but we tried to take them out of that process and we may have been imperfect in doing that but we thought we had eliminated all those under 40 hour a week people and if there's a few that are in there we wouldn't disagree with them being taken out to the extent that they were both and most instances they were both that is – they were employees that worked some weeks under 40 so they can't claim overtime in those weeks but they had also worked some weeks over 40 so they can participate and so I can't see any other categorical exclusions other than those two categories.

JUDGE: Well what others when you [INAUDIBLE] Mr. Gillingham?

STEVE GILLINGHAM: Out of the total of 6 your Honor the third category was already been paid for their claims.

JUDGE: Okay well let's take that one out. Have you seen that information Mr. Lee?

JACK LEE: Your Honor I have and I just need to look at that because there are some people that have payroll records that show that they go 80 hours a week pay which doesn't seem right and it happened a lot in Alaska and I don't know the reasons for that but there's a lot of anomalies in terms of the record keeping and I can't take a position on that right now but as a principled matter if you've been paid for overtime already you shouldn't be paid again.

JUDGE: Category 4?

STEVE GILLINGHAM: Category 4 was Plaintiffs who acknowledged their supervisors did not or should not have known that they worked uncompensated overtime. That was one of the early questions and it's obviously element of proof.

JUDGE: Okay Mr. Lee what about that one?

JACK LEE: This is a problem that

became apparent as we set these things out but that question is apparently a question that causes speculation on someone's state of mind and many of the people did misunderstand that question. They wanted proof in their mind meant that their supervisors - yeah I know your working overtime but you need to keep on working and that's not what we meant by the question at all and what we gave examples in the questionnaire that they could - if the person was working next to them or saw them all during the day that would be knowledge but its imputed knowledge its inherently a legal question and people did not know how to answer that and sometimes they answered it wrong and sometimes they would call us sometimes we would call them and ask about why did you respond this way? Well I thought we had to have proof that they wrote it down that they knew and I didn't understand that of course they knew because they saw me everyday turning in these timesheets after I had started 12 hours earlier and those are the responses well then you

should be answering this yes can we change this to yes based on what you just said, yes you can because that's what happened.

JUDGE: Well alright well if they changed their answer and presumably we're not talking about them we're talking about the ones that haven't changed their answer presumably right?

STEVE GILLINGHAM: Correct your Honor and the questions was do you believe your supervisor knew or should have known, examples were given, this was all negotiated over the course of the year, and then they were asked if they believe why did they believe? So it's 100% subjective as to them. In any event to answer your question yes we're talking about people who acknowledge that their supervisors did not or should not have known not in non-response, not an ambiguous response they know.

JUDGE: Okay Mr. Lee I'm expecting – we're talking about people who haven't changed their answer and who is still on that first

question which [INAUDIBLE] very subjective do you have any reasons to think that he knew or should have known I mean how are they going to slide out of that down the road? And why they stuck with that?

JACK LEE: Your Honor just like any other pleading can be amended based on subsequent knowledge. This is not a document that first of all we contemplated that was something that they could never change. It's a document that we knew that we would get lots of questions on and that these are not easy questions to answer and when your under penalty of perjury and there's - you're talking about imputed knowledge here. I don't think people have a very sophisticated idea of how to answer that question.

JUDGE: Oh I know but that may be our fault in negotiating a questionnaire but one way or the other that's what we negotiated and that's what their stuck with at least it seems to me unless there's some formal as to containing them. Well alright what's category 5 or 6 what are we

on now?

STEVE GILLINGHAM: Yes we're up to 5 your Honor, failing to respond to question 13, 16 or 17. What I'm reading off now is a letter where we provided the first 482 people we came across who had defects in their claim, this particular defect was one person who failed to respond to questions 13, 16 or 17 - whether any of the numbers written on their claims basically are based on an estimate - 13 asks whether they believe their supervisor had knowledge and 17 gives a reason why they thought their supervisor had knowledge or should have had knowledge.

JUDGE: So you're saying no answer to those.

STEVE GILLINGHAM: Failed to respond yes your Honor.

JUDGE: Alright what we do with those Mr. Lee?

JACK LEE: Well we called each of one of those and we asked them why didn't they answer those and they explained that some of them were

confused and then we asked them why do you think your supervisor knew or didn't know? And they would go ahead and explain it and we believe that it fit into one of these categories we would check it off. If they said there's no way they knew we would say we'd leave it.

JUDGE: Alright so at this point everybody that left it blank you've talked to again and in that interview process if they in fact could have said yes to you instead of no that's what the log now shows or that's what the database now shows.

JACK LEE: Yes.

JUDGE: Okay so now we're talking about a subset where the answer is still blank and the answer is still presumed…

STEVE GILLINGHAM: No they changed it in the database your Honor those answers were added into the database so they have the new answer.

JUDGE: Are we talking Mr. Gillingham about original answers versus the current

database?

STEVE GILLINGHAM: Uh yes we're talking about what appears on the claim form.

JACK LEE: Your Honor the earlier question I also think I need to clarify because you might have been under the misimpression that even the database reflected. If they put a different answer on the questionnaire and we talked to them and they changed - we would change it on the database as well so they can see both.

JUDGE: Right. Well Mr. Gillingham it sounds as if we're not going be able to negotiate a quick answer with respect to people who have different answers on the database than the original form. What's category 6?

STEVE GILLINGHAM: This may overlap with the previous one but it says the following plaintiff's failed to explain the basis of either the amount of their claim or their belief of supervisor knowledge but actually those questions were posed in questions 16 and 17 - oh where they had some words in there but it didn't explain the

basis or whether there is nothing in there it might be that they have not answered the question basically.

JUDGE: Alright now if he relied only on the database and not the original questionnaire are there still people in the category 5 and 6?

STEVE GILLINGHAM: That I could not tell you.

JUDGE: Presumably Mr. Lee if there were wouldn't those be right for dismissal?

JACK LEE: There would be no people like that because they would not have been submitted. We would not have put forth their claim forms if they had not responses on those.

JUDGE: Okay well then back to category 1 or ABCD or 1 through 4 whatever it is - my suggestion is or maybe this is already what you're planning to do Mr. Gillingham your [INAUDIBLE] names and categories and reasons why you think people ought to be bounced?

STEVE GILLINGHAM: Yes.

JUDGE: Okay well rather than try the hard cases first why don't you try what you think are the easy cases based on this conversation. Mr. Lee there's no reason not to move forward with that is there?

JACK LEE: I'm sorry your Honor I'm not quite sure what your suggesting.

JUDGE: Well alright we have the…

JACK LEE: You should go ahead and try to settle the ones that we can?

JUDGE: Yes.

JACK LEE: Yes.

JUDGE: Now what about Mr. Gillingham the ones that you conclude are entitled, well have them say that they were working overtime and the supervisor knew what do we do with them?

STEVE GILLINGHAM: [INAUDIBLE] backwards but our goal was actually - because they have a process where we can identify those ones that should be out for starters to the extent that we ever get any sort of lump sum negotiations, I'm going to throw out all the ones

that are - they were willing to settle if there's people in here that just don't belong in here they can act as a sort of effective counterbalance. Our goal is have a procedure and where a procedure where we would furnish the names and the reasons and have to get a response within a week or two weeks whatever is reasonable.

JACK LEE: There's no reason why the 100 or so people that you have no questions on should not be paid a valuated 8 years and they're dying and we're losing contact with them we should be settling these cases that we can where there's no contest there because the rest of this case could still pit 2 or 3 more years.

JUDGE: Yeah Lord willing we'll be done before the next census. What about - I don't understand why - I can understand the appeal of a lump settlement because to them what that means people aren't getting quite as much as they would get if they went to trial in exchange for not having to go to trial but why can't you just

factor that in Mr. Gillingham I mean you have people that have better proof - why does everybody have to be treated the same?

STEVE GILLINGHAM: I'm not trying to con - I understand your question but…

JUDGE: In other words why not go ahead and seek out 100 people to take a number if this satisfied if they went to trial they would recover something why not go ahead and pay them out and presumably that would be through a settlement and that means that it can be negotiated in such a way that it has no binding effect on anybody that's left. It seems to me just by way of reducing the numbers I agree if we ought to find a way to eliminate people who are not going to recover by anybody's understanding but I don't know why we can't move forward on the others and if that affects your ability to settle the rest then so be it but I frankly don't see a reason to wait for people to you know you're not going to be fighting over later.

STEVE GILLINGHAM: Okay we'll certainly

talk about negotiating those.

JUDGE: Okay.

STEVE GILLINGHAM: Well for the hard cases that's - I guess presumably settlement of the easy cases although still have a few people left over from Concord. Can we get a procedure for getting through the 500? Our goal is to get a procedure or by we would furnish names in groups of 100 or whatever's not unwieldy and then get a response within a specified time.

JACK LEE: Your Honor to me that's kind of [INAUDIBLE] I have no idea what these 500 are going to be like if the question is going to be something like well why did Mr. Smith estimate 2 hours of overtime on a Thursday seven years ago I'm not going to be calling 500 people and asking them that question and I'm not quite sure what he's asking me here. If he's asking do I agree principally that people that are not in this lawsuit because they work in the office in a class I agree with that as a principled matter but I'm not going to go back to 500 people and

ask them a single question.

JUDGE: Well you don't have to do that why can't we build on what we know apparently there are some people - it may be a small number that only work in the office only presumably their claims for the field if they worked in the office would keep them alive so we don't need to fool with them and I wouldn't encourage partial dismissal of only office claims for people that have field office claims and field claims left but what I'm hearing is that I suspect the number that you ought to agree on is going to be something less than 500 so my thought is that you begin Mr. Gillingham with the easy ones - ones that are only office and that are only less than 40 hours and see how large that is and see if that's a useful process and then push your luck with a different group later but it seems to me that unless there's a good reason not to is that the people that you know are going to get paid and some of them [INAUDIBLE] let's get rid of them. If in terms of the dismissal that can be

without prejudice to their claim about the [INAUDIBLE] or if these are people who the plaintiff thinks should have gotten money because they would have been entitled despite the fact they worked less than 40 hours then the dismissal ought to be without prejudice preserving that claim if they ever want to take it up on appeal but one way or the other it seems to me that you have to be able to work on both ends of this thing it may not be huge numbers but [INAUDIBLE] help us reduce the size of what's left and that could be useful.

STEVE GILLINGHAM: Well our goal is to get this thing done as quickly as possible and we joke about the next census coming up the people who are working on this case actually are working on the next census and I just think with deadlines we tend to do a lot better. So I am willing to work from both ends but I want to make sure that we're working as hard to analyze the so called good cases or presumably payable cases as we are to work on the ones that have got be put

out.

JUDGE: They have you on a deadline?

STEVE GILLINGHAM: For us to be able to give a list of people even if we take for suggestion say we'll just pursue the top 3 – categories 1, 2 and 3 of the dismissables I'll call them and that is those fewer than 40, those who were office workers not field workers at any time during which they might have had a claim and 3 those that were paid.

JACK LEE: [INAUDIBLE] overtime totally paid for all their overtime.

STEVE GILLINGHAM: Right so if I – right all claims the ones in the lawsuit. So we submit those by Sunday can we get a response by a specified date later?

JUDGE: I think that was for you Mr. Lee.

JACK LEE: Sure I mean if you say you're going to give me a list of 1,000 I'm going to have a different response if you give me a list of 100. It's hard for me to say.

JUDGE: I understand well let's deal with numbers let's assume it's under 100 why don't you just give a target date for responding in why 2 weeks?

STEVE GILLINGHAM: Okay so we'll give the first 100 and then 2 weeks later we'll get a response or…

JUDGE: And now my suggestion would be that you deal with the ones – I heard the number 100 a while back that you've [INAUDIBLE] probably going to get paid I'm assuming that they have to be paid on some consistent basis if there's no reason for distinguishing between them and so I would urge you to negotiate some kind of a figure for the hours that those kind of people have and just pick a number say call it 100 if you got that many people and just pay them out and its part of this 3 week process let's see if we can work on a 100 from the other direction as well and so why don't we reconvene if we're talking about briefing and what did you suggest? Two weeks for the briefing is that what I heard?

JACK LEE: We were talking about the base of July 8th for the opening and July 22nd for the closing but I need to talk to some people before we can confirm those.

JUDGE: Okay.

JACK LEE: But its within a month or 5 weeks so…

JUDGE: Why don't we try to have - let's try to do sort of a one side thing all arguments on those and a reporting back on what's happened as for this wave of [INAUDIBLE] results in to both ends of this list and we'll just - why don't you call Jeremy in care of my office after you and Mr. Gillingham negotiate a time and the week I know of July 24th would be good so maybe that would be a good target date for an oral argument/status report oral status report and could you just set with Mr. Gillingham after you confirm whatever you need to and call Jeremy and set something up.

STEVE GILLINGHAM: Great we can do that. Your Honor could you repeat what you said

earlier about you said the process from both sides - work on a 100 from either direction but you said something about hang on a consistent basis.

JUDGE: Well if you got just to pick a number out of the hat if you think there are probably a 100 people that you wouldn't challenge - I don't know maybe its 500 whatever it is I'm assuming that at this stage you would want to have some kind of consistence protocols for paying them out. This is the settlement so I can't tell you what to do you might have some wacky system that I hadn't contemplated but 6 months down the road if you go through the process of being somewhat satisfied but not as satisfied then I can see that you want to pay them slightly less per hour or whatever you come up with but I want to [INAUDIBLE] how to settle it but I'd just assume that you would want at least initially you got a group of people that you can't distinguish them on because they're all in hiding and they all have reasonable hours I

this case?

STEVE GILLINGHAM: The what? I…

JUDGE: Partial judgment.

STEVE GILLINGHAM: Yes I think we done some.

JACK LEE: I'm sorry I can't hear you.

JUDGE: I was asking whether or not we've done partial judgments in this case have you all agreed on some already that were entitled to claim and we've paid them off?

JACK LEE: Yeah just the Concord ones we've agreed on and we've paid some of the Concord one wave about two years ago we paid them off and then there's another wave here it's a much smaller group and we've agreed to dismiss the ones that did not participate the Concord folks so Concord's almost all finished up.

JUDGE: We have a track record of using partial judgments to move people out.

STEVE GILLINGHAM: I think there has been a dismissal of people who did not participate - didn't show up for depositions in

Concord and otherwise pursue your claims I think we put…

RENA ELLER: [INAUDIBLE]

STEVE GILLINGHAM: Yeah that and earlier settled people I think went out via 54B.

JUDGE: Okay that's fine. Okay then well I see - I didn't mean to cut y'all off but what else can we do today?

STEVE GILLINGHAM: Nothing from the government you're Honor.

JUDGE: Mr. Lee?

JACK LEE: That's all on my agenda sir.

JUDGE: Okay then Mr. Lee if you can set with Mr. Gillingham on the timing of the briefing and the oral argument and get back with Jeremy and he'll land on a date.

JACK LEE: Yeah we can get back to you on that we'll talk to your law clerk on that sir.

JUDGE: Okay.

JACK LEE: And I assume all arguments can be done like this?

JUDGE: Yes.

JACK LEE: Okay, okay great.

JUDGE: Okay thank you very much.

STEVE GILLINGHAM: Thank you your Honor.

JACK LEE: Thank you your Honor.

(END OF TAPE)

would assume you would want to pay them on the same basis but that's what I was referring to I mean you don't have to do it that way.

STEVE GILLINGHAM: Your saying within the group of 100 pay each of them on the same basis as the other in the group.

JUDGE: Yes.

STEVE GILLINGHAM: Yeah certainly.

JUDGE: Right okay.

STEVE GILLINGHAM: I understand there was 100 - I don't recall that I'd said a number, but…

JUDGE: Well maybe I'm making it up but…

STEVE GILLINGHAM: We can certainly talk about 100 I know I suggested that we only thought 100 people.

JUDGE: Right I'm hoping…

STEVE GILLINGHAM: Never settle I don't want to leave with that impression.

JUDGE: I'm hoping it's a lot more than that. Have we already don't 54B judgments in

Def. Ex. 2

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS WASHINGTON D.C.

## <u>KENT CHRISTOFFERSON, et al., vs. THE UNITED STATES (No. 01-495C)</u>

## NOTICE OF CLAIMS PROCEDURE

**<u>Why Are You Receiving this Notice?</u>** You are part of a group of people ("Plaintiffs") who filed a claim that you are owed money for unpaid overtime work you performed as a U.S. Census Bureau employee in the Year 2000. This Notice explains this lawsuit, the settlement process for this lawsuit and what you must do to continue your claim for unpaid overtime pay.

This Notice has been agreed to by the parties and is being sent to you by MINAMI, LEW & TAMAKI LLP, the San Francisco law firm representing the Plaintiffs, to determine if you may be eligible to receive any money from this settlement for money damages. It is important that you follow these instructions carefully or you may lose any benefits to which you might be otherwise entitled.

*You must complete, sign and return the Claim Form and Payroll Summary by mail with a postmark no later than **<u>SEPTEMBER 29, 2006</u>**. If the completed, signed Claim Form and Payroll Summary are not returned in time, your claim will be rejected and you will lose all rights to receive any money from this settlement. Mail the completed forms in the enclosed envelope to:*

MINAMI, LEW & TAMAKI LLP
Census Lawsuit
360 Post St., Eighth Floor
San Francisco, CA 94108

Returning the completed forms on time does not guarantee that you will be paid any particular amount of money. It does mean that these forms will be reviewed to determine whether you will be paid any overtime pay and, if so, how much.

**<u>What If I Have Questions?</u>** If you have questions about completing the Claim Form, please contact this law firm, at the above address, by calling our toll-free number, **1-888-528-9707**, e-mailing us at **<u>census@mltsf.com</u>**, or going to the website: **<u>www.censusclassaction.com</u>** ("Frequently Asked Questions").

Please do not call the Court, the U.S. Census Bureau or any Department of Justice attorneys for assistance. As your attorneys, our conversations with you are confidential and protected by the attorney-client privilege. However, any communications you have with persons outside this law firm about your claim are not confidential.

You are responsible for keeping us informed of any changes of names, addresses or phone numbers. If you fail to update us on any changes in your contact information, you may lose your right to participate in this lawsuit.

**What is this Lawsuit About?** This case, filed in August 2001, alleges that certain Census employees (Enumerators, Crew Leader Assistants, Crew Leaders, Field Operations Supervisor Assistants, Field Operations Supervisors, and Special Places Operation Supervisors) while conducting the 2000 Decennial Census were denied the opportunity to claim overtime or to be paid overtime, even though their supervisors knew, or had reason to know, of their overtime work prior to their working it. In this lawsuit, Plaintiffs now ask that they be paid the overtime pay they claim they should have been paid.

**How Will Your Claim Be Resolved?** The Court has approved a process for determining who may continue with this lawsuit and who is eligible to be paid for unpaid overtime. In general, you must: (1) review the information from census records contained in the attached Payroll Summary which indicates the days of work and the number of hours you recorded on timesheets you submitted for payment; (2) estimate or provide a calculation, to the best of your ability, of the overtime you worked as an Enumerator, Crew Leader Assistant, Crew Leader, Field Operations Supervisor Assistant, Field Operations Supervisor, or Special Places Operation Supervisor for the Census Bureau between January 1, 2000 and November 1, 2000; (3) affirm that your supervisor knew or should have known that you worked overtime prior to your working it; (4) complete the Claim Form and the Payroll Summary, to the best of your ability; (5) sign the Claim Form under penalty of perjury; and (6) return the Claim Form postmarked by the **SEPTEMBER 29, 2006**, deadline.

**What is Overtime?** The regulation defines overtime as "work performed by an employee for the benefit of an agency, whether requested or not, provided the employee's supervisor knows or has reason to believe that the work is being performed and has an opportunity to prevent the work from being performed." 5 C.F.R. § 551.104.

In summary, overtime is defined as work you performed:

(1) in excess of forty (40) hours per work week (Sunday through Saturday); and
(2) that your supervisor knew of or should have known you worked prior to your working it.

Overtime can only be earned if you worked more than 40 hours total during a work week (a period of 7 consecutive days from Sunday through Saturday).

**Example 1:** You worked 10 hours on Sunday, 10 hours on Monday and 15 hours on Tuesday (for a total of 35 hours). You have not worked overtime because you did not work more than 40 hours in one work week.
**Example 2:** You worked 10 hours on Tuesday, 10 hours on Wednesday, 10 hours on Thursday,

10 hours on Friday (for a total of 40 hours), and an additional 4 hours on Saturday. You can claim 4 hours of overtime (40 + 4).
**Example 3:** You worked 8 hours on Monday, 8 hours on Tuesday, 8 hours on Wednesday, 8 hours on Thursday, 8 hours on Friday (for a total of 40 hours), and an additional 8 hours on Saturday. You can claim 8 hours of overtime (40 + 8).

"Work time" includes travel time to and from your home, time you spent at home making work-related calls or on other work activities, and time you worked during a lunch or dinner break. If you claim overtime, your claim is subject to verification by U.S. Government officials.

Overtime is payable only if your supervisor "knew or should have known" you worked overtime. It is not necessary for your supervisor to state directly to you that he/she knows that you are working overtime to show knowledge. Examples of how your supervisor "knew or should have known" you worked overtime would include, but are not be limited to, the following situations: (1) where your supervisor asked you to record hours worked over 40 on the next week's time sheet (rolling over hours); (2) where your supervisor signed off on your weekly timesheets which already recorded 40 hours that week and advised you to work more hours to complete the job; (3) where your supervisor asked or ordered you to work overtime for which you have not been paid; (4) where you told your supervisor that you were or would be working overtime; and (5) where your supervisor worked overtime alongside you. This is not an exhaustive list of how your supervisor "knew or should have known."

**What Is The Process?**

**Step One.** First, you must complete and mail the Claim Form and Payroll Summary postmarked by the SEPTEMBER 29, 2006 due date. Respond to each item in the spaces to the best of your memory. If you need additional space to complete your response, use a separate piece of paper with your name, SSN, and the item number to which you are responding clearly indicated. Attach all additional pages to your Claim Form. To assist you in calculating any overtime worked, we have provided a Payroll Summary of your Census payroll records, indicating the days and hours for which you were paid. You should estimate the overtime you believe you worked directly on the printout of the Payroll Summary. We understand that it will be difficult to recall exact dates and hours of overtime after so many years, but, if you wish to receive compensation, you **must** make a reasonable good faith estimate. Your claim for overtime will not necessarily be disqualified if you cannot recall the exact days and/or amounts of overtime you worked. The Claim Form must be signed under penalty of perjury and must be returned by the date indicated. A good faith estimate of your overtime hours which later turns out to be in error is not perjury.

**Step Two.** A limited number of plaintiffs who complete Step One will be questioned under oath at a later date - either in person or over the telephone. The questioning will be conducted by the Department of Justice in a manner which will minimize any burden on you. You will be represented by this law firm during the questioning process.

**Step Three.** The Department of Justice and this law firm will attempt to agree on appropriate compensation based upon the Claim Form responses and the sworn oral statements of some claimants. We cannot provide you any estimates about what your compensation, if any, might be at this time. However, the Parties have agreed that Compensation will be based upon some analysis of the completed forms submitted. If the Department of Justice and this law firm cannot agree, the Court may be called upon to decide your claim for compensation.

# CLAIM FORM

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**WASHINGTON D.C.**
**KENT CHRISTOFFERSON, et al., vs. THE UNITED STATES (No. 01-495C)**

Please print clearly in dark ink.

1. ______________________________ ______________________
   Name (First, Middle, Last) Social Security Number

2. ______________________________________________
   Street Address Apartment Number

   ____________________ ________ ________
   City State Zip Code

3. Do you wish to continue with your claim against the federal government for unpaid overtime?

   ___YES ___NO

   If "Yes," please complete this Claim Form and provide estimates of your overtime on the Payroll Summary. If "No," you do not need to complete the rest of this Claim Form. Please return this form and the Payroll Summary to our offices at the address provided. A "No" means you no longer wish to be a participant in this lawsuit.

4. ______________________________________________
   E-mail Address (if any)

5. ______________________________ ____________________
   Work Phone Number Best Times to Call

6. ______________________________ ____________________
   Home Phone Number Best Times to Call

7. ______________________________ ____________________
   Cell Phone Number Best Times to Call

8. ______________________________________________
   Phone Number of Relative or Other Contacts (Optional)

9. Please list any other names used while employed by the U.S. Census Bureau in the year 2000.

   ________________________ ____________________

10. While working for the Census Bureau in 2000, did you ever work more than 40 hours in a work week (Sunday through Saturday)? You should include as work time the time you spent traveling to and from your home, time spent on work-related activities at your home, and lunch or dinner breaks if you worked during those breaks.
___ Yes ___ No

11. Review the Payroll Summary produced from the Census Bureau payroll records which show the days you worked and hours you submitted in 2000. What is your best estimate of which weeks you worked MORE THAN 40 hours (40+) per work week, and how many hours of overtime you worked each of those 40+ hour weeks?

There are spaces on the right hand side of the Payroll Summary where you should indicate how much overtime you believe you worked. Please include on the Payroll Summary overtime hours that you claim to have worked in the following decennial field positions only: Enumerator, Crew Leader Assistant, Crew Leader, Field Operations Supervisor Assistant, Field Operations Supervisor, and Special Places Operation Supervisor.

**Example:** Assume you worked 50 hours in the first week of May and 20 hours in the second week of May. Because you were not permitted to record more than 40 hours in a week, you only recorded 40 hours for the first week of May and did not submit any overtime worked. Therefore, you would indicate your estimate of overtime as follows:

| PAY PERIOD END DATE | TYPE | PAYROLL DATA SUN | MON | TUE | WED | THU | FRI | SAT | TOTAL | ESTIMATE UNPAID OVERTIME* |
|---|---|---|---|---|---|---|---|---|---|---|
| 05-06-2000 | REG | 0.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 0.00 | 40.00 | |
| 05-06-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-06-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-06-2000 | TOTAL | 0.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 0.00 | 40.00 | 10 HRS |
| 05-13-2000 | REG | 4.00 | 8.00 | 8.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20.00 | |
| 05-13-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-13-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-13-2000 | TOTAL | 4.00 | 8.00 | 8.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20.00 | ______ |

12. If you "banked," "rolled," or "carried over" any overtime you worked, add those also to the Payroll Summary, in the space indicated. "Rolled-over," "banked" or "carried-over" hours refer to overtime hours you worked in one week, but were not able to record because doing so would exceed 40 hours in one week. Some census employees were told to "roll" or "carry" over their overtime hours to later weeks in which they worked less than 40 hours and therefore were already partially paid for their overtime. You may be entitled to some recovery even if you rolled over your overtime hours.

13. Are any of the numbers you wrote on the Payroll Summary based on an estimate?
    ___ Yes ___ No

14. If any of your numbers are based on estimates, please identify on the Payroll Summary, where indicated, which numbers are estimates and describe how you arrived at those estimates.

15. If you have any documents, which existed in 2000, that may tend to show that you worked the overtime claimed (e.g. datebooks, calendar entries), attach copies of the documents to this claim form. If you provide documents, send copies only. No originals should be provided as your documents will not be returned to you. *Note that documentary proof is not required to make a claim.*

16. Do you believe your supervisor knew or had reason to know that you worked overtime prior to your working the overtime?
    ___ Yes ___ No

17. If you answered yes to Question 16, explain why you believe your supervisor knew or had reason to know that you worked overtime prior to your working the overtime. (Please refer to pages 2 and 3, **"What is Overtime?"** for examples of how your supervisor knew or should have known about your working overtime.)

If you need additional space to respond to any of the above questions, use a separate sheet of paper. Clearly print your name and SSN at the top of each additional page, and indicate the question number.

Certification: I swear or affirm under penalty of perjury that the above statements are true to the best of my knowledge and belief.

Date: ________________ Signature: ______________________________

Print Name: ______________________________

**You Must Complete, Sign and Return this Claim Form and the enclosed Payroll Summary by mail postmarked no later than SEPTEMBER 29, 2006.**

If you wish to confirm our receipt of this form, we strongly recommend that you send it via Registered Mail/Return Receipt requested. To obtain a Registered Mail/Return Receipt form, please visit your local post office or go to: www.usps.com.
**You must keep a copy of completed forms for your records.**

Def. Ex. 3

MINAMI LEW & TAMAKI LLP

ATTORNEYS AT LAW

360 Post St, Eighth Floor San Francisco, CA 94108
*Phone*: 415-788-9000 *Fax*: 415-398-3887
Census Toll-Free Hotline: 1-888-528-9707
*Website:* www.censusclassaction.com

**CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**

August 1, 2006

Re: Your Claim for Unpaid Overtime Against the U.S. Census Bureau: *Christofferson vs. U.S.*, U.S. Court of Federal Claims (No. 01-495C)

Dear Sir or Madam:

We are the law firm representing you and over 7,000 other individuals who have filed claims that the U.S. Census Bureau failed to pay overtime during the Year 2000 Census. The United States Government has agreed to a process of evaluating all claims of unpaid overtime that have been filed in this case.

**How Much Is Your Claim Worth?** Unpaid overtime is paid at 1.5 times your normal hourly rate and then doubled. For example, if you were paid at an hourly rate of $15/hour and you worked a total of 40 overtime hours but were not paid any overtime, your claim would be calculated as follows:

$15 x 1.5 = $22.50/hour
$22.50 x 40 = $900.00
$900 x 2 = **$1800.00**

**What Are The Next Steps?** This packet contains three documents: 1) a Notice of Claims Procedure; 2) a Claim Form; and 3) a Payroll Summary. The latter two documents must be completed and returned by the U.S. mail postmark deadline stated below in order for us to process your claim for overtime compensation.

To continue with your claim, you **must** do the following:

- Review the instructions on the "Notice of Claims Procedure" before completing the forms.

- Review the enclosed "Payroll Summary" which is data from the Census Bureau of the work days and hours you reported in 2000. In most cases, this Summary will **not** show any overtime hours you actually worked in 2000. We provide the Payroll Summary to refresh your memory because we know it will be extremely difficult for most claimants to

remember the days and hours they worked more than six years ago and then to estimate their overtime hours.

- Estimate, to the best of your ability, the overtime you worked between January 1, 2000 and November 1, 2000, in the spaces provided on the Payroll Summary. You **must** make a good faith estimate of your overtime to be eligible for payment and to determine the amount of any payment.

- Answer the questions in the "Claim Form" truthfully and completely by giving your best estimates.

- State on your Claim Form (Question No. 15) how your supervisor knew or should have known that you worked overtime prior to your working it. (See pages 2-3, "**What is Overtime**" in the Notice of Claims Procedure for guidance).

- Sign and return the completed Claim Form and Payroll Summary by mail **postmarked no later than September 29, 2006.** Failure to return the completed forms by the deadline will void your claim.

It is important that you not set this packet aside and forget it. I urge you to return the completed forms as soon as possible. Don't wait until the deadline nears before you begin completing these forms because this task does not get easier the longer you delay. Don't let the passage of time discourage you from continuing in this process. The vast majority of the 7,000-plus claimants will not have supporting documents or exact recall but will be making good faith estimates of their overtime. If you want the opportunity to receive the unpaid wages for overtime you worked in the 2000 Census, your only chance is to complete the enclosed forms and send them to us on time.

We appreciate your patience during the years this case has been pending. We have actively litigated this case but the timing of its resolution is beyond our control. We remain available to assist you. If you have any questions in completing your Claim Form and Payroll Summary, you should go to our website: **www.censusclassaction.com**, e-mail us at census@mltsf.com, call our toll-free hotline 1-888-528-9707, or write us at: MINAMI, LEW & TAMAKI, LLP, Census Lawsuit 360 Post St., Eighth Floor San Francisco, CA 94108. We appreciate your patience and look forward to a successful resolution of your claim.

Very truly yours,

Jack W. Lee
Attorney at Law

Def. Ex. 4

061101A



UNITED STATES COURT OF FEDERAL CLAIMS

KENT CHRISTOFFERSON, et al., )
Plaintiffs, ) Docket No. 01-495C
)
v. )
UNITED STATES, )
Defendant. )

Room 301
National Courts Building
717 Madison Place NW
Washington, D.C.
Wednesday,
November 1, 2006

The parties met, pursuant to notice of the Court, at 2:00 p.m.

BEFORE: HONORABLE ERIC G. BRUGGINK
Judge

APPEARANCES: (Via Telephone)

For the Plaintiffs:

JACK WING LEE, Esquire
JOHN OTA, Esquire
Minami, Lew & Tamaki, LLP
360 Post Street, 8th Floor
San Francisco, California 94108
(415) 788-9000



APPEARANCES: (Continued)

For the Defendant:

STEVEN J. GILLINGHAM, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-2311

RAYNA G. ELLER, Esquire
Department of Commerce
Bureau of the Census
Office of General Counsel
Suitland, Maryland 20746
(301) 763-6513

P R O C E E D I N G S

(2:00 p.m.)

THE COURT: Good morning, Mr. Lee.

MR. LEE: Good morning, Judge Bruggink. With me is Sonia Merida and John Ota.

THE COURT: All right. And good afternoon, Mr. Gillingham.

MR. GILLINGHAM: Good morning, Your Honor. I'm here alone.

THE COURT: And Ms. Eller.

MS. ELLER: Good afternoon, Judge Bruggink.

THE COURT: Good afternoon or morning, as the case may be. I guess the purpose of the conference is for me to get caught up on where things stand after, I assume now you all have been receiving the returns on the questionnaires, Mr. Lee?

MR. LEE: Yes, Your Honor.

THE COURT: Let me give you an update of where we are. In early August, we sent out claim forms, 7,500 of them, approximately, and asked for returns of those completed claim forms by the end of September. About 600 of those came back with inaccurate addresses and we re-sent those, so that's delayed to some extent the deadline.

Also, we have a small group of about 500

addresses where we had the wrong return address, but we've fixed that, and so people are able to send it to the correct return address now. To date, we have about 2,700 claim forms returned to us completed.

THE COURT: How many are still not overdue because of the problems with the addresses? In other words, what new date did you give for the people who either had the wrong return address or you had the wrong address?

MR. LEE: We gave them till yesterday, October 31.

THE COURT: I see.

MR. LEE: Which is kind of an artificial date but we wanted to have a date certain for them, and even though they are coming in a day or two late we're still accepting them because we wanted a date in there so that they would have something real to deal with, but we didn't want to quibble with them over one week or four, so we still are accepting them until probably the end of November.

THE COURT: Okay. And what are we going to treat as the drop-dead-date?

MR. LEE: We were intending to use the drop-dead date of either the end of November or mid-December as an absolute drop-dead date. But let me go

5

on and tell you what we are doing so maybe you can have some context with that.

THE COURT: All right.

MR. LEE: The claim forms that are received, we have a staff of six people looking at each one of those and entering them into a database which we intend to share with the government. It's going to be on Excel spreadsheet, and we've done about 850 to date, about 30 percent, and we're continuing to do them as fast as we can. But we do have to call back at least the majority of people that are filling out the claim forms because there's ambiguities on their claim forms, and they don't understand how to roll over hours. And so we have to talk to them that oftentimes involves phone calls. So it's not a quick process but we're hoping that we can finish most of them by November, end of November, and by mid-December complete the whole group.

THE COURT: Okay. Now, did you end up hiring a third party to do the processing?

MR. LEE: What we did was we hired a third party to send out claim forms and to do the re-mails and handle some of the logging, but our staff here is handling the actual contact with the class.

THE COURT: When you said 850 were



processed, does that mean so that you have sufficient data that you don't need to recontact these people?

MR. LEE: In general, that's true, although we're finding that here and there we're having to contact people because we get clarification on an

issue and we change our position, or we're basically seeing an issue more than once, so we're calling people back that we had a different conclusion on. So in general, the ones that are in the database are the ones that we do not intend to go back to.

THE COURT: And that's the 850 or some other number?

MR. LEE: 850.

THE COURT: Okay. And what kind of shorthand version results are you getting with that 850?

MR. LEE: If you mean in germs of the number of overtime hours claimed, we're getting some for as little as one or two hours, and some in excess of a thousand, 2,000 is the highest, and most of them are, I would say, under 100.

THE COURT: Okay. Have you been in contact with the government as this process has unfolded?

MR. LEE: Well, we have been continuing to talk about settlement, and about 30 or 40 of those



that I think we've reached resolution on, so we're narrowing our differences on that. I think there are still about five or six that we still have differences on and we intend to address those, but at least for the Concord people, the ones who we did the trial on, we're nearing settlement on all those, and I think we have three-quarters of those resolved.

THE COURT: Okay. I meant more generally.

In terms of the results you're getting on these forms, is, for example, the problem with the addresses, either the bad addresses for the Plaintiffs or the return address, is this something, Mr. Gillingham, that you're hearing for the first time or have you been tied into this?

MR. GILLINGHAM: Mr. Lee and I spoke today about his progress. I knew generally that he was sending these out, but we haven't been getting weekly updates or anything like that. But no, Mr. Lee and I have spoken.

THE COURT: Okay. Now, as I recall, both the application of my ruling to the Concord group and the application of the returns on these forms to the larger group are both something that presumptively you're going to try to work out a settlement for, is that right?



MR. LEE: That's my understanding, Your Honor.

MR. GILLINGHAM: That's right, Your Honor.

THE COURT: Okay. In terms of the returns that you haven't gotten, why would someone who hasn't sent in a return yet be likely to send one in? If they're operating with an end of September deadline or even if it's an extended deadline, why do you think you're likely to get more?

MR. LEE: Well, because we get phone calls

almost daily asking for extensions because of some emergency or another that are personal in nature, and we're giving them limited extensions, quick turnaround extensions. But even though they're coming back to the table and asking us for other extensions because of personal circumstances. So there is going to be a point in time when we're going to just cut it off.

THE COURT: All right. And is this something that you and Mr. Gillingham needed to negotiate up front or are you just planning to do that after you get all your results?

MR. LEE: Well, I guess the way we've been approaching it is that we haven't really agreed among ourselves, you know, between the parties that there will be a drop-dead date. We assume there will be,



but we want to set that date as we go, and there certainly is going to be a time period where it's just too late.

THE COURT: But is that going to be communicated to everybody you haven't heard from or is that just an in-house, drop-dead date?

MR. LEE: That's an in-house. We don't intend to send anymore flyers out saying, you know, there is one last chance. Right now I guess we haven't set that date yet. The only reason I guess is I'm not comfortable setting that date is that we've given people, with deadlines.

MS. ELLER: Your Honor, may I say something

on behalf of the Department of Commerce? When we negotiated this, and our understanding of that questionnaire was that there was going to be a drop-dead date filled in on that, and it was going to mean something, and that it wasn't going to be something that was done, you know, after the fact.

MR. LEE: I guess I would disagree with that. The government has never stated that we agreed to a drop-dead date. We haven't. And we agree that that's something we will agree to, but we haven't set that date yet, and we don't want to argue with the claimants about a week here or a week there.



THE COURT: Well, it's one thing to give the, I think what we discussed, Ms. Eller is correct, we discussed putting a drop-dead date into the form, but that's a somewhat different question than what the Department of Justice is going to accept as a straggler in the future.

I really think it's probably best that the three of you, or the four of you, however many, five of you out there, really need to talk about that, and I'm not sure this is the time or the place to do it. But it seems to me that there will probably be stragglers coming in a year from now, and we need to know what to do with those people and the people who come in two months from now.

So because this is a negotiated process, I

think you have the option to do whatever you can agree on, but I really think that at some point in the very near future there needs to be some clear understanding that X date is the time that returns are presumptively in effect ignored. And I assume these are being stamped somehow with the date of receipt?

MR. LEE: Yes, they are.

THE COURT: Okay. But I guess, Mr. Gillingham, I need to hear from you as well on this subject.



MR. GILLINGHAM: Well, I don't have any agreement in front of me. Whatever it says it says. I recall that we had a date, and it was going to be a false date inserted so people have a built-in period for stragglers. But I'll review that, and discuss it with all concerned, and we'll, I guess, proceed from what we've agreed on. And to the extent there is an ambiguity, or a lack of precision, then we'll negotiate as you've suggested to be more precise.

THE COURT: All right. I would highly recommend that. The people who are claiming, say, a thousand hours based on -- I'm not asking you to give away anybody's rights here, but is it a return that has some plausibility to it?

I really don't know how many hours people worked total, for example, whether or not that's in effect such an extreme that you all are going to have to ignore it, or is that a total outlier kind of

claim, or is it physically possible to have worked 1,000 hours of overtime?

MR. LEE: The claims that are coming in like that are plausible, are credible.

MS. ELLER: Your Honor, for the Department of Commerce, we don't even have people who -- there are very few people who would have straight time for



the decennial that would have been paid that much for 40 hours a week. The decennial isn't that long.

THE COURT: Did we not talk about having some process of eliminating, or maybe this is just a statistical analysis you all have to do, but there is probably some principled way to look at things like this and focus on where the mean, median or mode lie?

MR. GILLINGHAM: Your Honor, Steve Gillingham. We each have experts in this area who would certainly advise us of that. In general, what the agreement left open was into which strata or groups the questionnaires would be placed, and there is a number of options.

Hours could be the grounds for a strata or it could be done by area of the country or by region or by office or by type of claim, or it could be by all of those. Obviously the more strata you have the more groups you have to deal with.

An agreement was that within each strata there would be designated --

THE COURT: Deponents.

MR. GILLINGHAM: -- deponents to sort of flush out the issues, and we would go from there. There are also those whose -- those responses would be designated as the certainty group, and I think the



criteria for that were also to be developed. I would imagine we would be looking at anybody with a high number as someone who would be placed in the certainty group.

In effect, the certainty group is a group of one; that is, that person would probably be deposed, or the case would be analyzed somehow on its own merits and negotiated, resolved on its own merits, and whatever happened wouldn't affect anybody else basically.

THE COURT: And then how do you use the results of that certainty group?

MR. GILLINGHAM: Well, they would just affect the individuals. So if you have 15 that were, for example, if they were outliers, we would probably identify those as ones who we wanted to treat as a certainty group, meaning one at a time, and negotiate those one at a time.

Those who are not in the certainty group, those who were not designated for one-at-a-time treatment would be banded by -- according to the criteria the parties have yet to agree upon -- and what the agreement provided was that some number

everything or the time that all returns are supposed to be due. But whatever that is, my suggestion would be to talk to each other about that, otherwise the next 30 days may lead to more misunderstandings or confusion.

So it may be that 30 days ends up being premature in terms of the final database's being produced, but I'd rather stick with a 30-day reporting back date just to make sure that you all have further conversation about what's going to happen in the next couple of months.

MR. LEE: Yes, I think we're committed to doing that and can file status reports whenever.

THE COURT: Okay. Well, let me ask Mr. Lee to take the initiative in doing that and run it by the government as well. But I'm assuming that prior to



that 30 days that you all would have talked about any other pieces that can be most usefully negotiated now rather than later in terms of anything left out of the MOU or cutoff dates and that kind of thing.

MR. LEE: Sure.

MR. GILLINGHAM: That's fine, Your Honor.

THE COURT: All right. Anything else?

MR. GILLINGHAM: Nothing from the government, Your Honor.

THE COURT: Mr. Lee?

MR. LEE: No.

THE COURT: All right. Thank you, folks.

MR. LEE: Thank you, Your Honor.

MR. GILLINGHAM: Thank you.

(Whereupon, at 2:25 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//



REPORTER'S CERTIFICATE

DOCKET NO.: 01-495C

CASE TITLE: Kent Christofferson v. United States

HEARING DATE: November 1, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

061101A

Date: November 1, 2006

Barbara Berney
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018

within a given group would be negotiated, and depending upon the experience of the deponents.



For example, if someone claimed -- people were deposed in a ceratin group of hours and following negotiations the parties agreed that their claim should be discounted 10 percent, that 10 percent discount would then be applied to everybody else in the group, so that's the effect of being in a strata.

If you are in a certainty group, you're just being handled on your own merits basically, and our thinking was there wouldn't be a whole lot of those. I guess if I see a claim for 1,000, I think that person is probably a pretty good candidate to be examined on his own because I gather from what Mr. Lee is saying that's not the usual case.

MR. LEE: Right. And Your Honor, the named Plaintiff for this case, Ken Christofferson, has extensive documentation of 500 overtime hours. And if you look at the class period we have here, which is 11 months, if you worked 160 hours for that full 11 months, you would come out to something like 1,700 out of normal time. I mean, it is unusual but certainly possible.

THE COURT: You mean 160 days?

MR. LEE: One hundred and sixty hours per month.

THE COURT: Oh, per month. I'm sorry. I

missed the per month. Okay.

MR. LEE: Eleven months --

THE COURT: All right.

MR. LEE: -- gives us 1,700 hours total.

THE COURT: All right. Okay. So I guess it's premature until you the Plaintiffs develop whatever it is that you're going to offer to the government to negotiate these strata groups and certainty groups and all that?

MR. LEE: Yes, Your Honor. I mean, we're doing that every day.

THE COURT: Doing which part every day?

MR. LEE: Doing the database, talking to people, filling out their forms -- excuse me -- filling out the database based on what they put down in their claim forms.

THE COURT: Okay. So I gather that there is no point in asking you all to negotiate that in the short term, but am I right in thinking that whatever the terms are for telling somebody you're too late is something that needs to be negotiated before you can draw the database to a close?

MR. LEE: Your Honor, we're not opposed to that. We will talk to the government about that.

THE COURT: Okay.

MS. ELLER: This is Rayna Eller. Another issue that I don't recall ever being resolved, of course, was what to do about like an index for attorney-client privileges, what's being claimed as attorney-client privilege, because I gather we're not getting transcriptions of what's on these questionnaire forms.

MR. LEE: You're getting summaries.

THE COURT: Okay. I gather you're right that that's something we haven't drawn closure on. Are you saying, Ms. Eller, that that's something that the government is going to insist on seeing raw data?

MR. GILLINGHAM: Your Honor, as I recall you had, Your Honor, mentioned this in one of your orders. I know I've e-mailed awhile ago Mr. Lee about that being one of our concerns, and we're not going to see the original papers because in the end we were going to see these spreadsheets or database that was going to contain all the answers, most of which would be one-word answers.

THE COURT: Right.

MR. GILLINGHAM: If something is being excluded, then, of course, you know, we would want to know what that is. The whole purpose of the claim is to determine what people are saying that is the basis

17

for their claim.

THE COURT: All right. It's one thing to talk about sort of mass evaluation of documents. It's another thing to depose somebody. How would the government be able to, or how in a deposition would a Plaintiff, the deponent be able to meaningfully respond to questions unless they had their own either cuff list or their original written response in front of them?

MR. GILLINGHAM: We did have something about this in the MOU. I can't remember right off the bat, but I do remember that it talked about the possibility that original documents would be available for those chosen for depositions, and otherwise they would generally not be available.

THE COURT: Well, it seems to me you're going to have to have some kind of an outlet like that for the government to test certainly whoever you draw on a sample groups, otherwise their level of certainty about what they're getting in the summary data is not going to be all that meaningful.

Okay. Well, I guess I'm responding to Ms. Eller's suggestion. Is that something that needs to be further negotiated or is what's in the MOU sufficient for purposes at least for the present?

18

MR. GILLINGHAM: Your Honor, I would have to go back and look at it again because I remember that we reserved until later on, and I just was not prepared to address this today.

THE COURT: Okay. Well, then I'll ask the five of you, what, other than giving me an update on where things stand at the moment, what do you all need to tell me or what do I need to be asking you?

MR. LEE: Well, I think most of what we will need to talk about after we complete the database and give it to the Defendants and they do their analysis. And at that point we need to sit down and agree upon what statistical analysis we're going to be using, and I think there might be a point in time where we need to sit down together and do that.

THE COURT: Well, that's certainly true. If that is sort of the next major step, the only interim step that I can see that you have to reach some agreement on is, as I said, the closure date, because otherwise the database is a continuous work in process.

MR. LEE: Right. And we don't disagree with that, Your Honor. In fact, we agree that there should be a drop-dead date. I want to talk to my supervisor about what that should be, but the concept was



completely agreeable. We're not trying to hold this thing open. We don't think that serves any purpose for people that are stragglers, and we want also to cut it off.

THE COURT: Okay. All right. Well, when should I next inquire, or is it sufficient for our

present purposes for you all to report in writing jointly in a status report say in 30 days or thereabouts what the status of things is?

MR. LEE: That would be fine. We could do that in 30 days.

THE COURT: Mr. Gillingham?

MR. GILLINGHAM: It depends on whether Mr. Lee expects if anything is going to change in the next 30 days.

THE COURT: Change?

MR. GILLINGHAM: From the status today. I mean, the last thing he referred to is getting us documents in December. We'll certainly go over the MOU again and see if there is any imprecision concerning plans or anything else that needs to be negotiated. I was wondering whether Mr. Lee expects there would be anything to report in the next 30 days.

THE COURT: Well, I'm assuming that you all are going to have to have a conversation about the



timeliness of late returns in something less than 30 days. Otherwise he won't know what's going to happen in 30 days unless there is some understanding reached as to whether or not you have a series of dates or a final date or how firm that is.

But Mr. Lee was talking about two possible dates, the end of November and the middle of December, and I'm not sure exactly what that would represent, whether it would be the time that the government gets

Def. Ex. 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KENT CHRISTOFFERSON et al., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | No. 01-495C (Judge Bruggink) |

## JOINT STATUS REPORT

Pursuant to the Court's November 1, 2006 order requiring the parties to submit a joint status report no later than December 4, 2006, counsel for plaintiffs submit this report on behalf of the parties. Counsel for defendant has read and concurs with this Status Report.

Since the last status telephone conference on November 1, 2006, counsel for the parties agreed upon a final postmark date for the receipt of all Claim Forms, November 30, 2006. Plaintiffs have received 2730 completed claim forms as of the final deadline.

The Claim Forms, Payroll Summaries and Notice of Claims Procedure were sent in stages to approximately 7459 class members beginning on August 1, 2006. Hundreds of claimant addresses turned out to be no longer accurate. As a consequence, plaintiffs had to research and resend approximately 700 new claims packets to claimants. The last mailing to claimants with new addresses occurred on September 18, 2006.

Plaintiffs are currently reviewing and compiling the responses to the Claim Form and entering the information into a database, with the intention of sharing this database with Defendant. The vast majority of the completed Claim Forms require clarification or additional

information from the claimant before their data can be entered into the database. Plaintiffs have a staff of five persons working solely on calling claimants and entering their information into the database. Plaintiffs expect that 95% of the data entry will be completed by February 15, 2007. At that time or shortly thereafter, plaintiffs will provide defendant with the database.

Respectfully submitted,

JACK W. LEE
MINAMI, LEW & TAMAKI LLP
360 Post St. 8th Floor
San Francisco, CA 94108-4903
415-788-0204

December 4, 2006

Attorneys for Plaintiffs

Def Ex. 6

| | | | | | |
|---|---|---|---|---|---|
| EMPLOYEE NAME | Abate,Tewodros | PP END DATE | 4/22/2000 | | |
| SSN | [redacted] | REG HRS (paid) | 0 | REG Hrs CLAIMED | |
| LCO CODE | 2718 | TRN HRS (paid) | 24 | ROLLOVER HRS C | |
| LCO NAM | Oakland | OT HRS (paid) | 0 | OT HRS CLAIMED | |
| POSITION | Enumerator | TOTAL HRS (paid) | 24 | HRLY RATE | |
| DECLINE | ☐ | | | OT PAID | ☐ |

16 Supervisor Knowledge ☐
16a I told/complained to my Supe that I worked OT ☐
16b I saw others denied OT so did not claim myself ☐
16c Supe asked me to work OT ☐
16d Supe told me to work until job complete ☐
16e Supe rejected my timesheet with OT ☐
16f Supe told me to ROLLOVER OT hrs ☐
16g Supe worked alongside me ☐
16h Supe saw me early am and late at night ☐

13 Is Claim Estimate ☐
13a Reconstructed memory ☐
13b Contemp records/DOCS ☐
13c Added lunch/breaks and/or travel time ☐

CF SIGNED UNDER PENALTY OF PERJURY ☐

| | | | | | |
|---|---|---|---|---|---|
| EMPLOYEE NAME | Abate,Tewodros | PP END DATE | 4/29/2000 | | |
| SSN | [redacted] | REG HRS (paid) | 14.75 | REG Hrs CLAIMED | |
| LCO CODE | 2718 | TRN HRS (paid) | 7.25 | ROLLOVER HRS C | |
| LCO NAM | Oakland | OT HRS (paid) | 0 | OT HRS CLAIMED | |
| POSITION | Enumerator | TOTAL HRS (paid) | 22 | HRLY RATE | |
| DECLINE | ☐ | | | OT PAID | ☐ |

Def. Ex. 7

Smith, Clara

OCT 1 0 2006

# CLAIM FORM

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
WASHINGTON D.C.
KENT CHRISTOFFERSON, et al., vs. THE UNITED STATES (No. 01-495C)

Please print clearly in dark ink.

1. Carla Smith [redacted]
Name (First, Middle, Last) Social Security Number

2. 501 West 143st. 32
Street Address Apartment Number

New York NY 10031
City State Zip Code

3. Do you wish to continue with your claim against the federal government for unpaid overtime?
✓ YES ___NO

If "Yes," please complete this Claim Form and provide estimates of your overtime on the Payroll Summary. If "No," you do not need to complete the rest of this Claim Form. Please return this form and the Payroll Summary to our offices at the address provided. A "No" means you no longer wish to be a participant in this lawsuit.

4. www. cinamonlane@yahoo.com
E-mail Address (if any)

5. (718) 264-8351 anytimes
Work Phone Number Best Times to Call

6. 2126946243 anytime
Home Phone Number Best Times to Call

7. 6467642444 anytime
Cell Phone Number Best Times to Call

8. N/A
Phone Number of Relative or Other Contacts (Optional)

9. Please list any other names used while employed by the U.S. Census Bureau in the year 2000.

N/A

10. While working for the Census Bureau in 2000, did you ever work more than 40 hours in a work week (Sunday through Saturday)? You should include as work time the time you spent traveling to and from your home, time spent on work-related activities at your home, and lunch or dinner breaks if you worked during those breaks.
✓ Yes ___ No

11. Review the Payroll Summary produced from the Census Bureau payroll records which show the days you worked and hours you submitted in 2000. What is your best estimate of which weeks you worked MORE THAN 40 hours (40+) per work week, and how many hours of overtime you worked each of those 40+ hour weeks?

There are spaces on the right hand side of the Payroll Summary where you should indicate how much overtime you believe you worked. Please include on the Payroll Summary overtime hours that you claim to have worked in the following decennial field positions only: Enumerator, Crew Leader Assistant, Crew Leader, Field Operations Supervisor Assistant, Field Operations Supervisor, and Special Places Operation Supervisor.

**Example:** Assume you worked 50 hours in the first week of May and 20 hours in the second week of May. Because you were not permitted to record more than 40 hours in a week, you only recorded 40 hours for the first week of May and did not submit any overtime worked. Therefore, you would indicate your estimate of overtime as follows:

| PAY PERIOD END DATE | TYPE | SUN | MON | TUE | WED | THU | FRI | SAT | TOTAL | ESTIMATE UNPAID OVERTIME* |
|---|---|---|---|---|---|---|---|---|---|---|
| | | PAYROLL DATA | | | | | | | | |
| 05-06-2000 | REG | 0.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 0.00 | 40.00 | |
| 05-06-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-06-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-06-2000 | TOTAL | 0.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 0.00 | 40.00 | 10 HRS |
| 05-13-2000 | REG | 4.00 | 8.00 | 8.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20.00 | |
| 05-13-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-13-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-13-2000 | TOTAL | 4.00 | 8.00 | 8.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20.00 | ____ |

12. If you "banked," "rolled," or "carried over" any overtime you worked, add those also to the Payroll Summary, in the space indicated. "Rolled-over," "banked" or "carried-over" hours refer to overtime hours you worked in one week, but were not able to record because doing so would exceed 40 hours in one week. Some census employees were told to "roll" or "carry" over their overtime hours to later weeks in which they worked less than 40 hours and therefore were already partially paid for their overtime. You may be entitled to some recovery even if you rolled over your overtime hours.

13. Are any of the numbers you wrote on the Payroll Summary based on an estimate?
___ Yes ✓ No

14. If any of your numbers are based on estimates, please identify on the Payroll Summary, where indicated, which numbers are estimates and describe how you arrived at those estimates.

15. If you have any documents, which existed in 2000, that may tend to show that you worked the overtime claimed (e.g. datebooks, calendar entries), attach copies of the documents to this claim form. If you provide documents, send copies only. No originals should be provided as your documents will not be returned to you. *Note that documentary proof is not required to make a claim.*

16. Do you believe your supervisor knew or had reason to know that you worked overtime prior to your working the overtime?

X Yes X No

MD Per phone conf w/ client on 12/11/06

17. If you answered yes to Question 16, explain why you believe your supervisor knew or had reason to know that you worked overtime prior to your working the overtime. (Please refer to pages 2 and 3, **"What is Overtime?"** for examples of how your supervisor knew or should have known about your working overtime.)

If you need additional space to respond to any of the above questions, use a separate sheet of paper. Clearly print your name and SSN at the top of each additional page, and indicate the question number.

Certification: I swear or affirm under penalty of perjury that the above statements are true to the best of my knowledge and belief.

Date: 10/6/06

Signature: Carla Smith

Print Name: Carla Smith

**You Must Complete, Sign and Return this Claim Form and the enclosed Payroll Summary by mail postmarked no later than SEPTEMBER 29, 2006.**

If you wish to confirm our receipt of this form, we strongly recommend that you send it via Registered Mail/Return Receipt requested. To obtain a Registered Mail/Return Receipt form, please visit your local post office or go to: www.usps.com.
**You must keep a copy of completed forms for your records.**

ID: 6278

Carla Smith
9028 186TH ST
HOLLIS, NY 11423-2424

SSN : [redacted]

**PAYROLL SUMMARY**



NAME : Smith,Carla

| CHANGEDATE | LOCAL CENSUS OFFICE NAME | POSITION |
|---|---|---|
| 05-08-2000 | Jamaica | Enumerator |

Hours Worked During 1/1/2000 - 11/30/2000

* Overtime can only be claimed if you worked more than 40 hours total during a work week (Sunday through Saturday). "Work time" includes travel time to and from your home, time you spent at home making work-related calls or on other work activities, and time you worked during a lunch or dinner break.

| PAY PERIOD END DATE | TYPE | PAYROLL DATA SUN | MON | TUE | WED | THU | FRI | SAT | TOTAL | ESTIMATE OVERTIME WORKED* |
|---|---|---|---|---|---|---|---|---|---|---|
| 05-13-2000 | REG | 0.00 | 0.00 | 0.00 | 0.00 | 2.50 | 6.00 | 7.50 | 16.00 | |
| 05-13-2000 | TRAIN | 0.00 | 8.00 | 8.00 | 8.00 | 0.00 | 0.00 | 0.00 | 24.00 | |
| 05-13-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 2.50 | 0.00 | 0.00 | 2.50 | |
| 05-13-2000 | TOTAL | 0.00 | 8.00 | 8.00 | 8.00 | 5.00 | 6.00 | 7.50 | 42.50 | 3 hour |
| 05-20-2000 | REG | 0.00 | 7.50 | 6.00 | 6.00 | 3.00 | 6.00 | 7.00 | 35.50 | |
| 05-20-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-20-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-20-2000 | TOTAL | 0.00 | 7.50 | 6.00 | 6.00 | 3.00 | 6.00 | 7.00 | 35.50 | 4 hours |
| 05-27-2000 | REG | 7.50 | 5.00 | 3.00 | 0.00 | 0.00 | 2.00 | 5.00 | 22.50 | |
| 05-27-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-27-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-27-2000 | TOTAL | 7.50 | 5.00 | 3.00 | 0.00 | 0.00 | 2.00 | 5.00 | 22.50 | 8 hours |
| 06-03-2000 | REG | 5.00 | 0.00 | 4.00 | 0.00 | 4.00 | 0.00 | 6.00 | 19.00 | |
| 06-03-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 06-03-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 06-03-2000 | TOTAL | 5.00 | 0.00 | 4.00 | 0.00 | 4.00 | 0.00 | 6.00 | 19.00 | 5 hours |
| 06-10-2000 | REG | 3.00 | 3.00 | 0.00 | 0.00 | 0.00 | 5.00 | 2.00 | 13.00 | |
| 06-10-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 06-10-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 06-10-2000 | TOTAL | 3.00 | 3.00 | 0.00 | 0.00 | 0.00 | 5.00 | 2.00 | 13.00 | 6 hours |
| 06-17-2000 | REG | 0.00 | 3.00 | 0.00 | 6.50 | 5.00 | 3.00 | 7.00 | 24.50 | |
| 06-17-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 06-17-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 06-17-2000 | TOTAL | 0.00 | 3.00 | 0.00 | 6.50 | 5.00 | 3.00 | 7.00 | 24.50 | 6 hours |
| 06-24-2000 | REG | 0.00 | 6.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.00 | |
| 06-24-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 06-24-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 06-24-2000 | TOTAL | 0.00 | 6.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.00 | 0 hours |

ROLLED-OVER OVERTIME HOURS:
"Rolled," "banked" or "carried over" hours refer to overtime hours that you worked in one week, but were not able to record on the day that you actually worked them, and, therefore, you recorded them on a later date. Some census employees were told to "roll" or "carry" over their overtime

hours to later weeks in which they worked less than 40 hours and therefore were already partially paid for their overtime.

If you DID NOT roll over any overtime hours, leave this section blank.

If you "banked," "rolled" or "carried over" any of the overtime you have claimed above, in the spaces below, give your best estimate of the dates on which you actually worked those hours and also the dates on which you recorded those hours on your pay form.

Example: Assume you worked 50 hours in the first week of May. Because you were not permitted to record more than 40 hours in a week, you recorded only 40 for that week and then kept track of the 10 additional hours. Assume you worked only 20 hours in the second week of May. Instead of recording 20 hours for that week, you recorded 30 (the 20 actually worked that week, plus the 10 carried over from the first week). In that example, your answer to this Question would be: "Rolled 10 hours from the first week of May to the second week of May."

If you are not sure of exact dates, you may estimate. For example, "Rolled about 20 hours in May to June."

1a. Week/Date Overtime Worked: 6/4/00 to 6/10/00

1b. Number of Overtime Hours Not Recorded: 12

1c. Week/Date in which Overtime was recorded: ____________

---

2a. Week/Date Overtime Worked: 6/11 to 6/17

2b. Number of Overtime Hours Not Recorded: 12

2c. Week/Date in which Overtime was recorded: ____________

---

3a. Week/Date Overtime Worked: ____________

3b. Number of Overtime Hours Not Recorded: ____________

3c. Week/Date in which Overtime was recorded: ____________

---

(Continue on another sheet of paper as necessary.)

If any of the numbers you give for Overtime or Rolled-Over Hours are based on estimates, please write out below, to the best of your knowledge, which dates and numbers are estimates, and describe how you arrived at those estimates. Please use the back of the Payroll Summary for your description. If you need additional space, use a separate sheet of paper clearly labeled with your name and SSN at the top of each additional page.

Standard Form 50-B
Rev 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch-4

# NOTIFICATION OF PERSONNEL ACTION

Exception to SF-50-B
Approved by GSA/IRMS 2-8

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Smith,Carla | [redacted] | 05-14-1975 | 07-09-2000 |

## FIRST ACTION

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 357 | Termination 08-12-2000 |
| **5-C. Code** | **5-D. Legal Authority** |
| UYM | SCH A 213.3102(i)(3) |
| **5-E. Code** | **5-F. Legal Authority** |
| | |

## SECOND ACTION

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |
| **6-C. Code** | **6-D. Legal Authority** |
| | |
| **6-E. Code** | **6-F. Legal Authority** |
| | |

7. FROM: Position Title and Number
Enumerator
PD: 38 Position: 00002018

| 8.Pay Plan | 9.Occ. Code | 10.Grade/Level | 11.Step/Rate | 12.Total Salary | 13.Pay Basis |
|---|---|---|---|---|---|
| AD | 0303 | 00 | 00 | $18.50 | PH |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| $18.50 | $0 | $18.50 | $0 |

14. Name and Location of Position's Organization
BUREAU OF THE CENSUS
FIELD DIVISION
NEW YORK REGIONAL CENSUS CENTER
NEW YORK, NY 572242

15. TO: Position Title and Number

| 16.Pay Plan | 17.Occ. Code | 18.Grade/Level | 19.Step/Rate | 20.Total Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| | | | |

22. Name and Location of Position's Organization

## EMPLOYEE DATA

23. Veterans Preference: 1 (1-None; 2-5 Point; 3-10 Point/Disability; 4-10 Point/Compensable; 5-10 Point/Other; 6-10 Point/Compensable/30%)

24. Tenure: 0 (0-None; 1-Permanent; 2-Conditional; 3-Indefinite)

25. Agency Use:

26. Veterans Preference for RIF: YES [ ] X NO

27. FEGLI: A Ineligible for Life Ins Coverage

28. Annuitant Indicator: 9 Not Applicable

29. Pay Rate Determinant: 0

30. Retirement Plan: 2 FICA

31. Service Comp. Date (Leave): 05-08-2000

32. Work Schedule: I Intermittent

33. Part-Time Hours Per Biweekly Pay Period:

## POSITION DATA

34. Position Occupied: 2 (1-Competitive Service; 2-Excepted Service; 3-SES General; 4-SES Career Reserved)

35. FLSA Category: N (E-Exempt; N-Nonexempt)

36. Appropriation Code:

37. Bargaining Unit Status: 8888

38. Duty Station Code: 364170081

39. Duty Station (City-County-State or Overseas Location): New York -Queens Queens NY USA

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | PAR Number: 0546843840003 |

45. Remarks

- SF-8 issued to employee.
- Intermittent employment totaled 30 days in pay status from 00-05-08 to 00-07-09.
- Intermittent employment totaled 160 hours in pay status from 00-05-08 to 00-07-09.
- Forwarding address: 90-28 186TH ST
  HOLLIS, NY 11423 USA
- OPF retained by National Personnel Records Center. Civilian Personnel Records, 111 Winnebago Street, St. Louis, MO 63118.
- Reason(s) for termination: Lack of Work

46. Employing Department or Agency: DEPARTMENT OF COMMERCE

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date |
|---|---|---|
| CM 63 | 1701 | 07-07-2000 |

50. Signature Authentication and Title of Approving Official
LESTER A FARTHING, REGIONAL DIRECTOR

TURN OVER FOR IMPORTANT INFORMATION

1 - Employee Copy - Keep for Future Reference

Editions Prior to 7/91 Are Not Usable After 6/30/93

Def. Ex. 8

# CLAIM FORM

OCT 0 2 2006

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**WASHINGTON D.C.**
**KENT CHRISTOFFERSON, et al., vs. THE UNITED STATES (No. 01-495C)**

Please print clearly in dark ink.

1. ASHLEY SMART — Name (First, Middle, Last) — [redacted] Social Security Number

2. 17454 DEER HILL RD — Street Address — Apartment Number

   HIDDEN VALLEY LAKE — City — CA — State — 95467 — Zip Code

3. Do you wish to continue with your claim against the federal government for unpaid overtime?

   ✓ YES ___NO

   If "Yes," please complete this Claim Form and provide estimates of your overtime on the Payroll Summary. If "No," you do not need to complete the rest of this Claim Form. Please return this form and the Payroll Summary to our offices at the address provided. A "No" means you no longer wish to be a participant in this lawsuit.

4. ______________________ E-mail Address (if any)

5. 707-987-0660 — Work Phone Number — ANY TIME — Best Times to Call

6. SAME — Home Phone Number — ______ Best Times to Call

7. ______ Cell Phone Number — ______ Best Times to Call

8. ______________________ Phone Number of Relative or Other Contacts (Optional)

9. Please list any other names used while employed by the U.S. Census Bureau in the year 2000.

   ______________ ______________

10. While working for the Census Bureau in 2000, did you ever work more than 40 hours in a work week (Sunday through Saturday)? You should include as work time the time you spent traveling to and from your home, time spent on work-related activities at your home, and lunch or dinner breaks if you worked during those breaks.
✓ Yes ___ No

11. Review the Payroll Summary produced from the Census Bureau payroll records which show the days you worked and hours you submitted in 2000. What is your best estimate of which weeks you worked MORE THAN 40 hours (40+) per work week, and how many hours of overtime you worked each of those 40+ hour weeks?

There are spaces on the right hand side of the Payroll Summary where you should indicate how much overtime you believe you worked. Please include on the Payroll Summary overtime hours that you claim to have worked in the following decennial field positions only: Enumerator, Crew Leader Assistant, Crew Leader, Field Operations Supervisor Assistant, Field Operations Supervisor, and Special Places Operation Supervisor.

**Example:** Assume you worked 50 hours in the first week of May and 20 hours in the second week of May. Because you were not permitted to record more than 40 hours in a week, you only recorded 40 hours for the first week of May and did not submit any overtime worked. Therefore, you would indicate your estimate of overtime as follows:

| PAY PERIOD END DATE | PAYROLL DATA TYPE | SUN | MON | TUE | WED | THU | FRI | SAT | TOTAL | ESTIMATE UNPAID OVERTIME* |
|---|---|---|---|---|---|---|---|---|---|---|
| 05-06-2000 | REG | 0.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 0.00 | 40.00 | |
| 05-06-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-06-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-06-2000 | TOTAL | 0.00 | 8.00 | 8.00 | 8.00 | 8.00 | 8.00 | 0.00 | 40.00 | 10 HRS |
| 05-13-2000 | REG | 4.00 | 8.00 | 8.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20.00 | |
| 05-13-2000 | TRAIN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-13-2000 | OT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 05-13-2000 | TOTAL | 4.00 | 8.00 | 8.00 | 0.00 | 0.00 | 0.00 | 0.00 | 20.00 | ________ |

12. If you "banked," "rolled," or "carried over" any overtime you worked, add those also to the Payroll Summary, in the space indicated. "Rolled-over," "banked" or "carried-over" hours refer to overtime hours you worked in one week, but were not able to record because doing so would exceed 40 hours in one week. Some census employees were told to "roll" or "carry" over their overtime hours to later weeks in which they worked less than 40 hours and therefore were already partially paid for their overtime. You may be entitled to some recovery even if you rolled over your overtime hours.

13. Are any of the numbers you wrote on the Payroll Summary based on an estimate?
~~✓~~ Yes ✓ No

14. If any of your numbers are based on estimates, please identify on the Payroll Summary, where indicated, which numbers are estimates and describe how you arrived at those estimates.

15. If you have any documents, which existed in 2000, that may tend to show that you worked the overtime claimed (e.g. datebooks, calendar entries), attach copies of the documents to this claim form. If you provide documents, send copies only. No originals should be provided as your documents will not be returned to you. *Note that documentary proof is not required to make a claim.*

Per phone conv w/ Molly D. 10/30/06

16. Do you believe your supervisor knew or had reason to know that you worked overtime ~~prior to your~~ working the overtime?

X Yes ✓ No

17. ~~If you~~ answered yes to Question 16, explain why you believe your supervisor knew or had reason to know that you worked overtime prior to your working the overtime. (Please refer to pages 2 and 3, **"What is Overtime?"** for examples of how your supervisor knew or should have known about your working overtime.)

If you need additional space to respond to any of the above questions, use a separate sheet of paper. Clearly print your name and SSN at the top of each additional page, and indicate the question number.

Certification: I swear or affirm under penalty of perjury that the above statements are true to the best of my knowledge and belief.

Date: 9-28-2006 Signature: Ashley Linda Smart

Print Name: ASHLEY SMART

**You Must Complete, Sign and Return this Claim Form and the enclosed Payroll Summary by mail postmarked no later than SEPTEMBER 29, 2006.**

If you wish to confirm our receipt of this form, we strongly recommend that you send it via Registered Mail/Return Receipt requested. To obtain a Registered Mail/Return Receipt form, please visit your local post office or go to: www.usps.com.
**You must keep a copy of completed forms for your records.**