**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| KENT CHRISTOFFERSON, et al., Plaintiffs | Case N. 01-495C |
| v. | Senior Judge Eric G. Bruggink |
| UNITED STATES OF AMERICA, Defendant. | **Plaintiffs' Brief Submitted Pursuant To Court's July 1, 2008 Order** |

Jack W. Lee
Bethany Caracuzzo
MINAMI TAMAKI LLP
360 Post St. 8th Floor
San Francisco, CA 94108-4903
Telephone: (415) 788-9000
Attorneys of Record

## TABLE OF CONTENTS

ISSUES PRESENTED ..... 2

RELEVANT PROCEDURAL HISTORY ..... 2

INTRODUCTION ..... 3

ARGUMENT ..... 5

A. ISSUE 1: Whether Plaintiffs' Attorneys' Notes Are Protected From Disclosure By Applicable Privileges Or The Court's Prior Orders ..... 5

1. Liability Is Still Contested In This Case ..... 5

2. Plaintiffs' Attorneys' Notes Are Protected From Disclosure By The Attorney-Client Privilege ..... 5

3. Plaintiffs' Attorneys' Notes Are Protected From Disclosure By The Work Product Doctrine ..... 8

(a) Attorney Impressions, Opinions, and Theories Are Absolutely Protected ..... 9

(b) Defendant Is Not Prejudiced By Not Having These Attorney Notes ..... 10

4. Plaintiffs' Attorneys' Notes Are Protected From Disclosure By The Court's Prior Orders: This Issue Has Been Ruled Upon ..... 11

5. Plaintiffs Did Not Waive The Privilege Or Work Product Doctrine ..... 12

6. The MOU Did Not Contemplate A Waiver Of The Attorney-Client Privilege Or Work Product Doctrine Protections ..... 12

B. ISSUE 2: Whether The Claim Forms Could Be Amended By Counsel After Conversations With The Individual Plaintiff ..... 13

1. The Process ..... 13

2. The Confusion ..... 14

3. Adding Information After Speaking With Clients Is Proper ..... 17

CONCLUSION ..... 19

# TABLE OF AUTHORITIES

**Cases**

*Barton v. U.S. District Court for Central Dist. Of Cal.*, 410 F.3d 1004 (2005) ............................ 7

*Binks Manufacturing Co. v. National Presto Industries, Inc.*, 709 F.2d 1109 (9th Cir. 1983)...... 10

*Caremark Inc. v. Affiliated Computer Services,* Inc. 195 FRD 610 (N.D. Ill 2000) ...................... 9

*Connelly v. Dun & Bradstreet,* 96 FRD 339 (D.C. Mass. 1982) .......................................... 10, 11

*Doe 2 v. Sup. Ct. (Calkins),* 132 Cal.App.4th 1504 (2005) ............................................................ 5

*EEOC v. Int'l Profit Assocs., Inc.*, 206 F.R.D. 215 (N.D. Ill. 2002) ...................................... 7, 12

*Hickman v. Taylor*, 329 US 495.................................................................................................. 8

*Rittenhouse v. Sup. Ct. (Board of Trustees of Leland Stanford Jr. Univ.),*
235 Cal.App.3d 1584 (1991) ......................................................................................................... 5

*Rodriguez v. McDonnell Douglas Corp,*. 87 Cal.App. 3d 626 (1978) .......................................... 9

*Sparton Corp. v. United States*, 44 Fed.Cl. 557(1999)...................................................... 5, 9, 10

*United States v. White,* 950 F.2d 426 (7th Cir.1991)................................................................... 8

*University of So. California (Comeau) v. Superior Court* 45 Cal.App.4th 1283 (1996)................. 6

*Upjohn Co. v. United States*, 449 U.S. 383 (1981)........................................................ 5, 8, 10, 11

*Zimmerman v. Atlanta Hawks, Ltd.* 3 Empl. Prac. Dec. (CCH) ¶39774 (N.D. Ga. 1990) ........... 11

**Rules**

Fed. Rules of Civil Procedure Rule 26(b)..................................................................................... 18

Federal Rules of Evidence §50 ....................................................................................................... 6

Federal Rules of Evidence §503 ..................................................................................................... 5

Rule 15(b) of the Rules of the Court of Federal Claims ................................................................ 17

Rule 26(b)(2) of the Rules of the Court of Federal Claims ............................................................. 9

Rule 26(e) of the Rules of the Court of Federal Claims ................................................................ 17

**INDEX TO THE EXHIBITS**

United States Court of Federal Claims July 1, 2008 Order....................................Exhibit A

Memorandum of Understanding..............................................................Exhibit B

United States Court of Federal Claims October 25, 2007 Order..............................Exhibit C

Letter dated February 13, 2008 from Jack W. Lee to Steven Gillingham..................Exhibit D

Letter dated March 24, 2008 from Steven Gillingham to Jack W. Lee........................Exhibit E

Letter dated April 14, 2008 from Steven Gillingham to Jack W. Lee.........................Exhibit F

Letter dated April 22, 2008 from Bethany Caracuzzo to Steven Gillingham...............Exhibit G

Database entries for the 5 persons Plaintiffs gave as examples in their Brief..............Exhibit H

Carol Siemons' Claim Form and Payroll Summary..........................................Exhibit I

Claim Forms, Payroll Summaries and supporting documentation..........................Exhibit J

**PLAINTIFFS' BRIEF**
**PURSUANT TO COURT'S JULY 1, 2008 ORDER**

Plaintiffs respectfully submit this Brief in compliance with the Court's July 1, 2008 Order which followed the parties' June 17, 2008 Status Conference.

**ISSUES PRESENTED**

In its Order, the Court requested simultaneous briefing on the following issues:

1. Whether the notes written by plaintiffs' counsel regarding their conversations with claimants and relating to changes plaintiffs' counsel made to information supplied to plaintiffs on the questionnaire responses, or information that was added or deleted by plaintiffs' counsel on the questionnaire responses, are protected from disclosure by the applicable privileges or the Court's prior orders.

2. Whether questionnaire responses may be amended by plaintiffs' counsel with plaintiffs' consent subsequent to their execution under penalty of perjury. (See Exhibit "A" to the Declaration of Jack Lee, submitted herewith.)

**RELEVANT PROCEDURAL HISTORY**

On or about February 18, 2005, the parties, by and through their counsel, entered into a Memorandum of Understanding. (Exh. B to J. Lee Decl.) This Memorandum set forth the entire understanding reached between the two parties.

On or about August 1, 2006, Plaintiffs' counsel mailed to Plaintiffs the claimant questionnaires or "claim forms." Between August 2006 and February 2007, Plaintiffs' counsel received claim forms back from Plaintiffs, spoke to thousands of Plaintiffs about their responses, and followed up with Plaintiffs regarding incomplete responses and forms. The final database of all claimants was provided to Defense counsel in February 2007.

Thereafter, on or about May 25, 2007, counsel for Defendant, Mr. Gillingham, wrote a letter to Plaintiffs counsel demanding Defendant get a copy of each and every Claim Form. Plaintiffs refused to produce on the grounds of attorney-client privilege and attorney work prod-

uct and filed a Motion for Protective Order. Plaintiffs' Motion was heard on October 19, 2007, and the Court issued its Opinion on October 25, 2007. (Exh. C to J. Lee Decl.)

In that Opinion, the Court ordered that the Plaintiffs' claim forms be produced, but also expressly noted that, "...**defendant does not seek counsel's notes from conversations with clients, communications defendant recognizes as <u>privileged</u>**." (Opinion, Exh C, at p.10, ¶2; emphasis added.) The Court also held that, while Plaintiffs must produce the claim forms, Plaintiffs were permitted to do so "in a way that preserves plaintiffs' right to assert specific instances of privilege." (Opinion, at p.13, "Conclusion")

In January 2008, Plaintiffs' counsel produced the claimant questionnaires and all documents submitted by claimants, without redaction, in compliance with the Court's October 25, 2007 Order. In addition, on February 13, 2008, Plaintiffs' counsel sent Defense counsel a 77-page, single-spaced, privilege log identifying all clients with whom Plaintiffs' counsel spoke to regarding their claim forms during the period of August 2, 2006 to February 20, 2007. (Exh. D to J.Lee Decl.) Defense counsel responded on March 24, 2008 and April 14, 2008, insisting for the first time that Plaintiffs' counsel submit their privileged attorney notes and work product documenting conversations between individual Plaintiffs and their counsel (Exhs. E and F to J. Lee Decl.) Plaintiffs' counsel responded on April 22, 2008, and explained Plaintiffs' position in detail. (Exh. G to J. Lee Decl.)

The parties informed the Court of this dispute in its Joint Status Report filed June 6, 2008, and the Court set a briefing schedule during the June 17, 2008 Status Conference.

## <u>INTRODUCTION</u>

Defendant seeks to obtain conversations between Plaintiffs and their counsel in violation of the attorney-client privilege and also seeks to obtain Plaintiffs' counsel's protected work product that contains counsel's thoughts, impressions, analyses, opinions and strategies. Defendant

also takes the extraordinary position that Plaintiffs' Claim Forms, as completed by the individual Plaintiffs themselves, who are laypersons unsophisticated in the law, must be self-contained and are unalterable.

Plaintiffs' attorney notes are absolutely protected from disclosure on multiple grounds: (1) the attorney notes reflect the substance of conversations between clients and their attorneys—therefore subject to the attorney-client privilege; (2) the attorney notes of the telephone calls contain and reflect Plaintiffs' attorneys thoughts, impressions, analyses, opinions and strategy for the litigation—all of which is protected by the attorney work product doctrine; and, (3) Defendant has been provided with all of the Claim Forms and the database, and has the opportunity to depose Plaintiffs---as such, there are less intrusive means of obtaining this information.

As to the second issue, there was ***never*** any agreement between the parties that the Plaintiffs' Claim Forms, as filled out by the individuals themselves, are unalterable after Plaintiffs' consultations with their counsel. Thousands of Plaintiffs were confused by the Claim Forms—forms that ask laypersons for evidence of their supervisors' intent and to speculate as to the knowledge of third persons. These Plaintiffs are absolutely permitted to speak and confer with their counsel about their responses, and about changing their responses, as they would be permitted to do at any point during the litigation process, including during trial. A party, at any time, is permitted to confer with the counsel when providing factual responses and information to Defense counsel. In addition, these Plaintiffs expressly authorized that such changes be made when speaking to Plaintiffs' counsel. Defendant improperly seeks to attack the entire claims process after-the-fact, by suddenly creating a "requirement" that the individual Plaintiffs' responses be perfect *ab initio*.

## ARGUMENT

### A. ISSUE 1: Whether Plaintiffs' Attorneys' Notes Are Protected From Disclosure By Applicable Privileges Or The Court's Prior Orders

#### 1. Liability Is Still Contested In This Case

The context in which this dispute arises is very important to consider: the status of this case is not a situation involving claimant questionnaires that are submitted after a litigation has been settled for the purposes of valuing claims and dividing up a lump sum settlement between plaintiffs. *This is an ongoing litigation*, one that could very well proceed to trial on individual claims.

Permitting the discovery of attorney notes and attorney-client communications in a litigation where liability is still hotly disputed would be extremely damaging to Plaintiffs and would unduly prejudice them. Of course, no limiting order could address this issue---the bell could never be "unrung" once Defendant was permitted access to Plaintiffs' counsels' thoughts, impressions, strategies and communications with their clients.

#### 2. Plaintiffs' Attorneys' Notes Are Protected From Disclosure By The Attorney-Client Privilege

The attorney-client privilege "provides *unqualified, **absolute** protection*" to communications both "made by a client to an attorney for the purpose of obtaining legal advice" and "the legal advice and opinion communicated from the attorney to the client." (See Federal Rules of Evidence §503; *Sparton Corp. v. United States*, 44 Fed.Cl. 557, 566 (1999); citing to *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); Emphasis added.) The court *cannot* "weigh" or "balance" the privilege against the need for the information: "As a general rule, privileged communications are protected regardless of their relevancy to the issues in the litigation, and despite any private or public interest in disclosure." (*Rittenhouse v. Sup. Ct. (Board of Trustees of Leland Stanford Jr. Univ.)* 235 Cal.App.3d 1584, 1590 (1991); *See Doe 2 v. Sup. Ct. (Calkins)* 132 Cal.App.4th 1504 (2005)—court cannot compel disclosure even if protective order imposed.)

Furthermore, Courts cannot create exceptions to statutory privileges beyond those provided by the statute. (*University of So. California (Comeau) v. Superior Court* 45 Cal.App.4th 1283, 1290 (1996)) This privilege is claimed by both the client and the lawyer. (Fed. Rules of Evid. §503)

Here, Defendant, having already received all of the copies of the claimant form containing the "raw" information provided by the individual Plaintiffs, now seeks the production of attorney notes of conversations between Plaintiffs and their attorneys. These notes were undeniably created by Plaintiffs' attorneys, were intended to be used solely by Plaintiffs' attorneys, and reflect communications between clients and their attorney. Furthermore, these notes include attorney impressions, opinions, thought processes and analyses. There is no authority that provides for the release of such privileged and confidential information to Defendant, under any circumstances.

The document at issue is a document of attorney notes. It was, and is, maintained on Minami Tamaki's server, in its client files. (See Decl. of J.Lee at ¶18.) Without waiving any protections as to its content, it looks like a chart. The clients' names are listed and it includes dates and summaries of conversations between counsel and the individual Plaintiff. They include the attorneys' legal analysis and advice in response to client questions, as well as the attorneys' impressions and legal strategy for the future. (*Id.*) For example, the attorney would, if the situation arose, note issues for the individual plaintiff's deposition or trial that the attorneys would want to document.

As is common in the attorney-client relationship, during these conversations, sometimes a client would impart information that was not relevant to this litigation, but would disclose it to counsel seeking their advice and opinion. Examples of this contained within these attorney notes includes Plaintiffs' references to other lawsuits some of them have been involved in, marital issues, divorce issues, family problems, etc.

These communications occurred in four possible ways: (1) a client "cold-called" Minami Tamaki with questions and seeking advice about their case; (2) a client called Minami Tamaki

after receiving the blank claim form to fill out with questions about how to fill it out; (3) a client called Minami Tamaki after they sent in the claim form with additional questions that the form raised in their minds, and/or (4) Minami Tamaki attorneys or law school graduates called a client after receiving a claim form that had missing or inconsistent information. (*Id.* at ¶17)

In each of these situations, the information recorded constitutes communications made in the course of the lawyer-client relationship: they are the questions and advice exchanged between attorney and client. The case of *Barton v. U.S. District Court for Central Dist. Of Cal.*, 410 F.3d 1004 (2005), is instructive. In *Barton*, the court determined that law firm questionnaires that were completed and submitted by potential clients via the internet were protected by the attorney-client privilege because, (1) the communications were submitted in the course of an attorney-client relationship and, (2) the individuals providing the information had reason to believe that such information was exchanged in confidence pursuant to that attorney-client relationship. (*Id.* at 1110.) "It is [the client's] privilege, not any right of the lawyers, that is at stake." (*Id.*)

In fact, the *Barton* court held that such communications made even before the law firm was properly retained were still protected by the privilege, and found the "'rationale for this rule" to be "compelling," because "[w]ithout it, people could not safely bring their problems to lawyers…" Here, these plaintiffs that spoke to Minami Tamaki attorneys were already existing clients. Therefore, any and all such communications fall squarely within the privilege.

In *EEOC v. Int'l Profit Assocs., Inc.*, 206 F.R.D. 215 (N.D. Ill. 2002) ("IPA"), the EEOC filed suit against IPA on behalf of a class of about 2000 IPA female employees involving intentional discrimination and sexual harassment against women. (*Id.* at 217). After the EEOC had filed the suit, it sent a letter and "Questionnaire to Potential Class Members" out to the 2000 current and former employees. (*Id.*) The women then initiated contact with the EEOC attorneys by telephone or by returning the questionnaire. (*Id.*) Both EEOC counsel and other employees under their direction conducted telephone interviews of the women who responded to the letter. (*Id.*)

The EEOC provided the questionnaires but did not provide the attorneys' notes of the interviews and objected on the basis of the attorney-client privilege and the work product doctrine. (*Id.* at 217-18.) The IPA, "not satisfied with the factual summaries" of the interviews, filed a motion to compel production of the notes of all interviews. (*Id.* at 218.)

The court found that the attorney-client privilege *did* exist to protect the communications on the grounds that the communications were made by or to legal advisors or their staff, the communications were made for the purpose of the litigation, they were made in confidence by the client; therefore the communications were "**permanently protected from disclosure**" unless waived. (*Id.*, citing Wigmore and *United States v. White,* 950 F.2d 426, 430 (7th Cir.1991).)[1]

The *EEOC* court went on to find that the EEOC did not waive the attorney client privilege by producing questionnaires and pre-lawsuit interview summaries. This is on point with Plaintiffs herein as discussed further below.

*Upjohn Company v. United States, supra,* also supports the application of the privilege: the "privilege exists to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound and informed advice." Divulging the conversations between the employees of the client and the attorney would frustrate the very purpose of the privilege by "discouraging communication of relevant information" by the client to attorneys seeking to render legal advice. (*Id.* at 684). The notes that the corporate attorneys took regarding oral statements made by employees were protected since they revealed communications.

### 3. Plaintiffs' Attorneys' Notes Are Protected From Disclosure By The Work Product Doctrine

"The work product doctrine, announced in *Hickman v. Taylor*, 329 US 495, protects otherwise discoverable documents and tangibles, and was codified in Rules 26(b)(3) of the Federal

[1] The *EEOC* decision expressly noted that the attorney-client privilege undisputedly extends to interview notes taken by nonattorney employees of an attorney and law school graduates. (*Id.* at 219, FN 4)

Rules of Civil Procedure." (*EEOC*, *supra,* at 220, citing to *Caremark Inc. v. Affiliated Computer Services,* Inc. 195 FRD 610, 612 (N.D. Ill 2000); Rule 26(b)(2) of the Court of Federal Claims)

### (a) Attorney Impressions, Opinions, and Theories Are Absolutely Protected

"...[T]he court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." (*Id.*, citing to FRCP 26(b)(3)). The protection of attorney thoughts, opinions and/or impressions, e.g. "brain work," is absolute and ***shall not be discoverable under any circumstances:***

The Federal Court of Claims, in *Sparton v. The United States,* 44 Fed. Cl. 557 (1999), court held that:

> Opinion work product, unlike ordinary work product, is afforded nearly absolute protection from disclosure. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney. (*Id.* at 565 (citation omitted).)

Here, the attorney notes at issue include the attorneys or law school graduates' (or "Law Grads") impressions of the client, conclusions about what the client expressed to them about their hours, conclusions about the individual's case, opinions regarding the individual themselves and the strength and/or weaknesses of their case, and theories and strategies for deposition of that individual and for trial. (See Decl. of J. Lee at ¶¶29, 30.) The Law Grads' notes include statements drawn from the Law Grads' memory and mental impressions of oral statements made by Plaintiffs, and, therefore, would squarely meet the definition of classic opinion work product. (*Sparton, supra,* 44 Fed. Cl. at 564--"an attorney's memory, notes and impressions of oral statements of witnesses interviewed in the course of preparing for litigation are also a form of opinion work product which merits special protection"; citing *Upjohn*). Where the witness' statement and the attorney's impressions are *inextricably intertwined*, **then absolute protection is afforded to *all portions* of the attorney's notes.** (*Rodriguez v. McDonnell Douglas Corp.* 87 Cal.App. 3d 626, 647 (1978); Emphasis added.)

Furthermore, documents that prepared in anticipation of litigation are also afforded protection. (*Connelly v. Dun & Bradstreet* 96 FRD 339, 342-3 (D.C. Mass. 1982) --questionnaires completed by clients are subject to the work product doctrine.) The test to determine whether materials were prepared in anticipation of litigation and to qualify as work product, the material must have "come into existence because of the prospect of litigation or some articulable claim is likely to lead to litigation. (*EEOC, supra*, at 220, citing to *Binks Manufacturing Co. v. National Presto Industries, Inc.* 709 F.2d 1109, 1119 (9th Cir. 1983). Here, these attorney notes were created after the lawsuit was filed and were to assist Plaintiffs' counsel in both providing complete claim forms, but also to gain information from clients in anticipation of deposition and/or trial, and to assist in Plaintiffs' counsel's evaluation of each claim and strategizing and theorizing for the litigation. (See Decl.of J. Lee.)

The *EEOC* Court, in the case cited above, supports Plaintiffs' position herein. The *EEOC* decision found that the attorney interview notes, in addition to being subject to the attorney-client privilege, were protected by the work product doctrine: "Not only was litigation already in fruition, these interviews produced articulable claims likely to lead to trial." (*Id.*, citing to *Binks,* 709 F.2d, at 1120.)

**(b) Defendant Is Not Prejudiced By Not Having These Attorney Notes**

While the law is clear that the attorney notes of their opinions and impressions are absolutely privileged under RCFC 26(b)(2), even if the Court is not convinced that the absolute privilege for "brain work" applies, attorney work product is still protected, unless the party seeking discovery has demonstrated that the protection is not justified and that it has shown prejudice, substantial need or undue hardship in attaining "similar materials" by other means. (*Sparton, supra*, 44 Fed. Cl. At 564.)

Here, Defendant has not, and cannot, make such a showing. Defendant has been provided with the claim forms, pursuant to the Court's Order. Defendant has been provided with Plaintiffs' database of information. The database provides Defense counsel with all the necessary information, without violating the privilege.

In addition, Defendant is entitled to depose any of the individual Plaintiffs whose claim forms Defendant questions. (*See* MOU, Exh. B to J.Lee Decl. at ¶8; *See also* argument further below.) "Defendant has not met its burden of showing a substantial need for plaintiff's notes because it has had the opportunity to obtain …substantially equivalent information through other sources…its deposition of [plaintiff]" (*Zimmerman v. Atlanta Hawks, Ltd.* 3 Empl. Prac. Dec. (CCH) ¶39774, 1990 WL 58462, 53 (N.D. Ga. 1990))

Therefore, Defendant is not unduly prejudiced by not having Plaintiffs' counsel's personal analysis, thoughts, impressions, opinions, strategies and conclusions. **"A party may not use the liberal rules of discovery to engage in inquiry about the way the other side intends to conduct its case."** (*Connelly, supra*, 96 FRD at 343, citing to *Upjohn, supra*, at 397.) Defendant is improperly attempting to do just that.

**4. Plaintiffs' Attorneys' Notes Are Protected From Disclosure By The Court's Prior Orders: This Issue Has Been Ruled Upon**

In this action, the Court's October 25, 2007 Opinion requiring Plaintiffs' turn over the claim forms was expressly limited to the claim forms and the information that the individual Plaintiffs knew would be provided directly to persons other than their counsel. (Opinion, Exh. C, at p.10, ¶1: "Thus, claimants could not have reasonably expected that their returned questionnaires would remain confidential.") The Court focused on the fact that Defendant agreed to settle claims based solely on the individuals' responses to the questionnaire. (Id. at ¶3)

The Court went on to expressly distinguish the discoverability of the claim forms themselves as opposed to attorney notes of communications with individual clients:

> "Indeed, unlike *Upjohn* and *EEOC*, defendant does not seek counsel's notes from conversations with clients, communications defendant recognizes as privileged. Rather, defendant seeks the answers to a jointly drafted questionnaire." (Id. at ¶2)

The Court held that Plaintiffs' counsel *may* assert the attorney-client privilege "to redact notes and impressions from the completed questionnaires before providing copies to defendant." (Opinion, Exh C, at p.11, ¶1) The Court also noted that attorney notes, whether written on the

questionnaire themselves or found elsewhere, would be protected by the work product doctrine, but that the doctrine does not apply to the individual clients' "written responses to the questions." (*Id.* at p. 12, ¶2)

It is clear that the Court has already determined that Plaintiffs' attorneys' notes of conversations with their clients, e.g. the individual plaintiffs, is protected by both the attorney-client privilege and the attorney work product doctrine.

### 5. Plaintiffs Did Not Waive The Privilege Or Work Product Doctrine

In the *EEOC v. International Profit Associates* case discussed above, the Court found that the EEOC's voluntary production of the questionnaires and a summary of pre-lawsuit interview notes did not constitute a waiver of the privilege because the EEOC had never produced the attorney interview notes that were taken after the lawsuit was filed. (206 FRD at 219-220.) Here, ***all*** of Minami Tamaki's attorney notes were taken after the lawsuit was filed. Minami Tamaki has not produced any of their notes and produced the questionnaires only under objection and pursuant to Court Order after Plaintiffs' Motion for Protective Order was denied. Plaintiffs' have not waived the assertion of the privilege.

### 6. The MOU Did Not Contemplate A Waiver Of The Attorney-Client Privilege Or Work Product Doctrine Protections

The parties entered into the MOU with the understanding that the MOU would provide available remedies in a circumstance where Defendant has questions regarding an individual Plaintiff's claims: Defendant can take his or her deposition. (MOU, Exh B, at ¶8) At no point did the parties discuss, nor did Plaintiffs intend, to waive any and all communications between Plaintiffs and their counsel. The MOU sets forth explicit procedures for attempting to resolve these issues: (1) obtaining work data; (2) submitting the questionnaires, (3) processing the questionnaires, and (4) deposing individuals subject to further discovery. (Exh B) There is nothing in the MOU indicating that Defendant is entitled to Plaintiffs' attorney notes reflecting conversa-

tions between counsel and client. Nor is there anything in the MOU indicating that Plaintiffs waived the privilege or the protections of the work product doctrine in any way.

Furthermore, under ¶7 of the MOU, the Plaintiffs' Counsel is tasked only with "creat[ing] a *database* that will record all relevant information contained in the questionnaire." (Id; emphasis added). Plaintiffs have produced this database. The MOU does not say that, in addition to this database, the Defendant would have access to the attorneys' notes, impressions, or legal advice contained therein.

## B. <u>ISSUE 2</u>: Whether The Claim Forms Could Be Amended By Counsel After Conversations With The Individual Plaintiff

Defendant has also taken the position that Plaintiffs could not add information to their claim forms after they were mailed, signed, to Plaintiffs' counsel. Defendant has cited no authority to support this extraordinary position, despite the fact that the burden is on the Defendant.

### 1. The Process

A brief description of the claim form process, and the resulting confusion cited by a multitude of individual Plaintiffs, is warranted here:

Thousands of plaintiffs called Minami Tamaki for assistance with completing their questionnaires and/or provided questionnaires that were missing information. (See Decl. of J. Lee at ¶16)

When a plaintiff called for assistance in completing the questionnaire (as they were encouraged to do within the questionnaire), or if Minami Tamaki attorneys or Law Grads called a Plaintiff regarding an incomplete or unclear claim form, the attorney would take notes during the conversations. These notes included the questions the attorneys asked Plaintiffs and the Plaintiffs' answers.

Although clients discussed factual information regarding their claims, Minami Tamaki did not record, verbatim, any individual plaintiff's answers. Instead, the attorney applied their knowledge and analysis to the information provided to them and wrote it into the log of their notes.

Minami Tamaki attorneys and Law Grads would then specifically ask the client if the client agreed that Minami Tamaki could update the client's claim form based upon the oral discussion. ***Minami Tamaki would not make an additions or changes to a claim form unless and until the client themselves responded in the affirmative.*** (Decl. of J. Lee)

### 2. The Confusion

As simple as Defense counsel may think the form was, numerous clients experienced difficulty in completing their questionnaires and needed to discuss their claims with their attorney. The overwhelming number responses Minami Tamaki received from plaintiffs indicated their confusion and inability to respond to the questions. Many of them had problems trying to estimate their overtime and/or speculate as to whether or not their supervisor had knowledge of their overtime. Frequently they would attach other documents or write long explanations as to what they knew or understood. (*Id.* at ¶¶23-26)

One can imagine the difficulty clients had with remembering exact minutes that they worked in a given week during a 6-month period over 7 years ago, under pain of perjury. Many clients got confused or discouraged when they had to attest to something under oath without first speaking to their attorneys about it. (See Decl. of J. Lee at ¶16) Other clients sent their claim forms in, but then called Minami Tamaki afterwards to ask questions about answers they had left blank. (*Id.*) Discussing their responses with their attorneys is something they are entitled to do under the law, and something the questionnaire itself contemplated and encouraged. Defendant has set forth no authority otherwise.

Furthermore, when the Plaintiffs did provide responses the answers they provided were not always concise. Their answers to our questions were often long and almost always not en-

tirely to the point. These Plaintiffs, like most people, had never had to fill out a questionnaire before that had legal consequences. And so to err on the side of caution, would leave the information blank, sign the document and send to their attorneys. Plaintiffs' counsel would have to then follow-up and question the client appropriately to gain an understanding of what the client was trying to communicate.

As the circumstances varied from plaintiff to plaintiff, and the Claim Form did not provide much space to provide a detailed response, Minami Tamaki had the database created so as to provide for a greater response. Within the last two fields were subfields to allow an answer in greater depth. Under the "supervisor knowledge" field were nine categories of "reasons" that could apply as to how the individual Plaintiff knew that his or her supervisor, such as "I complained about overtime," and, "supervisor worked alongside me". (See Decl. of J Lee at ¶23) Breaking the reasons down this way was necessary for Minami Tamaki to place them into broad categories. These 9 reasons represented the total universe of answers given by claimants.

There were two areas of inquiry that provided the most difficulty for the individual Plaintiffs:

> **<u>Question No. 14</u>:** "If any of your numbers are based on estimates, please identify on the Payroll Summary, where indicated, which numbers are estimates and describe how you arrived at those estimates." (Exh. H to J.Lee Decl.)

Invariably, many Plaintiffs left this blank, requiring Plaintiffs to call them to determine what was being calculated and why. Frequently, these Plaintiffs had no idea how to calculate this information, or even what hours could be calculated. They relied on the Minami Tamaki attorneys and Law Grads to assist them with this. (See Decl. of J.Lee)

> **<u>Question No. 16:</u>** "Do you believe your supervisor knew or had reason to know that you worked overtime prior to your working the overtime?" (Exh H)

This question is speculative from a legal standpoint, and, as a result, confused many Plaintiffs. Without waiving any objections based on privilege or protections, here are some illustrative examples, which were provided to Defense counsel in Plaintiffs' counsel's letter of April 22, 2008 (Exh. **G** to J.Lee Decl.):

- **Carol Siemons**: Ms. Siemons is a typical example of someone who was confused by the process and overwhelmed at having to explain her hours without assistance of counsel. She expressed her confusion and the difficulty she was having in an attachment to her *completed claim form*, both of which were provided to Defendant. Ms. Siemons sent this document to her attorneys, hoping that her lengthy response would clarify her responses to the questionnaire. Upon receiving this addendum, Minami Tamaki attorneys or Law Grads spoke to Ms. Siemons to help her understand the question and clarify her response. Ms. Siemons' own attachment shows how these hours were determined, without need to violate the attorney-client privilege and work product doctrine.

Ms. Siemons' Claim Form, Payroll Summary and additional documentation she provided to Minami Tamaki are attached as Exhibit "I" to the Declaration of Jack Lee and explained in detail therein. In summary, Ms. Siemons' claimed she could not estimate her overtime, but that it was substantial. (BATES Q015320). She wrote on her Claim Form/Payroll Summary to see a document she attached. The attachment was a detailed letter explaining that she had worked overtime alongside her crew chief (one of her supervisors) and that another supervisor, a Mr. Tranquallino, had told her to, "just get the job done no matter what it takes." She also reported that she had to participate in meetings with other enumerators at her home after-hours to get the job done. (See Decl. of J. Lee at ¶24) This information was not on her Claim Form, but was on her attachments.

It is clear that Ms. Siemons had to work overtime, and that her supervisors were aware of it. Minami Tamaki attorneys and Law Grads spoke to Ms. Siemons, and were able to put an estimate together after questioning her more about the meetings at her home that she discussed I her Claim Form. Along with Ms. Siemons, they came up with weeks where she worked 10 hours

of overtime, and weeks where she worked no overtime. (See Exh. "H" to Decl. of J. Lee, at ¶21, database entry re. Carol Siemons.)

The Claim Form/Payroll Summary/additional documentation, as well as the database—shown on Exhibit "H"---were provided to Defense counsel as to each and every Plaintiff. (See Decl. of J.Lee at ¶28.)

- **Shunell Kiper**: Minami Tamaki attorneys had a very long conversation with Ms. Kiper. In our database, which was provided to Defendant, Plaintiffs' counsel noted how Ms. Kiper came up with her estimates by adding lunch breaks and/or travel times. It was clear that Ms. Kiper did not fully understand the question and needed attorney assistance in interpreting it and helping her to respond as to how she was to reach her estimate as to time.

- **Steve Graham**, **Doris McAfee**, **and Robert Maxwell**: These people all had specific memories of events, but did not understand how to place them as single-word answers, or even put them in writing.

**3. Adding Information After Speaking With Clients Is Proper**

The examples set forth above reflect a common problem in litigation involving multiple plaintiffs and questionnaires. Amendments are necessary and are also contemplated by the Rules. Rule 15(b) of the Rules of the Court of Federal Claims ("RCFC") permits amendments of pleadings to confirm to the evidence up through trial, and even after judgment. Rule 26(e) provides that a party may "supplement or correct a disclosure or response" at any time. A responding party is to correct any mistaken information and/or supplement a response when the party learns that the information disclosed is somehow "incomplete" or "incorrect." The purpose is to ensure that the factually correct information is before the Court as to the merits of the action. (See Rule 15(b)) Defendant is suggesting, without legal basis, the opposite: that it is somehow improper for a party to correct or supplement its factual disclosures. This just does not make sense. Furthermore, the burden is on the Defendant. Likening this to Discovery responses, the party

contesting amendment or withdrawal of an admission must demonstrate that prejudice will result from amendment or withdrawal. (Fed. Rules of Civ. Proc. Rule 26(b))

Plaintiffs' counsel Jack Lee has litigated and settled over 30 class action lawsuits, and has never observed an unalterable standard of perfection for claim forms such as the one Defendant seeks to impose on the layperson Plaintiffs in this case. In those lawsuits, Plaintiffs were permitted to amend and revise, for example, their lengths of employment, the dates and times they applied for jobs or promotions, and who they spoke to about job opportunities, etc. It is commonplace and completely acceptable in class action procedure for claimants to revise their completed claim forms, even if submitted under penalty of perjury. (Decl. of J. Lee at ¶7)

Nor is a standard of perfection imposed in pharmaceutical "mass tort" litigation. Frequently the plaintiffs in mass tort "multi-district litigation" and class actions are required to complete questionnaires in lieu of participating in traditional discovery. And frequently the plaintiffs sign the questionnaires after leaving numerous areas of inquiry blank--for example, areas involving injuries, and questions involving dates of ingestion or place of purchase. Plaintiffs' counsel and paralegals then follow-up, obtain the information, fill out the questionnaire, and submit the complete package to defense counsel, including the client's original signature page. It is unheard of in these litigations that Plaintiffs' counsel would be required to turn over their attorney notes of conversations with these clients regarding the questionnaires. It is unheard of that the questionnaires would somehow be rejected because the attorney properly and diligently followed up with the client to fill out blank spaces in the questionnaires. In fact, quite the opposite occurs: if a claimant questionnaire is left blank, the defense attorneys object that they cannot adequately evaluate that plaintiff's claim and refuse to do so until the form is completed in its entirety.

Utilizing another comparison, this situation is not unlike a party providing discovery responses. Frequently, a client is provided with written discovery such as form interrogatories. The client writes out his or her answers, and sends the answers back to counsel with the signed verification. Invariably, the client has failed to respond to a question, or her answer indicates she did not understand the question at all. Counsel then calls the client, obtains the proper informa-

tion, and updates the answer before providing it to defense counsel. There is nothing inappropriate about this, and Defendant has not provided Plaintiffs' counsel with any authority otherwise. If at any time the party propounding the written discovery had reason to doubt a response, the Discovery Act provides them an opportunity to depose that party or ask questions at trial. This is no different, and, in fact, the MOU provides for such.

**The way Defendant in this case would have it, Plaintiffs could never win.** If they submitted incomplete forms, the Defendant would refuse to consider it and would argue that that individual Plaintiff cannot assert a claim because their responses on the Claim Form were incomplete, inconsistent, or confusing.

Yet, if a Plaintiff completes a form with assistance of counsel, Defendant still wants to refuse to consider it. Plaintiffs are in a lose-lose situation. This is not what the law, or the MOU, contemplated.

**The way Defendant would have it, Plaintiffs would have to proceed as if they had no attorney representing them.** Defense counsel is improperly seeking to "stack the deck" in Defendant's favor: Defendant wants the Court to force these Plaintiffs to proceed through litigation as if they have no attorney, while Defendant continues to have the full and complete representation of its counsel. This is extremely prejudicial and seeks to violate the due process rights of these Plaintiffs.

One of the reasons a person obtains counsel is to assist them in responding to and communicating with Defendants—whether by letter, by discovery response, in trial, or in completing questionnaires. Defendant is improperly seeking to place Plaintiffs at a disadvantage by placing upon them a heightened standard of perfection while denying them the ability to confer confidentially with their attorneys.

## CONCLUSION

Plaintiffs' attorney notes' memorializing conversations between Plaintiffs' counsel and their clients, as well as containing the attorneys' thoughts, impressions, strategies, theories and opinions are absolutely protected by the attorney-client privilege and work product doctrine and

are not discoverable. Furthermore, it was entirely appropriate that Plaintiffs' counsel be permitted to add missing information and clarify information on the submitted Claim Forms after speaking with the individual Plaintiffs and receiving their authorization to make such changes.

DATED: July 15, 2008

Respectfully submitted,
MINAMI TAMAKI LLP

JACK W. LEE
BETHANY CARACUZZO
360 Post St. 8th Floor
San Francisco, CA 94108-4903
Telephone: (415) 788-9000
Fax: (415) 398-3887

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 15, 2008, copies of the PLAINTIFFS' BRIEF SUBMITTED PURSUANT TO COURT'S JULY 1, 2008 ORDER and DECLARATION OF JACK W. LEE IN SUPPORT OF PLAINTIFFS' BRIEF were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's Electronic Filing System. Following the Court's Order, I also served copies by electronic mail on the Court at Jeremy_Kehr@ao.uscourts.gov; and on steve.gillingham@usdoj.gov.

Rob Robinson