**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| KENT CHRISTOFFERSON, et al., Plaintiffs | ) | Case N. 01-495C |
| v. | ) | Senior Judge Eric G. Bruggink |
| UNITED STATES OF AMERICA, Defendant. | ) | **Declaration of Jack W. Lee in support of Plaintiffs' Brief Pursuant to Court's July 1, 2008 Order** |

Pursuant to the Rules of the U.S. Court of Federal Claims, I, Jack W. Lee, declare as follows:

1. I am the attorney of record for the Plaintiffs in the above-captioned civil action, and a partner with the law firm of Minami Tamaki LLP. I have personal knowledge of the following facts and can testify regarding these facts if called to do so:

2. Attached as Exhibit **A** hereto is a true and correct copy of the Court's July 1, 2008 Order requesting that the parties submit these Briefs;

3. Attached as Exhibit **B** hereto is a true and correct copy of the Memorandum of Understanding, or "MOU", entered into between the parties on or about February 18, 2005;

4. Attached as Exhibit **C** hereto is a true and correct copy of the Court's October 25, 2007 Opinion ruling on Plaintiffs' Motion for Protective Order;

5. Attached as Exhibit **D** hereto is a true and correct copy of my February 13, 2008 letter to Defense counsel Steven Gillingham;

6. Attached as Exhibit **E** hereto is a true and correct copy of Mr. Gillingham's March 24, 2008 letter to me;

7. Attached as Exhibit **F** hereto is a true and correct copy of Mr. Gillingham's April 14, 2008 letter to me;

8. Attached as Exhibit **G** hereto is a true and correct copy of an April 22, 2008 letter from my associate, Bethany Caracuzzo, to Mr. Gillingham regarding these same legal issues discussed in this Brief.

9. I have litigated and settled over 30 class action lawsuits, and I have never heard of any case where a claim form could not be altered or amended after its receipt by the claimant's attorney. In my experience, individual plaintiffs were permitted to amend and revise on their claim forms/questionnaires to change their lengths of employment, the dates and times they applied for jobs or promotions, and who they spoke to about job opportunities, etc. It is commonplace and completely acceptable in class action procedure for claimants to revise their completed claim forms, even if submitted under penalty of perjury. It is also commonplace to authorize their counsel to change the forms on their behalf.

10. As Plaintiffs' Counsel, my firm has completed all actions required of under the Memorandum of Understanding (MOU). Specifically, we administered a questionnaire, the "Claim Form," which was sent to approximately 7,000 class members to elicit information about their overtime worked, and we provided all relevant data in a database to Defendant's counsel.

11. This questionnaire was sent out as part of a Claim Packet to all 7,000 Plaintiffs on or around August 1, 2006. The Claim Packet consisted of four documents: 1) an Attorney Letter signed by me to the class members; 2) the Notice of Claims Procedure; 3) a Claim Form

(questionnaire); and 4) a Payroll Summary, which was a document created specifically for each individual plaintiff by my firm.

12. The Notice of Claims Procedure ("Notice") explained to the Plaintiffs: why they were receiving the Claim Packet; what to do if they needed help filling out the questionnaire; and general information about the lawsuit. The Attorney Letter, as well as the Notice of Claims Procedure, instructed Plaintiffs to contact my firm if they had any questions, either by telephone or e-mail. Both documents also directed class members to call our toll-free phone line, 1-888-528-9707, with questions. My firm had previously informed class members of the hotline in September 2001; since then, class members have relied on it to leave confidential messages to Counsel.

13. The "What If I Have Questions?" section of the Notice contained the language, "As your attorneys, our **conversations with you are confidential and protected by the attorney-client privilege.** (Emphasis added) However, any communications you have with persons outside this law firm about your claim are not confidential." The Notice was reviewed by the Defendant during the questionnaire negotiations. Although several drafts of the Notice were exchanged electronically between both parties' counsel, the Defendant did not attempt to eliminate, or even comment upon, the above-quoted language.

14. A statistician, using the payroll data we received from the Census Bureau, created a Payroll Summary specific to each individual. This document showed the number of hours, per week, for which each Plaintiff was paid. This document was intended to help Plaintiffs estimate their overtime hours.

15. We began receiving completed questionnaires as early as August 7, 2006. The questionnaires continued to arrive through July 2007; as of July 3, 2007, 2,807 Claim Forms and

Payroll Summaries were received, although not all of these contained valid claims. Anything received after November 29, 2006, was considered "late," unless an exception was made due to the late receipt of payroll data, thereby delaying the creation of a Payroll Summary.

16. By early September 2006, my firm hired three full-time law school graduates ("the Law Grads") to assist a full-time associate in the processing of the questionnaires, including answering plaintiffs' questions and ensuring the incoming questionnaires were completely filled out. By mid-October, the firm hired two more Law Grads to ensure timely processing of the questionnaires and completion of the database.

17. The five Law Grads performed these duties under my supervision and under the supervision of other licensed attorneys from our firm at all relevant times. I received regular updates from the associates and Law Grads, and also reviewed the attorney notes of the conversations.

18. Once a questionnaire was returned to our office, the Law Clerks and/or associate attorneys responded to Plaintiffs' telephone calls and questions about, and advised them on, how to complete the Claim Packets, telephoned Plaintiffs as necessary in order to complete the forms or to clarify ambiguous claims or responses.

19. The Law Grads have communicated, via phone and/or e-mail, with thousands of the Plaintiffs. In some cases, returned claim forms were not finished; *e.g.,* Plaintiffs left their Payroll Summary blank or failed to answer some of the required questions. In other cases, Plaintiffs' estimates were not clear: overtime estimates may have represented straight time, overtime, or rollover time. Because we wanted to accurately enter all of the estimates, the Law Grads would telephone Plaintiffs to clarify this information. Plaintiffs also called the firm, either via the toll-free hotline or the direct firm telephone line, for help in filling out their claim forms.

During the telephone conversations, ***which number in the thousands***, the Law Grads would take notes, but did not make verbatim recordings of the calls.

20. These communications occurred in four possible ways: (1) a client "cold-called" Minami Tamaki with questions and seeking advice about their case; (2) a client called Minami Tamaki after receiving the blank claim form to fill out with questions about how to fill it out; (3) a client called Minami Tamaki after they sent in the claim form with additional questions that the Claim Form raised in their minds, and/or (4) Minami Tamaki attorneys or Law Grads called a client after receiving a Claim Form that had missing or inconsistent information.

21. All of these attorney notes were written into a document that contains only client names and those attorney notes. It was, and is, maintained on Minami Tamaki's server, in our client files.

22. The Law Grads and attorneys then entered all of the data contained on the Claim Forms and Payroll Summaries into a database.

23. In early October 2006, a statistician retained by Plaintiffs, again using the payroll data from the Census Bureau, created a database of this information, organized by a Plaintiff's last name, then by first name, and finally by weeks worked, in chronological order.

24. Attached as Exhibit **H** hereto is a true and correct copy of the database entries for the 5 persons Plaintiffs gave as examples in their Brief: Carol Siemons, Shunell Kiper, Doris McAfee, Robert Maxwell and Steven Graham.

25. The database includes the fields: Employee name, SSN, LCO (Local Census Office) Code, LCO Name, Position, Pay Period End Date, Regular Hours Paid, Training Hours Paid, Overtime Hours Paid, and Total Hours Paid. In addition to the fields created by the data supplied by the Census Bureau, our statistician also created the following fields: Regular Hours

Claimed; Rollover Hours Claimed; Overtime Hours Claimed; Claim Form Signed Under Penalty of Perjury; whether the class member wished to decline further participation in the lawsuit; whether the class member's supervisor knew that the employee was working overtime prior to his working overtime (Question 16 on the Claim Form); and finally, whether the claim was an estimate (Question 13 on the Claim Form). (*Id.*)

26. The responses Minami Tamaki received from plaintiffs indicated their confusion and inability to respond to the speculative question about whether or not their supervisor had knowledge of their overtime. As the circumstances varied from plaintiff to plaintiff, and the Claim Form did not provide much space to provide a detailed response, Minami Tamaki had the database created so as to provide for a greater response. Within the last two fields were subfields to allow an answer in greater depth. Under the "supervisor knowledge" field were nine categories of "reasons" that could apply as to how the individual Plaintiff knew that his or her supervisor. These nine categories constitute the universe of all responses we received: They are:

(16a) I told/complained to my Supervisor that I worked OT;

(16b) I saw others denied OT so did not claim myself;

(16c) Supervisor asked me.to work overtime;

(16d) Supervisor told me to work until job complete;

(16e) Supervisor rejected my timesheet with OT;

(16f) Supervisor told me to rollover OT hrs;

(16g) Supervisor worked alongside me;

(16h) Supervisor saw me early am and late at night; and

(16i) Supervisor denied travel time.

27. Breaking the reasons down this way was necessary for Minami Tamaki to place them into broad categories. These 9 reasons represented the total universe of answers given by claimants. For example, please look at Carol Siemons, the first person listed on Exhibit **H**. See also Exhibit **I**. Attached as Exhibit **I** hereto is a true and correct copy of Carol Siemons' Claim Form and Payroll Summary and all the documentation she sent to Minami Tamaki with her claim form. On her Claim Form, Ms. Siemons checked off question 16 as a "yes"—that she believed her supervisor knew or had reason to know she worked overtime prior to her working the overtime. But in response to Question No. 17, which asked her to explain why, she wrote "see attached sheet." (BATES Q015314)

On the Payroll Summary, also attached as Exh **I**, Ms. Siemons left the column "Estimate Overtime Worked" blank and wrote "see attached sheet." (BATES Q015318)

The "attachment" Ms. Siemons referred to is a document she typed up which has her name and address at the top. (BATES Q015320.) The first sentence she wrote was "Guessing at the amount of overtime is impossible…I do not recall the exact amount of overtime, but it was substantial...I was doing double the workload." She explains that she met with people, checking over the work, after work every day.

She also indicates that it was her supervisor, Mr. Leroy Adams, who came to her house after work to do more work. She also indicates that Mr. Adams' supervisor Mr. Tranquallino told her "just to get the job done, no matter what it takes."

28. After receiving Ms. Siemons Claim Form, Payroll Summary and attached typed letter (Exh. I), Minami Tamaki attorneys or Law Grads contacted her to try to understand how many hours a week Ms. Siemons spent meeting with enumerators at her home at the end of the

day, plus the meetings that she said she attended each day. This was then written on the Payroll Summary by the Law Grad, who noted the date of the conversation. (11/10/06).

29. The Law Grads then updated the database with the information gleaned from both the Claim Form/Payroll Summary and the conversation he or she had with Ms. Siemons. We determined which of the 9 "reasons" why the plaintiff believed that their boss was aware of their overtime was selected. For example, with Ms. Siemons, 16(d) "supervisor told me to work until my job was complete" was selected. This is because, as set forth in her letter (BATES Q015320), Ms. Siemon's boss Mr. Tranquallino told her to "just get the job done no matter what it takes." In addition, 16(g) was selected in the database, for "supervisor worked alongside me," because Ms. Siemons had also indicated that her direct crew leader, Leroy Adams, had held regular meeting with her and came to her house to work, outside of the regular work day. The overtime hours that the Law Grad or attorney computed with Ms. Siemons was 10 hours for specific weeks, and no hours for other weeks. (See Exh **H** "OT Hrs Claimed" column"; and Exh I, Payroll Summary at BATES Q015318)

30. This same procedure applies to the other examples cited. (See Exh **H**) Attached as Exhibit "**J**" hereto are the Claim Forms, Payroll Summaries and supporting documents for Shunell Kiper, Doris McAfee, Robert Maxwell and Steven Graham.

31. Defendant has already been provided with all of the Claim Forms, Payroll Summaries, supporting documentation and database entries for each of the Plaintiffs.

32. In addition, during these conversations between Minami Tamaki attorneys/Law Grads and individual plaintiffs, as is common in the attorney-client relationship, sometimes a client would impart information that was not relevant to this litigation, but would disclose it to counsel seeking their advice and opinion. Examples include attorney notations regarding

questions the clients would have about possible other lawsuits, family problems, divorce issues, etc. These Plaintiffs understand Minami Tamaki to be their lawyers, which we are, and treated us as such. As a result, the conversations we had with our clients included all those things that attorneys discuss with their clients. We absolutely believed, and still do, that these conversations, and our notes and impressions of them, are protected by the attorney-client privilege and work product doctrine.

33. Plaintiffs signed their questionnaires under penalty of perjury and they took the duty to tell the truth seriously. Consequently, if changes needed to be made to a Claim Form or Payroll Summary, Plaintiffs frequently requested that the Law Grads make the changes since they were already in our possession. Hand-written notes by my staff were often made directly on the Claim Forms and Payroll Summaries.

34. The standard procedure required any time an attorney or Law Grad made any change or addition to a Claim Form or Payroll Summary was as follows: The attorney or Law Grad would expressly ask the individual Plaintiff if the attorney should, based upon the information received during an attorney-client conversation, change Plaintiff's Claim Form to accurately reflect their statements. ***The change would only be made if the Plaintiff responded in the affirmative.***

35. All of the completed Claim Forms are housed in my firm's office within filing drawers and bankers' boxes. The files completely occupy six lateral file drawers (each drawer being 33 inch across). According to a Pitney Bowes company representative, the standard industry rule of thumb is that a standard lateral office file drawer can hold about 4500 to 5000 pages of documents. Thus, six drawers would hold between 27,000 and 30,000 pages. If the files were stacked atop one another in a pile, the pile would be about 16.5 feet high.

36. Defense counsel then sought copies of all of the Claim Forms and of Minami Tamaki's database. Plaintiffs sought a Protective Order, which was denied. (See Exh **C** hereto.) Plaintiffs provided all of the Claim Forms and the database to Defendants. Now Defendant seeks Plaintiffs' counsel's notes and the contents of privileged communications between Plaintiffs' counsel and Plaintiffs. Plaintiffs' counsel and Defense counsel Mr. Gillingham exchanged several "meet and confer" letters on this issue. (See Exhs **D-G** described above and attached hereto.)

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 15th day of July, 2008 in San Francisco, California.

Jack W. Lee
Attorney for the Plaintiffs